## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE SOLODYN (MINOCYCLINE HYDROCHLORIDE) ANTITRUST LITIGATION | MDL No. 14-md-2503-DJC |
| THIS DOCUMENT RELATES TO:<br><br>All Direct Purchaser Actions | **FILED UNDER SEAL** |

## FIRST AMENDED CONSOLIDATED
## CLASS ACTION COMPLAINT
## AND JURY DEMAND

## TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ...................................................................................................1

II.    PARTIES ...............................................................................................................3

       A.     Plaintiffs. ....................................................................................................3

       B.     Defendants. .................................................................................................4

III.   JURISDICTION AND VENUE ............................................................................5

IV.    REGULATORY BACKGROUND ........................................................................6

       A.     The prescription pharmaceutical marketplace is unique, uncoupling product
              choice and payment obligation. ..................................................................6

       B.     Generic drugs cost significantly less and take substantial sales directly from the
              corresponding brand drugs. .........................................................................7

       C.     The regulatory structure incentivizes drug innovation and encourages approval
              and use of generic drugs. ............................................................................9

       D.     Manufacturers can and do unlawfully "game" the regulatory structure. ...............14

              1.     Manufacturers sometimes abuse the 30-month stay provision to delay
                     generic competition. .........................................................................14

              2.     Manufacturers sometimes conspire to pay potential generic competitors to
                     stay off of the market. ......................................................................14

              3.     Manufacturers shift the market from one version of their product to
                     another to thwart generic competition. ..................................................16

V.     FACTUAL ALLEGATIONS ...............................................................................17

       A.     Solodyn is based on an old antibiotic but has sales in the hundreds of millions of
              dollars annually. .......................................................................................17

       B.     The '838 Patent—the primary patent Medicis claims protects Solodyn—is
              unenforceable and invalid. .........................................................................20

              1.     In applying for the '838 Patent in 1998, Medicis knew the claimed
                     invention in the '838 Patent had been available for more than a year in the
                     U.S., a bar to patentability. ...............................................................20

              2.     Medicis deliberately omits and misrepresents information in securing the
                     '838 Patent to cover Solodyn, a fact that would have emerged in future
                     patent litigation. .............................................................................22

C.    In 2006, Medicis gains approval for Solodyn in Legacy Strengths (45mg, 90mg, and 135mg) but recognizes the drug's immediate vulnerability to generic competition. ...................................................................................25

D.    In 2008, Medicis lays the foundation for its scheme and enters the first unlawful Exclusion Payment Agreement...........................................................................27

        1.    In late 2007, Impax attempts to bring a generic Solodyn to market, and Medicis stands in its way. ...................................................................27

        2.    Eyeing a future product switch, Medicis seeks approval of new Add-On Strengths of Solodyn.............................................................................28

        3.    Medicis files a frivolous petition to delay approval of generic Solodyn, taking a position opposite to the position it took when seeking approval of Solodyn. .........................................................................................29

        4.    The USPTO begins reexamining the '838 Patent, questioning whether it ever should have been granted.....................................................30

        5.    Medicis and Impax agree to enter into the Medicis/Impax Exclusion Payment Agreement to delay Impax's generic Solodyn............................30

E.    In 2009, Medicis continues the scheme, filing baseless patent infringement suits against multiple potential generic competitors, misleading the USPTO again, and entering an Exclusion Payment Agreement with a second conspirator.................36

        1.    Medicis improperly lists the '838 Patent in FDA's Orange Book and sues three ANDA filers, sparing only Impax because of the Medicis/Impax Exclusion Payment Agreement.................................................36

        2.    FDA denies Medicis's frivolous Proportionality Petition and approves Impax's ANDA, but Impax has been paid not to launch and so does not. 39

        3.    Medicis files a second frivolous petition that is swiftly disposed of by FDA........................................................................................40

        4.    Medicis keeps Teva from opening the floodgates of generic competition to Legacy Strength Solodyn..........................................................41

        5.    Medicis Pays Impax to Continue the Medicis/Impax Exclusion Payment Agreement...........................................................................41

        6.    Upon reexamination, the USPTO rejects all 18 of the '838 Patent's original claims.  Medicis responds with further omissions and misrepresentations.........................................................................42

        7.    Medicis and Sandoz conspire, entering into the Medicis/Sandoz Exclusion Payment Agreement to delay Sandoz's generic product. ...........................45

F.    In 2010 and 2011, Medicis caps off the scheme, settling sham lawsuits against potential generic competitors, entering into additional Exclusion Payment Agreements, and impairing the market for the Legacy Strengths. ........................50

1.     Medicis's misrepresentations and omissions to the USPTO work and the agency reissues the '838 Patent, but with all new or amended claims. .....50

2.     Medicis keeps Mylan from starting generic Legacy Strength Solodyn competition earlier than Impax and Sandoz agreed. ..................................51

3.     Medicis again pays Impax in January 2011 to continue to stay off the market and maintain the Medics/Impax Exclusion Payment Agreement. .52

4.     Medicis battles other potential generic competitors over the invalid and/or unenforceable '838 Patent. ........................................................................54

5.     Medicis uses the delay it bought to switch the market from the Legacy Strengths to the Add-On Strengths of Solodyn, greatly reducing generic Legacy Strengths sales when they belatedly entered the market. ...............56

6.     Medicis's Additional Anticompetitive Conduct to Impair Competition to the Add-On Strengths. ........................................................................60

7.     Medicis bribes Lupin to stay off of the market with the Medicis/Lupin Exclusion Payment Agreement. ........................................................................63

8.     Medicis could not have successfully used the patents purportedly covering Solodyn to delay generic competition. ........................................................66

VI.     ANTICOMPETITIVE PURPOSE AND EFFECTS OF DEFENDANTS' CONDUCT ..68

VII.    ANTICOMPETITIVE EFFECTS AND DAMAGES TO THE CLASS ..........................71

VIII.   ANTITRUST IMPACT ........................................................................75

IX.     EFFECT ON INTERSTATE COMMERCE ........................................................76

X.      MARKET POWER AND RELEVANT MARKET ........................................................76

XI.     CLASS ACTION ALLEGATIONS ........................................................79

XII.    CLAIMS FOR RELIEF ........................................................................81

## I.   INTRODUCTION

1.      Medicis Pharmaceutical Corp. ("Medicis") faced a major dilemma in 2006.  The Food and Drug Administration ("FDA") had just approved its acne medication Solodyn, an extended release minocycline hydrochloride tablet, for sale in the United States in three dosage strengths: 45mg, 90mg, and 135mg (the "Legacy Strengths" or "Legacy Strength Solodyn").  But because it contained minocycline, an old antibiotic ingredient, Solodyn had none of the usual protections for a newly approved brand drug and therefore it did not enjoy any regulatory periods of marketing exclusivity that would prevent FDA from approving generic extended release minocycline hydrochloride products.  Furthermore, the only patent that purportedly covered Solodyn—U.S. Patent No. 5,908,838 (the "'838 Patent")—was invalid and/or unenforceable and could not protect Solodyn from generic competition.  Solodyn, which would shortly exceed annual sales of more than $500 million and become the "#1 dermatology medication by dollars in the world," was likely to face generic competition, and soon.

2.      Confronting the imminent threat of competition, Medicis hatched and orchestrated a multi-faceted scheme to illegally delay generic competition for Solodyn, undertaking some pieces alone and effectuating others through conspiracy with potential rivals, the Generic Defendants.  Medicis's Chief Executive Officer even boasted about this strategy to delay competition in calls with investors.

3.      When potential generic competitors began to emerge, starting with defendant Impax Laboratories, Inc. ("Impax") in 2007, Medicis went to work using its invalid and unenforceable '838 Patent and other tactics—namely illegal exclusionary payment agreements—to delay generic competition.

4.     Medicis and potential generic competitors—first Impax and later Sandoz Inc. ("Sandoz") and Lupin Limited and Lupin Pharmaceuticals, Inc. (collectively, "Lupin")[1]— entered into unlawful exclusion or "reverse payment" agreements, whereby Medicis paid the Generic Defendants to stay out of the market for Legacy Strength extended release minocycline hydrochloride until November 2011.

5.     The scheme further involved Medicis listing the '838 Patent, which it knew was invalid and unenforceable, in FDA's Orange Book and using it as a basis to file sham patent infringement suits against potential generic competitors to delay generic entry.

6.     Medicis used the time it bought free of generic competition for its Legacy Strengths of Solodyn to switch the Solodyn market from the Legacy Strengths that were set to belatedly face generic competition in November 2011 to new strengths—65mg, 55mg, 80mg, 105mg, and 115mg (the "Add-On Strengths" or "Add-On Strength Solodyn")—that could not be automatically substituted for generic versions of the Legacy Strengths.

7.     When potential generic competitors then tried to gain approval for generic version of the Add-On Strengths, Medicis continued its scheme using the same tactics—sham patent litigation and an unlawful exclusion payment agreement with Lupin—to delay generic competition in the Add-On Strengths, which now dominate the market, to February 2018 (for 65mg and 115mg) or February 2019 (for 55mg, 80mg and 105mg).

8.     In essence, Medicis bribed the Generic Defendants to stay out of the market.  The deals unlawfully protected Medicis's stream of monopoly profits and paid Impax, Sandoz, and Lupin handsomely to do so.  But for the unlawful conduct, Impax, Sandoz, Lupin, and other generic manufacturers would have begun and would have sustained their marketing of generic

---

[1] Impax, Sandoz and Lupin are collectively referred to as the "Generic Defendants."

Legacy Strength Solodyn earlier than they finally did and before the market for Legacy Strength

Solodyn was impaired by the scheme.  Defendants' unlawful conduct delayed and substantially

diminished the sale of generic Solodyn products in the United States, and unlawfully enabled

Medicis to sell Solodyn at artificially inflated prices, including after July 2009 and continuing to

this date and beyond.

9.      Plaintiffs and members of the Class have been compelled to pay supracompetitive

prices for minocycline hydrochloride extended release tablets, including after July 2009 and

continuing to this date.  Plaintiffs and members of the Class will continue to pay artificially

inflated, supracompetitive prices for minocycline hydrochloride extended release tablets until

some future date when the anticompetitive effects of defendants' conduct cease.

10.      Direct purchaser plaintiffs Ahold USA, Inc. and Rochester Drug Co-Operative,

Inc. bring this action under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, on behalf of

themselves and all others similarly situated who purchased Solodyn directly from Medicis in the

United States, including Puerto Rico.  Plaintiffs seek a judgment declaring defendants'

anticompetitive conduct unlawful as well as treble damages and other relief.

## II.      PARTIES

### A.      Plaintiffs.

11.      Plaintiff Ahold USA, Inc. is a Maryland corporation with its principal place of

business located at 1385 Hancock Street in Quincy, Massachusetts.  Ahold brings this action as

an assignee of McKesson Corporation, which purchased Solodyn directly from Medicis during

the Class Period.  Ahold suffered antitrust injury as a result of defendants' illegal conduct.

12.      Plaintiff Rochester Drug Co-Operative, Inc. ("RDC") is a wholesale drug

cooperative located at 50 Jet View Drive in Rochester, New York.  RDC purchased Solodyn

directly from Medicis during the Class Period and suffered antitrust injury as a result of the defendants' illegal conduct.

**B.    Defendants.**

13.    Defendant Medicis Pharmaceutical Corp. is a division of Valeant Pharmaceuticals International, Inc. ("Valeant"). Valeant acquired Medicis in December 2012. Prior to that time, Medicis was incorporated under the laws of the State of Delaware and its common stock was traded on the New York Stock Exchange under the symbol MRX. Until July 2013, Medicis's corporate headquarters were located at 7720 N. Dobson Road in Scottsdale, Arizona. Since July 2013, Medicis's corporate headquarters have been located at 400 Somerset Corporate Blvd. in Bridgewater, New Jersey. Medicis develops, manufactures, and markets Solodyn, as well as other pharmaceuticals and related products, in the United States.

14.    Defendant Impax Laboratories, Inc. ("Impax") is a Delaware corporation with its principal place of business at 30831 Huntwood Avenue in Hayward, California. Impax develops, manufactures, and markets pharmaceutical products, primarily generic products, in the United States.

15.    Defendant Lupin Limited is a company organized under the laws of India with its principal place of business at B/4 Laxami Towers, B Wing, Bandra Kurla Complex, Bandra (East), Mumbai, Maharashtra 400 051, India. Defendant Lupin Pharmaceuticals, Inc. is a Virginia corporation with its principal place of business at 111 South Calvert Street, 21st Floor in Baltimore, Maryland. Lupin Pharmaceuticals, Inc. develops, manufactures, and markets pharmaceutical products, primarily generic products, in the United States. Defendants Lupin Limited and Lupin Pharmaceuticals, Inc. are, together, "Lupin."

16.    Defendant Sandoz Inc. ("Sandoz") is a Colorado corporation with its principal place of business at 506 Carnegie Center in Princeton, New Jersey. Sandoz develops,

4

manufactures, and markets pharmaceutical products, primarily generic products, in the United States.

17.     All of the defendants' actions described in this Complaint are part of, and in furtherance of, the unlawful anticompetitive scheme and illegal restraints of trade alleged herein, and were authorized, ordered, and/or performed by the defendants' various officers, agents, employees, or other representatives while actively engaged in the management of the defendants' affairs, within the course and scope of their duties and employment, and/or with the actual, apparent, and/or ostensible authority of the defendants.

### III.     JURISDICTION AND VENUE

18.     Plaintiffs file this action, and institute these proceedings, under Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover threefold damages and the costs of suit and reasonable attorneys' fees, for the injuries (in the form of overcharges) sustained by the plaintiffs and members of the class of direct purchasers of Solodyn resulting from the violation by the defendants of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2.  The Court has jurisdiction over this action based upon 28 U.S.C. §§ 1331 and 1337(a), and 15 U.S.C. § 15.

19.     Venue is proper in this Court under Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391, because defendants transact business in this district.  Defendants carried on and continue to carry on a substantial part of the interstate trade and commerce involved and affected by the violations of the antitrust laws within this district.  The acts complained of have and will continue to have substantial effects in this district.

## IV.    REGULATORY BACKGROUND

**A.    The prescription pharmaceutical marketplace is unique, uncoupling product choice and payment obligation.**

20.    The marketplace for the sale of prescription pharmaceutical products in the United States suffers from a significant imperfection that brand manufacturers can exploit to obtain or maintain market power in the sale of a particular pharmaceutical composition.  Markets function best when the person who pays for a product is also the person who chooses which product to purchase.  When the same person has both the payment obligation and the choice of products, the price of the product plays an appropriate role in product choice and, consequently, manufacturers have an appropriate incentive to lower prices.

21.    The pharmaceutical marketplace, however, is characterized by a "disconnect" between the payment obligation and the product selection.  State laws prohibit pharmacists from dispensing many pharmaceutical products, including Solodyn, to patients without a prescription written by a doctor.  The prohibition on dispensing certain products without a prescription introduces a disconnect between the payment obligation and the product selection.  The patient (and in most cases his or her insurer) has the obligation to pay for the pharmaceutical product, but the patient's doctor chooses which product the patient will buy.

22.    Brand manufacturers exploit this price disconnect by employing large forces of sales representatives to visit doctors' offices and persuade them to prescribe the manufacturer's products.  These sales representatives typically do not advise doctors of the cost of the brand products.  Moreover, studies show that doctors typically are not aware of the relative costs of brand pharmaceuticals and, even when they are aware of the relative costs, they are insensitive to price differences because they do not have to pay for the products.  The result is a marketplace in which price plays a comparatively unimportant role in product selection.

23.     The relative unimportance of price in the pharmaceutical marketplace reduces what economists call the price elasticity of demand, the extent to which unit sales go down when price goes up.  This reduced price elasticity in turn gives brand manufacturers market power: the ability to raise price substantially above marginal cost without losing so many sales as to make the price increase unprofitable.  The market imperfections and manufacturers' marketing practices described above allow brand manufacturers to gain and maintain market power for many brand prescription pharmaceuticals.

**B.     Generic drugs cost significantly less and take substantial sales directly from the corresponding brand drugs.**

24.     Manufacturers of generic drugs typically price their versions of brand drugs significantly below the brand price.  These price differentials prompt pharmacists to liberally and substantially substitute generic versions for the brand counterparts whenever generics are available and the law permits substitution.  Generic drugs that are pharmaceutically equivalent (same dosage form and strength) and bioequivalent (exhibiting the same drug absorption characteristics) (together, "therapeutically equivalent") to their brand counterparts are given an "AB" rating by FDA and are typically priced much less than their brand counterpart.  Pharmacists substitute a less-expensive AB-rated generic product for the corresponding brand product unless the doctor has indicated that the prescription for the brand product must be "dispensed as written" or the patient objects.  As more generic manufacturers enter the market, prices for generic versions of a drug predictably decrease even further because of competition among the generic manufacturers, and the loss of sales volume by the brand drug to the corresponding generics accelerates.

25.     All states permit (and some states require) pharmacists to automatically substitute an AB-rated generic drug for the corresponding brand drug unless the doctor has stated that the prescription for the brand product must be dispensed as written or unless the patient objects.

26.     Many third party payors (such as health insurance plans and Medicaid programs) have adopted policies to encourage the substitution of AB-rated generic drugs for their brand counterparts and many consumers routinely switch from a brand drug to an AB-rated generic drug once the generic becomes available.  Consequently, AB-rated generic drugs typically capture a significant share of their brand counterparts' sales, causing a rapid and significant reduction of the branded drug's unit and dollar sales.

27.     Once a generic equivalent enters the market, the generic quickly captures sales of the brand drug, often capturing 80% or more of unit sales within the first six months.  According to a 2010 study by the Federal Trade Commission ("FTC"), one year after market entry, generics on average have taken 90% of the brand's unit sales and generic prices are on average 15% of the brand price.

28.     Generic competition enables purchasers at all levels of the pharmaceutical supply chain, including plaintiffs and all members of the proposed Class of direct purchasers, to: (a) purchase generic versions of a drug at substantially lower prices and/or (b) purchase the brand drug at a reduced price.  Until a generic manufacturer enters the market, however, there is no bioequivalent generic drug to compete with the brand drug, and therefore the brand manufacturer can continue to profit from supracompetitive pricing, without losing its brand sales.  Brand manufacturers have a strong incentive to use various tactics to delay the introduction of generic competition into the market.

29.     Brand manufacturers are well aware of generics' rapid erosion of their previously monopolized market. Brand manufacturers thus seek to extend their monopoly for as long as possible, sometimes resorting to illegal means.

**C.     The regulatory structure incentivizes drug innovation and encourages approval and use of generic drugs.**

30.     Under the Federal Food, Drug, and Cosmetic Act (21 U.S.C. §§ 301-392) ("FDCA"), manufacturers that create a new, pioneer drug must obtain FDA's approval to sell the new drug by filing a New Drug Application ("NDA"). An NDA must include submission of specific data concerning the safety and effectiveness of the drug, as well as any information regarding applicable patents.

31.     In 1984, Congress amended the FDCA with the enactment of the Hatch-Waxman amendments, called the Drug Price Competition and Patent Term Restoration Act of 1984, Pub. L. No. 98-417, 98 Stat. 1585 (1984) ("Hatch-Waxman").

32.     Hatch-Waxman simplified the regulatory hurdles for prospective generic manufacturers by eliminating the need for them to file a lengthy and costly NDA to obtain FDA approval. Instead, FDA provides an expedited review process by which generic manufacturers may file an Abbreviated New Drug Application ("ANDA").

33.     The ANDA relies on the scientific findings of safety and effectiveness included by the brand manufacturer in the original NDA. The ANDA filer must demonstrate to FDA that the generic drug it proposes to market is bioequivalent and pharmaceutically equivalent to the brand drug.

34.     As a counter-balance to this abbreviated process for bioequivalent generic drugs, Hatch-Waxman provided a number of benefits to brand manufacturers. For example, Hatch-Waxman grants a five-year period of exclusivity (regardless of any patent protection) to NDAs

9

for products containing chemical entities never previously approved by FDA either alone or in combination. Hatch-Waxman also grants a three-year period of exclusivity (regardless of any patent protection) for a drug product that contains an active ingredient that has been previously approved, when the application contains reports of new clinical investigations (other than bioavailability studies) conducted by the sponsor that were essential to approval of the application. Neither of these exclusivities was available to Medicis for Solodyn.

35.    Hatch-Waxman also streamlined the process for a brand manufacturer to enforce its patents against infringement by generic manufacturers, and provided that, under certain conditions, FDA could not grant a generic manufacturer final approval to market or sell a generic version of the brand drug for up to 30 months.

36.    When it approves a brand manufacturer's NDA, FDA lists any compound patents which, according to the brand manufacturer, claim the approved drug in a publication entitled the "Approved Drug Products with Therapeutic Equivalence Evaluations," known as the "Orange Book."[2] In the case of method-of-use patents, FDA also lists in the Orange Book any patents that, according to the brand manufacturer, claim the drug for its approved method of use. A manufacturer may properly submit method-of-use patents to FDA for Orange Book listing only if it could reasonably assert a claim of patent infringement against a person who was not licensed by the owner to manufacture, use, or sell the drug.[3] In listing patents in the Orange Book, FDA performs a purely ministerial act. FDA does not check the facts supplied to it by the brand manufacturer, instead trusting that the manufacturer will be truthful. After the NDA is approved, the brand manufacturer may list other new patents in the Orange Book as related to the NDA if the brand manufacturer similarly certifies, *inter alia*, that the new patents claim either the

---

[2] 21 U.S.C. §355(j)(7)(A)(iii).

[3] 21 U.S.C.A. § 355 (b)(1).

approved drug (for compound patents) or the drug for approved methods of use (for method-of-use patents).

37.    To obtain FDA approval of an ANDA, and thus the right to sell a generic version of a brand drug, a generic manufacturer must certify that the generic drug will not infringe any patents listed in the Orange Book.  Under Hatch-Waxman, a generic manufacturer's ANDA must contain one of four certifications:

    a.    that no patent for the brand drug has been filed with FDA
          (a "Paragraph I certification");

    b.    that the patent for the brand drug has expired (a "Paragraph
          II certification");

    c.    that the patent for the brand drug will expire on a particular
          date and the generic manufacturer does not seek to market
          its generic product before that date (a "Paragraph III
          certification"); or

    d.    that the patent for the brand drug is invalid or will not be
          infringed by the generic manufacturer's proposed product
          (a "Paragraph IV certification").[4]

38.    If a generic manufacturer files only Paragraph I, II, or III certifications, it can take advantage of the expedited Hatch-Waxman approval process and unless both FDA and the applicant agree to extend the deadline, FDA must act on the application within 180 days of receipt.[5]

39.    If a generic manufacturer files a Paragraph IV certification asserting that a patent listed in the Orange Book is invalid or will not be infringed, a brand manufacturer often has an opportunity to delay the final FDA approval of the ANDA and the sale of the competing generic drug.  When a generic drug manufacturer files a Paragraph IV certification with its ANDA, it

---

[4] 21 U.S.C. § 355(j)(2)(A)(vii).
[5] 21 U.S.C. § 355(j)(5)(A).

11

must promptly give notice of its certification to both the NDA-holder and the owner of the patent(s) at issue.

40.     If the NDA-holder initiates a patent infringement action against the ANDA filer within 45 days of receiving the Paragraph IV certification, then in certain circumstances FDA may not grant final approval to the ANDA until the earlier of (a) 30 months or (b) the issuance of a decision by a court that the patent is invalid or not infringed by the generic manufacturer's ANDA.[6]  By listing a patent in the Orange Book and filing a suit within 45 days of receiving a Paragraph IV certification, a brand manufacturer often may delay FDA's approval of the generic drug and its entry into the market.[7]  During the pendency of an applicable 30-month stay, FDA may grant "tentative approval" to an ANDA applicant if it determines that the ANDA would otherwise qualify for final approval but for the stay.  FDA does not grant tentative approvals when 30-month stays are inapplicable, however.

41.     Congress also created incentives for generic manufacturers to seek approval of generic alternatives to brand drugs and challenge weak patents.  Hatch-Waxman grants a 180-day period of market exclusivity ("180-day exclusivity") to the first generic manufacturer to file a substantially complete ANDA containing a Paragraph IV certification to at least one Orange Book-listed patent (a "first filer").  During this time, the first filer enjoys temporary freedom from competition from other generic versions of the drug approved via an ANDA.[8]

42.     This 180-day exclusivity period (or any period during which there is only one generic version of a brand drug on the market) is extremely valuable to generic companies.

---

[6] 21 U.S.C. §355(j)(5)(B)(iii).

[7] Brand companies can wait and sue after the 45-day period, but then cannot take advantage of the automatic 30-month Hatch-Waxman stay.

[8] The exclusivity does not apply to a brand company selling its own "authorized generic" version (basically, the brand with a general label, priced like a generic).  Brand companies often start selling an authorized generic when the first ANDA-based generic launches to recapture some of the sales the brand would otherwise lose.

While only one generic is on the market, the generic price, while lower than the brand price, is much higher than after multiple generic competitors enter the market. The entry of a second generic (or additional generics) can cut the original generic price by half or more. Selling six months' worth of a generic drug for a product such as Solodyn, as the only generic on the market, can be worth hundreds of millions of dollars in profit. As the Supreme Court explained in *FTC v. Actavis*, the period during which a generic is exclusive in the market is exceedingly valuable, indeed, the "vast majority of potential profits for a generic drug manufacturer materialize during the 180-day exclusivity period."[9]

43.     Several provisions of Hatch-Waxman did not apply to Solodyn until October 8, 2008, after the effective date of the so-called "QI Act."[10] Before then, drugs like Solodyn that contained an active antibiotic moiety like minocycline hydrochloride that had been the subject of a marketing application received by FDA before November 21, 1997 (and thus known as an "old antibiotic") were exempted from the market exclusivity, patent listing, patent certification, and 30-month stay provisions of Hatch-Waxman. The QI Act brought such old antibiotics within those provisions of Hatch-Waxman.

44.     The QI Act included three transitional provisions. Those provisions: (1) require antibiotic drug NDA sponsors to submit to FDA for Orange Book listing information on applicable patents within 60 days of enactment of the QI Act; (2) require FDA to list those patents in the Orange Book no later than 90 days after the enactment of the QI Act; and (3) create "first filer" status (for 180-day exclusivity purposes) for each ANDA applicant that no later than 120 days after enactment of the QI Act amends a pending application to add a Paragraph IV certification for a newly listed antibiotic drug patent. If multiple ANDA applicants

---

[9] *FTC v. Actavis, Inc.*, 570 U.S. ___, 133 S. Ct. 2223, 2229 (2013) (citation omitted).

[10] Pub. L. No. 110-379, 122 Stat. 4075 (2008) (codified in relevant part at 21 U.S.C. § 355(v)).

each submitted a Paragraph IV certification to a newly listed antibiotic drug patent within the requisite time period, they would each be "first filers" within the meaning of Hatch-Waxman and share 180-day exclusivity. Launching of the generic product by any of the first filers would start the 180-day exclusivity for all of them.

**D.      Manufacturers can and do unlawfully "game" the regulatory structure.**

>    **1.      Manufacturers sometimes abuse the 30-month stay provision to delay generic competition.**

45.      Brand manufacturers can "game the system" by listing patents in the Orange Book (even patents that are not eligible for listing) and then suing any generic competitor that files an ANDA with a Paragraph IV certification (even if the patent is clearly invalid, or the generic's product is non-infringing) in order to obtain the automatic 30-month stay and delay final FDA approval of the ANDA for up to two and a half years. Brand manufacturers often sue generics under Hatch-Waxman simply to delay generic competition, rather than to enforce valid patents against infringing products. Generic firms have prevailed in Paragraph IV litigation, by obtaining a judgment of invalidity or non-infringement or by the patent holder's voluntary dismissal, in 73% of the cases studied.

>    **2.      Manufacturers sometimes conspire to pay potential generic competitors to stay off of the market.**

46.      To delay the drastic loss of monopoly profits from their brand drugs, some brand manufacturers design schemes to enter exclusion payment agreements to buy their way out of competition from generics and the chance that the brand patents might be invalidated or found not to be infringed. Brand manufacturers sometimes compensate generic manufacturers to defer entering the market and to drop their challenges to the patents. Brand and generic manufacturers often try to disguise these payments to try to escape liability under the antitrust laws.

47.     Although these exclusion payment agreements purport to settle patent infringement suits, in making a payment to the accused infringer, the patentee uses the strength of its wallet, as opposed to the strength of its patents, to delay entry into the market and avoid a court decision as to whether the patent is invalid or not infringed.  The brand manufacturer effectively shares its monopoly profits with the generic manufacturers as a *quid pro quo* for their agreement to delay competition.  The brand and generic manufacturers split between themselves the savings that earlier generic entry would have brought to consumers.  As the Supreme Court stated: "The patentee and the challenger gain; the consumer loses."[11]

48.     In many circumstances, the first generic applicant can help the brand manufacturer "game the system" by delaying not only its own market entry, but also the market entry of all other generic manufacturers.  By agreeing not to begin marketing its generic drug, the first generic applicant delays the start of any relevant 180-day period of generic market exclusivity, exclusivity "parking."  This tactic creates a bottleneck because later generic applicants cannot launch their generic versions of the product until the first generic applicant's 180-day exclusivity has elapsed or is forfeited.

49.     On December 8, 2003, Congress enacted the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("MMA") to make it more difficult for brand and generic manufacturers to conspire to delay the start of the first filer's 180-day period of generic market exclusivity.  The MMA outlines a number of conditions under which an ANDA applicant forfeits its eligibility for 180-day exclusivity, making way for other ANDA filers to launch their generic products.  Under the "failure to market" provision, a first ANDA applicant forfeits 180-day exclusivity if it fails to market its generic drug by the later of: (a) the earlier of the date that

---

[11] *Actavis*, 570 U.S. ___,133 S. Ct, at 2235.

is (i) 75 days after receiving final FDA approval; or (ii) 30 months after the date it submitted its

ANDA; or (b) the date that is 75 days after the date as of which, as to each of the patents that

qualified the first applicant for exclusivity, at least one of the following has occurred: (i) a final

decision of invalidity or non-infringement; (ii) a settlement order entering final judgment that

includes a finding that the patent is invalid or not infringed; or (iii) the NDA holder delists the

patent from the FDA Orange Book.

50.     The brand manufacturer and first filer frequently seek to fortify the bottleneck by

making it less economically viable for subsequent filers to trigger the first filer's exclusivity.  For

instance, exclusion payment agreements often include provisions allowing the first filer to enter

the market before the later date otherwise agreed with the brand manufacturer if a subsequent

filer succeeds in entering the market before that later date.  The co-conspirators disclose these

terms publicly, broadcasting to subsequent filers that even if they incur the substantial expense

involved in dislodging the bottleneck, they will be guaranteed to face competition from at least

the first filer—and likely others.  By eliminating all possibility that subsequent filers will enjoy

any period of *de facto* exclusivity, these provisions significantly reduce the value to subsequent

filers of obtaining a court decision that would break the bottleneck.  Thus, where a first filer has

"parked" its 180-day exclusivity and agreed to such a provision, subsequent filers have

comparatively less to gain by obtaining a court decision of invalidity and/or non-infringement

and are willing to settle for much less time on the market than they otherwise would have.

### 3.     Manufacturers shift the market from one version of their product to another to thwart generic competition.

51.     To be substitutable for a brand product at the pharmacy counter, and approvable

by FDA as AB-rated to a particular brand product, a generic product must be, among other

things, pharmaceutically equivalent (same dosage form and strength) and bioequivalent (exhibiting the same drug absorption characteristics) as the branded product.

52.    FDA regulations, which are concerned only with safety and effectiveness and not with effects on competition, permit brand manufacturers to seek FDA approval to modify the dosage form and strength of their existing products.  A brand manufacturer that anticipates the onset of generic competition to its drug sometimes modifies the dosage form, strength, or some other characteristic of its product from, say, A to $A_1$, for no reason other than to prevent generic competition to A.  Before the generic manufacturer receives FDA approval for the generic version of A and enters the market, the brand manufacturer might get approval for $A_1$ and use various tactics to cause physicians to write prescriptions only for $A_1$ instead of A, including discontinuing the sale of A.  The brand manufacturer's modification of A to $A_1$ may thereafter cause the manufacturer of the generic version of A to garner few or no sales, because its product is not substitutable for $A_1$.

## V.    FACTUAL ALLEGATIONS

### A.    Solodyn is based on an old antibiotic but has sales in the hundreds of millions of dollars annually.

53.    Medicis sells Solodyn, a brand name, prescription drug for the treatment of inflammatory lesions of non-nodular moderate to severe acne vulgaris in patients age 12 and older.  Non-nodular acne is the bright red pimples on the surface layer of the skin.  Solodyn uses a once daily, minocycline hydrochloride extended release tablet with a unique dissolution rate to treat this form of acne.

54.    Minocycline is an industry mainstay antibiotic ingredient approved to treat acne. It is a broad-spectrum tetracycline antibiotic and the most lipid-soluble of the tetracycline-class antibiotics, giving it the greatest penetration into the prostate and brain, but also the greatest

amount of central nervous system-related side effects, such as vertigo.  Other side effects include diarrhea, skin discoloration, and autoimmune disorders that are not seen with other drugs in the class.  Minocycline is not a naturally-occurring, antibiotic but was synthesized from natural tetracycline antibiotics by Lederle Laboratories in 1972 and subsequently marketed under the brand name Minocin.

55.     Antibiotics like minocycline go after the bacterial culprits responsible for non-nodular acne.  P.acnes is the anaerobic bacterium species that is widely thought to cause this particular form of acne inflammation.  The strain has the ability to change, perpetuate, or adapt to the abnormal cycle of inflammation, oil production, and inadequate sloughing activities of acne pores.  In contrast to antibiotic acne medications, isotretinoin medications such as Roaccutane, Accutane, and Claravis treat acne primarily by reducing the secretion of oils from the glands.

56.     Solodyn's active ingredient is minocycline hydrochloride, a semi-synthetic derivative of tetracycline.  Solodyn's once daily, extended release tablet regimen purports to be more convenient, and potentially more effective, for patients than other tetracycline drugs or isotretinoins, which require multiple doses per day.  Extended release medications like Solodyn have special coatings or ingredients that control how fast the drugs are released from the pill into the patient's body, allowing the patient to take these medications only once or twice a day.  Medicis touts Solodyn's once daily, extended release feature to differentiate it from other acne treatments, emphasizing that Solodyn is "the only branded oral minocycline approved for once daily dosage in the treatment of inflammatory lesions of non-nodular moderate to severe acne vulgaris in patients 12 years of age or older" and "the first and only extended release minocycline with eight FDA-approved dosing strengths."

57.     Solodyn's pharmacological profile, and thus its side effect and efficacy profile, is different than other tetracycline and/or antibiotic products that doctors prescribe to treat the same or similar conditions.  Those other drugs are not AB-rated to Solodyn, cannot be automatically substituted for Solodyn by pharmacists, and do not exhibit substantial cross-price elasticity of demand with respect to Solodyn at competitive prices; they are not economic substitutes for, nor reasonably interchangeable with, Solodyn.  Medicis's 2008 10-K confirms: "SOLODYN® is not bioequivalent to any other minocycline products, and is in no way interchangeable with other forms of minocycline."

58.     Since obtaining FDA approval in 2006, Solodyn has proven to be very lucrative to Medicis.  Annual U.S. sales for Solodyn between 2007 and 2011 tripled, growing from $247 million in 2007 to $761 million in 2011 and nearly $2.5 billion during that period combined.

| YEAR | SALES |
|------|-------|
| 2007 | $247M |
| 2008 | $316M |
| 2009 | $479M |
| 2010 | $673M |
| 2011 | $761M |

59.     As of 2011, Medicis announced that Solodyn was "[t]he #1 dermatology medication by dollars in the world and the #1 most prescribed branded dermatology product in the U.S. by prescriptions and dollars."

60.     Solodyn was Medicis's "flagship" product, accounting for approximately half of Medicis's sales.  Medicis unlawfully protected those revenues by executing an anticompetitive scheme that used a variety of unlawful monopolistic tools.

19

**B.      The '838 Patent—the primary patent Medicis claims protects Solodyn—is unenforceable and invalid.**

        **1.      In applying for the '838 Patent in 1998, Medicis knew the claimed invention in the '838 Patent had been available for more than a year in the U.S., a bar to patentability.**

61.      Eugene H. Gans, Ph.D., Chairman of Medicis's Central Research Committee, filed the application that lead to the '838 Patent on February 19, 1998.  At that time, public use or sale in the United States of the claimed invention more than one year prior to the date of the filing of the patent application classified the invention itself as prior art and thus operated as a bar to patentability.[12]  The claimed invention in the '838 Patent – "a method for the treatment of acne... which results in the reduction of vestibular side effects following administration of oral tetracycline antibiotics" and is based upon achieving a slower dissolution rate than typical for tetracyclines – had been available as early as 1993 and sold by Medicis as a slow-dissolving treatment for acne under the trade name Dynacin.  The claimed invention of the '838 Patent was not patentable.

62.      In 1990, FDA approved Medicis's ANDA to sell minocycline hydrochloride capsules for the treatment of acne in the United States under the trade name Dynacin.  Although FDA had approved Dynacin as an AB-rated therapeutic equivalent to Minocin, an immediate release minocycline hydrochloride product, Dynacin is in fact dissolved and entered the bloodstream more slowly than Minocin and other immediate release minocycline hydrochloride products.  Medicis sold and patients used this slower dissolving Dynacin in the United States since 1993, and well before February 18, 1997, a year before the filing of the '838 Patent application and the relevant priority date for the '838 Patent application.

---

[12] 35 U.S.C. § 102(b) (2010), amended by Pub. L. No. 112-29 (2011).

63.     In October 1997, in Medicis's Clinical Acne Reviews, Dr. Gans published a study

comparing the side effects of Dynacin capsules with Vectrin, another commercially available

minocycline hydrochloride product that is therapeutically equivalent to Minocin.[13] This

"Dynacin Study" compared the two minocycline hydrochloride products to examine the effect of

differences in *in vitro* dissolution rates on the occurrence and magnitude of, among other things,

vestibular side effects *in vivo*.  The vestibular system contributes to balance and spatial

orientation; vestibular side effects include dizziness, vertigo, and blurred vision.

64.     Vectrin releases its minocycline almost immediately *in vitro* (100% within 15

minutes) and anecdotal reports from dermatologists indicated that Vectrin produced significant

vestibular side effects in some patients.  Dynacin has a slower in vitro dissolution (90% within

45 minutes) and was not known to cause similar vestibular side effects.  Dr. Gans and his co-

authors compared fast dissolving Vectrin with slower dissolving Dynacin (which they termed

"regulated release"), understanding that vestibular side effects might depend in part on "the

speed with which the drug enters the bloodstream and becomes transferred to vestibular and

other organs."[14]

65.     The Dynacin Study demonstrated that while both Vectrin and Dynacin provided

complete dissolution and bioavailability, patients taking Vectrin had more than five times the

number of vestibular side effects than patients taking Dynacin.  Dr. Gans and his co-authors

theorized in their Medicis-funded, Medicis-published Dynacin Study that the difference in

vestibular side effects stemmed from the difference in dissolution rates between the fast

---

[13] Donachie et al., "A comparison of the side effects produced by Vectrin and Dynacin after normal dosage," Clinical Acne Reviews Vo. 2; 1997 ("Dynacin Study").

[14] *Id*, at 1.

dissolving dosage form (Vectrin) and the slower dissolving dosage form (Dynacin) – that the slower, or "regulated" release of minocycline in Dynacin led to fewer vestibular side effects.

66.     Medicis funded the Dynacin Study, published the Dynacin Study, and used the Dynacin Study to promote Dynacin to doctors, claiming superiority to Vectrin and other generic minocycline hydrochloride products based on a lower incidence of vestibular effects due to its slower regulated release.

67.     By at least October 1997, Medicis distributed promotional materials that touted the Dynacin Study as demonstrating that Dynacin was "over five times less likely to cause vestibular symptoms than Vectrin," and that Vectrin "produced significantly higher levels (over five times higher) of the common vestibular side effects, dizziness and vertigo, in terms of incidence, severity and duration, compared with Dynacin."[15]  At the same time, Medicis promoted Dynacin as achieving greater clinical efficacy than other minocycline hydrochloride products that were also AB-rated to Minocin.

**2.      Medicis deliberately omits and misrepresents information in securing the '838 Patent to cover Solodyn, a fact that would have emerged in future patent litigation.**

68.     Medicis used data from the Dynacin Study to mislead the United States Patent and Trademark Office (the "USPTO") in applying for and securing the '838 Patent that Medicis claims covers Solodyn.  The '838 Patent application claimed "a method for reducing the incidence or severity of vestibular side effects resulting from the treatment of acne by the use of oral tetracycline antibiotics, comprising administering the oral tetracycline antibiotic in a slowly dissolving dosage form."[16]  The '838 Patent application relied entirely on data from Dynacin and the Dynacin Study without disclosing to the USPTO that (a) the data was based on Dynacin and

---

[15] Warning Letter from FDA to J.Shacknai, dated December 22, 1998 at 4.

[16] '838 Patent Claim 1.  The original application contained nine claims.  After amendment in November 1998 and as eventually granted in 1999, the application contained eighteen claims.

the Dynacin Study, (b) Dynacin had been publicly used and sold in the United States long before February 18, 1997 (one year prior to the application for the '838 Patent was filed), or (c) Medicis had been promoting Dynacin to doctors on the basis of results of the Dynacin Study and the lower incidence of vestibular side effects due to the product's slower dissolution profile.

69.     Dr. Gans and Medicis had a legal duty of candor to and a duty of good faith in dealing with the USPTO, including a duty to disclose information material to patentability, "which includes a duty to disclose to the [USPTO] all information known to that individual to be material to patentability as defined in this section."[17] Dr. Gans signed a declaration acknowledging these duties in the '838 Patent application.

70.     Dr. Gans and Medicis violated their duty of candor and good faith.  For example, the '838 Patent application contains data from the Dynacin Study, without attribution to Dynacin, a product that had been on the market for eight years.  Table 1 of the '838 Patent describes the results reported in the Dynacin Study for vestibular side effects, but Medicis scrubbed all reference to Dynacin in the '838 Patent application: where the Dynacin Study reports the vestibular side effects for "Dynacin," the '838 Patent refers only to an unidentified "slower-dissolving minocycline," obscuring the fact that the data was based on an FDA-approved, publicly used, on sale drug sold for five years by Medicis and touted for its slow-dissolving qualities.

71.     The slower dissolving dosage form used in the study of vestibular effects reported in the '838 Patent was Medicis's Dynacin capsules.  Yet Dr. Gans and Medicis intentionally omitted from the '838 Patent application and supporting materials any and all references to Dynacin.  Dr. Gans and Medicis, despite their legal duty of candor to the USPTO, intentionally

---

[17] 37 C.F.R. § 1.56(a) (July 1, 1999). *See* Manual of Patent Examining Procedure § 2001 (7th ed. July 1998). Applicants have the duty to disclose promptly, generally before the first office action by the USPTO, but the duty is ongoing.  37 C.F.R. § 1.59 (July 1, 1999).

omitted this critical information because they knew that the prior public use and sale of Dynacin

before February 19, 1997 would have classified the claimed invention of the '838 Patent as prior

art and thus been a bar to patentability.

72.     Neither Dr. Gans nor Medicis disclosed Dynacin nor the Dynacin Study to the

USPTO before the '838 Patent issued.  The fact that Medicis and Dr. Gans knew in 1997 that a

slower release composition of minocycline hydrochloride (*i.e.*, Dynacin) was on sale and would

reduce vestibular side effects as later claimed in the '838 Patent and in Medicis's promotional

materials about Dynacin would have been relevant to a reasonable examiner under 37 C.F.R.

§1.56, and would have rendered the application and claimed invention un-patentable.

73.     Instead, without knowing that Medicis had been employing the method of use

disclosed in the patent application in the United States since 1993 in the form of Dynacin, the

USPTO issued U.S. Patent No. 5,908,838 on June 1, 1999, covering 18 claims.  Medicis asserts

that the '838 Patent covers "methods for the treatment of acne" through the "use of oral

tetracycline antibiotics."  The '838 Patent expires on February 19, 2018.

74.     The '838 Patent suffered from the inequitable conduct Medicis committed in the

original application, was also invalid and unenforceable, and Medicis knew it.  Indeed, when the

USPTO reexamined the '838 Patent nearly a decade after its issuance—a reexamination likewise

marred by Medicis's misrepresentations and omissions—Medicis was forced to cancel claims 1-

2, 5-11, and 15-18 of the '838 Patent, amend claims 3, 4, 12, and 13 to be independent, and come

up with new claims 19-34.  Although the USPTO ultimately reissued the '838 Patent on June 1,

2010 (after Medicis had asserted it in patent litigation, and entered unlawful exclusion payment

agreements with Impax and Sandoz), none of the original '838 Patent claims survived without

amendment.  Medicis knew that the '838 Patent was invalid as originally issued.  And the

reissued '838 Patent is also invalid due to the public use and sale of Dynacin prior to February 18, 1997.

75.     Given its invalidity and/or unenforceability, the '838 Patent was unlikely to prevent a generic Solodyn product from coming to market in advance of patent expiration. Medicis recognized this, cautioning investors in 2007 that its "failure to obtain additional patent protection could adversely affect our ability to deter generic competition, which would adversely affect Solodyn revenue."

76.     But the known invalidity and unenforceability of the '838 Patent did not deter Medicis from executing its plan to use that patent to delay generic competition, including as a conduit to illegal exclusionary payment agreements.

**C.     In 2006, Medicis gains approval for Solodyn in Legacy Strengths (45mg, 90mg, and 135mg) but recognizes the drug's immediate vulnerability to generic competition.**

77.     On June 30, 2005, Medicis submitted NDA No. 50-808 seeking FDA approval to market Solodyn extended release tablets in the 45mg, 90mg, and 135mg Legacy Strengths for the treatment of inflammatory lesions of non-nodular moderate to severe acne vulgaris in patients 12 years of age or older.  FDA approved Medicis's Solodyn NDA for the Legacy Strengths on May 8, 2006 (and would grant approval for five additional "Add-On Strengths" in 2009 and 2010).

78.     FDA grants many newly approved drugs for one or more periods of marketing exclusivity as an incentive to develop new products, such as manufacturers can obtain new chemical entity exclusivity or new clinical trial exclusivity.  Because the active ingredient in Solodyn is the "old antibiotic" minocycline, which has been marketed since at least the early 1970s, those periods of marketing exclusivity did not apply.  Additionally, at the time Medicis submitted and FDA approved its NDA for Solodyn in the Legacy Strengths, the '838 Patent was not and could not have been listed in the Orange Book; Medicis could not use the '838 Patent to

automatically trigger the 30-month Hatch-Waxman stay. This, in combination with the invalid

and/or unenforceable '838 Patent, left Solodyn particularly vulnerable to the drastic loss of sales

that would accompany the start of AB-rated generic competition.

79.     Knowing Solodyn was critical to its overall financial performance, Medicis

embraced a strategy to impede generic competition. As Medicis explained to its investors: "you

can be sure that in every conceivable respect, we are attempting to protect Solodyn,"[18] "keeping

it alive as long as we can."[19] Medicis's Chief Executive Officer, Jonah Shacknai, even boasted

that it had "hired a couple of [law] firms that I think are vicious" to go after generics and prop up

the Solodyn brand.[20]

80.     In fact, during an earnings call on February 27, 2008, Shacknai outlined Medicis's

strategy to insulate Solodyn from generic competition. In reality, Medicis's strategy included

using the unenforceable '838 Patent (and any other patents it could convince the USPTO to

grant) to file sham litigations against potential generic competitors to delay generic competition

and/or serve as conduits for entering into agreements—including illegal exclusion payment

agreements—with those generic competitors to delay the launch of generic Solodyn. Medicis

would also use the time bought by its delay tactics to develop and launch "other generations of

Solodyn"—the Add-On Strengths—that cannot be automatically substituted for with generic

Legacy Strength Solodyn when those strengths belatedly enter the market. Mr. Shacknai

characterized Medicis's plan as a "fairly complex strategy to defend the brand to the utmost of

our ability." Medicis systematically executed its scheme to delay and impair competition from

generic versions of Solodyn.

---

[18] Medicis at Credit Suisse Healthcare Conference (Nov. 14, 2007).

[19] Medicis at Merrill Lynch 19th Global Pharmaceutical, Biotechnology & Medical Device Conference (Feb. 7, 2008).

[20] Medicis Earnings Conference Call (Feb. 28, 2007).

**D.    In 2008, Medicis lays the foundation for its scheme and enters the first unlawful Exclusion Payment Agreement.**

**1.    In late 2007, Impax attempts to bring a generic Solodyn to market, and Medicis stands in its way.**

81.    On or about October 5, 2007, Impax submitted to ANDA 90-024 to FDA seeking to market generic versions of Solodyn in the 45mg, 90mg, and 135mg Legacy Strengths. Because there were no Orange Book-listed patents for Solodyn at the time Impax submitted its ANDA, Impax was not required by the Hatch-Waxman Act to notify Medicis of its application to market generic Solodyn or send a Paragraph IV notice informing Medicis that its generic would not infringe the '838 Patent.

82.    Instead, on December 20, 2007, Impax notified Medicis of its generic Solodyn ANDA filing and requested that Medicis provide Impax with a covenant not to sue under the '838 Patent in connection with Impax's ANDA.  Impax informed Medicis that any attempt to enforce the '838 Patent against generic versions of Solodyn would be "clearly improper, since the claims of the '838 patent issued only because the patent examiner was not aware of highly relevant prior art during prosecution of the '838 patent."  Impax further notified Medicis that "[i]f Medicis were to attempt to enforce the '838 patent against IMPAX. . . such an effort would be objectively and subjectively baseless, and would give rise to potential antitrust liability."

83.    Rather than granting Impax's requested covenant not to sue, Medicis informed Impax that it would aggressively and vigorously enforce the '838 Patent against all generic competitors of Solodyn, which was consistent with Medicis's scheme to thwart generic competition and public statement that it "intend[s] to enforce with ultimate vigor the patents that have issued."[21]

---

[21] Medicis at Deutsche Bank 32nd Annual Health Care Conference (May 3, 2007).

84.     On January 15, 2008, Impax filed a complaint for declaratory judgment in the United States District Court for the Northern District of California seeking a declaration that the claims of the '838 Patent are invalid and not infringed by Impax's generic.

85.     Reflecting Wall Street's view of the actual strength of Medicis's patent protection and the strength of competition from Impax, the price of Medicis's shares on the New York Stock Exchange plunged 12% percent, its biggest decline in seven years of U.S. trading—after Medicis disclosed the Impax ANDA filing in an 8-K filed January 15, 2008, the same day that Impax brought suit.

86.     On March 5, 2008, Medicis moved to dismiss Impax's declaratory judgment complaint.  Medicis's argument that no justiciable Article III controversy existed because Medicis was not then preventing Impax from marketing a generic Solodyn product and Impax had not begun the commercial marketing of its generic Solodyn products ignored its own repeated threats to preserve its monopoly position with respect to Solodyn by aggressively enforcing the '838 Patent against potential generic competitors through the use of "vicious" patent litigation and the public's interest in increasing competition in the drug industry through lower-priced generic drugs.

**2.      Eyeing a future product switch, Medicis seeks approval of new Add-On Strengths of Solodyn.**

87.     Knowing that despite its best efforts, due to the weakness of the '838 Patent, the Legacy Strengths of Solodyn would soon face generic competition, Medicis worked to market Solodyn in new strengths that would not be subject to automatic substitution with generic Legacy Strength Solodyn.  On February 29, 2008, Medicis submitted a supplemental NDA ("sNDA") 50-808/S-007 to FDA seeking approval of 65mg and 115mg strength Solodyn.  FDA approved that sNDA on July 23, 2009.

3.      **Medicis files a frivolous petition to delay approval of generic Solodyn, taking a position opposite to the position it took when seeking approval of Solodyn.**

88.      Before the district court could decide whether Impax had standing to challenge the '838 Patent, on March 18, 2008, Medicis filed a frivolous citizen petition to FDA (Number FDA-2008-P-0185), asking the agency not to approve any generic versions of Solodyn, including Impax's generic product, without requiring *in vivo* bioequivalence testing for each strength of Solodyn, something Solodyn had successfully argued *against* in obtaining approval in the first place ("Medicis's Proportionality Petition").

89.      In gaining approval of Solodyn, Medicis convinced FDA to approve 45mg and 90mg Solodyn on the ground that they are dose-proportional to the 135mg strength, thus *in vivo* bioequivalence testing was only required for 135mg Solodyn.  Medicis made this request because its *in vivo* pharmacokinetic studies demonstrated that the different strengths of Solodyn result in dose-proportional exposure.  Based on this finding of dose-proportional exposure, FDA designated the highest approved strength of Solodyn tablets, 135mg, as the reference standard against which generic versions of Solodyn must establish *in vivo* bioequivalence.

90.      Since at least December 2007, FDA's draft bioequivalence guidelines for Solodyn (minocycline hydrochloride) extended-release tablets, posted on FDA's website, required *in vivo* bioequivalence testing only for the 135mg tablets of Solodyn, but not for 45mg and 90mg tablets as long as those strengths were "proportionally similar" to the 135mg tablets.  This was because Medicis had shown that the different strengths of Solodyn result in dose-proportional exposure.

91.      But in its Proportionality Petition, Medicis argued the exact opposite of what it argued in obtaining approval for Solodyn, namely that FDA should not approve 45mg and 90mg strengths of any generic Solodyn products on the basis of bioequivalence testing in comparison to the 135mg strength because, it now claimed, the 45mg and 90mg strengths of Solodyn *are not*

*dose-proportional* to the 135mg strength.  Indeed, Medicis went a step further, requesting that

FDA designate 90mg Solodyn as a separate reference-listed drug from the 135mg strength, and

that the 90mg be the focus of bioequivalence testing for all strengths other than the 135mg,

including the 45mg.  FDA denied this frivolous petition in February 2009.

      **4.**      **The USPTO begins reexamining the '838 Patent, questioning whether it ever should have been granted.**

      92.      In June 2008, an unidentified third party requested the USPTO engage in an *ex*

*parte* reexamination of the '838 Patent to determine whether certain identified prior art raised a

substantial question of patentability.  During an *ex parte* reexamination, the prior art that the

USPTO considers includes only patents and printed publications, not evidence or arguments

regarding prior public use or sale of the claimed invention.[22]  The Dynacin Study

misrepresentations and omissions that plagued the initial application process concerned prior

public use or sale of the claimed invention.

      93.      The third party asserted that Medicis failed to disclose three (non-Dynacin) prior

art references – patents for Valorose and Doyon and information in the Physician's Desk

Reference regarding Minocin – that bore on patentability.[23]  The USPTO began the

reexamination process in August 2008.

      **5.**      **Medicis and Impax agree to enter into the Medicis/Impax Exclusion Payment Agreement to delay Impax's generic Solodyn.**

      94.      On April 16, 2008, the district court granted Medicis's motion to dismiss Impax's

declaratory judgment complaint for lack of jurisdiction.  The court did not address Impax's

contentions concerning the validity or infringement of the '838 Patent and Impax timely filed a

---

[22] 37 C.F.R. §§ 1.552(a), (c).

[23] The three references were: (1) Valorose, Jr. *et al.*, U.S. Patent No. 4,837,030 ("Valorose"); (2) Doyon *et al.*, U.S. Patent No. 5,283,065 ("Doyon"); and (3) 1989 Physician's Desk Reference, 43rd, pp. 1134-36, MINOCIN, Minocycline Hydrochloride Oral Use ("PDR").

notice of appeal of the motion to dismiss decision with the United States Court of Appeals for

the Federal Circuit on May 12, 2008.

95.     Unwilling to risk having to rely on the strength of the sure-to-be invalidated '838

Patent, Medicis opted to buy off Impax to keep the generic manufacturer from successfully

challenging the '838 Patent and to insulate Legacy Strength Solodyn from generic competition.

96.     As the Supreme Court recently explained in *FTC v. Actavis*, a patent "may or may

not be valid, and may or may not be infringed. '[A] *valid* patent excludes all except its owner

from the use of the protected process or product[.]' And that exclusion may permit the patent

owner to charge a higher-than-competitive price for the patented product. But an *invalidated*

patent carries with it no such right. And even a valid patent confers no right to exclude products

or processes that do not actually infringe."[24] A payment by a brand company to its generic

competitor can "provide a workable surrogate for [the] patent's weakness[.]"[25] "An unexplained

large reverse payment" – like the payment at issue here – "itself would normally suggest that the

patentee has serious doubts about the patent's survival."[26]

97.     In November 2008, with Impax continuing to press its declaratory judgment suit

to invalidate the '838 Patent, Medicis agreed to provide Impax continuing large and unjustifiable

payments in exchange for Impax's agreement to forestall coming to market with its generic

Solodyn products (the "Medicis/Impax Exclusion Payment Agreement"). The agreement

allowed Medicis to unlawfully preserve its monopoly power in exchange for sharing its

supracompetitive revenues. To obscure the nature of the delay payments to Impax, the

Medicis/Impax Exclusion Payment Agreement consisted of two intertwined cross-referencing

---

[24] *See Actavis, Inc.*, 570 U.S. ___, 133 S. Ct. at (citation omitted).

[25] *See id.* at 2236-37.

[26] *Id.* at 2236. A "large" payment is one that exceeds the brand/patentee's litigation costs saved by entering into
its agreement with the generic. *Id.* The reverse payments at issue here easily meet that criterion.

agreements, both executed on November 26, 2008: (a) a License and Settlement Agreement

(including any amendments) in which Impax agreed to drops it challenge of the '838 Patent and

keep its Legacy Strength generic Solodyn products off the market until November 2011, and (b)

a Joint Development Agreement (including any amendments), specifically referenced in the

License and Settlement Agreement, through which Impax received large unjustified and

continuing payments that far exceed the fair value for any services that may have been

performed by Impax under that agreement.

     98.     Under the Medicis/Impax Exclusion Payment Agreement, Impax agreed to delay

launching its Legacy Strength generic Solodyn products until the earlier of: (a) November 26,

2011; (b) ███████████████████████████████████████ (c)

███████████████████████████████████████████████

███████ or (d) ████████████████████████████

█████████████████████ Simply, Impax agreed to delay the launch of its

generic Solodyn products until November 26, 2011 unless market entry of another Solodyn

product triggered its right to launch earlier.

     99.     Impax also agreed to refrain from challenging the validity or enforceability of the

'838 Patent as well as 297 unissued claims from twelve pending patent applications purportedly

relating to Solodyn and, in doing so, purported to admit that its ANDA product infringed the

'838 Patent and the claims in the unissued patents. At the time of the agreement, Medicis had

not, and could not have, sued Impax for infringement of any of the 297 unissued claims. But by

including those unissued claims in the agreement, Medicis ensured that if any of those claims

were ever included in any patent covering any Add-On Strength Solodyn product, it could use

that patent to prevent Impax from using its ANDA product to compete.

100.    As the *quid pro quo* for Impax's agreement to delay entry of its generic Solodyn products and drop its challenge to the '838 Patent, Medicis agreed to pay Impax well in excess of $40 million dollars with substantial additional potential payments through the Medicis/Impax Joint Development Agreement.  The Joint Development Agreement purportedly covers the collaboration on and development of four generic dermatology products and an advanced form of Solodyn by Impax.  Under the terms of the Joint Development Agreement, though, Medicis paid Impax a "non-creditable, non-refundable payment of Forty Million United States Dollars" for doing nothing more than signing the agreement and keeping generic Solodyn off the market.  By comparison, the average costs of Hatch-Waxman patent litigation through trial has been reported as $6 million.  The upfront fee was fully non-refundable, meaning Impax kept the payment even if it did not perform under the Joint Development Agreement and even if its development efforts completely failed.  This payment is far in excess of any fair value that Medicis could expect in return; it was for delayed generic entry.

101.    The Medicis/Impax Joint Development Agreement further obligated Medicis to pay Impax up to $23 million in "non-creditable, non-refundable milestone payments." The non-refundable milestone payments included payments ranging from ███████████████████ ███████████████████████████████████████████████████████████ ████████████████████████████████  To date, Medicis has paid Impax non-refundable milestone payments totaling at least $15 million in addition to the $40 million up-front payment, including at least (a) $5 million in March 2009, (b) $5 million in September 2009, (c) $2 million in December 2009, and (d) $3 million in March 2011.

102.    These non-refundable milestone payments are well in excess of the fair value of any services performed by Impax under the agreement.  In fact, the preparation and filing costs

associated with a typical ANDA are no more than between $300,000 and $1,000,000.[27]   The

payments were made to compensate Impax for continuing to keep its Legacy Strength generic off

the market until November 2011.

103.    In addition to the non-refundable $40 million upfront fee for doing nothing and

the excessive, unjustifiable, and non-refundable milestone payments for, among other things, ████

██████████████████████████████████ the Medicis/Impax Joint Development

Agreement also included significant royalties for Impax if █████████████████████

█████████████████████████████████ If Impax ██████

█████████████████████████████████ t would receive

generous royalties to more than sufficiently compensate it for its efforts; the non-refundable

upfront fee and milestone payments instead compensate Impax for delaying the launch of its

Legacy Strength generic.

104.    The Medicis/Impax License and Settlement Agreement included a promise from

Medicis that Impax could sell an authorized generic ("AG") of 65mg and 115mg Solodyn when

a generic of those strengths reached the market.

105.    As specifically contemplated by the License and Settlement Agreement, on

November 13, 2009, Impax and Medicis entered into a Distribution and Supply Agreement

whereby Medicis agreed to supply Impax with the AG product at little more than cost and Impax

could pocket ██████████████ of the 65mg and 115mg AG Solodyn sold in the United

States.  This arrangement protected Impax from Medicis's plans to switch the Solodyn market

from the Legacy Strengths to the Add-On Strengths during the delay period that Medicis bought

through the Medicis/Impax Exclusion Payment Agreement.  It ensured Impax would be able to

---

[27] *See* http://media.law.stanford.edu/publications/archive/pdf/ssrn-id1736822.pdf  (at p. 5, n. 11).

sell a generic of some strength of Solodyn at some future time, even if Medicis's eliminated or otherwise impaired the opportunity for generic sales of the Legacy Strengths through a market switch. If Impax breaches the License and Settlement Agreement, for instance, by launching its generic earlier than November 2011, Medicis can cancel the Distribution and Supply Agreement. All of these payments were due to Impax well after the execution of the Medicis/Impax Exclusion Payment Agreement.

106.    All of these benefits had substantial value to Impax and are compensation that it could not have obtained even if it had litigated and won the '838 Patent case. These payments caused Impax to agree to stay out of the market longer than it otherwise would have. Medicis agreed to and did pay Impax to delay entry into the market.

107.    In the years that followed entry of the Medicis/Impax Exclusion Payment Agreement, Impax continued to receive those payments and continued with its commitment not to launch a generic equivalent of Legacy Strength Solodyn until November 26, 2011.

108.    The large unjustified payments of at least $55 million from Medicis to Impax pursuant to the Medicis/Impax Exclusion Payment Agreement serve no purpose other than to compensate Impax from keeping its generic Solodyn product off the market until November 2011, allowing Medicis and Impax to share Medicis's Solodyn monopoly profits and buying time for Medicis to launch its Add-On Strengths of Solodyn. There are no procompetitive justifications for those payments, which are well in excess of any limited value, other than the delay of generic Solodyn. Furthermore, the $40 million non-refundable upfront payment and up to $23 million in non-refundable milestone payments far exceed any approximation of the costs to Medicis of continuing to litigate the Impax declaratory judgment action. Additionally, Medicis and Impax cannot establish that those large payments were in consideration for the fair

value of any services provided by Impax to Medicis.  Indeed, Impax was not required to provide

any services, other than its own delayed generic entry, in exchange for the non-refundable $40

million upfront payment.  The large unjustified non-refundable milestone payments for

developing ANDAs of between ██████████████ owed and paid to Impax by Medicis dwarf the

$300,000 to $1,000,000 preparation and filing costs associated with a typical ANDA and are far

in excess of the fair value for any services provided by Impax

109.   But for Medicis's unlawful continuing payments to Impax under the

Medicis/Impax Exclusion Payment Agreement, Medicis and Impax would have settled in a

manner less restrictive of competition, such as an earlier agreed entry date, resulting in much less

delay of Impax's generic entry.  Under such an agreement, or even without one (such as with a

launch by Impax after it received final FDA approval or launch after a court ruling in Impax's

favor), Impax would have launched its generic Legacy Strength Solodyn substantially earlier

than November 2011.

E.      **In 2009, Medicis continues the scheme, filing baseless patent infringement suits
        against multiple potential generic competitors, misleading the USPTO again, and
        entering an Exclusion Payment Agreement with a second conspirator.**

1.      **Medicis improperly lists the '838 Patent in FDA's Orange Book and sues
        three ANDA filers, sparing only Impax because of the Medicis/Impax
        Exclusion Payment Agreement.**

110.   On October 8, 2008, Congress enacted the QI Act which amended the FDCA to

create select Hatch-Waxman provisions for "old" antibiotics, including minocycline, permitting

the listing of relevant patents in the Orange Book by NDA holders, affording them the benefits

of the provisions of the Hatch-Waxman Act, and allowing ANDA filers who add a Paragraph IV

certification of non-infringement, invalidity, or unenforceability of a newly listed antibiotic drug

patent to receive a first filer status, even if that results in multiple ANDA filers with first filer

status.

111.    Although the QI Act made the Orange Book patent listing provisions of Hatch-Waxman generally applicable to old antibiotics like Solodyn, any such patents still had to meet all of the other requirements for Orange Book listing, *i.e.* the patent must be valid and enforceable.[28]  Medicis knew the '838 Patent was neither but, on December 3, 2008, submitted it to FDA for Orange Book listing anyway as part of its plan to delay generic competition.

112.    Before passage of the QI Act in 2008, the Paragraph IV and 30-month stay provisions of Hatch-Waxman did not apply to Solodyn.  For any ANDA on file before December 3, 2008, when Medicis listed the '838 Patent in the Orange Book, Medicis was not entitled to and could not obtain a 30-month stay of FDA regulatory approval of AB-rated generic versions of Solodyn simply by filing a patent infringement suit within 45 days of receiving the Paragraph IV certification.

113.    After improperly listing the '838 Patent in the Orange Book, Medicis received timely Paragraph IV notifications from multiple generic manufacturers amending their ANDAs for generic Solodyn products.  Those Paragraph IV notifications each contained certifications that the '838 Patent was invalid, unenforceable and/or would not be infringed by the respective generic products.

114.    On or about December 5, 2008, Mylan served a notice letter regarding its Paragraph IV certification for ANDA 09-0911 for 45mg, 90mg, and 135mg extended release minocycline hydrochloride (the Legacy Strengths of Solodyn).

115.    On or about December 8, 2008, Sandoz served a notice letter regarding its Paragraph IV certification for ANDA 09-0422 for 45mg, 90mg, and 135mg extended release minocycline hydrochloride.

---

[28] Again, FDA does not police patents when listing them; FDA simply lists the patents submitted to it.

116.    On or about December 12, 2008, Impax served a notice letter regarding its Paragraph IV certification for its ANDA for 45mg, 90mg, and 135mg extended release minocycline hydrochloride.  Of course, Medicis and Impax had already entered into the Medicis/Impax Exclusion Payment Agreement by this time.  Impax served the Paragraph IV notice to preserve its first-to-file status, which would allow it to launch if another generic manufacturer successfully invalidated the '838 Patent.

117.    On or about December 23, 2008, Teva Pharmaceuticals USA, Inc. ("Teva") served a notice letter regarding its Paragraph IV certification for ANDA 64-485 for 45mg, 90mg, and 135mg extended release minocycline hydrochloride.  The notice letter was submitted by Barr Pharmaceuticals, which, as of December 23, 2008, became a wholly owned subsidiary of Teva.

118.    Because Mylan, Sandoz, Impax, and Teva had each timely submitted a Paragraph IV certification to the newly-listed '838 Patent, these four generic manufacturers shared 180-day exclusivity for the 45mg, 90mg, and 135mg Legacy Strengths of generic Solodyn.

119.    On January 13, 2009, Medicis filed suit against Mylan, Teva, and Sandoz in the United States District Court for the District of Delaware, claiming infringement of the '838 Patent.  At that time, the USPTO was in the process of reexamining the '838 Patent and would, within two months, reject all of the original claims in the '838 Patent.  Because Mylan, Teva, and Sandoz each filed a Legacy Strength ANDA before December 3, 2008, the 30-month Hatch-Waxman stay of FDA approval did not apply to any of Medicis's meritless suits.

120.    No reasonable litigant could have realistically expected to succeed on Medicis's claims that Mylan, Teva, Sandoz—or any generic manufacturer—infringed the invalid and unenforceable '838 Patent.  Medicis filed and prosecuted the '838 Patent infringement suits to unlawfully delay generic competition.

121.    Medicis commenced the lawsuits against Teva, Sandoz, and Mylan not with any reasonable expectation of obtaining a favorable outcome on the merits of the lawsuits, but with the wrongful intent to achieve an anticompetitive result and maintain its monopoly position through the improper use of the judicial process and the settlement of those suits.

**2.      FDA denies Medicis's frivolous Proportionality Petition and approves Impax's ANDA, but Impax has been paid not to launch and so does not.**

122.    On February 3, 2009, FDA denied Medicis's Proportionality Petition, explaining that "none of the[] facts" Medicis asserted were "directly relevant to whether ANDA applicants must separately demonstrate *in vivo* bioequivalence to Solodyn for multiple strengths." FDA also noted that Solodyn's own labeling states that "[a] single-dose, four-way crossover study demonstrated that all strengths of Solodyn tablets (45 mg, 90 mg, 135 mg) exhibited dose-proportional pharmacokinetics." As a result of Medicis's own studies and labeling, FDA concluded there was in fact "dose proportional exposure *in vivo*," and reaffirmed its prior finding that "135 mg [Solodyn is] the reference standard against which generic versions of Solodyn must establish in vivo bioequivalence."

123.    The same day that it denied Medicis's Proportionality Petition, FDA gave final approval to Impax's ANDA for generic 45mg, 90mg, and 135mg minocycline hydrochloride extended release tablets.

124.    Impax, however, did not launch its generic versions of the Solodyn Legacy Strengths that day. Rather than launch its products—which Impax had represented would be in the public's interest in increasing competition in the drug industry and obtaining generic drugs at lower prices—Impax delayed its entry into the market for almost three years, until November 26, 2011, as agreed to in the Medicis/Impax Exclusion Payment Agreement.

125.    Other generic manufacturers were still threatening to enter the market with competing generic Solodyn products.

Medicis swiftly mitigated the threat from other potential generic competitors with additional tactics that were designed to, and did in fact, delay generic Solodyn products from entering the market.

### 3.    Medicis files a second frivolous petition that is swiftly disposed of by FDA.

126.    Just ten days after FDA denied Medicis's frivolous Proportionality Petition, on February 13, 2009, Medicis—attempting to leverage its recently-filed sham patent suits against Teva, Sandoz, and Mylan—submitted a second citizen petition to FDA (Number FDA-2009-P-0081-0004), requesting that the agency not approve for 30 months, measured from the date Medicis received notice of the Paragraph IV notice: (a) the ANDAs submitted by Mylan, Teva, and Sandoz; and (b) any other then-pending ANDA referencing Solodyn for which the applicant made a Paragraph IV certification, and for which Medicis sued for patent infringement within 45-days period.  ("Medicis's 30-Month Stay Petition").

127.    FDA swiftly denied Medicis's 30-Month Stay Petition a mere month later, on March 17, 2009.  FDA ruled that no 30-month stay of FDA approval applied because the '838 Patent was not Orange Book-listed until after the generic manufacturers filed the ANDAs before FDA.  According to FDA, Medicis's positions were "not supported by either the plain language of the QI Act or by the regulatory framework for innovator and generic drug products of which the QI Act is a part."

### 4. Medicis keeps Teva from opening the floodgates of generic competition to Legacy Strength Solodyn.

128.    FDA approved Teva's generic Solodyn ANDA on March 17, 2009, the same date it denied Medicis's 30-Month Stay Petition.  Teva commenced shipment of its generic Solodyn immediately after receiving FDA's approval of its ANDA.

129.    On March 18, 2009, however, the day after Teva launched, Medicis and Teva entered into an agreement settling their litigation (the "Teva Settlement Agreement") wherein Teva agreed to (1) stop selling its generic Solodyn and (2) delay resuming selling its generic Solodyn until November 2011, or earlier under certain circumstances.  Teva also agreed to refrain from challenging the validity or enforceability of the '838 Patent as well as unissued claims from twelve pending patent applications purportedly relating to Solodyn with regard to its Legacy Strength generic product only and, in doing so, admitted that its Legacy Strength generic product infringed the '838 Patent.

130.    For its part, Medicis agreed to release Teva from any liability for its abbreviated launch (not that it would have had any liability).  Teva was also able to enjoy *de facto* generic exclusivity for that period, rather than sharing it with Impax.

### 5. Medicis Pays Impax to Continue the Medicis/Impax Exclusion Payment Agreement.

131.    Under the Medicis/Impax Exclusion Payment Agreement, Medicis agreed not to ████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████  If Medicis authorized another generic manufacturer to sell such generic Solodyn before Impax's delayed licensed entry date of November 2011, ███████████████████████████████████  ███████ ██████████████████████████████████████████████████████████

132.    On May 19, 2009, shortly after Teva launched its generic Solodyn, Impax sued

Medicis in the Superior Court of the State of Arizona in and for the County of Maricopa alleging

that Medicis had denied that Impax's right to launch its generic Solodyn product had been

triggered by Teva's sales.  It was Impax's view that under the terms of the Medicis/Impax

Exclusion Payment Agreement, it was permitted to come to market in March 2009 when Teva

launched.  However, Impax did not come to market in March or May of 2009, but instead

accepted an additional ███████ from Medicis to dismiss the lawsuit in June 2009 and to

continue to stay off the market and abide by the Medicis/Impax Exclusion Payment Agreement.

**6.      Upon reexamination, the USPTO rejects all 18 of the '838 Patent's original
claims.  Medicis responds with further omissions and misrepresentations.**

133.    On March 13, 2009, the USPTO issued a Non-Final Office Action rejecting

claims 1-18 of the '838 Patent, all of the claims, as anticipated by the prior art references cited by

the third party in its request for *ex parte* reexamination.

134.    Medicis replied on May 13, 2009, with a narrative response and a declaration

under oath by Jonah Shacknai, Medicis's CEO, to attempt to convince the USPTO to overturn

the rejection.  Both the Shacknai Declaration and the narrative contained numerous willful and

knowing omissions and misrepresentations of fact.

135.    For example, Shacknai falsely stated that before the launch of Solodyn and the

filing of the '838 Patent, "practitioners generally believed that the use of slower-dissolving

minocycline rather than a faster-dissolving form would only decrease the effectiveness of the

minocycline without any commensurate reduction in vestibular side effects."[29]  But Shacknai

cited literature from 1977, more than a decade before Medicis started selling Dynacin, two

decades before the Dynacin Study demonstrated that Dynacin's slower dissolving form would

---

[29] Declaration of Jonah Shacknai Under 37 C.F.R. § 1.132, May 12, 2009 at ¶ 13 ("Shacknai Declaration").

significantly decrease vestibular side effects, and two decades before Medicis used the Dynacin

Study to promote Dynacin to practitioners as producing fewer vestibular effects because of its

slower dissolution profile and without any reduction in efficacy.

136.    Mr. Shacknai stated that "[p]rior to the filing of the '838 Patent, the only oral

dosage form of minocycline approved by the FDA was the faster-dissolving immediate release

form."[30]   But Mr. Shacknai, Dr. Gans, and Medicis knew that Dr. Gans characterized Dynacin as

a "regulated release" product in the Medicis-funded, Medicis-published Dynacin Study and that

Dynacin was the "slower-dissolving minocycline" product reported in the '838 Patent.

137.    Mr. Shacknai told the USPTO that "dermatologists treating acne would not have

used a dosage form that was slower dissolving than known faster-dissolving forms of

minocycline prior to the filing of the '838 patent because the administration of such a slower-

dissolving form of minocycline would not have been expected to be as effective for acne

treatment."[31]   But Mr. Shacknai, along with Medicis and Dr. Gans, knew that Dynacin, which

had been prescribed by dermatologists since at least 1993, was slower-dissolving and as effective

as faster-dissolving products.

138.    Mr. Shacknai further misled the USPTO when he stated that "[c]ontrary to the

expectations of such practitioners, large properly controlled human clinical trials of Solodyn

have confirmed that methods of acne treatment using the slower-dissolving minocycline forms in

the '838 patent are in fact effective for the treatment of acne"[32] while omitting that Dynacin was

a slower-dissolving minocycline product that was known to be effective for the treatment of

acne.

---

[30] *Id.* at ¶16.

[31] *Id.* ¶18.

[32] *Id.* at ¶21.

139.    Mr. Shacknai claimed that "at least one [prior art] reference strives for rapid release of minocycline, particularly in the more neutral regions of the small intestine, because such minocycline forms 'can be better tolerated in terms of CNS side effects'"[33] while omitting that Medicis sold its slower-dissolving Dynacin since at least 1993 and promoted it to dermatologists by telling them that Dynacin's slower dissolution profile reduced vestibular effects five-fold.

140.    Mr. Shacknai stated that "[c]ontrary to the expectations of such practitioners, a lower incidence of side effects was experienced by the individuals using the slower-dissolving minocycline forms of the '838 patent during the human clinical trials of Solodyn"[34] while omitting that individuals using Dynacin during the Dynacin Study experienced a lower incidence of side effects.

141.    Medicis incorporated these misrepresentations and omissions by Mr. Shacknai into its May 13, 2009 narrative response to the USPTO's March 13, 2009 Office Action.

142.    Medicis went further, stating in the May 13, 2009 narrative response that "the benefits of the inventions claimed in the '838 Patent are embodied in the use of Medicis's commercially available Solodyn product"[35] while omitting that the benefits of the inventions claimed in the '838 Patent are embodied in the use of Medicis's Dynacin product, which was commercially available as early as 1993.

143.    Medicis told the USPTO that "Solodyn solved this long felt need because patients were able to use a slower-dissolving form of minocycline that was effective for the treatment of

---

[33] *Id.*

[34] *Id.* at ¶24.

[35] May 13, 2009 Reply to Office Action in Ex Parte Examination at 16.

acne while at the same time reducing the incidence and/or severity of vestibular side effects."[36] In fact, Medicis knew that Dynacin was the product that established that patients could use a slower-dissolving form of minocycline that was effective for the treatment of acne while at the same time reducing the incidence and/or severity of vestibular side effects

144.    Although Medicis belatedly submitted the Dynacin Study to the USPTO in connection with the reexamination, it buried the study amongst 180 references supplied to the examiner in a February 20, 2009 Information Disclosure Statement.  Medicis did not specifically bring the Dynacin Study to the examiner's attention or disclose the truth regarding the study data included in the specification of the '838 Patent.  As the examiner explained in the November 10, 2009 Office Action regarding the '838 Patent, "the requisite degree of consideration to be given to [information submitted by the patentee] will be normally limited by the degree to which the party filing the information citation has explained the content and relevance of the information."

**7.     Medicis and Sandoz conspire, entering into the Medicis/Sandoz Exclusion Payment Agreement to delay Sandoz's generic product.**

145.    Medicis had sued Sandoz on January 13, 2009, along with Teva and Mylan, in the United States District Court for the District of Delaware, No. 1:09-CV-00033-LPS, alleging that Sandoz infringed the '838 Patent by submitting to FDA its ANDA for Legacy Strength (45mg, 90mg, and 135mg) minocycline hydrochloride extended release tablets.

146.    On February 27, 2009, Sandoz answered the complaint and asserted a counterclaim seeking a declaratory judgment that the '838 Patent is invalid and would not be infringed by its generic Solodyn products.

---

[36] *Id.* at 18.

147.    On August 13, 2009, FDA granted Sandoz final approval to market its generic

Legacy Strength Solodyn products.  Sandoz immediately launched its Legacy Strength generic

Solodyn upon approval even though the Medicis patent infringement suit was still pending.

148.    Within days, Medicis and Sandoz entered into the Medicis/Sandoz Exclusion

Payment Agreement memorialized, in part, in a written agreement dated August 18, 2009, and

Sandoz stopped selling its generic Solodyn product. The parties had not briefed and the court had

not adjudicated the merits of Medicis's sham infringement suit.  Rather than continue to litigate

and suffer the invalidation of the '838 Patent and destruction of its Solodyn monopoly, Medicis

opted to buy off Sandoz to insulate Legacy Strength Solodyn from generic competition.

149.    Pursuant to the Medicis/Sandoz Exclusion Payment Agreement, Sandoz agreed

to: (a) stop selling its generic Solodyn products; (b) delay resuming selling its Legacy Strength

generic Solodyn products until November 26, 2011, or earlier under certain circumstances, ████

████████████████████████    ███████████████████████████████) and

(c) not launch an Add-On Strength generic product until ████████████████████████████

██████████████████████████████████████████████████████

████    Sandoz also agreed to acknowledge the validity and enforceability of the claims in the

'838 Patent, two other patents and unissued claims in eleven patent applications, which was an

about fact from the positions taken by Sandoz during the '838 Patent litigation, and refrain from

challenging the validity or enforceability of the claims of the '838 Patent, two other patents and

unissued claims in eleven patent applications.  The Medicis/Sandoz Exclusion Payment

Agreement allowed Medicis to preserve its monopoly position in exchange for sharing its

supracompetitive revenues.  At the time of the agreement, Medicis had not sued Sandoz for

infringement of any patent other than the '838 Patent and did not, and could not have, sued

Impax for infringement of any of the unissued claims. But by including claims from the unissued patents in the agreement, Medicis ensured that if any of those claims were ever included in any patent covering any Add-On Strength Solodyn product, it could use that patent to prevent Sandoz from using its ANDA product to compete.

150.    As the *quid pro quo* for Sandoz's agreement to drop its challenge to the '838 Patent and delay entry of its Legacy Strength generic Solodyn products until November 2011, Medicis agreed to make large, unjustified and continuing payments to Sandoz.

151.    The Medicis/Sandoz Exclusion Payment Agreement consists of several intertwined agreements and amendments thereto. First, on August 18, 2009, Medicis and Sandoz executed a Settlement Agreement and Mutual Release ("Medicis/Sandoz Settlement Agreement") settling their '838 Patent litigation and resulting in Sandoz halting its sales of Legacy Strength generic Solodyn. The Settlement Agreement includes commitments from Medicis and Sandoz to negotiate and finalize what the parties euphemistically call a patent license and business partnership agreement, but which really sets forth the terms of Medicis's payments to Sandoz for Sandoz agreeing to stay off the market for two plus years until November 2011. The basic parameters of those payments and the terms of the later-executed agreements are set out in the exhibits to the Medicis/Sandoz Settlement Agreement.

152.    As agreed to in the Medicis/Sandoz Settlement Agreement on November 27, 2009, the parties executed an Asset Purchase Agreement. Pursuant to the Asset Purchase Agreement, Medicis agreed to pay Sandoz over ███████████████████████████████ ██████████████████████████████████████████ for which there was no viable market because the brand manufacturer of the reference listed drug, Warner Chilcott, had pulled its ███████████████ from the market and switched to ███████ four years earlier.

Sandoz's 

Hence,

was worth little or nothing.  Yet, the Asset Purchase Agreement obligated Medicis to (i)

pay Sandoz [redacted] cash upfront for the virtually worthless [redacted] (ii) [redacted]

[redacted] and (iii) [redacted]

153.     These payments to Sandoz are in addition to Medicis's agreement in the

Medicis/Sandoz License Agreement, also executed on November 27, 2009, pursuant to the

Medicis/Sandoz Settlement Agreement, to "pay to Sandoz an amount equal to Sandoz's total,

reasonable and out-of-pocket attorneys fees and costs, including, but not limited to, the costs of

any expert(s) and/or consultant(s), incurred by Sandoz in connection with the action captioned

*Medicis Pharms. Corp. v. Sandoz, Inc., et al.*, 09-033-JJF in the U.S. District Court for the

District of Delaware."  Notably, this is not an agreement by Medicis to pay to Sandoz an amount

approximating the attorneys' fees and costs Medicis would incur if the litigation would continue,

but is instead a commitment to make an uncapped payment covering *Sandoz's attorneys' fees*

*and costs.*

154.     All of these benefits had substantial value to Sandoz, and other than the attorneys'

fees, are compensation that it could not have obtained even if it had litigated and won the patent

case.  These payments caused Sandoz to agree to stay out of the market longer than it otherwise

would have. Medicis agreed to and did pay Sandoz to delay Sandoz's launch of its generic version of Solodyn in Legacy Strengths (45mg, 90mg and 135 mg).

155.     The large, unjustified payments from Medicis to Sandoz pursuant to the Medicis/Sandoz Exclusion Payment Agreement serve no purpose other than to compensate Sandoz for keeping its generic Solodyn product off the market until November 2011, allowing the parties to share Medicis's Solodyn monopoly profits, and buying time for Medicis to launch its Add-On Strength Solodyn products. There are no procompetitive justifications for those payments, which are well in excess of any limited value, other than the delay of generic Solodyn. The more than ███████ paid by Medicis to Sandoz for Sandoz's ████████████████ ███████ far exceeds any approximation of the costs to Medicis of continuing to litigate the '838 Patent litigation. The uncapped reimbursement for the fees and costs Sandoz incurred in defending the '838 Patent litigation are in no way tied to, and are likely in excess of, the costs to Medicis of continuing to litigate the '838 Patent litigation, where there only savings are for the incremental costs of removing Sandoz from the continuing lawsuit against Mylan. Medicis and Sandoz cannot establish that those large payments were in consideration for the fair value of the ANDA rights and generic Doryx capsules provided by Sandoz to Medicis because market for those capsules had collapsed years before the Asset Purchase Agreement was executed. Indeed, to date, Medicis has not sold a single ████████████████ The ███████ paid to Sandoz was to compensate Sandoz for keeping its generic Solodyn off the market, not for the right to sell generic Doryx capsules.

156.     But for Medicis's unlawful payments to Sandoz under the Medicis/Sandoz Exclusion Payment Agreement, Medicis and Sandoz would have settled in a manner less restrictive of competition, resulting in much less delay of Sandoz's generic entry. Under such an

agreement, or even without one (such as a launch upon receiving FDA approval or a launch after

a court ruling in Sandoz's favor). Sandoz would have launched and kept on the market its

generic Legacy Strength Solodyn substantially earlier than November 2011.

**F.     In 2010 and 2011, Medicis caps off the scheme, settling sham lawsuits against
potential generic competitors, entering into additional Exclusion Payment
Agreements, and impairing the market for the Legacy Strengths.**

      **1.     Medicis's misrepresentations and omissions to the USPTO work and the
agency reissues the '838 Patent, but with all new or amended claims.**

157.    Medicis continued to undergo *ex parte* reexamination of the '838 Patent through

2009 and into 2010.  During the reexamination, Medicis acknowledged that none of the original

claims could stand and instead moved to cancel several of the original claims in the '838 Patent,

amended others, and added new claims 19-34.

158.    On November 11, 2009, the USPTO rejected amended claims 3, 4, 12 and 13 and

new claims 19-34 of the '838 Patent.   Among other things, the examiner found that it would

have been obvious to use the slow-release formulations of minocycline disclosed by Valorose to

treat acne while reducing the well-known vestibular side effects of minocycline.

159.    On January 8, 2010, Medicis filed a reply to the November 10, 2009 Office

Action.  Medicis argued, *inter alia*, that: (a) the Valorose reference did not teach the

administration of minocycline pursuant to a method of reducing vestibular side effects resulting

from the treatment of acne, or a slowly dissolving dosage form as measured under standard U.S.

Pharmacopeia test conditions; and (b) it would not have been obvious to use the minocycline

dosage forms disclosed in Valorose in treating acne because only *"rapidly dissolving* dosage

forms" had been known to treat acne and Valorose did not involve testing at standard U.S.

Pharmacopeia conditions.

160.    In its attempt to distinguish the prior art, Medicis did not disclose to the examiner that slower-dissolving Dynacin had been on sale since at least 1993 for the treatment of acne, and Dynacin produced less vestibular effects than other minocycline hydrochloride products due to its slower dissolution, demonstrated by the Dynacin Study, Medicis's promotional materials related to the Dynacin Study, and the data reported in the '838 Patent.

161.    Medicis's statement that only rapidly dissolving dosage forms of minocycline had been used in the prior art to treat acne was unmistakably false.

162.    On March 11, 2010, the USPTO reversed course and issued its Reasons for Patentability/Confirmation, finding claims 3, 4, 12, 13 and 19-34 were not obvious over the prior art Valorose reference.  On June 1, 2010, the USPTO issued the Ex Parte Reexamination Certificate for the '838 Patent with four amended and sixteen new claims.

163.    In connection with the reexamination of the '838 Patent, Shacknai, Dr. Gans, and Medicis made false representations or deliberate omissions of highly material information to the USPTO examiner with the intent to deceive the USPTO.  A reasonable examiner would have considered each of these misrepresentations and deliberate omissions material to the patentability of the claims of the '838 Patent and would not have reissued the '838 Patent knowing the truth.

**2.    Medicis keeps Mylan from starting generic Legacy Strength Solodyn competition earlier than Impax and Sandoz agreed.**

164.    Medicis had also sued Mylan on January 13, 2009, in the United States District Court for the District of Delaware, No. 1:09-CV-00033-LPS, alleging that Mylan infringed the '838 Patent by submitting to FDA the ANDA for 45mg, 90mg, and 135mg minocycline hydrochloride extended release tablets.

165.    On July 20, 2010, FDA granted Mylan final approval to market its generic 45mg,

90mg, and 135mg Legacy Strength Solodyn products.  Mylan immediately launched its Legacy

Strength generic Solodyn products.

166.    On July 22, 2010, Medicis and Mylan entered into an agreement settling their

litigation (the "Mylan Settlement Agreement"). Pursuant to that agreement, Mylan agreed to: (a)

stop selling its 45mg, 90mg, and 135mg generic Solodyn products; (b) delay resuming selling

those Legacy Strength generic Solodyn products until November 2011 (or earlier under certain

circumstances); and (c) delay launching its generic Solodyn products in 65mg and 115mg

strengths until ███████████████████████████████████

███████████████████████████████████ Mylan also agreed to refrain

from challenging the validity or enforceability of the '838 Patent, the claims in two other patents

and 10 pending patent applications solely with regard to Mylan's Solodyn ANDA products.

167.    Medicis agreed to release Mylan from any purported liability for its abbreviated

launch of its generic Solodyn products and paid Mylan ███████████████████

███████████████ [37]

**3.    Medicis again pays Impax in January 2011 to continue to stay off the market and maintain the Medics/Impax Exclusion Payment Agreement.**

168.    As noted above, under the Medicis/Impax Exclusion Payment Agreement,

Medicis agreed ███████████████████████████████████

███████████████████████████████████ If Medicis

authorized another generic manufacturer to sell such generic Solodyn products before Impax's

licensed entry date of November 2011, Impax ███████████████████

---

[37] On May 4, 2010, Medicis settled with Ranbaxy, Inc. and Ranbaxy Laboratories Limited (collectively, "Ranbaxy"), who were sued for infringement of the '838 Patent, on similar terms, securing Ranbaxy's agreement to (a) delay launching its generic Solodyn products in the 45mg, 90mg, and 135mg strengths until November 2011, or earlier under certain circumstances and (b) delay launching its generic Solodyn products in the 65mg and 115mg strengths until ███████████████████████████████

████████████ As it did with regard to the abbreviated Teva launch in 2009, Impax filed suit against Medicis ██████████████████████████████████████████████████████

169.     Subsequent to the Medicis/Sandoz Exclusionary Payment Agreement and just days after Medicis settled with Mylan, on July 27, 2010, Impax filed suit against Medicis in the Superior Court of the State of Arizona in and for the County of Maricopa alleging that Impax's right to launch its generic Solodyn product had been triggered by Sandoz's and Mylan's generic Solodyn sales.  It was Impax's view that under the terms of the Medicis/Impax Exclusion Payment Agreement, it was permitted to come to market as early as August 2009 when Sandoz launched its generic Solodyn product.  Impax did not come to market in August 2009 when Sandoz launched or in July 2010 when Mylan launched.  Instead, on January 21, 2011, in an affirmative act in continuation of the conspiracy with Medicis under the Medicis/Impax Exclusion Payment Agreement, Impax dismissed the state litigation against Medicis, accepting an additional ████████████ from Medicis for renewing its commitment to keep its Legacy Strength generic Solodyn off the market—insulating Medicis from competition not only from Impax, but also from Sandoz, Teva and Mylan—until November 2011.  This overt act furthered and reaffirmed the conspiracy between Medicis and Impax to delay generic competition for the Legacy Strengths of Solodyn.

170.     The agreement settling Impax's Arizona litigation against Medicis explicitly referenced and, indeed, amended the Impax/Medicis Joint Development Agreement, demonstrating the clear interdependent relationship between the Medicis/Impax License and Settlement Agreement and Joint Development Agreement in forming the Medicis/Impax Exclusion Payment Agreement.  In total, pursuant to and in furtherance of the Medicis/Impax Exclusion Payment Agreement, Medicis paid Impax a total of ████████████ consisting of (a) a

$40 million non-refundable upfront payment, (b) $15 million in milestone payments and (c) ██████ ██████n payments to compensate Impax for continuing to stay off the market despite the abbreviated launches of Teva, Sandoz and Mylan.  Additionally, Impax is entitled to up to an additional $8 million in milestone payments and royalties on the sales of various future products and ████ of 65mg and 115mg Solodyn authorized generic sales.

**4.    Medicis battles other potential generic competitors over the invalid and/or unenforceable '838 Patent.**

171.    On October 8, 2009, Medicis received a Paragraph IV certification from Lupin giving notice that it had filed ANDA No. 19-424 with FDA for generic Solodyn in 45mg, 90mg, and 135mg Legacy Strengths.  Lupin's Paragraph IV certification stated that the '838 Patent was invalid, unenforceable, and/or would not be infringed by Lupin's generic products.

172.    On November 17, 2009, Medicis filed a sham suit against Lupin in the United States District Court for the District of Maryland, No. 1:09-cv-03062, alleging that Lupin infringed one or more claims of Medicis's invalid and/or unenforceable '838 Patent by submitting its ANDA for 45mg, 90mg, and 135mg Solodyn.  Because Lupin filed its ANDA after passage of the QI Act and the '838 Patent was by then listed in the Orange Book, this sham suit triggered the automatic 30-month Hatch-Waxman stay.

173.    On November 24, 2009 (as to the 65 mg dosage) and December 23, 2009 (115 mg), Lupin served Medicis with Paragraph IV notices regarding the amendment or supplement of its ANDA to cover additional strengths of Solodyn, each time asserting that the '838 Patent was invalid, unenforceable, and/or would not be infringed by Lupin's generic.  Medicis responded by amending its baseless complaint to cover those strengths as well.

174.    On March 4, 2010, Lupin answered Medicis's complaint, asserting defenses of non-infringement, invalidity, and unenforceability and asserting a counterclaim seeking a

declaratory judgment that the '838 Patent is invalid, not infringed, and unenforceable due to inequitable conduct before the USPTO.

175.    After the USPTO issued the Ex Parte Reexamination Certificate for the '838 Patent, Medicis doubled down, filing a third amended complaint on July 1, 2010, alleging that Lupin infringed the '838 Patent as amended pursuant to the June 1, 2010 Ex Parte Reexamination Certificate.

176.    As early as April 2007, Medicis engaged in extensive efforts to convince the USPTO to issue additional patents ostensibly covering Solodyn that Medicis could use to pursue additional lawsuits against generic filers, particularly those seeking to sell Add-On Strength generics. The USPTO issued one such patent, U.S. Patent No. 7,790,705 titled "Minocycline Oral Dosage Forms for the Treatment of Acne" (the "'705 Patent"), on September 7, 2010. The '705 Patent covers the method of use of dosing extended release minocycline hydrochloride according to weight to prevent some adverse effects. This method of use was well-known, indeed, Medicis sold Solodyn in several strengths for this reason. Medicis submitted the application for the '705 Patent on October 17, 2008 (just before Medicis bought off Impax); the '705 Patent to expires in 2025.[38]

177.    On September 9, 2010, just two days after the USPTO issued the '705 Patent, Medicis had the '705 Patent listed in the Orange Book for Solodyn in 45mg, 65mg, 90mg 115mg, and 135mg strengths, aiming to use the weak patent to sue generic filers to further delay entry of generic Solodyn.

---

[38] Medicis also obtained U.S. Patent No. 7,541,347 (issued on June 2, 2009) (the "'347 Patent"), and U.S. Patent No. 7,544,373 (issued June 9, 2009) (the "'373 Patent") each of which purportedly cover the use of the 90mg controlled-release oral dosage form of minocycline to treat acne. Medicis has never sued a generic manufacturer for infringement of either of these patents.

178.    On or about September 17, 2010, Medicis received notice from Lupin stating that its ANDA and supplements were submitted with a Paragraph IV certification and that its ANDA did not infringe the '705 Patent.  On October 18, 2010, Medicis filed its fourth amended complaint, alleging that Lupin's proposed generic Solodyn in 45mg, 65mg, 90mg, 115mg, and 135mg strengths would infringe the '838 and '705 Patents.  As the '705 Patent was listed in the Orange Book after Lupin filed its ANDA, it could not result in a 30 month stay.

179.    Thereafter, the pattern continued.  On December 3, 2010 (as to the 55mg and 80mg dosages) and January 24, 2011 (105mg), Lupin served Medicis with Paragraph IV notices regarding the amendment or supplement of its ANDA to cover additional strengths of Solodyn, each time asserting that the '838 Patent was invalid, unenforceable, and/or would not be infringed by Lupin's generic and that the '705 Patent would not be infringed.  Medicis responded by amending its complaint to cover those strengths as well on January 10, 2011 (55mg and 80mg) and March 2, 2011 (105mg), alleging that Lupin's 105mg generic Solodyn product would infringe the '838 and '705 Patents.

180.    As with the suits before it, no reasonable litigant could have realistically expected to succeed on Medicis's claims that Lupin had infringed the invalid and unenforceable '838 Patent.  Medicis filed and prosecuted the '838 Patent infringement suits solely to delay generic competition.

### 5.    Medicis uses the delay it bought to switch the market from the Legacy Strengths to the Add-On Strengths of Solodyn, greatly reducing generic Legacy Strengths sales when they belatedly entered the market.

181.    Through the various anticompetitive tactics described above, which successfully delayed the onset of unrestrained generic competition to Medicis's Legacy Strength Solodyn until November 2011, Medicis bought itself time to switch the market for those strengths to Add-

On Strength Solodyn (*i.e.*, 55mg, 65mg, 80mg, 105mg, and 115mg) that did not face imminent generic competition.

182.    On February 29, 2008, Medicis had submitted a supplemental NDA # 50-808/S-007 to FDA seeking approval to market Solodyn in the 65 mg and 115 mg strengths.  On July 23, 2009, FDA approved Medicis's application.  In August 2010, FDA also approved a supplemental NDA # 50-808/S-013 revising the Solodyn label to include the 55mg, 80mg, and 105mg strengths.

183.    A key benefit to launching the Add-On Strengths from Medicis's perspective was that the Legacy Strength generics finally set to come to market in November 2011 would not be "AB-rated" to brand Add-On Strength Solodyn, and therefore pharmacists could not automatically substitute less-expensive generic Solodyn in one of the Legacy Strengths for Add-On Strength prescriptions.  Such automatic substitution of less-expensive AB-rated generics at the pharmacy counter is the primary means by which generic competition reduces drug costs, including the prices paid by Plaintiffs and other members of the Class of direct purchasers.

184.    Engaging in the anticompetitive behavior described herein was critical to Medicis's ability to successfully move the Solodyn market from the Legacy Strengths to the Add-On Strengths.  Medicis needed to delay Legacy Strength generic entry until after it gained FDA approval to market Solodyn in the Add-On Strengths and had some time to launch and market those new strengths.  It is well known in the pharmaceutical industry that if generic versions of the original brand product (here, the Legacy Strengths) enter the market before the brand follow-on product (here, the Add-On Strengths), the follow-on product will make very few sales compared to a situation in which launch of the original generic is delayed until after launch of the follow-on brand product.  For example, one brand manufacturer estimated that it would

make ten times more sales on its brand follow-on product if it beat generic versions of the

original product onto the market.[39]  Similarly, in a detailed inquiry into the pharmaceutical

industry, the European Commission concluded that "it is of utmost importance for the originator

company to bring the follow-on product on the market before the first product effectively loses

exclusivity."[40]  Industry analysts in the United States echoed that conclusion, warning brand

manufacturers that "it is essential that the brand holder switch their patients to the new

formulation prior to generic launch."[41]

185.    It was also known in the pharmaceutical industry that for Medicis's product

switch strategy to work, it needed to switch the market to the Add-On Strengths sufficiently in

advance of generic Legacy Strength competition in November 2011, and that Medicis's

Exclusion Payment Agreements with Impax and Sandoz and settlements of the sham litigations

against Teva and Mylan had bought Medicis the time it needed to do just that.  An October 8,

2010 Morningstar report, for example, stated:

> Medicis has managed to fend off generic Solodyn competition until late 2011,
> thanks to several deals with Teva, Sandoz (a unit of Novartis), Mylan, and Impax.
> By paying the generic companies to delay competition, Medicis has lengthened
> the runway for Solodyn.  The firm may have bought enough time to get its follow-
> on product to Solodyn approved and launched.  If Medicis can transition current
> Solodyn users to the next-generation product, then the picture could be more
> optimistic for Solodyn than we had assumed earlier.

186.    Once Medicis had approval for the 65mg and 115mg Add-On Strengths, but

before Legacy Strength generics came to market because of the various agreements, Medicis

worked to eliminate prescriptions for Legacy Strength Solodyn, converting those prescriptions to

---

[39] Shadowen, Steve D. and Leffler, Keith B. and Lukens, Joseph T., Anticompetitive Product Changes in the Pharmaceutical Industry, Rutgers Law Journal, Vol. 41, No. 1-2, Fall/Winter 2009 at 52.

[40] European Commission, Final Report, p. 356 (8 July 2009), available at http://www.europa-nu.nl/id/vi6wcj7amsx3/pharmaceutical_sector_inquiry_fianl?start-006-00c=10.

[41] Stephen Perrett, The Modified-Release Drug Delivery Landscape: The Commercial Perspective, in II MODIFIED-RELEASE DRUG DELIVERY TECHNOLOGY 1, 3 (Michael J. Rathbone et al. eds., 2d ed. 2008).

the new Add-On Strengths by discontinuing sales of the Legacy Strengths and by using its army of sales force detailers.

187.    Medicis's CEO Shacknai confirmed that strategy, which included pulling Legacy Strength Solodyn altogether in July 2011, in an August 8, 2011 earnings call, explaining that Medicis's purpose in withdrawing the Legacy Strengths from the market was to "deplete channel inventory of branded and generic versions of the legacy strengths months ahead of the November 26 date upon which five generic companies could launch generic competitors only to these legacy strengths of SOLODYN."  Shacknai continued to describe how the launch of the Add-On Strengths and withdrawal of the Legacy Strengths would "have the effect of reducing the impact significantly of generic launches at the end of November 2011."

188.    By the time generic Solodyn became available in November 2011, the prescription base for those strengths had been significantly impaired by Medicis's scheme.

189.    Medicis's ability to switch the market from the Legacy Strengths to the Add-On Strengths was dependent on the delayed launch of Legacy Strength generics.  But for the anticompetitive conduct that delayed generic entry of generic Legacy Strength products, the switch of the Solodyn prescription base would either have not occurred at all, or been unsuccessful because the availability of Legacy Strength generics would have significantly impinged on Medicis's market shifting efforts.

190.    But for Medicis's unlawful exclusion payment agreements and other anticompetitive conduct, generic Solodyn would have been available long before November 2011, and Medicis would not have launched the Add-On Strengths or, if it had, it would have made far fewer sales of those strengths.

6.    **Medicis's Additional Anticompetitive Conduct to Impair Competition to the Add-On Strengths.**

191.    Having bought time until November 2011 to switch the market to the new dosage strengths, Medicis next took steps to delay and suppress competition to *those* strengths.

192.    As a result of Medicis's market switching efforts, the 65mg and 115mg Add-On Strengths comprised approximately three-quarters of Solodyn sales. Medicis needed to protect these Solodyn sales from generic competitors if it was to retain the bulk of its supracompetitive Solodyn profits.

193.    Knowing that Medicis's '838 Patent was invalid and unenforceable, generic manufacturers—who had not already been bought off—sought FDA approval to market generic versions of the Add-On Strengths. To continue to reap the benefits of its anticompetitive scheme, Medicis needed to delay and impair this new competitive threat.

194.    Medicis filed sham litigation against Teva, the first-filer with respect to the 65mg and 115mg strengths, and then settled with Teva, creating a bottleneck by causing Teva to "park" its 180 day exclusivity. Medicis paid the later-filing generic manufacturer, Lupin, not to unplug the bottleneck that Medicis created by settling with Teva and to create a bottleneck in the 55mg strength for which Lupin had first-to-file exclusivity.

195.    On November 20, 2009, Medicis received a Paragraph IV certification indicating that Teva had filed a supplement to its ANDA No. 65-485, seeking permission to market generic Solodyn in 65mg and 115mg strengths. In its Paragraph IV certification, Teva again stated that the '838 Patent was invalid, unenforceable, and/or would not be infringed by Teva's generic product. Teva could do so because in its first settlement agreement, it only "admitted" that the '838 Patent was valid and enforceable as to its Legacy Strength generic product, not that the patent was generally valid and enforceable.

196.    Teva was the first generic manufacturer to file a substantially complete ANDA with respect to the 65mg and 115mg strengths. As the first filer, Teva was potentially entitled to 180-day exclusivity on the generic 65mg and 115mg strengths, provided it met the other statutory criteria and a forfeiture event did not occur.

197.    On December 28, 2009, Medicis filed another sham suit against Teva in the United States District Court for the District of Maryland, No. 1:09-cv-03464, alleging that Teva infringed one or more claims of Medicis's invalid and/or unenforceable '838 Patent by submitting the ANDA.

198.    On March 5, 2010, Teva answered the complaint, asserting defenses of non-infringement, invalidity, and unenforceability due to inequitable conduct before the USPTO and unclean hands.

199.    On July 9, 2010, Medicis filed an amended complaint, alleging that Teva infringed the '838 Patent as amended pursuant to the June 1, 2010 Ex parte Reexamination Certificate.

200.    On August 9, 2010, Teva answered the amended complaint, asserting defenses of non-infringement, invalidity, and unenforceability due to inequitable conduct before the USPTO and unclean hands.

201.    On September 7, 2010, the USPTO issued the '705 Patent and Medicis had it listed in the Orange Book for Solodyn in 45mg, 65mg, 90mg 115mg, and 135mg strengths. As the patent was listed in the Orange Book after Teva filed its ANDA, it could not result in a 30 month stay as to Teva's ANDA.

202.    On October 18, 2010, Medicis filed a second amended complaint, alleging that Teva infringed one or more claims of the '838 Patent and '705 Patent by its ANDA supplement for 65mg and 115mg generic Solodyn.

203.    On November 28, 2010, Teva answered the second amended complaint, asserting defenses of non-infringement, invalidity, and unenforceability due to inequitable conduct before the USPTO and unclean hands with respect to the '838 Patent and defenses of non-infringement and invalidity with respect to the '705 Patent.

204.    On or about February 25, 2011, Medicis and Teva entered into an agreement settling the litigation (the "Second Teva Settlement Agreement"). At the time of the agreement, neither the parties nor the court had addressed the substantive merits of the suit.

205.    Pursuant to that agreement, Teva agreed to: (a) admit that the '838 Patent and '705 Patent are valid and enforceable as to generic Add-On Strength Solodyn; (b) admit that the '838 Patent and '705 Patent are infringed by Teva's generic Solodyn 65mg and 115mg products and other generic Add-On Strength products; (c) delay entry of generic 65mg and 115mg Solodyn products until February 2018, or earlier under certain circumstances; and (d) delay entry of generic 55mg, 80mg and 105mg Solodyn products until February 2019, or earlier under certain circumstances.

206.    Because Teva was the first filer as to the 65mg and 115mg strengths and was entitled to 180 days of marketing exclusivity on those strengths, the agreement created a bottleneck that impaired later-filing generics' ability to get their 65mg and 115mg products onto the market. Medicis then entered into another exclusion payment agreement to ensure that Lupin, a later filer, would not be able to dislodge the bottleneck.

207.    On May 18, 2012, Teva received final approval for its 65mg and 115mg strength generic Solodyn.  However, pursuant to the terms of the Second Teva Settlement Agreement, Teva is precluded from launching its generic product until February 2018 unless another generic manufacturer invalidates the '838 and '705 Patents.

### 7.    Medicis bribes Lupin to stay off of the market with the Medicis/Lupin Exclusion Payment Agreement.

208.    Ever reluctant to rely on its '838 Patent and very concerned about the strength of its '705 Patent, Medicis once again opted to pay a generic, this time Lupin, to keep its generic Solodyn products off the market, keep the 65mg/115mg bottleneck in place and create a bottleneck on the 55mg strength rather than litigate.  Medicis did so to avoid Lupin successfully invalidating the '838 and '705 Patents and irreparably destroying its fragile Solodyn monopoly.

209.    On July 21, 2011, Medicis and Lupin entered into the Medicis/Lupin Exclusion Payment Agreement pursuant to which Lupin received large, continuing, unjustifiable payments in exchange for agreeing to forestall coming to market with its generic Solodyn products.  The Medicis/Lupin Exclusion Payment Agreement consisted of two related written agreements, a License and Settlement Agreement and a Joint Development Agreement, and amendments thereto.  At the time of the agreement, neither the parties nor the district court had addressed the substantive merits of Medicis's infringement suit.  The agreement allowed Medicis to preserve its monopoly position in exchange for sharing its supracompetitive revenues.

210.    Pursuant to the Medicis/Lupin Exclusion Payment Agreement, Lupin agreed to: (a) delay launching its generic Solodyn products in 45mg, 90mg, and 135mg Legacy Strengths until November 26, 2011, or earlier under certain circumstances; (b) delay launching its generic Solodyn products in 65mg and 115mg strengths until February 2018, or earlier under certain circumstances; and (c) delay launching its generic Solodyn products in 55mg, 80mg, and 105mg

strengths until February 2019, or earlier under certain circumstances.  Lupin also admitted that

the claims of the '838 and '705 Patents and three additional patents and eight patent applications

are valid, enforceable, and infringed by Lupin's proposed generic Solodyn products.

211.    Notwithstanding the foregoing admissions with respect to Medicis's patent rights,

Lupin explicitly retained its right to maintain its Paragraph IV certification—which certification

includes an assertion by Lupin that Medicis's patents are unenforceable.  That created an FDA

approval bottleneck on the 55mg strength of generic Solodyn because Lupin is the first generic

filer on 55mg Solodyn and Lupin maintained its Paragraph IV certification against Medicis.  As

a result, no other generic can come to market with a generic version of 55mg Solodyn until after

Lupin in February 2019.

212.    As the *quid pro quo* for Lupin's agreement to drop its challenge to the '838 and

'705 Patents and delay marketing its generic Solodyn products, Medicis agreed to pay Lupin

well over $20 million dollars.  Medicis's payments to Lupin under the Agreement took a variety

of forms.

213.    First, Medicis provided Lupin with non-refundable and non-creditable upfront

payments totaling $20 million under the guise of a Joint Development Agreement.  Those

upfront payments included ▬▬▬▬ for access to Lupin intellectual property, which did not

include a single issued patent, for the development of formulations containing ▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ and ▬▬▬▬

for access to Lupin's intellectual property, which again, did not include a single issued patent, for

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬  Notably, the parties entered into an Amended Joint Development

Agreement on or about March 30, 2012, whereby the ▬▬▬▬ was swapped for a different

64

product:█████████████████████████████████████
████████████ Medicis was required to make an additional upfront payment to Lupin

of $2.5 million.  The total upfront payments to Lupin amounted to $22.5 million.

214.    The $22.5 million upfront payments received by Lupin were fully non-refundable,

meaning Lupin kept the money even if it did not perform under the Joint Development

Agreement and even if its development efforts completely failed (*see, e.g.*, the upfront payment

for the SPB Product).

215.    The $22.5 million in upfront payments were not the only compensation that Lupin

received for agreeing to settle Medicis's sham lawsuit and delay the launch of generic Solodyn.

The Joint Development Agreement further obligated Medicis to pay Lupin up to $35.5 million in

"non-refundable and non-creditable milestone payment[s]" listed in the agreement.  None of the

milestone payments required Lupin to█████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
█████████████████ To date, Lupin has received at least $6.5 million in non-refundable and

non-creditable milestone payments from Medicis pursuant to the Joint Development Agreement.

216.    All of these benefits had substantial value to Lupin, and are compensation that it

could not have obtained even if it had litigated and won the patent case brought against it.  These

payments caused Lupin to agree to stay out of the market longer than it otherwise would have

done.  Medicis agreed to and did pay Lupin to delay entry into the market.

217.    The large unjustified payments from Medicis to Lupin of $29 million and as much

as $58 million pursuant to the Medicis/Lupin Exclusion Payment Agreement serve no purpose

other than to compensate Lupin for keeping its generic Solodyn product off of the market for

years, allowing the parties to share Medicis's Solodyn monopoly profits.  There are no

procompetitive justifications for those payments which are well in excess of any limited value,

other than the delay of generic Solodyn, provided by Lupin under the agreement.  Furthermore,

the $22.5 million non-refundable upfront fees, up to $35.5 million in non-refundable milestone

payments, far exceed any approximation of the costs to Medicis of continuing to litigate is

infringement case against Lupin.  Additionally, Medicis and Lupin cannot establish that those

large payments were in consideration for the fair value of any services provided by Lupin to

Medicis under the Joint Development Agreement.  Indeed, Lupin was not required to provide

any services in exchange for the non-refundable $22.5 million upfront payments and has

received large unjustified non-refundable milestone payments regardless of Lupin's success in

developing any marketable products and in addition ███████████████████████████████

█████████████████████████  Such amounts far exceed any fair value for the

services performed by Lupin under the Joint Development Agreement.

218.    But for Medicis's unlawful continuing payments to Lupin under the

Medicis/Lupin Exclusion Payment Agreement, Medicis and Lupin would have settled in a

manner less restrictive of competition, resulting in much less delay of Lupin's generic entry.

Under such an agreement, or even without one (such as with a launch by Lupin when it received

final approval from FDA or launch after a court ruling in Lupin's favor), Lupin would have

launched its Add-On Strength Solodyn products substantially earlier than 2018 or 2019 as agreed

to in the Medicis/Lupin Exclusion Payment Agreement.

**8.     Medicis could not have successfully used the patents purportedly covering
Solodyn to delay generic competition.**

219.    In addition to the '838 and '705 Patents (and the '347 and '373 Patents on which

Medicis never sued), Medicis obtained two other patents purportedly covering Solodyn:

- U.S. Patent No. 7,919,483 (the "'483 Patent"), issued on April 5, 2011, that purports to cover methods of using a controlled-release oral dosage form of minocycline to treat acne in all eight of Solodyn's eventual dosages and expires in 2027; and

- U.S. Patent No. 8,268,804 (the "'804 Patent"), issued on September 8, 2012, that purports to cover a method for the treatment of acne and relates to all strengths of Solodyn and expires in 2025.

220.    None of the Later Issued Patents (*i.e.*, the '705, '347, '373, '483 and '804 Patents) would have prevented generic Solodyn products from entering the market before those patents expired.  At the time Medicis filed sham lawsuits with respect to the '838 Patent, and entered the Medicis/Impax Exclusion Payment Agreement, none of the Later Issued Patents had issued.  And the invalid and/or unenforceable '838 Patent alone would not have kept generics from entering the market before its expiration in 2018 for all the reasons discussed above.  In fact, Teva, Sandoz and Mylan all launched without regard for the '838 Patent and while Medicis was pursuing sham lawsuits against them alleging infringement thereof.  Although the '347 and '373 patents had issued by the time of Medicis/Sandoz Exclusion Payment Agreement, and the '705 and '483 patents had also issued by the time of Medicis/Lupin Exclusion Payment Agreement, none of those patents would have prevented earlier generic entry by Generic Defendants or other generics.  But for Medicis's anticompetitive conduct, Medicis would not have prosecuted any of the Later Issued Patents to issuance, because Medicis would have lost its profit motive to do so once generics entered and purchasers switched to the less expensive generics.

221.    But even if the Later Issued Patents actually issued, they would not have prevented generics from entering the market earlier absent Medicis's unlawful conduct.  No automatic 30-month stay of FDA approval applied to any of the Generic Defendants' or other generics' ANDAs that were submitted before the Orange Book listing of any of the Later Issued Patents.  Moreover, each of the Later Issued Patents is weak, and was likely to have been

adjudicated invalid, unenforceable, or not infringed.  In fact, Medicis has never sued any generic

manufacturer for infringement of any of the Later Issued Patents other than the '705 Patent

## VI.   ANTICOMPETITIVE PURPOSE AND EFFECTS OF DEFENDANTS' CONDUCT

222.   Defendants' anticompetitive conduct delayed and substantially impaired

competition from generic Solodyn products in the United States, and unlawfully enabled Medicis

to sell Legacy and Add-On Strength Solodyn at artificially inflated prices and volumes, including

after July 2009 and continuing to this date and beyond.

223.   But for the Medicis/Impax Exclusionary Payment Agreement, Impax would have

begun marketing its generic Legacy Strength products long before November 11, 2011, and

likely by late July or August 2009.  Instead, Impax did not launch its Legacy Strength generic

products until November 2011, when Medicis had already shifted the Solodyn prescription base

to the Add-On Strengths.

224.   Impax's entry would have significantly reduced the prices Plaintiffs and members

of the Class paid for minocycline hydrochloride extended release tablets and would have

drastically reduced Medicis's Solodyn brand sales.

225.   Furthermore, but for Medicis's sham patent litigation and the Medicis/Impax

Exclusion Payment Agreement, Teva would have launched upon receiving final FDA approval

on March 17, 2009, as it did, and would have *remained* on the market because Teva would have

had no reason to execute the Teva Settlement Agreement.  If Impax had not yet launched by

March 2009, when Teva received approval and launched, Impax would have launched then.  The

vast majority of existing prescriptions for the Legacy Strengths would have been swiftly and

permanently converted to generic Solodyn, long before Medicis could switch the market to the

Add-On Strengths.

226.    The entry and sustained availability of two generics in the market would have reduced the prices Plaintiffs and members of the Class paid for minocycline hydrochloride extended release tablets and further reduced Medicis's Solodyn brand sales.

227.    With Impax and Teva on the market, Sandoz would have launched its Legacy Strength generic Solodyn upon receiving final approval on August 13, 2009, as it did, and, without payment, Sandoz too would have stayed on the market, further driving down prices for Solodyn/generic Solodyn and further diminishing any remaining Medicis's brand sales.

228.    By the time Medicis was able to come to market with its 65mg and 115mg Add-On Strength Solodyn products after receiving approval from FDA on July 23, 2009, there would have been two, and shortly thereafter three, Legacy Strength generics on the market.  As explained above, without sufficient time to switch doctors' prescription writing habits from Legacy Strength to Add-On Strength, Medicis's 65mg and 115mg launch would have been largely unsuccessful, if Medicis launched those strengths at all.[42]  Despite the fact that Medicis launched the 65mg and 115mg Solodyn in July 2009, as late as August 2010 the Legacy Strengths still accounted for over 40% of the Solodyn prescriptions and it was not until May 2011 that sales of the Legacy Strengths dipped below 10%.  These percentages reflected a period during which, other than the abbreviated launches by Teva and Sandoz, only brand Legacy Strength Solodyn was on the market.  This explains why Medicis needed to literally buy time to launch the Add-On Strengths.

229.    But for Medicis's anticompetitive conduct that bought it the time necessary to effectuate its switch strategy, Medicis would not have developed or marketed Solodyn in the new Add-On Strengths and switched a substantial portion of sales to those strengths before generic

---

[42] If Medicis were to abandon its efforts to launch the Add-On Strengths, it likely would have launched a Legacy Strength authorized generic soon after Impax and/or Teva launched in 2009 to capture revenue otherwise lost to competing generics, thus further reducing the prices paid by Plaintiffs and the Class.

Legacy Strength Solodyn was available.  Even assuming Medicis nonetheless marketed the Add-On Strengths, generic Solodyn in Legacy Strengths would have entered and remained on the market before the launch of the Add-On Strengths and Medicis would have been able to switch very few prescriptions to the higher priced Add-On Strengths.

230.     Furthermore, but for the Medicis/Impax and Medicis/Sandoz Exclusionary Payment Agreements, Mylan would have launched its generic Legacy Strength product upon receiving final FDA approval on July 20, 2010, as it did, and, without any incentive to enter into the Mylan Settlement Agreement, would have remained on the market, thus further reducing what Plaintiffs and Class members paid for minocycline hydrochloride extended releases tablets and further reducing any remaining Medicis brand sales.  Instead, other than the abbreviated launch, Mylan did not launch its Legacy Strength generic products until November 2011, when Medicis had already shifted much of the Solodyn prescription base to the Add-On Strengths.

231.     By August 7, 2010 when Medicis received approval for the 55mg, 80mg and 150mg Add-On Strengths of Solodyn, there would have been at least four Legacy Strength generics on the market, five including a Medicis Solodyn AG, making any efforts to move the market from the Legacy Strengths to the Add-On Strengths virtually, if not entirely, impossible.

232.     In the event that Medicis were to continue to market Add-On Strength Solodyn, generic versions of the Add-On Strengths, including from Lupin, would have become available after Teva obtained FDA approval on May 18, 2012, and well before the delayed launch dates in 2018 and 2019 established in Medicis's various agreements.  This is because, absent the exclusion payment, Medicis and Lupin would still have settled the case, but with an earlier entry date untarnished by a payment, or Lupin would have continued to pursue litigation to conclusion

## VII.   ANTICOMPETITIVE EFFECTS AND DAMAGES TO THE CLASS

233.   The Medicis/Impax Exclusion Payment Agreement, Medicis/Sandoz Exclusion Payment Agreement and Medicis/Lupin Exclusion Payment Agreement (collectively, the "Exclusion Payment Agreements") and Medicis's sham litigations and the settlements thereof, enabled Medicis to: (a) delay entry of less expensive generic versions of Solodyn in the United States; (b) fix, raise, maintain or stabilize the price of Solodyn in the United States; (c) maintain a monopoly in the United States market for Solodyn and its generic equivalents; and (d) allocate the market for Solodyn—first Legacy Strength, then Add-On Strengths—and its generic equivalents almost exclusively to Medicis.  Defendants' conduct had the effect of delaying generic competition for Legacy Strength Solodyn for well over two years and impairing competition for the Legacy Strengths since actual entry, and continues to delay the entry for generic Add-On Strength Solodyn.

234.   But for the anticompetitive conduct alleged above, generic manufacturers, including the Generic Defendants, would have been able to enter the market with generic Legacy Strength Solodyn unimpeded either by prevailing in a patent litigation and then entering, entering while a patent litigation was pending, or agreeing to an earlier entry date as part of a settlement that did not involve a reverse payment, and compete on the merits against Medicis.

235.   As discussed in detail above, if Medicis had continued to pursue the sham litigations against the generics, Medicis would have lost those litigations because the '838 Patent was invalid, unenforceable and procured through inequitable conduct, allowing all generics to come to market.  The '838 Patent suits filed by Medicis were objectively baseless and Medicis had no realistic expectation of prevailing in them.  Medicis also knew that the '705 Patent was

weak and likely would not have kept generics off the market.[43]  Medicis knew that it could not

use its patents to keep generic Solodyn off the market.

236.    Furthermore, it was well-known within the pharmaceutical industry that generics

were and are willing to introduce generic products while patent litigation was ongoing (*i.e.*,

launch "at risk").  In fact, Teva,[44] Sandoz, and Mylan all did just that here, having launched their

generic Solodyn products with Medicis's sham patent litigations pending.  Similarly, Lupin has a

history of launching at risk, having launched generic Fortamet at-risk on September 30, 2011.[45]

237.    But for the substantial payments Medicis made to Impax and later to Sandoz in

exchange for their agreements to delay marketing Legacy Strength generic Solodyn products,

Medicis and one or more of the generics would have agreed to a licensed entry date significantly

earlier than November 2011 for generic Solodyn in the Legacy Strengths (and, to the extent

Medicis would have even marketed the Add-On Strengths, significantly earlier than February

2018 for generic versions of the 65mg and 115mg strengths and February 2019 for the 55mg,

80mg, and 105mg strengths).  That Medicis did not need to resort to illegal payments to the

Generic Defendants in order to resolve the patent litigations is confirmed by empirical studies.

According to the FTC, "the vast majority of patent settlements (greater than 70%)" are resolved

"without compensation to the generic manufacturer."[46]  FTC analyses also show that in 2004 and

---

[43] In Hatch-Waxman patent litigation, generic firms have prevailed, by obtaining a judgment of invalidity or non-infringement or by the patent holder's voluntary dismissal, in cases involving 73% of the drug products studied. Federal Trade Commission, Generic Drug Entry Prior to Patent Expiration, at 20 (July 2002), available at ww.ftc.gov/os/2002/07/genericdrugstudy.pdf.

[44] Teva, has launched at-risk over twenty times, including a September 2005 launch of a generic version of Allegra prior to resolution of the patent litigation.  See Press Release, "Teva and Barr Announce Launch of Generic Allegra Tablets By Teva Under Agreement With Barr," available at http://www.tevapharm.com/pr/2005/pr_544.asp.

[45] *See* Shionogi & Co., Ltd. and Shionogi Inc. Announce a Favorable Decision In FORTAMET® Preliminary Injunction Proceedings, Business Wire, Dec. 7, 2011, available at http://www.businesswire.com/news/home/20111207005999/en/Shionogi-Ltd.-Shionogi-Announce-Favorable-Decision-FORTAMET%C2%AE.

[46] FTC Bureau of Competition, Overview of Agreements Filed in FY 2012, at 2 (Jan. 17, 2013), available at http://www.ftc.gov/os/2013/01/130117mmareport.pdf.

2005, twenty-seven out of thirty, or 90% of agreements between brand and generic manufactures

settling patent disputes contained no anticompetitive payment from the brand to the generic

manufacturer.[47]  Many of those twenty-seven agreements allowed for sustained entry of a

generic drug well before the date of patent expiration.  Those agreements took various forms, but

many agreements resulted in either: (a) split patent life whereby the generic would enter the

market before the expiry of the challenged patent; or (b) unrestricted generic entry immediately

upon or very soon after the settlement, sometimes accompanied by a royalty payment from the

generic manufacturer to the brand manufacturer.  Here, Medicis could and likely would have

entered into agreements with the Generic Defendants and other generic manufacturers containing

such provisions, but without large reverse payments, but for the Exclusion Payment Agreements

and other conduct alleged herein.

238.    But for the anticompetitive conduct alleged above, Medicis's efforts to switch the

market from Legacy Strength to Add-On Strength Solodyn either would not have occurred at all,

or would not have significantly affected the generics'—particularly, Impax, Teva and Sandoz—

ability to make sales of generic Legacy Strength Solodyn.  Absent the delay paid for and

obtained by Medicis, those generics would have launched well before Medicis launched and/or

established a market for Add-On Strength Solodyn, and the vast bulk (on the order of 90%) of

the sales of Solodyn would have switched to the generics before the launch or establishment of a

market base for Add-On Strength Solodyn, assuming it would have still launched at all.

---

[47] *See* FTC, Agreements Filed with the Federal Trade Commission Under the Medicare Prescription Drug,
Improvement, and Modernization Act of 2003: Summary of Agreements Filed in FY 2005: A Report by the Bureau
of Competition (2006), available at http://www.ftc.gov/os/2006/04/fy2005drugsettlementsrpt.pdf; FTC, Agreements
Filed with the Federal Trade Commission Under the Medicare Prescription Drug, Improvement, and Modernization
Act of 2003: Summary of Agreements Filed in FY 2004: A Report by the Bureau of Competition (2005), available
at http://www.ftc.gov/os/2005/01/050107medicareactrpt.pdf.

239.    Defendants' anticompetitive conduct had the purpose and effect of restraining competition unreasonably and injuring competition by protecting Solodyn from generic competition.

240.    Impax, Teva, Sandoz, Mylan, and Lupin have extensive experience in the pharmaceutical industry, including in obtaining approval for ANDAs and marketing generic pharmaceutical products, and manufacturing commercial launch quantities adequate to meet market demand.

241.    Defendants' anticompetitive conduct, which delayed introduction and sustained marketing into the United States marketplace of generic versions of Solodyn, has caused Plaintiffs and the Class to pay more than they would have paid for Legacy Strength and Add-On Strength minocycline hydrochloride extended release tablets absent Defendants' illegal conduct.

242.    Typically, generic drugs are initially priced significantly below the corresponding brand drug to which they are AB-rated.  As a result, upon generic entry, nearly all brand drug purchases are rapidly substituted for generic equivalents of the drug.  As more generic manufacturers enter the market, prices for generic versions of a drug predictably plunge even further due to competition among the generic manufacturers, and, correspondingly, the brand drug loses even more of its brand sales to the generic versions of the drug.

243.    This price competition enables all purchasers of the drug to: (a) purchase generic versions of a drug at substantially lower prices; (b) purchase generic equivalents of the drug at a lower price, sooner; and/or (c) purchase the brand drug at a reduced price.  Consequently, brand manufacturers have a keen financial interest in delaying and impairing generic competition, and purchasers experience substantial cost inflation from that delay and impairment.

244.    But for Defendants' anticompetitive conduct, Plaintiffs and members of the Class would have paid less for minocycline hydrochloride extended release tablets by: (a) substituting purchases of less-expensive AB-rated generic Solodyn for their purchases of more-expensive brand Solodyn; (b) receiving discounts on their remaining brand Solodyn purchases; and (c) purchasing generic Solodyn at lower prices sooner.

## VIII.   ANTITRUST IMPACT

245.    During the relevant period, Plaintiffs and members of the Class purchased substantial amounts of brand Solodyn directly from Medicis and/or purchased substantial amounts of AB-rated Solodyn bioequivalent generic directly from the Generic Defendants or other generic manufactures.  As a result of Defendants' illegal conduct, members of the Class were compelled to pay, and did pay, artificially inflated prices for their minocycline hydrochloride extended release tablets requirements.  Those prices were substantially greater than those that members of the Class would have paid absent the illegal conduct alleged herein, because:  (a) the price of brand Solodyn was artificially inflated by Defendants' illegal conduct; (b) Class members were deprived of the opportunity to purchase lower-priced generic versions of Solodyn; and/or (c) the price of AB-rated Solodyn generic was artificially inflated by Defendants' illegal conduct.

246.    As a consequence, Plaintiffs and members of the Class have sustained substantial losses and damage to their business and property in the form of overcharges incurred after July 2009 and continuing through this date.  Plaintiffs and members of the Class will continue to pay artificially inflated prices for minocycline hydrochloride extended release tablets until some future date when the anticompetitive effects of Defendants' conduct cease.  The full amount and forms and components of such damages will be calculated after discovery and upon proof at trial.

## IX.    EFFECT ON INTERSTATE COMMERCE

247.    At all material times, Medicis manufactured, promoted, distributed, and sold substantial amounts of Solodyn in a continuous and uninterrupted flow of commerce across state and national lines and throughout the United States.

248.    At all material times, Defendants transmitted funds, as well as contracts, invoices and other forms of business communications and transactions, in a continuous and uninterrupted flow of commerce across state and national lines in connection with the sale of Solodyn and/or its AB-rated bioequivalents.

249.    In furtherance of their efforts to monopolize and restrain competition in the market for Solodyn and its generic equivalents, Defendants employed the United States mails and interstate and international telephone lines, as well as means of interstate and international travel.  Defendants' activities were within the flow of and have substantially affected interstate commerce.

## X.    MARKET POWER AND RELEVANT MARKET

250.    At all relevant times, Medicis had substantial market power (*i.e.*, monopoly power) with respect to minocycline hydrochloride extended release tablets, including Solodyn and its AB-rated generic equivalents, because it had the power to maintain the price of the drug it sold as Solodyn at supracompetitive levels without losing so many sales as to make the supracompetitive price unprofitable.  This market power may be shown directly, and therefore no relevant market needs to be defined.

251.    A small but significant, non-transitory price increase above the competitive level for Solodyn by Medicis would not have caused a loss of sales sufficient to make the price increase unprofitable.

252.    Solodyn does not exhibit significant, positive cross-elasticity of demand with respect to price with any product other than AB-rated generic versions of Solodyn.

253.    The existence of other medications for the treatment of non-nodular moderate to severe acne did not constrain Medicis's ability to raise or maintain Solodyn prices without losing substantial sales, and therefore those other drug products are not in the same relevant antitrust market with Solodyn.   Therapeutic alternatives are not the same as economic alternatives.

254.    Medicis needed to control only Solodyn and its AB-rated generic equivalents, and no other products, in order to maintain the price of Solodyn profitably at substantially supracompetitive prices.   Only the market entry of a competing, AB-rated generic version of Solodyn would render Medicis unable to profitably maintain substantially supracompetitive prices for Solodyn.

255.    Medicis knew that entry of a generic version of Solodyn would be a uniquely significant market event.   The entry of other products indicated to treat non-nodular severe to moderate acne (or generic versions of those other brands) did not take substantial sales from Solodyn or cause Medicis to lower its price.   By contrast, the competitive impact of an AB-rated generic version of Solodyn on brand Solodyn would be substantial, causing brand Solodyn to immediately lose well more than half of its unit sales.   The entry of an AB-rated generic Solodyn would deliver hundreds of millions of dollars of savings to purchasers.

256.    At all relevant times, Medicis has sold Solodyn at prices well in excess of marginal costs, and in excess of the competitive price, and enjoyed high profit margins.

257.    Medicis had, and exercised, the power to exclude and restrict competition to Solodyn and its AB-rated bioequivalents.

258.    Medicis, at all relevant times, enjoyed high barriers to entry with respect to competition in the relevant product market due to patent and other regulatory protections and high costs of entry and expansion.

259.    To the extent that Plaintiffs are legally required to prove substantial market power circumstantially by first defining a relevant product market, Plaintiffs alleges that the relevant product market is minocycline hydrochloride extended release tablets or narrower markets contained therein.  During the relevant time, Medicis has been able to profitably maintain the price of minocycline hydrochloride extended release tablets substantially above competitive levels.

260.    The relevant geographic market is the United States and its territories.

261.    At all relevant times, until the entry of AB-rated generic competition, Medicis's market share in the relevant market was at or near 100%, implying a substantial amount of market power.

# XI.    CLASS ACTION ALLEGATIONS

262.    Plaintiffs bring this action on behalf of themselves and, under Fed. R. Civ. P.

23(a) and (b)(3), as representative of a Class defined as follows:

> All persons or entities in the United States and its territories,
> including Puerto Rico, who purchased Solodyn 45mg, 55mg,
> 65mg, 80 mg, 90mg, 105mg, 115mg, and/or 135mg tablets directly
> from Medicis and/or generic versions of one of more of these
> dosages from any Generic Defendant or other generic
> manufacturer at any time from July 23, 2009 until the
> anticompetitive effects of Defendants' conduct cease (the "Class").

Excluded from the Class are Defendants, and their officers, directors, management, employees,

subsidiaries, or affiliates, and all federal governmental entities.

263.    Members of the Class are so numerous and geographically dispersed that joinder

is impracticable.  Further, the Class is readily identifiable from information and records in the

possession of Defendants.

264.    Plaintiffs' claims are typical of the claims of the members of the Class.  Plaintiffs

and all members of the Class were damaged by the same wrongful conduct of Defendants, *i.e.*,

they paid artificially inflated prices for minocycline hydrochloride extended release tablets and

were deprived of the benefits of earlier and *more* robust competition from cheaper generic

versions of minocycline hydrochloride extended release tablets as a result of Defendants'

wrongful conduct.

265.    Plaintiffs will fairly and adequately protect and represent the interests of the

Class.  The interests of the Plaintiffs are coincident with, and not antagonistic to, those of the

Class.

266.    Plaintiffs are represented by counsel with experience in the prosecution of class

action antitrust litigation, and with particular experience with class action antitrust litigation

involving pharmaceutical products.

267.   Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class members because Defendants have acted on grounds generally applicable to the entire Class, thereby making overcharge damages with respect to the Class as a whole appropriate.

268.   Questions of law and fact common to the Class include, but are not limited to:

a.   whether Medicis conspired with each or any of the Generic Defendants to willfully maintain and/or enhance Medicis's monopoly power over Solodyn and its generic equivalents;

b.   whether Medicis improperly listed the '838 Patent in FDA's Orange Book;

c.   whether Medicis engaged in baseless sham patent litigation against one or more of the Generic Defendants or other actual or would-be generic manufacturers;

d.   Whether Medicis unlawfully excluded competitors and potential competitors from the market for Solodyn and its generic equivalents;

e.   whether Medicis conspired with each or any of the Generic Defendants to suppress generic competition to Solodyn;

f.   whether Medicis entered into an unlawful agreement in restraint of trade with each or any of the Generic Defendants;

g.   whether, pursuant to the Exclusion Payment Agreements, each or any of the Generic Defendants agreed to delay its entry into the market with generic Solodyn;

h.   whether, pursuant to the Exclusion Payment Agreements, Medicis compensated each or any of the Generic Defendants;

i.   whether Medicis's compensation to each or any of the Generic Defendants was for any purpose other than delayed entry of generic Solodyn;

j.   whether Medicis's compensation to each or any of the Generic Defendants was necessary to yield some procompetitive benefit that is cognizable and non-pretextual;

k.   whether one or more of the Exclusion Payment Agreements is illegal;

l.   whether Medicis possessed substantial market power over Solodyn and its AB-rated generic equivalents;

m. whether the law requires definition of a relevant market when direct proof of monopoly power is available and, if so, the definition of the relevant market;

n. whether Medicis maintained monopoly power over Solodyn by unlawfully suppressing generic competition to Solodyn;

o. whether the activities of Defendants as alleged herein have substantially affected interstate commerce;

p. whether, and to what extent, Defendants' conduct caused antitrust injury (*i.e.*, overcharges) to Plaintiffs and the members of the Class; and

q. the quantum of aggregate overcharge damages to the Class.

269.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy.  Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

270.    Plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its proceeding as a class action.

## XII.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### For Monopolization Under Sherman Act - Section 2
### (against Medicis)

271.    Plaintiffs hereby repeat and incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

272.    At all relevant times, Medicis possessed substantial market power (*i.e.*, monopoly power) in the relevant market.  Medicis possessed the power to control prices in, prevent prices from falling in, and exclude competitors from the relevant market.

81

273.   As alleged above, Medicis knowingly and willfully engaged in anticompetitive conduct designed to unlawfully extend and maintain its monopoly power.

274.   Through the anticompetitive conduct alleged extensively herein, Medicis willfully maintained its monopoly power through restrictive or exclusionary conduct, rather than by means of greater business acumen, in order to exclude competition for Solodyn and injured Plaintiffs and the Class thereby.

275.   The goal, purpose, and effect of Medicis's anticompetitive conduct was to delay and impair the sale of generic Solodyn products in the United States at prices significantly below Medicis's prices for Solodyn, thereby effectively preventing the average market price of extended-release minocycline hydrochloride products from declining dramatically.

276.   By engaging in the foregoing conduct, Medicis has intentionally and wrongfully maintained monopoly power in the relevant market in violation of Section 2 of the Sherman Act.

277.   But for Medicis's unlawful conduct, the Generic Defendants and other generic manufacturers would have launched generic Solodyn earlier than they finally did: (a) "at-risk" (that is, while the patent litigation was still pending); or (b) after winning the patent suit; or (c) via a lawful settlement agreement without a large reverse payment from Medicis.

278.   Plaintiffs and members of the Class have been injured in their business or property by reason of Medicis's antitrust violations alleged herein.  Their injuries consist of: (a) being denied the opportunity to purchase lower-priced generic extended-release minocycline hydrochloride products; and (b) paying higher, supracompetitive prices for extended-release minocycline hydrochloride products than they would have paid in the absence of Medicis's conduct from July 2009 and continuing to the present.  These injuries are of the type the

Sherman Act was designed to prevent, and flow from that which makes Medicis's conduct unlawful.

## SECOND CLAIM FOR RELIEF
### For Attempted Monopolization Under Sherman Act - Section 2
### (against Medicis)

279.    Plaintiffs hereby repeat and incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

280.    At all relevant times, Medicis possessed substantial market power (*i.e.*, monopoly power) or possessed a dangerous probability of achieving monopoly power.

281.    With the specific intent to achieve a monopoly, Medicis attempted to acquire and/or willfully maintain monopoly power by means of restrictive or exclusionary conduct, rather than by means of greater business acumen, in order to exclude competition for Solodyn.

282.    The goal, purpose, and effect of Medicis's conduct was to delay and impair the sale of generic Solodyn products in the United States at prices significantly below Medicis's prices for Solodyn, thereby effectively preventing the average market price for Solodyn and its generic equivalent products from declining dramatically.

283.    By engaging in the foregoing conduct, Medicis has intentionally and wrongfully attempted to monopolize the relevant market in violation of the Sherman Act.

284.    But for Medicis's unlawful conduct, the Generic Defendants and other generic manufacturers would have launched generic Solodyn earlier than they finally did: (a) "at-risk" (that is, while the patent litigation was still pending); or (b) after winning the patent suit; or (c) via a lawful settlement agreement without a large reverse payment from Medicis.

285.    Plaintiffs and members of the Class have been injured in their business or property by reason of Medicis's antitrust violations alleged herein.  Their injuries consist of: (a)

being denied the opportunity to purchase lower-priced generic extended-release minocycline

hydrochloride products; and (b) paying higher, supracompetitive prices for extended-release

minocycline hydrochloride products than they would have paid in the absence of Medicis's

conduct from July 2009 and continuing to the present.  These injuries are of the type the

Sherman Act was designed to prevent, and flow from that which makes Medicis's conduct

unlawful.

### THIRD CLAIM FOR RELIEF
**For Conspiracy and Combination in Restraint of Trade Under Sherman Act - Section 1**
**(against Medicis and Impax)**

286.    Plaintiffs hereby repeat and incorporate by reference each preceding and

succeeding paragraph as though fully set forth herein.

287.    In or about November 2008 and at times before the formal execution thereof,

Medicis and Impax entered into the Medicis/Impax Exclusion Payment Agreement, a continuing

illegal contract, combination, and conspiracy in restraint of trade under which Medicis agreed to

make substantial payments to Impax in exchange for its agreement to delay bringing its generic

version of Solodyn to the market, the purpose and effect of which was to: (a) allocate to Medicis

100% or nearly 100% of the market for Solodyn and its generic equivalents in the United States;

(b) delay or impair the sale of generic versions of Solodyn in the United States, thereby

protecting Medicis from unrestrained generic competition; and (c) fix the price at which

Plaintiffs and the Class would pay for Solodyn and its generic equivalents at supracompetitive

levels.

288.    The purpose and effect of the payments flowing from Medicis to Impax under

their agreement was to delay and impair generic competition to Solodyn, and there is no

legitimate, nonpretextual, procompetitive business justification for the payments that outweighs their harmful effects.

289.    The Medicis/Impax Exclusion Payment Agreement covered a sufficiently substantial percentage of the relevant market to harm competition.

290.    As a direct and proximate result of Medicis's and Impax's unlawful restraint of trade and unlawful maintenance of and conspiracy to maintain Medicis's monopoly power, Plaintiffs and members of the Class paid artificially inflated prices for Solodyn and its generic equivalents as described herein, and were harmed as a result.

291.    By engaging in the foregoing conduct, Medicis and Impax have intentionally and wrongfully engaged in one or more combinations and conspiracies in restraint of trade in violation of the Sherman Act.

292.    But for Medicis's and Impax's unlawful conduct, the Generic Defendants and other generic manufacturers would have launched generic Solodyn earlier than they finally did: (a) "at-risk" (that is, while the patent litigation was still pending); or (b) after winning the patent suit; or (c) via a lawful settlement agreement without a large reverse payment from Medicis.

293.    Plaintiffs and members of the Class have been injured in their business or property by reason of Medicis's and Impax's antitrust violations alleged herein.  Their injuries consist of: (a) being denied the opportunity to purchase lower-priced generic extended-release minocycline hydrochloride products; and (b) paying higher, supracompetitive prices for extended-release minocycline hydrochloride products than they would have paid in the absence of Medicis's and Impax's conduct from July 2009 and continuing to the present.  These injuries are of the type the Sherman Act was designed to prevent, and flow from that which makes Medicis's and Impax's conduct unlawful.

## FOURTH CLAIM FOR RELIEF
### For Conspiracy and Combination in Restraint of Trade Under Sherman Act - Section 1
### (against Medicis and Sandoz)

294.    Plaintiffs hereby repeat and incorporate by reference each preceding and
succeeding paragraph as though fully set forth herein.

295.    In or about August 2009 and at times before the formal execution thereof, Medicis
and Sandoz entered into the Medicis/Sandoz Exclusion Payment Agreement, a continuing illegal
contract, combination, and conspiracy in restraint of trade under which Medicis agreed to make
substantial payments to Sandoz in exchange for its agreement to delay bringing its generic
version of Solodyn to the market, the purpose and effect of which was to: (a) allocate to Medicis
100% or nearly 100% of the market for Solodyn and its generic equivalents in the United States;
(b) delay or impair the sale of generic versions of Solodyn in the United States, thereby
protecting Medicis from unrestrained generic competition; and (c) fix the price at which
Plaintiffs and the Class would pay for Solodyn and its generic equivalents at supracompetitive
levels.

296.    The purpose and effect of the payments flowing from Medicis to Sandoz under
their agreement was to delay and impair generic competition to Solodyn, and there is no
legitimate, nonpretextual, procompetitive business justification for the payments that outweighs
their harmful effects.

297.    The Medicis/Sandoz Exclusion Payment Agreement covered a sufficiently
substantial percentage of the relevant market to harm competition.

298.    As a direct and proximate result of Medicis's and Sandoz's unlawful restraint of
trade and unlawful maintenance of and conspiracy to maintain Medicis's monopoly power,

Plaintiffs and members of the Class paid artificially inflated prices for Solodyn and its generic

equivalents as described herein, and were harmed as a result.

299.    By engaging in the foregoing conduct, Medicis and Sandoz have intentionally and

wrongfully engaged in one or more combinations and conspiracies in restraint of trade in

violation of the Sherman Act.

300.    But for Medicis's and Sandoz's conduct, the Generic Defendants and other

generic manufacturers would have launched generic Solodyn earlier than they finally did: (a) "at-

risk" (that is, while the patent litigation was still pending); or (b) after winning the patent suit; or

(c) via a lawful settlement agreement without a large reverse payment from Medicis.

301.    Plaintiffs and members of the Class have been injured in their business or

property by reason of Defendants' antitrust violations alleged herein.  Their injuries consist of:

(a) being denied the opportunity to purchase lower-priced generic extended-release minocycline

hydrochloride products; and (b) paying higher, supracompetitive prices for extended-release

minocycline hydrochloride products than they would have paid in the absence of Medicis's and

Sandoz's conduct from July 2009 and continuing to the present.  These injuries are of the type

the Sherman Act was designed to prevent, and flow from that which makes Medicis's and

Sandoz's conduct unlawful.

**FIFTH CLAIM FOR RELIEF**
**For Conspiracy and Combination in Restraint of Trade Under Sherman Act - Section 1**
**(against Medicis and Lupin)**

302.    Plaintiffs hereby repeat and incorporate by reference each preceding and

succeeding paragraph as though fully set forth herein.

303.    In or about July 2011 and at times before the formal execution thereof, Medicis

and Lupin entered into the Medicis/Lupin Exclusion Payment Agreement, a continuing illegal

87

contract, combination, and conspiracy in restraint of trade under which Medicis agreed to make substantial payments to Lupin in exchange for its agreement to delay bringing its generic version of Solodyn to the market, the purpose and effect of which was to: (a) allocate to Medicis 100% or nearly 100% of the market for Solodyn and its generic equivalents in the United States; (b) delay or impair the sale of generic versions of Solodyn in the United States, thereby protecting Medicis from unrestrained generic competition; and (c) fix the price at which Plaintiffs and the Class would pay for Solodyn and its generic equivalents at supracompetitive levels.

304.   The purpose and effect of the payments flowing from Medicis to Lupin under their agreement was to delay and impair generic competition to Solodyn, and there is no legitimate, nonpretextual, procompetitive business justification for the payments that outweighs their harmful effects.

305.   The Medicis/Lupin Exclusion Payment Agreement covered a sufficiently substantial percentage of the relevant market to harm competition.

306.   As a direct and proximate result of Medicis's and Lupin's unlawful restraint of trade and unlawful maintenance of and conspiracy to maintain Medicis's monopoly power, Plaintiffs and members of the Class paid artificially inflated prices for Solodyn and its generic equivalents as described herein, and were harmed as a result.

307.   By engaging in the foregoing conduct, Medicis and Lupin have intentionally and wrongfully engaged in one or more combinations and conspiracies in restraint of trade in violation of the Sherman Act.

308.   But for Medicis's and Lupin's unlawful conduct, the Generic Defendants and other generic manufacturers would have launched generic Solodyn earlier than they finally did:

(a) "at-risk" (that is, while the patent litigation was still pending); or (b) after winning the patent suit; or (c) via a lawful settlement agreement without a large reverse payment from Medicis.

309.    Plaintiffs and members of the Class have been injured in their business or property by reason of Medicis's and Lupin's antitrust violations alleged herein. Their injuries consist of: (a) being denied the opportunity to purchase lower-priced generic extended-release minocycline hydrochloride products; and (b) paying higher, supracompetitive prices for extended-release minocycline hydrochloride products than they would have paid in the absence of Medicis's and Lupin's conduct from July 2009 and continuing to the present.  These injuries are of the type the Sherman Act was designed to prevent, and flow from that which makes Medicis's and Lupin's conduct unlawful.

## DEMAND FOR JUDGMENT

WHEREFORE, Plaintiffs, on behalf of themselves and the Class of direct purchasers, respectfully pray the Court for a judgment that:

A.    Adjudges and decrees that the conduct alleged herein are unlawful restraints of trade in violation of Section 1 of the Sherman Act and willful acts of monopolization and attempted monopolization in violation of Section 2 of the Sherman Act;

B.    Determines that this action may be maintained as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3), and direct that reasonable notice of this action, as provided by Fed. R. Civ. P. 23(c)(2), be given to members of the Class and declare Plaintiffs to be representatives of the Class;

C.    Grants each member of the Class three-fold the damages determined to have been sustained by each of them;

D.      Enters joint and several judgments against the Defendants in favor of Plaintiffs and the Class;

E.      Awards Plaintiffs and the Class their costs of suit, including reasonable attorneys' fees as provided by law; and

F.      Grants such other, further and different relief as the nature of the case may require or as may be determined to be just, equitable, and proper by this Court.

# JURY DEMAND

Pursuant to Fed. Civ. P. 38, Plaintiffs, on behalf of themselves and the proposed Class,

demand a trial by jury on all issues so triable.

Dated:  September 12, 2014

Respectfully Submitted,

**/s/ Thomas M. Sobol**
Thomas M. Sobol
Lauren Guth Barnes
Jessica MacAuley
Hagens Berman Sobol Shapiro LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142
Tel: (617) 482-3700
Fax: (617) 482-3003 (fax)
tom@hbsslaw.com
lauren@hbsslaw.com
jessicam@hbsslaw.com

*Interim Liaison and Co-Lead Counsel for*
*Proposed Direct Purchaser Class*

David F. Sorensen
Andrew C. Curley
Caitlin G. Coslett
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, PA 19103
Tel: (215) 875-3000
Fax: (215) 875-4604 (fax)
dsorensen@bm.net
acurley@bm.net
ccoslett@bm.net

*Interim Co-Lead Counsel for Proposed*
*Direct Purchaser Class*

Peter Kohn
Joseph Lukens
Faruqi & Faruqi, LLP
101 Greenwood Avenue – Suite 600
Jenkintown, PA 19046
Tel: (215) 277-5770

91

Fax: (215) 277-5771
pkohn@faruqilaw.com
jlukens@faruqilaw.com

Barry Taus
Archana Tamoshunas
Taus, Cebulash & Landau, LLP
80 Maiden Lane, Suite 1204
New York, NY 10038
Tel: (212) 931-0704
btaus@tcllaw.com
atamoshunas@tcllaw.com

*Counsel for Plaintiff Rochester Drug Co-operative, Inc.*

## CERTIFICATE OF SERVICE

I, Thomas M. Sobol, hereby certify that I caused a copy of the foregoing to be filed electronically via the Court's electronic filing system and electronic mail. Those attorneys who are registered with the Court's electronic filing system may access these filings through the Court's system, and notice of these filings will be sent to these parties by operation of the Court's electronic filing system.

Dated: September 12, 2014            **/s/ Thomas M. Sobol**
                                      Thomas M. Sobol, BBO # 471770