## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
              )
              )
              )
**IN RE SOLODYN (MINOCYCLINE**    )
**HYDROCHLORIDE) ANTITRUST**    )
**LITIGATION**           )    **Civil Action No. 14-md-02503**
              )
              )
_____)

### MEMORANDUM AND ORDER

**CASPER, J.**                      **October 16, 2017**

## I.  Introduction

This is a putative class action in which the Direct Purchaser Plaintiffs ("DPPs" or "direct purchasers") allege that Defendants Medicis Pharmaceutical Corporation ("Medicis"), Impax Laboratories, Inc. ("Impax"), Sandoz Inc. ("Sandoz") and Lupin Limited and Lupin Pharmaceuticals, Inc. (collectively, "Lupin") (collectively, "Defendants"), violated Section 1 of the Sherman Act, 15 U.S.C. § 1. D. 91. Additionally, putative class representatives of End-Payor Plaintiffs ("EPPs" or "end-payors") allege that Defendants have violated various state laws. D. 92. EPPs have moved for class certification, D. 569, and DPPs have also moved for class certification, D. 574. For the reasons set forth below, the Court ALLOWS DPPs' motion for class certification under Fed. R. Civ. P. 23(b)(3) and ALLOWS EPPs' motion for class certification under Fed. R. Civ. P. 23(b)(3), but DENIES EPPs' motion for certification under Fed. R. Civ. P. 23(b)(2).

## II.  Factual Background

Solodyn is a drug—a minocycline hydrochloride extended release tablet—that treats inflammatory lesions resulting from acne in patients age twelve and older, and is manufactured, marketed and sold by Medicis. See, e.g., D. 570 at 11; D. 575 at 10; D. 576-1 ¶ 6; D. 577 ¶ 7;

D. 611 at 6. Medicis received a patent on the brand Solodyn from the FDA in 1999, and in 2006, the FDA approved Medicis's New Drug Application ("NDA") for three dosages of Solodyn: 45mg, 90mg and 135mg ("Legacy Strengths"). D. 570 at 11; D. 576-2 ¶ 14; D. 611 at 6. In October 2007, Impax submitted an Abbreviated New Drug Application ("ANDA") to the FDA, seeking to market generic versions of Legacy Strength Solodyn. D. 570 at 11. On November 26, 2008, Medicis and Impax entered into two agreements, by which Impax agreed to abandon its challenge to Medicis's patent, and Medicis paid Impax approximately $40 million. D. 570 at 12; D. 575 at 11. On February 3, 2009, Impax received FDA approval on its ANDA. D. 570 at 12; D. 575 at 13. Impax did not begin selling generic Solodyn until November 2011. D. 570 at 13; D. 575 at 13.

In the interim, Teva, Sandoz and Mylan launched generic Solodyn "at risk"—without having received FDA approval—for brief periods. D. 570 at 12; D. 575 at 13; D. 598 at 7; D. 611 at 7. "[W]ithin days" of launching, each generic manufacturer entered into an agreement with Medicis and stopped selling generic Solodyn. D. 575 at 13; see D. 570 at 12; D. 598 at 7; D. 611 at 7. The generic manufacturers then re-launched sales of generic Legacy Strength Solodyn in November 2011. D. 570 at 13; D. 575 at 14.

Between March 2009, when Teva launched its generic Solodyn at-risk, and November 2011, Medicis also launched a series of promotion programs including co-pay card and coupon programs, in which patients participated "at high rates." D. 598 at 8. In 2009 and 2010, Medicis launched sales of additional dosages of Solodyn: 55mg, 65mg, 80mg, 105mg and 115mg ("Add-On Strengths"). D. 575 at 16. Medicis ceased sale of Legacy Strengths in July 2011. Id. According to their respective agreements with Medicis, generic manufacturers will delay launch of generic Add-On Strength Solodyn until at least February 2018. D. 570 at 12.

## III.    Procedural History

In July 2013, DPPs, direct purchasers of Solodyn, brought the first antitrust suit against Defendants in the United States District Court for the Eastern District of Pennsylvania.  Rochester Drug Co-Operative, Inc. v. Medicis Pharm. Corp., No. 2:13-cv-04270-JCJ (E.D. Pa. July 23, 2013).   Shortly thereafter, various EPPs, consumers and third-party payors who indirectly purchased, paid for or provided reimbursement for Solodyn other than for resale, filed suit.  See D. 2.  On February 25, 2014, the Judicial Panel on Multidistrict Litigation ordered all Solodyn antitrust actions centralized and transferred those and two subsequent actions to this Court.  D. 2; D. 153; D. 156.  The DPPs and EPPs filed their respective consolidated amended complaints on September 15, 2014.  D. 91; D. 92.  On August 14, 2015, this Court allowed in part and denied in part Defendants' motion to dismiss, D. 110.  D. 184; D. 203.  EPPs have now filed a motion for class certification.  D. 569.  DPPs have also filed a motion for class certification.  D. 574.  The Court heard the parties on the pending motions and took the matters under advisement.  D. 645.

## IV.    Discussion

### A.    Burden of Proof and Standard of Review

A class action may be certified only if "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed R. Civ. P. 23(a); In re New Motor Vehicles Canadian Export Antitrust Litig., 522 F.3d 6, 18 (1st Cir. 2008).  Where, as here, both putative classes have moved to certify the class under Fed. R. Civ. P. 23(b)(3), the Court must also determine whether "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the

3

controversy." Fed R. Civ. P. 23(b)(3); <u>New Motor Vehicles</u>, 522 F.3d at 18-19. "[T]he district court must undertake a 'rigorous analysis' to determine whether plaintiffs me[e]t the four threshold requirements of Rule 23(a) (numerosity, commonality, typicality, and adequacy of representation) and Rule 23(b)(3)'s two additional prerequisites." <u>In re Nexium Antitrust Litig.</u>, 777 F.3d 9, 17 (1st Cir. 2015) ("<u>Nexium III</u>")[1] (quoting <u>Comcast Corp. v. Behrand</u>, 569 U.S. 27, 33 (2013)).

EPPs also move for class certification under Rule 23(b)(2). D. 570 at 28. To certify the class under Rule 23(b)(2), the Court must determine whether defendants have "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2); <u>see</u> <u>New Motor Vehicles</u>, 522 F.3d at 12 n.8. This form of class certification "ordinarily is used when broad, class-wide injunctive or declaratory relief is appropriate." <u>McKenna v. First Horizon Home Loan Corp.</u>, 475 F.3d 418, 427 (1st Cir. 2007). It "does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages." Fed. R. Civ. P. 23(b)(2) advisory committee's note to 1966 amendment; <u>see</u> <u>DeRosa v. Mass. Bay Commuter Rail Co.</u>, 694 F. Supp. 2d 87, 95 (D. Mass. 2010).

The plaintiffs bear the burden of showing that all the prerequisites for a class action have been met. <u>Makuc v. Am. Honda Motor Co., Inc.</u>, 835 F.2d 389, 394 (1st Cir. 1987). Plaintiffs "need not make that showing to a degree of absolute certainty. It is sufficient if each disputed requirement has been proven by a preponderance of the evidence." <u>Nexium III</u>, 777 F.3d at 27

---

[1] The Court relies upon three opinions from the <u>Nexium</u> litigation and, for clarity's sake, hereafter refers to them as follows: the district court's opinion certifying a class of EPPs, <u>In re Nexium (Esomeprazole) Antitrust Litig.</u>, 297 F.R.D. 168 (D. Mass. Nov. 14, 2013), as <u>Nexium I</u>; the district court's opinion certifying the class of DPPs, <u>In re Nexium (Esomeprazole) Antitrust Litig.</u>, 296 F.R.D. 47 (D. Mass. Dec. 11, 2013) as <u>Nexium II</u>; and the First Circuit's opinion affirming end-payor class certification, <u>Nexium</u>, 777 F.3d 9, as <u>Nexium III</u>.

(quoting <u>Messner v. Northshore Univ. HealthSystem</u>, 669 F.3d 802, 811 (7th Cir. 2012)) (internal quotation marks omitted).  The "rigorous analysis" required under Rule 23(b) does not "require raising the bar for plaintiffs <u>higher</u> than they would have to meet in individual suits."  <u>Id.</u> at 20 (emphasis in original).  "Once plaintiffs have made their initial showing, defendants have the burden of producing sufficient evidence to rebut the plaintiff's showing."  <u>Id.</u> at 27.  The Court will address each putative class in turn.

### B.        <u>The Direct Purchasers</u>

DPPs allege that the Defendants have unreasonably restrained trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, by perpetuating reverse-payment settlements.  D. 91.  For such claims, guided by <u>FTC v. Actavis, Inc.</u>, ___ U.S. ___, 133 S. Ct. 2223 (2013), courts apply the "rule-of-reason" analysis to determine "whether under all the circumstances of the case the restrictive practice imposes an unreasonable restraint on competition," <u>Arizona v. Maricopa Cnty. Med. Soc'y</u>, 457 U.S. 332, 343 (1982).  The rule-of-reason analysis is a burden-shifting test:  first, the plaintiff must show "that the challenged action has had an *actual* adverse effect on competition as a whole in the relevant market"; if shown, the defendant must then show "that the agreement was formed for legitimate business purposes which outweigh any anti-competitive effects"; and if that is shown, the plaintiff must then show "that the legitimate ends of the agreement could have been accomplished through less restrictive alternatives."  <u>Addamax Corp. v. Open Software Found., Inc.</u>, 888 F. Supp. 274, 279 (D. Mass. 1995) (emphasis in original).

DPPs seek to certify a class with forty-eight members,[2] defined as follows:

> All persons or entities in the United States and its territories, including Puerto Rico, who purchased (a) 45mg, 55mg, 65mg, 80mg, 90mg, 105mg, 115mg, and/or 135mg brand or generic Solodyn tablets directly from any Defendant or other manufacturer

---

[2] DPPs initially listed forty-nine entities as putative members but state in their reply brief that the correct count is forty-eight.  D. 631 at 23 n.62.

at any time during the period July 23, 2009 through and including November 25, 2012 and/or (b) 55mg, 65mg, 80mg, 105mg, and/or 115mg brand Solodyn tablets directly from Medicis at any time from November 26, 2012 until November 30, 2015. Excluded from the Class are Defendants, and their officers, directors, management, employees, subsidiaries, or affiliates, and all federal government entities.

D. 575 at 9.[3] The DPPs argue that the putative class meets all of the required factors established by Rule 23. D. 575 at 19-31. The Defendants do not dispute that the DPPs meet Rule 23's requirements of typicality, commonality and adequate representation.[4] See D. 598; D. 611. Rather, Defendants argue only that this putative class is not "so numerous that joinder would be impractical," Fed. R. Civ. P. 23(a)(1), and that even if numerosity is satisfied, the Plaintiffs have failed to show that issues common to the class predominate over individual questions, as required by Rule 23(b)(3). D. 611 at 10-28. The Court thus focuses on those factors in dispute.

      *1.    Numerosity Is Satisfied Here*

To certify a class action, the class must b] so numerous that joinder of all members would be "impracticable." Fed. R. Civ. P. 23(a)(1). "'Impracticability' does not mean 'impossibility,' but only the difficulty or inconvenience of joining all members of the class." Advert. Specialty Nat. Ass'n v. FTC, 238 F.2d 108, 119 (1st Cir. 1956). "No minimum number of plaintiffs is required" to demonstrate impracticability, "but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met." García-

---

[3] DPPs also move to designate the following parties as class representatives: Ahold USA, Inc. and Rochester Drug Co-Operative, Inc. (collectively, "putative DPP representatives"). D. 574 at 1.

[4] Although not disputed, the Court still finds that the requirements of typicality, commonality, and adequacy of representation are met here. Commonality is readily met here, where DPPs allege injury from the same misconduct: the allegedly unlawful Medicis-Impax agreement. D. 575 at 21. DPPs argue that the putative DPP representatives' claims arise from the same unlawful conduct by the Defendants, satisfying the typicality requirement. D. 575 at 22. DPPs have also satisfied the adequacy of representation requirement, Fed. R. Civ. P. 23(a)(4), by explaining that the putative DPP representatives' interests will not conflict with that of other class members and showing that counsel is qualified and will vigorously prosecute the case. D. 575 at 22-23.

Rubiera v. Calderón, 570 F.3d 443, 460 (1st Cir. 2009) (quoting Stewart v. Abraham, 275 F.3d 220, 226-27 (3d Cir. 2001)); see In re Relafen Antitrust Litig., 218 F.R.D. 337, 342 (D. Mass. 2003). The Court may also take into account such "subjective factors" as the "geographic location of proposed class members, the nature of the action, and matters of judicial economy." Nexium II, 296 F.R.D. at 52. Impracticability is a matter of discretion for the Court, see Advert. Specialty, 238 F.2d at 119, and courts have certified smaller classes in generic suppression cases where judicial economy favors proceeding as a class action, see, e.g., Nexium II, 296 F.R.D. at 53 (certifying class of twenty-four or twenty-nine); Dale Elecs., Inc. v. R.C.L. Elecs., Inc., 53 F.R.D. 531, 535-36 (D.N.H. 1971) (certifying class of thirteen).

DPPs propose a class of forty-eight members and argue joinder is impracticable due to both the size of the class and the geographic dispersion of the members. D. 575 at 19-20. Defendants argue that DPPs' calculations of class membership at forty-eight members does not account for corporate ownership structure, which—by limiting class members to their common parent—results in a class of less than forty, namely thirty-nine members. D. 598 at 25-26; D. 598-1 at 66-156 ("Dr. Johnson Report") ¶ 35; D. 611 at 25. For one example, Defendants point to a press release stating that HD Smith, a putative class member, acquired Valley Wholesale Drug, another putative class member, in 2012. Dr. Johnson Report ¶ 35 n.48. Additionally, Defendants argue that the class should also exclude "five purchasers who have manifested, through filing individual lawsuits, their intention to opt out of the proposed class," resulting in a direct purchasers class that is "more appropriately viewed as having 34 members." D. 598 at 26; D. 611 at 26.

The Court rejects Defendants' consolidation of class members based upon corporate structure. Defendants have provided no legal support for their argument that class members with common corporate parents should not be considered distinct entities for class certification

purposes. On the other hand, DPPs argue that separately incorporated companies are distinct entities that should be treated as separate class members to vindicate their own antitrust injuries. D. 631 at 24 (citing Nichols & Co. v. Sec'y of Agric., 131 F.2d 651, 655 (1st Cir. 1942), vacated on rehr'g on other grounds, 136 F.2d 503 (1943)). They argue that here, the putative class members are separately incorporated companies that each suffered injury. D. 631 at 24. For example, using one but-for scenario prepared by DPPs' expert—and the jury will ultimately decide which but-for scenario is appropriate, as is explained in further detail below—Valley Wholesale Drug suffered $95,600 in overcharges and H.D. Smith Wholesale suffered $15,147,800 in overcharges. D. 632 at 59. Dr. Leitzinger identified putative class members by using transactional sales data, in which each member appeared as separate direct purchasers. D. 632 ¶ 30. Other courts have held that absent evidence that the putative class is attempting to inflate the number of plaintiffs by including corporate subsidiaries, "subsidiaries should be considered as potential class members to vindicate their own antitrust injury." Am. Sales Co., LLC v. Pfizer, Inc., No. 2:14-cv-361, 2017 U.S. Dist. LEXIS 137222, at *25 (E.D. Va. July 28, 2017). The Court finds this analysis persuasive, particularly in light of the DPPs' expert's showing of individual injury sustained by each member of the class. The Court thus holds that their corporate relationship does not defeat their status as individual class members here.

The Court also declines to adopt Defendants' position that five purchasers' filing separate complaints compels the conclusion that they would opt-out of the class, if certified. Regardless, even if these putative class members ultimately do opt out of the class, the remaining class of forty-three would still satisfy the numerosity requirement. After all, "[n]umerosity is established if the size of a proposed class, even if inexactly determined, is sufficiently large as to make joinder impracticable." Overka v. Am. Airlines, Inc., 265 F.R.D. 14, 17 (D. Mass. 2010) (quoting Relafen,

221 F.R.D. at 266) (internal quotation marks omitted). The size of this class alone demonstrates that joinder would be impracticable here.

Moreover, the "subjective" factors in the numerosity inquiry weigh in favor of certifying the DPP class, showing that joinder, even if not impossible, is impracticable here, even where the class includes corporate entities, certain of which share common corporate parents. Defendants rely upon In re Modafinil Antitrust Litig., 837 F.3d 238 (3d Cir. 2016) and King Drug Co. of Florence, Inc. v. Cephalon, Inc., No. 2:06-cv-1797, 2017 U.S. Dist. LEXIS 137601 (E.D. Pa. Aug. 28, 2017), in support of their argument that joinder would not be impracticable here. D. 611 at 28; D. 638. Neither case compels the conclusion Defendants seek. In Modafinil, the Third Circuit focused on the impracticability inquiry regarding a putative class consisting of far less than forty members, stating that under those circumstances, the inquiry is "particularly rigorous." Modafinil, 837 F.3d at 250. In King Drug, the putative class consisted of only twenty-two to twenty-four direct purchasers, and the small class size played a key part of the court's analysis of the "subjective" impracticability factors. King Drug, 2017 U.S. Dist. LEXIS 137601, at *23-40.[5]

DPPs have demonstrated that joinder would be impracticable here. First, geographic dispersion suggests joinder is impracticable, even when putative class members are corporate entities. See Lidoderm, 2017 U.S. Dist. LEXIS 24097, at *72; Am. Sales. Co., 2017 U.S. Dist.

---

[5] Notably, most of the district courts that have applied Modafinil's impracticability guidelines were, like King Drug, those facing putative classes of fewer than forty members. See, e.g., Am. Sales. Co., 2017 U.S. Dist. LEXIS 137222, at *29-32 (holding class of thirty-two members satisfied numerosity inquiry); Wilson v. Anthem Health Plans of Ky., Inc., No. 3:14-cv-743-TBR, 2017 U.S. Dist. LEXIS 572, at *12-18 (W.D. Ky. Jan. 3, 2017) (holding same for class of twenty-seven); Bland v. PNC Bank NA., No. 2:15-cv-01042-AJS, 2016 U.S. Dist. LEXIS 189220, at *28-34 (W.D. Pa. Dec. 15, 2016) (holding same for subclasses of twenty-seven, thirty-six and thirty-nine members apiece). But see In re Lidoderm Antitrust Litig., 14-md-02521-WHO, 2017 U.S. Dist. LEXIS 24097, at *72-73 (N.D. Cal. Feb. 21, 2017) (addressing Modafinil's holding for class of fifty-two or more and finding joinder impracticable).

LEXIS 137222, at *31; <u>Nexium II</u>, 296 F.R.D. at 52; <u>see also</u> 5-23 James Wm. Moore et al., Moore's Federal Practice § 23.22(1)(a) (3d ed. 2017). As DPPs have shown, putative class members are based throughout the country. D. 576-1 at 53; D. 632 at 54. Defendants do not dispute that the proposed class is geographically dispersed. <u>See</u> D. 611 at 27.

Second, judicial economy and the ability and motivation to litigate as joined plaintiffs—the two factors of "primary importance" in <u>Modafinil</u>, 837 F.3d at 253—weigh in favor of class certification here. Here, a class action serves judicial economy because all putative class members seek damages stemming from the same allegedly illegal activity. <u>See</u> <u>Am. Sales Co.</u>, 2017 U.S. Dist. LEXIS 137222, at *30; <u>Wilson</u>, 2017 U.S. Dist. LEXIS 572, at *15; <u>Nexium II</u>, 296 F.R.D. at 53. Even accepting the Third Circuit's definition of judicial economy—focused on "the administrative burden that multiple or aggregate claims place upon the courts," which "primarily involves considerations of docket control," <u>Modafinil</u>, 837 F.3d at 254, 257—the factor weighs in DPPs' favor due to the difficulty of coordinating attorneys, scheduling and docketing for forty-eight clients. <u>See</u> <u>Wilson</u>, 2017 U.S. Dist. LEXIS 572, at *14-15.

Finally, the Court is persuaded that the ability and motivation of these putative class members to litigate as joined plaintiffs supports class certification. DPPs argue that Defendants' assertions that all direct purchasers here would join in a common suit "ignore the formidable business realities and legal hurdles standing in the way of such a strategy." D. 631 at 26. The competitive relationship among some class members serves "as a significant business obstacle" to joinder. D. 631 at 26; <u>see</u> <u>Am. Sales Co.</u>, 2017 U.S. Dist. LEXIS 137222, at *31. To illustrate this, DPPs conducted an empirical analysis of approximately 20,000 federal case filings from the last fifteen years involving one or more members of this class, finding that in only five cases—

were these members plaintiffs in pharmaceutical antitrust cases that were not class actions.[6] DPPs

explain that such cases are so infrequent because the nature of the litigation makes ascertaining

damages difficult at the outset and many cases mirror this one, where DPPs have demonstrated

that approximately half of the putative class members have negative value claims. D. 631 at 27;

see Lidoderm, 2017 U.S. Dist. LEXIS 24097, at *72; Applegate v. Formed Fiber Techs., LLC, No.

2:10-cv-00473-GZS, 2012 U.S. Dist. LEXIS 105264, at *15 n.6 (D. Me. July 27, 2012) (explaining

that the "relatively small size of each plaintiff's claim would discourage many" putative class

members from pursuing claims individually). Such cases are the reason why the class action

mechanism exists: there is no incentive for these parties to join in light of the litigation costs as

compared to the damages at stake. See Amchem Prods. v. Windsor, 521 U.S. 591, 617 (1997).

The Court thus finds that the DPPs have met their burden of proving numerosity under

Rule 23(a)(1).

### 2. *Rule 23(b)(3) Predominance*

Rule 23(b)(3) requires the Court to find that "the questions of law or fact common to class

members predominate over any questions affecting only individual members." Fed. R. Civ. P.

23(b)(3).[7] The focus of the predominance inquiry is "whether proposed classes are sufficiently

cohesive to warrant adjudication by representation." Amchem, 521 U.S. at 623. When conducting

---

[6] Of the 20,000 cases in which these members appeared, only approximately 1,000 included them as plaintiffs, 288 of which were pharmaceutical antitrust cases, only five of which were not class actions. D. 628 ¶¶ 7-8; D. 631 at 27 n.88. Each of those five cases was filed alongside a class action concerning the same drug, "purportedly to opt out" of the class action. D. 628 ¶ 8; see D. 631 at 27 n.88.

[7] Rule 23(b)(3) also requires a putative class to show that a class action is superior to other methods of adjudicating the controversy. Fed. R. Civ. P. 23(b)(3). Although undisputed, the Court finds that the superiority requirement of Rule 23(b)(3) has been met here. As DPPs argue, a class action here avoids inconsistent results, allows members with small claims to participate in the case and promotes judicial economy. D. 575 at 31; see Amchem, 521 U.S. at 617.

such Rule 23(b)(3) analysis, the Court must determine whether there is "reason to think that [individualized] questions will overwhelm common ones and render class certification inappropriate." Halliburton Co. v. Erica P. John Fund, Inc., ___ U.S. ___, 134 S. Ct. 2398, 2412 (2014). A district court must "formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case." Waste Mgmt. Holdings, Inc. v. Mowbray, 208 F.3d 288, 298 (1st Cir. 2000). This may "entail some overlap with the merits of the plaintiff's underlying claim," Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 351 (2011), but "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage," Amgen Inc. v. Conn. Ret. Plans & Trust Funds, 568 U.S. 455, 466 (2013).

In antitrust actions, "[p]redominance is a test readily met." Amchem, 521 U.S. at 625; see Comcast, 569 U.S. at 41 (Ginsburg, J., dissenting). Nevertheless, the Court must conduct a thorough analysis of the facts and expert opinions provided to ensure predominance has been shown here. See Nexium III, 777 F.3d at 21. "To meet the predominance requirement, the party seeking certification must show that 'the fact of antitrust impact can[] be established through common proof' and that 'any resulting damages would likewise be established by sufficiently common proof.'" Id. at 18 (quoting New Motor Vehicles, 522 F.3d at 20) (emphasis and alteration in original). DPPs argue that questions of law and fact predominate because proof of violation of Section 1 of the Sherman Act, the unlawful conduct alleged here, will not vary among class members. D. 575 at 25-26. Defendants do not dispute, however, that proof of illegal activity will not vary among class members; they instead argue that individual questions will overwhelm common ones with respect to common impact and damages. D. 611 at 11-25. The Court thus takes each question in turn.

a)        Common Proof of Antitrust Impact

"[A]t class certification, plaintiffs must only show that 'antitrust impact is capable of proof at trial through evidence that is common to the class rather than individual members.'" Nexium III, 777 F.3d at 24 n.20 (quoting In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 311 (3d Cir. 2008)).

DPPs allege injury in the form of overcharges.  D. 575 at 26-27.  As the First Circuit recently reaffirmed, "antitrust injury occurs the moment the purchaser incurs an overcharge." Nexium III, 777 F.3d at 27; see Hanover Shoe, Inc. v. United Mach. Corp., 392 U.S. 481, 489 (1968).  DPPs argue that "were it not for the unlawful Medicis-Impax Agreement, unimpaired generic Solodyn competition would have begun in 2009, and all or nearly all Class members would have paid less for their requirements of minocycline hydrochloride extended release tablets by substituting less-expensive generic minocycline hydrochloride extended release tablets for more-expensive brand Solodyn."  D. 575 at 27.  DPPs allege that they will be able to provide "mostly or exclusively common" proof at trial, "including testimony from Defendants' employees, Defendants' business records, and expert testimony" to show antitrust impact common to class members.  D. 575 at 24-25.

DPPs proffer the opinion of Dr. Jeffrey Leitzinger, an economist with a career focus on industrial organization, D. 576-1 ¶¶ 1-2, to argue common injury or impact among class members.[8]

---

[8] DPPs also provide the opinions of the following experts in support of their motion:  Dr. Thomas G. McGuire, a Professor of Health Economics at Harvard Medical School, D. 576-2 ¶ 7; Dr. Meredith Rosenthal, a Professor of Health Economics and Policy at the Harvard School of Public Health and an Academic Affiliate of Greylock McKinnon Associates, a consulting and litigation support firm, D. 576-3 ¶ 1; John R. Tupman, Jr., a consultant with 284 Partners LLC, a professional services firm, D. 576-4 at 6; and John Thomas, Esq., a Professor of Law at Georgetown University with a focus on patent law, D. 576-5 ¶ 2.  They do not, however, rely on these opinions in their arguments regarding common injury to class members, see D. 575 at 26-31, so the Court likewise focuses on Dr. Leitzinger's report here.  Defendants moved to strike a rebuttal expert opinion

Dr. Leitzinger concludes that "Medicis and Impax's allegedly unlawful conduct, if proven, had a direct, market-wide effect on minocycline hydrochloride extended release tablet prices generally (*i.e.*, maintaining prices above the level that would have occurred absent Medicis and Impax's allegedly unlawful conduct)," and that "absent that conduct and unimpaired generic competition beginning in 2009, all or nearly all Class members would have paid less for their purchases of minocycline hydrochloride extended release tablets." D. 575 at 27. Dr. Leitzinger bases his conclusions upon: (1) "extensive empirical economic research demonstrating that generics are substantially cheaper than and rapidly substituted for their brand counterparts," D. 575 at 27, including a 2010 FTC study stating that generics account for ninety percent of the prescription base one year after entry onto the market; (2) "contemporaneous forecasting documents, prepared for business purposes by Medicis, Impax, Teva, Sandoz, Mylan and Lupin, which conclude that, with unimpaired generic competition, generic Solodyn would be priced lower than brand Solodyn, and would quickly capture most Solodyn sales"; and (3) "what happened during the abbreviated 2009 and 2010 launches of generic Solodyn, and after generic entry allowed under the challenged agreements, starting November 26, 2011," during which times the "[c]lass paid less for generic Solodyn than for brand Solodyn." D. 575 at 27-29; D. 576-1 ¶¶ 22-34. Dr. Leitzinger concludes that given that the putative class members are "nearly all wholesalers or retailers supplying product to broad cross-sections of the patient community," and that approximately ninety percent of Solodyn prescriptions would have converted to generics under competitive conditions at a fraction of the branded price, "if the jury concludes there was meaningful impairment of generic competition" here, "the only plausible inference is that all (or nearly all) Class members paid

supporting DPPs' reply memorandum by Dr. Stephen W. Schondelmeyer as untimely. D. 642. Regardless, the Court has not relied upon this report within this Memorandum and Order. Accordingly, the Court declines to strike Dr. Schondelmeyer's report at this time. D. 642.

inflated prices for (at least some of) their minocycline hydrochloride extended release tablets as compared to what they would have paid" otherwise. D. 576-1 ¶¶ 35-38.

Defendants argue that DPPs' evidence is insufficient to establish predominance because it is "generalized" and does not show actual injury of any members of the class. D. 598 at 12-14; D. 611 at 12-14. Defendants distinguish this case from other reverse payment cases where academic literature and forecasts provided the appropriate evidence because here, unusually, there was at least some time during the class period during which generics were on the market. D. 598 at 12-14. They argue that actual data showing prices and sales of those generics and brand Solodyn during that time is thus the better measure of whether the class members suffered any antitrust injury. Id. To support their arguments, Defendants submit the opinion of John H. Johnson, IV, the President and CEO of Edgeworth Economics LLC, a consulting firm that provides "economic and financial analysis for complex litigation and public policy debates." Dr. Johnson Report ¶ 5. Dr. Johnson argues "there was no actual delay in generic entry" in this case because generic Legacy Strength Solodyn was introduced through three at-risk entries and, "as a result, was continuously available to consumers throughout the class period." Dr. Johnson Report ¶ 1 (emphasis in original).

This argument serves as the basis for several attacks on Dr. Leitzinger's—and DPPs'— contentions. First, Defendants argue that Dr. Leitzinger's methodology is flawed because it ignores actual data about purchasers' rate of conversion to generic Solodyn during this period in favor of inaccurate forecasts and generalized economic literature. D. 598 at 13; D. 611 at 13. Second, Defendants argue that Dr. Leitzinger's conclusions depend upon a hypothetical world in which putative class members purchased more generic Solodyn than they actually did without providing a methodology showing that to be true. D. 598 at 16-17; D. 611 at 16-17. Third,

Defendants argue that Dr. Leitzinger's report fails to account for "case-specific supply and demand factors" such as Medicis marketing and promotion programs (e.g., coupon programs) that made the brand less expensive than the generic for many patients and Medicis's launch of the Solodyn Add-On Strengths. D. 598 at 17-18; D. 611 at 17-18. Defendants argue that these factors, and not restricted competition resulting from the Medicis-Impax agreement, explain the low demand of generic Solodyn during that time. D. 598 at 17-18.

Dr. Leitzinger responds by explaining that the "actual data" here is not "representative of what would have occurred in the but-for world" of unrestrained competition. D. 576-1 ¶ 44. He explains that he was "not able to make use of the actual generic experience for purposes of estimating generic penetration in the but-for world" because the "initial abbreviated Legacy Strength generic launches were limited to just a few days and therefore do not provide a meaningful window as to the likely generic penetration from a sustained generic presence in the market," and the "post-November 2011 launches occurred at a time when Medicis was no longer selling Solodyn in Legacy Strengths." Id. DPPs argue that the relevant comparison is not what happened in the actual world with brief generic launches, but rather the conversion rate and price assuming "sustained, full-fledged generic competition." See D. 631 at 11. With that understanding in mind, DPPs argue that all or nearly all class members paid overcharges on their purchases and thus experienced antitrust impact. D. 631 at 21.

Moreover, predictive evidence and methodologies often serve as the basis for a showing of predominance in antitrust cases. See, e.g., Lidoderm, 2017 U.S. Dist. LEXIS 24097, at *61 (accepting DPPs' arguments for classwide proof of injury "[g]iven the well-researched market at issue and the well-recognized type of antitrust injury alleged"); Relafen, 218 F.R.D. at 343-45. The Court declines to reject DPPs' reliance, at least in part, upon forecasts or predictions, even

here, where there was some data regarding the impact of generics on the market, because the limits of the latter data do not serve as an appropriate proxy for the but-for market.

Furthermore, the Court is persuaded that these forecasts serve as a better proxy for unconstrained competition than the "actual" data of generic and brand Solodyn sales. First, DPPs argue that the brief generic entry during 2009 and 2010 did not establish unfettered competition between generics and brand Solodyn. D. 631 at 14-15. Dr. Leitzinger points out that each generic seller separately entered the market for only a few days in each case before entering into agreements with Medicis, at which point they each announced that they were leaving the market. D. 632 ¶ 10. At the start of each brief launch there was "rapid growth in retail prescriptions filled by generics," but after each generic seller announced it would be ending sales, "the growth in generic prescription levels halted, turning sharply downward." D. 632 ¶¶ 11-12. Dr. Leitzinger also presents evidence that generic Solodyn was not accessible by many direct purchasers or registered on large health insurers' formularies until after the generics' sustained launch in 2011. D. 632 ¶¶ 15-17. Second, Dr. Leitzinger explains that Medicis's couponing during this period does not account for differences between actual sales and forecasted sales of generics during this time because, among other things, "the primary process which drives generic penetration is automatic substitution at the pharmacy level," which is not impacted by any coupon or copay programs for consumers.[9] D. 632 ¶ 24. Third, DPPs argue that post-2011 generic sales are not a valid proxy because by November 2011, Medicis had taken "advantage of the generic delay it had

---

[9] Additionally, Dr. Leitzinger explains that couponing does not generally prevent large scale conversion to generic competitors, but rather addresses brand-to-brand competition, and it is unlikely that couponing alone could have impacted the market the way Defendants suggest. D. 632 ¶¶ 21-26. The Court is wary of venturing further into this question, as it is closely intertwined with the merits of Defendants' liability here. It is for the jury to decide whether the Solodyn market was impacted during this time by Medicis's marketing strategies or unlawful agreements restricting generic competition.

purchased to shift the majority of Solodyn prescriptions from the Legacy to the Add-On Strengths." D. 631 at 15-16. Additionally, Dr. Leitzinger did take the actual data into account in forming his conclusions, noting that even during the points of limited entry, the generic was priced at approximately fifty percent of the brand minocycline, and prices dropped even further after full generic entry in November 2011. D. 576-1 ¶¶ 22, 34. To the extent Defendants further dispute whether the Medicis-Impax agreement stifled competition and the date of sustained generic entry absent the Medicis-Impax agreement, these are questions for the jury to resolve, not the Court at class certification. The Court is thus persuaded that Dr. Leitzinger's methodology is sufficiently reliable to show common impact at this juncture.

b)      Damages Methodology

Rule 23(b)(3) also places a burden on a putative class to present a damages model demonstrating "that damages are capable of measurement on a classwide basis." Comcast, 569 U.S. at 35. This model must be "consistent with [the class's] liability case, particularly with respect to the alleged anticompetitive effect of the violation," id. (quoting ABA Section of Antitrust Law, Proving Antitrust Damages: Legal and Economic Issues 57, 62 (2d ed. 2010)(internal quotation marks omitted)), meaning it must be "limited to and reflecting only the theories of liability accepted by the Court." Nexium II, 296 F.R.D. at 54. "In other words, the defendants cannot be held liable for damages beyond the injury they caused." Nexium III, 777 F.3d at 18. Even if there are some disparities, "the need for some individualized determinations at the liability and damages stage does not defeat class certification." Nexium III, 777 F.3d at 21; see New Motor Vehicles, 522 F.2d at 28.

DPPs argue that "aggregate damages to the Class can be reliably measured using Class-wide evidence," D. 575 at 29, and present Dr. Leitzinger's "formulaic model" that establishes

aggregate overcharges incurred by the putative class as between $1.79 billion and $2.98 billion. D. 576-1 ¶ 10(c). Dr. Leitzinger provides twelve "but-for" scenarios, assuming that the jury finds the Medicis-Impax agreement unlawful, providing that Impax would have launched either at risk or within a range of dates that Medicis and Impax would have negotiated absent the agreement. D. 576-1 ¶¶ 38, 40; D. 576-1 at 54. For the reasons addressed above, Dr. Leitzinger relied upon forecasts of the generic penetration that likely would have occurred with unimpaired generic competition, created by Medicis, Impax, Lupin, Mylan, Sandoz and Teva. D. 576-1 ¶ 45. Using these forecasts, Dr. Leitzinger calculated an average generic penetration rate for each company, which served as the basis for a single average but-for generic penetration rate series. Id. He then used "the i) average quarterly forecasts for generic penetration rates (dating from the first date of generic entry), ii) actual brand prices, and iii) but-for generic discount rates applicable to the assumed number of generic competitors in the market, to calculate an average price for minocycline hydrochloride extended-release tablets that would have been used to fill Solodyn prescriptions under competitive conditions," explaining that "[b]y comparing that price to the actual average price paid by Class members, one can then calculate the per unit overcharge." D. 576-1 ¶ 47. Dr. Leitzinger then multiplied this difference by the actual unit sales volumes from July 23, 2009 through the end of the available sales data, November 2015. D. 576-1 ¶ 57. Within the range of aggregate overcharges, if all scenarios are equally likely, the expected value of class-wide damages would be the range's average, at $2.46 billion. D. 576-1 ¶ 58.

Defendants argue that Dr. Leitzinger's damages model is unreliable because "it is not properly limited or causally linked to the Medicis-Impax settlement." D. 611 at 19. First, Defendants argue that Dr. Leitzinger's damages model improperly relies upon a "product hopping" liability theory this previously Court dismissed, D. 203 at 29. D. 598 at 19-23; D. 611 at 19-23.

When resolving the Defendants' motion to dismiss, the Court ruled that DPPs had failed to allege plausibly that "product hopping" limited consumer choice for establishing a Section 2 monopolization claim. D. 184 at 28-29; D. 203 at 28-29. Dr. Leitzinger argues here that overcharges also occurred for purchases of brand Solodyn at Add-On Strength volumes because had full competition for Legacy Strengths existed, "some part of the actual conversion to the Add-On Strengths would not have occurred." D. 576-1 ¶ 49. This prediction is acknowledged and adopted by Medicis and Impax in their respective forecasts. D. 576-1 ¶¶ 54-56.

This, however, is not a resurrection of the now dismissed product hopping claim. Rather, in regard to Legacy Strength, DPPs are explaining how their theory of damages involves calculating overcharges on Legacy and Add-On Strength Solodyn that would have been purchased but for the Medicis-Impax agreement that delayed and suppressed generic entry into the market. That is, the theory present here is one of illegal reverse-payment settlements—specifically, the Medicis-Impax agreement—the impact of which is overcharges. See D. 631 at 19-20. If the jury finds the Medicis-Impax agreement was unlawful and that class members would have purchased lower-priced generic Solodyn rather than brand Add-On Strength Solodyn, then these class members who purchased brand Add-On Strength Solodyn were overcharged. See id. As Plaintiffs explain, "[w]hether a delay in full-fledged generic competition for the Legacy Strengths caused Class members to buy more high-priced brand Add-On instead of lower-priced generic Legacy is a factual dispute that will be resolved by the jury—yea or nay—based on classwide evidence." D. 631 at 20. This theory is thus a basis for calculating overcharges caused by the Medicis-Impax agreement and is not foreclosed by the Court's Memorandum and Order on the motion to dismiss.

Second, Defendants argue that Dr. Leitzinger's model provides for damages beyond the liability theory because it fails to isolate the alleged impact attributable to the Medicis-Impax

settlement from that resulting from settlement agreements between Medicis and other generic manufacturers. D. 598 at 19-21; D. 611 at 19-21. Dr. Leitzinger's model, however, provides for twelve but-for scenarios, contemplating the different possible points of sustained generic entry absent the Medicis-Impax agreement and the varying competitive conditions that would have followed. D. 576-1 ¶ 10; D. 631 at 16. The jury will need to resolve the disputes regarding the appropriate but-for scenario to apply here, so that the impact is appropriately tailored to the liability theory used. At this stage, any disagreement in this respect does not overcome the Plaintiffs' showing that damages will be substantially shown by common proof.

Third, Defendants argue that Dr. Leitzinger's model is unreliable because it fails to control for "underlying supply and demand conditions" that caused generic penetration and purchase price to vary widely among class members. D. 598 at 24; D. 611 at 24. The need for some individualized damages determinations will not defeat class certification. See Nexium III, 777 F.3d at 21; see also Lidoderm, 2017 U.S. Dist. LEXIS 24097, at *63. The use of averages to develop the aggregate amount of damages does not suggest Plaintiffs will be unable to ensure recovery is only for injured parties. See Nexium III, 777 F.3d at 21. "Apportioning damages ought wait until liability is decided upon the merits," Nexium I, 297 F.R.D. at 183, and although Plaintiffs bear the burden to establish predominance, uncertainties regarding damages should be resolved against the wrongdoer, and not those who have allegedly been injured, see In re Cardizem CD Antitrust Litig., 200 F.R.D. 326, 348 (E.D. Mich. 2001); In re Sumitomo Copper Litig., 182 F.R.D. 85, 92-93 (S.D.N.Y. 1998). This is particularly true in antitrust cases because uncertainty regarding damages is generally the result of the defendants' alleged wrongdoing. See Cardizem, 200 F.R.D. at 348 (explaining "[a]ntitrust plaintiffs have a limited burden with respect to showing that individual damages issues do not predominate" because of the "equitable notion that the wrongdoer should

not be able to profit by insistence on an unattainable standard of proof" (quoting <u>In re Potash</u> <u>Antitrust Litig.</u>, 159 F.R.D. 682, 697 (D. Minn. 1995))). Dr. Leitzinger has thus sufficiently shown that damages may be "demonstrated by a 'common methodology' applicable to the class as a whole." <u>See</u> <u>Nexium I</u>, 297 F.R.D. at 182 (quoting <u>Comcast</u>, 569 U.S. at 30).

c)     <u>Uninjured Plaintiffs</u>

Finally, Defendants argue that predominance has not been established because more than a *de minimis* number of class members were uninjured here. D. 598 at 14-18; D. 611 at 14-18. A class may be certified even if it contains "a de minimis number of potentially uninjured parties," <u>Nexium</u>, 777 F.3d at 25, as long as the Court is "satisfied that, prior to judgment, it will be possible to establish a mechanism for distinguishing the injured from the uninjured class members" that will be "'administratively feasible,' and protective of defendants' Seventh Amendment and due process rights," <u>id.</u> at 14, 19 (quoting <u>Carrera v. Bayer Corp.</u>, 727 F.3d 300, 307 (3d Cir. 2013)). The First Circuit defines "*de minimis*" in "functional terms," explaining that "if common issues 'truly predominate over individualized issues in a lawsuit, then the addition or subtraction of any of the plaintiffs to or from the class [should not] have a substantial effect on the substance or quantity of the evidence offered.'" <u>Id.</u> at 30 (quoting <u>Vega v. T-Mobile USA, Inc.</u>, 564 F.3d 1256, 1270 (11th Cir. 2009)) (alteration in original) (citation omitted). Defendants argue that the number of uninjured parties is too great here to be considered *de minimis*. D. 598 at 14-18; D. 611 at 14-18.

As to allegedly uninjured class members, Defendants argue that eight putative class members did not purchase any generic Solodyn during the period in question and ten members purchased only generic Solodyn during this time, thus suffering no overcharges. D. 598 at 15; D. 611 at 15. But these arguments do not account for the but-for world consistent with DPPs'

liability theory.  If Defendants are found liable on that theory, then these putative class members would have also been injured by overcharges, as the prices of both generic Solodyn and brand Solodyn during that time would have been affected by Defendants' illegal conduct.[10]  DPPs have thus sufficiently proven that if a jury finds Defendants liable, DPPs will be able to show impact for at least the vast majority of putative class members.

For all of these reasons, Defendants' contentions regarding lack of injury for some class members are not sufficient to destroy predominance for class certification purposes.

## C.    The End-Payors

The EPPs have also filed a motion for class certification.  D. 569.  Their claims arise under state law and include violations of state statutes prohibiting monopolization, attempted monopolization, conspiracy and combination in restraint of trade, unfair competition and deceptive trade practices and unjust enrichment.  D. 92.  In the Court's Memorandum and Order resolving Defendants' motion to dismiss, the Court dismissed several state-specific claims.  D. 184 at 34-46; D. 203 at 34-46.  EPPs now seek certification as a damages class and an injunctive relief class under Rule 23(b)(3) and (b)(2), respectively, for the remaining state law claims.  D. 570 at 9.  They define their class as follows:

> All persons or entities in the United States and its territories and possessions, including the Commonwealth of Puerto Rico, who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price for Solodyn 45mg, 55mg, 65mg, 80mg, 90mg, 105mg, 115mg and/or 135mg tablets and/or generic versions of one or more of these dosages in Alabama, Alaska, Arizona, Arkansas, California, Florida, Hawaii, Idaho, Illinois, Iowa, Kansas, Louisiana, Maine,

---

[10]   DPPs argue that if unconstrained competition had begun in 2009, "all or nearly all Class members who purchased brand Solodyn would have substituted some less-expensive generic for higher priced brands" and the price of generic Solodyn would have been substantially lower during this time.  D. 631 at 14; see Relafen, 218 F.R.D. at 345 (including plaintiffs who only purchased brand Relafen during the period in question within the certified class, explaining that net prices of the brand drug later decreased when competition grew and "additional class members might have been induced to purchase generic substitutes" during the relevant period).

Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oklahoma, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, Washington, West Virginia, Wisconsin, Wyoming, the District of Columbia and Puerto Rico, for consumption by themselves, their families, or their members, employees, insureds, participants, or beneficiaries, other than for resale, at any time from July 23, 2009 until the anticompetitive effects of Defendants' unlawful conduct cease.

D. 570 at 9 n.1. This class excludes seven categories of persons, including "[f]ully insured health plans (plans that purchased insurance from another third-party payor covering 100% of the plan's reimbursement obligations to its members") and "[f]lat co-payers (consumers who paid the same co-payment amount for brand and generic drugs)." D. 571-1 ¶ 282.[11]

As with the DPPs, the EPPs have detailed how their putative class satisfies all four factors of Rule 23(a) and the requisite factor under Rule 23(b). D. 570 at 15-28. Of the Rule 23(a) factors, Defendants challenge only adequacy of representation, Fed. R. Civ. P. 23(a)(4), D. 599 at 36-38; D. 609 at 36-38, and they dispute that EPPs have satisfied the specific requirements for Rule 23(b)(2) and Rule 23(b)(3) certification, D. 599 at 18-36; D. 609 at 18-36. The Court takes each disputed factor in turn.[12]

---

[11] EPPs further move to designate the following parties as class representatives: United Food and Commercial Workers Local 1776 & Participating Employers Health and Welfare Fund, the City of Providence, Rhode Island, Fraternal Order of Police, Fort Lauderdale 31 Insurance Trust Fund, International Union of Operating Engineers Local 132 Health and Welfare Fund, International Union of Operating Engineers Stationary Engineers Local 39 Health & Welfare Trust Fund, Painters District Council No. 30 Health and Welfare Fund, Plumbers & Pipefitters Local 178 Health & Welfare Trust Fund, Heather Morgan, Man-U Service Contract Trust Fund, Sheet Metal Workers Local No. 25 Health & Welfare Fund, Local 274 Health & Welfare Fund, and Allied Services Welfare Fund (collectively, "putative EPP representatives"). D. 569 at 1.

[12] The Court concludes on this record that numerosity, commonality and typicality have been shown here. As to numerosity, millions of prescriptions are estimated to be involved, D. 570 at 16; D. 577 ¶ 66, establishing impracticability of joinder here. See Relafen, 221 F.R.D. at 267. Even a single common question can suffice to show commonality under Rule 23(a)(2), Wal-Mart, 564 U.S. at 359, and EPPs' claims all stem from the same alleged anticompetitive conduct. D. 570 at 16; see D. 196 ¶ 288 (listing questions of law and fact common to putative class). As to typicality, EPPs argue that the putative EPP representatives' claims arise from the same unlawful

Of the four Rule 23(a) factors, Defendants challenge only Rule 23(a)(4)'s requirement of adequacy of representation.  Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  This factor requires Plaintiffs to establish an absence of potential conflict and an assurance of vigorous prosecution. [13] See Andrews v. Bechtel Power Corp., 780 F.2d 124, 130 (1st Cir. 1985).  The class representatives must be part of the class, possess the same interest and suffer the same injury as class members. See Amchem 521 U.S. at 625-26.  "[P]erfect symmetry of interest is not required and not every discrepancy among the interests of class members renders a putative class action untenable." Matamoros v. Starbucks Corp., 699 F.3d 129, 138 (1st Cir. 2012).  Rather, the inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent," Amchem, 521 U.S. at 625, and focuses on conflicts that are "fundamental to the suit and that go to the heart of the litigation," Matamoros, 699 F.3d at 138 (quoting 1 William B. Rubenstein, Newberg on Class Actions § 3:58 (5th ed. 2012)) (internal quotation marks omitted).  "[S]peculative conflict should be disregarded at the class certification stage."  Natchitoches Parish Hosp. Serv. Dist. v. Tyco Int'l, Ltd., 247 F.R.D. 253, 265 (D. Mass. 2008) (quoting In re Visa Check/MasterMoney Antitrust Litig., 280 F.3d 124, 145 (2d Cir. 2001), overruled on other grounds by In re Initial Pub. Offering Sec. Litig., 471 F.3d 24 (2d Cir. 2006)) (internal quotation marks omitted).

---

conduct by the Defendants as absent class members and they suffered the same injury in the form of overpayments, D. 570 at 17-18, satisfying the typicality requirement.

[13] Defendants are not challenging the adequacy of legal representation here, and the Court finds Motley Rice LLC, Hilliard & Shadowen LLP and Berman DeValerio have adequately prosecuted the interests of the class since the Court ordered them as interim co-lead counsel, D. 73 at 6, and will continue to do so.

Defendants first argue that EPPs have not shown adequacy of representation because third-party insurers and consumers are two fundamentally different groups who at minimum require separate representation. D. 609 at 36-37. This argument has been rejected by this Court and others certifying end-payor classes consisting of both consumers and third-party purchasers. See, e.g., Lidoderm, 2017 U.S. Dist. LEXIS 24097, at *109-10; Nexium I, 297 F.R.D. at 172; In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 533 (3d Cir. 2004). EPPs argue that the class's and class representatives' incentives align here because all putative members seek to show that they were injured in the same way—overcharges—through the same illegal conduct by Defendants. D. 570 at 18-19; D. 641 at 30. This alignment of incentives is generally sufficient to overcome a challenge on conflict of interest grounds. See, e.g., Lidoderm, 2017 U.S. Dist. LEXIS 24097, at *109-10; Nexium I, 297 F.R.D. at 172; Cardizem, 200 F.R.D. at 337 (explaining that "[e]ach class member 'has the same interest in maximizing the aggregate amount of classwide damages'" (quoting In re NASDAQ Market-Makers Antitrust Litig., 169 F.R.D. 493, 512 (S.D.N.Y. 1996)).

Second, Defendants argue that there are conflicts among class members because some class members, such as brand loyalists and insurers, benefitted from a delay in generic entry. D. 609 at 37. EPPs do not address this argument in their reply beyond a general argument that all members of the putative class "have identical interests in proving liability" and aggregate damages. D. 641 at 30. Nevertheless, the Court is not persuaded that the conflicts between those allegedly uninjured class members and putative EPP representatives destroy class certification here. Defendants' reliance upon Valley Drug Co. v. Geneva Pharms., Inc., 350 F.3d 1181 (11th Cir. 2003), D. 609 at 37, is misplaced. In Valley Drug, the Eleventh Circuit reversed certification of a class of direct purchasers where the putative class did not challenge the defendants' "assertions that the three national wholesalers, whose transactions with [a defendant] constitute over fifty percent of the

plaintiffs' total claims, experienced a net gain from the absence of generic drugs in the market." Valley Drug, 350 F.3d at 1190. Here, however, Defendants have not provided a similar percentage of uninjured—or conflicted—members of the putative class, nor have they quantified the conflict. Cf. D. 599 at 37; D. 609 at 37. "[D]efeating [the] adequacy requirement of Rule 23 requires a conflict that is 'more than merely speculative or hypothetical.'" Nexium III, 777 F.3d at 21 (quoting Gunnells v. Healthplan Servs., Inc., 348 F.3d 417, 430 (4th Cir. 2003)). Additionally, as detailed below, the Court is not convinced that the number of uninjured class members here is greater than *de minimis* such that predominance is not met. Adequacy of representation under Rule 23(a)(4) focuses on "fundamental" conflicts between class representatives and members. The Court thus hold that the presence of a *de minimis* number of uninjured members also does not defeat adequacy of representation.

Finally, Defendants argue that there is a conflict among class members sufficient to defeat adequacy here because they will be in competition with each other for damages shares. D. 609 at 37. Even if Defendants are correct that some conflict exists in damages allocation between third-party insurers and consumers in this putative class, however, such conflict fails to defeat class certification. Hypothetical conflicts, particularly regarding damages allocation, are insufficient to defeat a showing of adequacy under Rule 23(a)(4). See, e.g., Natchitoches, 247 F.R.D. at 266-69; Cardizem, 200 F.R.D. at 337. Defendants have not shown that alleged conflicts among putative class members would "permeate the aggregate damages calculation" and not merely arise at the time damages are allocated, see Lidoderm, 2017 U.S. Dist. LEXIS 24097, at *110, which can be addressed then. See id. (explaining that the court can employ claims mechanisms to resolve damages disputes at that time); Nexium I, 297 F.R.D. at 173.

## 2.    *Rule 23(b)(3) Predominance*

EPPs seek certification as a class under Rule 23(b)(3), in their pursuit of monetary damages.  To succeed, EPPs must show that common issues of law or fact predominate over any questions affecting only individual members, Fed. R. Civ. P. 23(b)(3).  In Nexium III, the First Circuit outlined three principles guiding the predominance inquiry that must be met before a class is certified under Rule 23(b)(3): (1) "the theory of liability is limited to the injury caused by defendants"; (2) "the definition of the class must be 'definite,' that is, the standards must allow the class members to be ascertainable"; and (3) "where an individual claims process is conducted at the liability and damages stage of the litigation, the payout of the amount for which the defendants were held liable must be limited to injured parties." Nexium III, 777 F.3d at 18-19.  As with DPPs, Defendants challenge EPPs' theory of common impact and damages model.  D. 599 at 19-30; D. 609 at 19-30.  Additionally, Defendants argue that EPPs fail the predominance inquiry because EPPs have failed to show the class is sufficiently ascertainable, D. 599 at 19-27; D. 609 at 19-27, and because variation among state law claims overwhelm common issues in the case, D. 599 at 30-33; D. 609 at 30-33.

### a)    Ascertainability

Defendants argue that EPPs have failed to propose a definite class in which the members of the class are ascertainable.  D. 609 at 19-20.  Rule 23(b)(3)'s "implied" ascertainability requirement focuses on whether the class is defined in terms of an "objective criterion." See Nexium III, 777 F.3d at 19; Matamoros, 699 F.3d at 139; see also Lidoderm, 2017 U.S. Dist. LEXIS 24097, at *105; Carrera v. Bayer Corp., 727 F.3d 300, 306 (3d Cir. 2013).  EPPs argue that they "can identify class members by reference to the objective criteria in the class definition:  (1) Solodyn purchases not for resale (2) in certain states (3) during a discrete time period," while excluding "several categories of purchasers who did not pay overcharges."  D. 570 at 19-20.  EPPs

also proffer the opinion of their expert, Paul DeBree, with extensive experience in the Pharmacy Benefit Manager industry, D. 577-1 ¶¶ 1-4, who explains that "in the pharmaceutical industry, data is collected and maintained at every level of the transaction," making ascertaining class membership here administratively feasible. D. 629 at 26.

Defendants argue that the class definition is not ascertainable because it includes more than a *de minimis* number of uninjured members because EPPs' class definition is broader than EPPs' expert's definition of a class that was harmed. D. 599 at 20-21; D. 609 at 20-21. This argument goes to common proof of injury and not whether the class is ascertainable. See Nexium III, 777 F.3d at 19. EPPs have provided objective criteria for defining the class, which is sufficient to show that the class is ascertainable, and therefore, "definite" for purposes of the predominance inquiry. See id.

b)      Common Proof of Impact

As with the putative direct purchaser class, the Court must determine whether the putative end-payor class is sufficiently cohesive. See Amchem, 521 U.S. at 623. This requires the Court to examine EPPs' proposals of common proof of class-wide injury. See Nexium III 777 F.3d at 15. "At the class certification stage, the court must be satisfied that, prior to judgment, it will be possible to establish a mechanism for distinguishing the injured from the uninjured class members." Nexium III, 777 F.3d at 19. The First Circuit has recognized, however, that in the certification context, "[a]t worst the inclusion of some uninjured class members is inefficient, but this is counterbalanced by the overall efficiency of the class action mechanism." Id. at 22.

EPPs submit the opinion and conclusions of their expert, Dr. Richard Frank, professor of health economics, D. 577 ¶ 1, to demonstrate class-wide antitrust impact. D. 570 at 23. They explain that their expert testimony will focus on the characteristics of the "but-for" world, and that "if the generic would have sold for less than the brand during the Class Period, all class members

29

who would have bought the generic were injured." D. 570 at 23; D. 629 at 9. Dr. Frank proposes three but-for scenarios: the first assumes all generic companies would have launched at-risk in 2009, and Solodyn Add-On strengths would not have launched; the second mirrors the first except it assumes that the Add-On Strengths launched as in the actual world; and the third contemplates a later date of true generic competition. D. 577 ¶ 48.

Defendants proffer the opinion of their expert, Dr. Cremieux, President of Analysis Group, Inc., an economics research consulting firm, and an adjunct economics professor, D. 599-1 ¶ 1[14], to support their argument that Plaintiffs' putative class contains a greater than *de minimis* number of consumer and institutional end-payor members who were not injured by Defendants' conduct, should they be found liable. D. 599 at 20; D. 609 at 20. The Court addresses Defendants' arguments regarding uninjured groups in turn, noting that the First Circuit recently affirmed class certification in a similar class of end-payors despite similar arguments regarding uninjured parties. See Nexium III, 777 F.3d at 14.

(1) Uninjured Consumers

Defendants rely upon Dr. Cremieux's report, identifying several groups of consumers that are likely to be unharmed and arguing that no class-wide data or method could distinguish between these unharmed consumers and those that could have suffered harm under Plaintiffs' allegations. D. 599 at 21-22. Dr. Cremieux states that determining whether a consumer would have switched to a generic in a fully-competitive market requires looking at several individualized factors. D. 599 at 23.

---

[14] Defendants filed Dr. Cremieux's report and other exhibits within the same document as their memorandum in opposition to EPPs' motion, D. 599. For the sake of clarity and specificity, the Court refers to Dr. Cremieux's report, D. 599 at 46-192, as D. 599-1.

First, Defendants argue that EPPs' putative class includes a number of brand loyalists. D. 599 at 21. Brand loyalists would not be injured by suppressed competition because generic entry often actually raises the price of the brand drug for the consumer—as it did here, in November 2011—and brand loyalists continue to purchase the brand drug despite entry of a lower-priced generic. See D. 599 at 21-22. The parties do not dispute that this group exists, but they dispute the group's size. See D. 599 at 21; D. 629-3 ¶ 20. Defendants argue that seventy percent of Solodyn purchasers during this time were brand-loyal and unharmed by alleged delayed entry because they continued to purchase brand Solodyn after November 2011, despite paying the same or more to do so. D. 599 at 21-22. On the other hand, Dr. Frank relies upon Medicis documentation and industry studies to ascertain a much smaller percentage of brand loyalists: as low as five percent of overall prescriptions, depending on the but-for scenario selected by the jury. D. 629-3 ¶ 20.[15] Dr. Frank has also excluded the corresponding percentage of prescriptions from aggregate overcharge calculations for each but-for scenario. D. 577 ¶¶ 59-60; D. 629-3 ¶ 20.

The Court does not accept Defendants' assertions that the presence of brand loyalists destroys predominance here. Defendants' argument assumes that all prescriptions for brand Solodyn after 2011 were by brand loyalists, but this conclusion does not necessarily follow. For instance, EPPs argue that Medicis was able to "switch a large segment of the market to the brand Add-On Strengths" prior to full generic entry, undercutting the typical conversion rate to generics after November 2011. D. 629 at 17. Moreover, for reasons explained in greater detail with respect to the DPP class, the Court accepts EPPs' argument that forecasts and academic literature serve as

---

[15] Dr. Frank's second and third but-for scenarios contemplate a brand loyalist percentage of around nineteen and thirty-seven percent, respectively. D. 577 ¶ 59. The third scenario contains a higher market share for Add-On Strength Solodyn "due to the fact that in this scenario the legacy generics launched much closer in time with respect to the Add-On Solodyn launch and therefore did not have as much time to capture market share." Id.

a better proxy for the but-for world of unrestrained competition here. Finally, the Court heeds the guidance of the First Circuit, noting both that "the number of prescriptions is not a necessary surrogate for the number of consumers," and that "a consumer was injured if he or she would have purchased generic [Solodyn] even once during the class period." Nexium III, 777 F.3d at 30. The Court is thus persuaded at this point that the amount of brand loyalists does not "cause non-common issues to predominate." See id. at 31.

Second, Dr. Cremieux estimates that at least 378,000 consumers were uninjured even if Defendants are found liable for antitrust violations as a result of coupon and voucher programs. D. 599 at 22-23; D. 599-1 ¶¶ 15, 77-89. EPPs first argue that consumers who never paid for brand or generic Solodyn—due to coupons, reimbursements, or any other means—are explicitly excluded from the class. D. 641 at 15. Next, EPPs argue that Defendants are confusing antitrust impact with individual damages here. D. 641 at 12. They explain that even if putative class members were reimbursed for overcharges through insurance plans or coupons, they still experienced antitrust injury in the form of an overcharge, although the amount of damages may require adjustment. Id.; see Nexium III, 777 F.3d at 28 n.23. Further, Dr. Frank has excluded prescriptions with no co-payments from his aggregate damages calculations. D. 629-3 ¶¶ 31. Finally, EPPs argue that Defendants are again inflating the number of purportedly uninjured consumers by ignoring the rule that a consumer need only incur one overcharge to have experienced antitrust injury and by confusing numbers of prescriptions with numbers of putative class members. D. 641 at 8; D. 629-3 ¶¶ 31, 34; see Nexium III, 777 F.3d at 30. For these reasons, the Court will not decline to certify this class on this basis.

Third, Defendants point to consumers who purchased Solodyn after meeting an annual out-of-pocket maximum or deductible as uninjured consumers because they would not have paid

anything for the prescription regardless of price.  D. 599 at 21; D. 599-1 ¶ 15.  Again, EPPs note that these consumers are already excluded from the class.  D. 629 at 10-11; D. 641 at 10-11.  To the extent that any remain, however, for the same reasons addressed above, their number is overstated by Defendants, and there is no reason to believe their remaining presence is not *de minimis*.  Furthermore, EPPs point out that even if the consumer would be uninjured in this situation, the third-party insurer who actually paid the costs would have been overcharged, and the aggregate damages award would remain the same, so there is no prejudice to Defendants at this time.  D. 629 at 14; D. 641 at 14; see Lidoderm, 2017 U.S. Dist. LEXIS 24097, at *92 n.27.  Finally, EPPs propose that a mechanism[16] can be developed to exclude them prior to judgment, which is all that is required at this time.  D. 629 at 10-11 (citing Nexium, 777 F.3d at 19-21).

Fourth, Defendants lists those who had access to generic Solodyn during the delay period as uninjured consumers.  D. 599 at 21; D. 599-1 ¶ 15.  According to his review of Solodyn sales and prescription data, "more than 360,000 prescriptions of generic minocycline ER were filled during the Plaintiffs' alleged period of delay."  D. 599 at 22; D. 59-1 ¶¶ 15, 51.  EPPs criticize Defendants' arguments for inflating the number of allegedly uninjured parties by conflating prescriptions with consumers, failing to isolate those who purchased exclusively generic minocycline during these years, and disregarding that a consumer need only be overcharged once to be injured here.  D. 629 at 18; D. 641 at 18; see Nexium III, 777 F.3d at 30.  More fundamentally, however, as the Court explained with respect to direct purchaser injury, mere access to generic Solodyn during this period does not ensure lack of injury.  Consistent with EPPs' liability theory, in a "but-for" world of unfettered generic competition, the generic minocycline prices would have

---

[16] EPPs provide, as an example of such mechanisms, "a claims process that requires members of the Class to submit an affidavit."  D. 629 at 11.

been lower during this time. D. 629 at 18. Indeed, EPPs argue that "the price of the generic did not fall to a fully competitive (equilibrium) price at any point during the Class Period." Id. (emphasis omitted). Thus, if the jury finds that Defendants' actions unlawfully restricted competition, those who purchased generic Solodyn during this time at a price greater than the equilibrium "but-for" price experienced antitrust injury in the form of overcharges.

Defendants rely upon Vista Healthplan, Inc. v. Cephalon, Inc., No. 2:06-cv-1833, 2015 U.S. Dist. LEXIS 74846 (E.D. Pa. June 10, 2015), for the proposition that EPPs' failure to provide a methodology to identify uninjured class members defeats predominance here.[17] D. 599 at 26-27; D. 609 at 26-27. In Vista, the court denied end-payors' motion for class certification because "every potential class member would need to be subject to individualized inquiries" to determine that they were not brand loyalists or insured consumers with flat copays, and the plaintiffs had not provided a class-wide methodology for identifying uninjured class members. Vista, 2015 U.S. Dist. LEXIS 74846, at *58-66. Defendants' reliance on Vista is misplaced. In Nexium III, the First Circuit explained that the putative class need not propose the specific mechanism to exclude uninjured consumers at the time of class certification, as long as a court is confident that such a mechanism does exist.[18] Nexium III, 777 F.3d at 19-20. In Vista, the court specifically rejected

_____

[17] At oral argument, Defendants also submitted a supplemental memorandum with excerpts of their depositions of Dr. Frank and Dr. DeBree. D. 648. In the excerpts provided, Dr. Frank admits he has not reviewed personal information of consumers or individual claims data for third-party payors, and Dr. DeBree acknowledges that further documentation would be necessary to identify purchasers, co-payment amounts and coupons. D. 648 at 1-4. EPPs argue that their experts' statements were taken out of context. D. 640 at 1-5. Regardless, even if their supposed concessions display that some "individualized review" will be required, D. 648 at 4, such arguments pertain to damages allocation and not proof of antitrust impact or aggregate damages.

[18] In Nexium III, the First Circuit explained that outside the class action context, the plaintiff could establish injury in two ways: (1) by arguing "for a presumption that consumers would purchase the generic if it were available, i.e., a presumption that economically rational consumers faced with two identical products would purchase the less expensive alternative"; and (2) "through testimony by the consumer that, given the choice, he or she would have purchased the generic." Nexium III,

the standards outlined in Nexium III, explaining that the Third Circuit imposes greater standards of proof at the time of class certification than does the First Circuit.  Vista, 2015 U.S. Dist. LEXIS 74846, at *37-38.  EPPs argue here that at the damages allocation phase, mechanisms such as affidavits and presumptions may be employed for the entire class, and that even if details of individual purchases and plans are relevant to calculating individual damages, they do not impact the class certification analysis here.[19]  D. 629 at 10-11; see Nexium III, 777 F.3d at 20.  The Court thus rejects Defendants' argument that individual issues predominate over common questions of antitrust impact on this basis.

In sum, the Court is not persuaded that the presence of any of these consumer groups would cause individualized issues to predominate in this case.  Many of the categories of consumers Defendants assert are uninjured here would have experienced injury if the jury accepts EPPs' liability theory.  Others rely on abnormalities in the "actual data" of generic conversion here, which the Court has explained is an imperfect proxy for the "but-for" world of unfettered competition here.[20]  For the groups of uninjured parties that remain—such as brand loyalists—Defendants have

---

777 F.3d at 20.  The First Circuit then declared "[t]here cannot be a more stringent burden of proof in class actions than in individual actions."  Id.  This is especially true at the class certification stage.

[19] The First Circuit held that class certification on such basis would not implicate Defendants' Seventh Amendment or due process rights.  Nexium III, 777 F.3d at 19-20.  The Court does not perceive any additional threat to Defendants' due process or Seventh Amendment rights where, here, uninjured parties have been excluded from aggregate damages estimates, see D. 577 ¶¶ 59-60; D. 629-3 ¶ 20, and EPPs have proposed a trial plan including jury consideration of evidence and special verdict questions at the damages phase, D. 571-7.

[20] This is also true for consumers "who would have been prescribed (and thus purchased) an entirely different drug" and those "whose insurers placed generic Solodyn on the same formulary tier that [brand] Solodyn occupied prior to generic entry," who Defendants argue "would pay the same co-payment for generic Solodyn as they did for [brand] Solodyn and would therefore not be injured."  D. 599 at 21-22; D. 599-1 ¶¶ 68-69, 94.  Dr. Frank argues, however, that Dr. Cremieux's suggestion that these groups would exist in a "but-for" scenario is based on "actual data."  D. 629-3 ¶¶ 27, 39.  EPPs argue that there is no basis for the conclusion that generic entry in 2009 would have caused more consumers to receive prescriptions for different drugs, and that any suggestion

not presented a credible estimate of the group's size to suggest the group is greater than *de minimis*. Additionally, EPPs have sufficiently shown that to the extent uninjured consumers remain in the class, their presence will be accounted for in an aggregate damages calculation and a mechanism may be developed to distinguish them prior to judgment. The Court thus declines to deny certification on this basis.

(2)      Uninjured Third-Party Payors

Defendants also argue that many uninjured institutional, or third-party, payors fall within EPPs' class definition. D. 599 at 24. They list as examples institutional payors that insured brand-loyal consumers; only covered generic Solodyn; provided access to generic Solodyn during the alleged delay period; or would have recouped costs of overcharges. Id. Dr. Cremieux identifies seven individual factors that would need to be addressed to determine whether and to what degree an institutional payor was injured by Defendants' alleged misconduct here. D. 599 at 25; D. 599-1 ¶¶ 99-115.

The argument that these groups are uninjured, however, contains many of the same flaws as with consumers. Defendants' third-party arguments rely heavily upon anomalies in actual data for their argument that institutional payors that covered only generic Solodyn or whose members purchased generic Solodyn between 2009 and 2011 were uninjured. See D. 599 at 24; D. 599-1 ¶¶ 99, 101. Again, assuming the jury finds liability here, forecasts and academic literature become the better proxy for the "but-for" scenarios, and on that basis, it is far more likely that third-party payors and their members experienced overcharges in their purchases of generic Solodyn during

---

otherwise is "[s]heer speculation." D. 629 at 19. Additionally, they argue that in the "but-for" scenarios they propose, "the generic would have been placed on formulary tiers with lower co-payments to encourage consumers to switch to the generic." D. 629 at 19.

this time. Moreover, as EPPs point out, to the extent institutional payors did not pay for any Solodyn purchases, they are excluded from the class. D. 629 at 22; D. 641 at 22.[21]

Furthermore, the likelihood that Defendants' arguments are inflating the number of uninjured members is even greater here than with respect to consumer class members. Third-party payors, like all antitrust plaintiffs, "need only suffer damage on one purchase to be injured." Lidoderm, 2017 U.S. Dist. LEXIS 24097, at *93; see Nexium III, 777 F.3d at 27. That is, an insurer with brand-loyal members is only uninjured here if every one of its members would have been brand-loyal for all Solodyn purchases in each "but-for" scenario. See D. 641 at 19. It is highly unlikely, therefore, that institutional payors were uninjured even if some of their members are brand-loyal or purchased the generic during the period in question. D. 629 at 19- 20.

Defendants also argue that third-party payors are uninjured because they would have recouped the costs of overcharges through higher premiums or co-pay amounts. D. 599 at 24; D. 599-1 ¶ 113. EPPs explain that "premiums and plan contributions are forward-looking," based on projected costs. D. 641 at 21; D. 629-3 ¶ 51. Thus, even to the extent that institutional payors can offset overcharges through later increases in premiums, the institutional payors experienced antitrust impact at the time of the initial overcharge. See Nexium III, 777 F.3d at 27. Additionally, Dr. Frank points out that there is no evidence "that plans adjust premium rates due to the increased

---

[21] This applies, for instance, to third-party payor health plans that are fully reimbursed by their own insurance. See D. 599 at 24; D. 609 at 24. Defendants argue that even though these putative class members are excluded from the class, "[i]dentifying which health plans are fully insured will require examining the specific terms and contracts for each insurer." D. 599 at 25; D. 609 at 25; D. 599-1 ¶ 142. Dr. Frank argues, however, that IMS Xponent data, which tracks retail sales across mail order and retail channels, D. 577 ¶ 56, and upon which he relies for his damages calculations, "captures the entity that paid for the prescription at the pharmacy," and that "a fully-insured plan, by definition, did not pay for the prescription at the pharmacy," D. 629-3 ¶ 70. The Court is persuaded that fully-insured plans will be excluded from the class on this basis.

cost of Solodyn or any *single* drug"; rather, they adjust rates to cover all expenses. D. 629-3 ¶ 51 (emphasis in original); see Lidoderm, 2017 U.S. Dist. LEXIS 24097, at * 98.

Finally, Defendants argue that institutional payors that received rebates through pharmacy benefit managers were uninjured here. D. 599 at 24-25; D. 599-1 ¶¶ 107-12. Defendants argue that "many TPPs benefited from the $664 million in Medicis rebate payments associated with Solodyn prescriptions between March 2009 and December 2015." D. 599 at 25. First, as with coupons and vouchers for consumers, however, rebates provided after purchase are a "damages setoff and do not affect the fact of injury." See Nexium III, 777 F.3d at 28 n.23. Second, Dr. Cremieux's conclusions rely upon generic pricing in the real world as the "but-for" generic price— priced at $525—as opposed to Dr. Frank's calculated "but-for" generic price as low as $206. D. 599-1 ¶¶ 111-12; D. 629-3 ¶ 49. Finally, the Court reiterates that each institutional payer "need only suffer damage on one purchase to be injured." Lidoderm, 2017 U.S. Dist. LEXIS 24097, at *93. Thus, even accepting that "many TPPs" received rebates, Defendants have not shown that this group was not injured. See D. 629-3 ¶ 50; cf. Nexium III, 777 F.3d at 28.

The Court is thus persuaded that the putative class will be able to show antitrust impact through common proof: if the jury finds Defendants' conduct violated the state laws in question here, the vast majority of EPPs who purchased generic or brand Solodyn during this period and experienced injury in the form of overcharges. The Court is not persuaded that any of the subgroups identified by Defendants as uninjured class members create individualized issues that undermine the predominance of the legal questions here. See Lidoderm, 2017 U.S. Dist. LEXIS 24097, at *99.

c)    Damages Methodology

"The use of aggregate damages calculations is well established in federal court and implied by the very existence of the class action mechanism itself." In re Pharm. Indus. Average Wholesale

Price Litig., 582 F.3d 156, 197 (1st Cir. 2009). Although the predominance inquiry requires plaintiffs to show they will be able to provide a damages model on a class-wide basis, see Comcast, 569 U.S. at 35-36, "it is well-established that '[t]he individuation of damages in consumer class actions is rarely determinative under Rule 23(b)(3),'" Nexium III, 777 F.3d at 21 (quoting Smilow v. Sw. Bell Mobile Sys., 323 F.3d 32, 40 (1st Cir. 2003)).

Dr. Frank presents three "but-for" scenarios, contemplating at-risk entry and no launch of Solodyn Add-on Strengths; at-risk entry and Add-On Strength launch; and a range of alternative settlement agreements. D. 577 ¶ 48. He begins accruing damages at the start of the class period, July 23, 2009, and he excludes uninjured parties such as estimated percentages of brand loyalists, from each aggregate damages calculation. D. 577 ¶¶ 48(a), 70. He relies upon publicly available data, data available for purchase—IMS Health data—and Defendants' data to implement his damages methodology. D. 577 ¶ 53. Using a yardstick approach, Dr. Frank concludes that overcharge damages for the putative EPP class range from $523.4 million to $790.3 million depending on the "but-for" scenarios at play. D. 577 at ¶¶ 55, 67-69. Additionally, he calculates unjust enrichment damages by calculating the difference between actual profits earned by Medicis and what they would have earned absent allegedly unlawful restraints on competition. D. 577 ¶ 72. He calculates the aggregate unjust enrichment damages to range from $557.9 million to $803.3 million for the relevant states.[22] D. 577 ¶¶ 77-79.

Defendants argue that EPPs have not provided a damages model that shows that common issues predominate. D. 599 at 28-30; D. 609 at 28-30. Their arguments repeat many they made in the antitrust impact context: that Dr. Frank's model includes too many "false positives" to be

---

[22] Dr. Frank also provides totals broken down by state for each calculation. D. 577 ¶¶ 56 n.92, 67.

reliable and valid. D. 599 at 28-30; D. 609 at 28-30. As the Court has acknowledged, however, because the putative class contains both consumers and third-party payors, even the presence of some uninjured consumers—such as those insured consumers whose co-pays would have remained the same in the "but-for" world—does not affect the aggregate damages calculation, as those overcharges were incurred by those consumers' insurers. See Lidoderm, 2017 U.S. Dist. LEXIS 24097, at *92 n.27. Dr. Frank has established several "but-for" scenarios, however, and in all of them he excludes uninjured parties when possible. See D. 577 ¶¶ 63-70. At the class certification stage, "[c]alculations need not be exact," but they "must be consistent with [the class's] liability case, particularly with respect to the alleged anticompetitive effect of the violation." Comcast, 569 U.S. at 35. The Court is thus persuaded that remaining issues in damages are not sufficient to defeat class certification here. See Nexium III, 777 F.3d at 23.

d)      State Laws

Finally, Defendants argue that the Court should deny class certification because the differences among state antitrust and unjust enrichment laws would overwhelm the case and individualized issues would thus predominate. D. 609 at 30-33. They point out that the remaining state law claims EPPs assert here total over fifty distinct claims, under the laws of forty different jurisdictions and argue that the state laws at issue here "vary so widely, and in some instances conflict with each other, that individualized issues would predominate." D. 609 at 31.

"[F]ederal appellate courts have viewed class actions governed by the law of multiple states with serious skepticism." Relafen, 221 F.R.D. at 276; see In re Bridgestone/Firestone, Inc., 288 F.3d 1012, 1015 (7th Cir. 2002); In re Am. Med. Sys., 75 F.3d 1069, 1085 (6th Cir. 1996). The need to apply multiple states' laws, however, does not necessarily defeat class certification. See Relafen, 221 F.R.D. at 278; Waste Mgmt. Holdings, 208 F.3d at 296 (rejecting "any per se rule" that the presence of state statutory variations is "an automatic disqualifier" for class certification).

Indeed, courts in this Circuit and elsewhere have certified classes in antitrust actions like this one despite the need to apply numerous states' laws. See, e.g., Nexium I, 297 F.R.D. at 176 (certifying class where twenty-six state laws were at issue); Relafen, 221 F.R.D. at 278-94 (certifying end-payor class where twelve states' antitrust laws were at issue); see also Lidoderm, 2017 U.S. Dist. LEXIS 24097, at *111-12 (seventeen states). EPPs argue that the differences in the applicable state laws are not material or significant and can thus be accommodated on a special verdict form or through other mechanisms routinely employed in complex litigation. D. 641 at 26-27; see Lidoderm, 2017 U.S. Dist. LEXIS 24097, at *111. The Court proceeds to consider whether variations in state law are sufficiently significant to negate predominance. See Relafen, 221 F.R.D. at 278-87.

EPPs argue that variation among states does not defeat predominance because proof of anticompetitive conduct establishes a violation of each state's laws, which is sufficient for Phase I of their proposed trial plan. D. 641 at 27; D. 571-7 at 2-3.

Certain of Defendants' arguments, however, go beyond mere variations in the state statutes that could be remedied by juror forms. For instance, Defendants argue that the Montana's and Utah's consumer protection statutes prohibit class actions. D. 609 at 31. Montana's consumer protection statute allows consumers to "bring an individual, but not a class action." Mont. Code Ann. § 30-14-133(1). The Court now holds that Montana's consumer protection prohibition of class actions is "so intertwined with a state right or remedy that it functions to define the scope of the state-created right." Shady Grove Orthopedic Assoc., P.A. v. Allstate Ins. Co., 559 U.S. 393, 423 (2010) (Stevens, J., concurring in part and in the judgment); see In re Target Corp. Customer Data Sec. Breach Litig., 66 F. Supp. 3d 1154, 1165 (D. Minn. 2014); but see Wittman v. CB1, Inc., No. 15-105-BLG-BMM, 2016 U.S. Dist. LEXIS 71383, at *13-14 (D. Mont. June 1, 2016)

(holding that the class action prohibition in Montana's consumer protection statute is preempted by Rule 23, rejecting Justice Stevens's concurrence and relying only on Justice Scalia's <u>Shady Grove</u> opinion). Consistent with this Court's earlier opinions on this matter, D. 203 at 37-38, the Court concludes that Montana's class action prohibition is similar to Illinois law on the matter and is, therefore, not preempted by Rule 23. <u>See</u> <u>Nexium</u>, 968 F. Supp. 2d at 409. The Court, therefore, excludes Montana's consumer protection statute from this putative class's claims.

Defendants also argue that Utah consumer protection law prohibits class actions, D. 609 at 31, although this seems contrary to their exhibits, D. 599 at 205 (stating that the "unique aspect" of Utah's consumer protection statute is that "[c]lass certification waives statutory damages"). Utah consumer protection law provides that class members waive statutory damages; it does not bar class actions. Utah Code Ann. §§ 13-11-19 *et seq.* The Court thus declines to exclude Utah class members on this basis.

Defendants' remaining state law arguments do not rise to the level necessary to defeat predominance here. EPPs have provided a compilation of state laws at issue here, D. 571-4, and highlighted the substantial similarities in the language among states and between state and federal antitrust provisions. D. 570 at 22; <u>see</u> <u>Nexium I</u>, 297 F.R.D. at 175-76. Issues regarding state law variations regarding damages, for instance, are not sufficiently material to defeat class certification. Rather, to the extent these damages questions or other issues are significant, they may be addressed at summary judgment and/or accommodated on a special verdict form during Phase I, as suggested by Plaintiffs, D. 571-7 at 2-3. <u>See</u> <u>Lidoderm</u>, 2017 U.S. Dist. LEXIS 24097, at *111; <u>Overka</u>, 265 F.R.D. at 20.

In sum, the Court excludes Montana consumer protection claims from the class, but otherwise holds that the variation in state laws does not overcome class certification and the remaining state law claims may proceed at this time.

### 3.     *Rule 23(b)(3) Superiority*

A putative class seeking certification under Rule 23(b)(3) also bears the burden of showing that a class action "is superior to other available methods for fairly and efficiently adjudicating the controversy," Fed. R. Civ. P. 23(b)(3).  See, e.g., Nexium III, 777 F.3d at 18.  The Court considers four factors within the superiority inquiry:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).  The Court here considers the alternatives to class action, conscious that "[t]he policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." Amchem, 521 U.S. at 617 (quoting Mace v. Van Ru Credit Corp., 109 F.3d 338, 344 (1997)) (internal quotation marks omitted).  The superiority inquiry thus ensures that litigation by class action will "achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." Amchem, 521 U.S. at 615 (quoting advisory committee's note on Fed. R. Civ. P. 23).  EPPs argue here that a "class action is the only practical means of adjudicating class members' claims while providing them with their day in court." D. 570 at 26.

Defendants reiterates its predominance arguments, contending class litigation would be unmanageable and potentially violate Defendants' rights, emphasizing the burden the Court would face when fashioning jury instructions, in light of the vast differences among the many states' laws

at issue.  D. 609 at 33-35.  Defendants have not persuaded the Court that this case will be unmanageable.  But even accepting that there will be certain manageability obstacles in this case's future, such is true of "most multi-state class actions."  See Relafen, 221 F.R.D. at 288.

Moreover, both fairness and efficiency support class certification, where otherwise "the numerous individual class members would be forced to file suit individually, producing numerous identical issues in each case that would waste judicial resources and leave all parties vulnerable to unfair inconsistencies."  In re Flonase Antitrust Litig., 284 F.R.D. 207, 234 (E.D. Pa. 2012); see Cardizem, 200 F.R.D. at 351.  Indeed, the consolidation of several related claims, from multiple districts and consisting of DPPs as well, within this court suggests "consistency would be best served by 'concentrating the litigation' in this forum."  Relafen, 221 F.R.D. at 288 (quoting Fed. R. Civ. P. 23(b)(3)(C)).  To the extent that trial management difficulties arise in the future, they can and will be addressed by the Court through the structuring of the trial in this matter.

### 4.    Rule 23(b)(2) Certification

EPPs also seek certification under Rule 23(b)(2) on the basis that the harm putative members face is ongoing, as generic competition for certain strengths of Solodyn will not begin until February 2018.  D. 570 at 28.  Under Rule 23(b)(2), the Court considers two additional factors:  whether the Defendants' actions were "on grounds generally applicable to the class" and whether injunctive relief is "appropriate . . . with respect to the class as a whole."  See Fed. R. Civ. P. 23(b)(2); New Motor Vehicles, 522 F.3d at 12 n.8.  "[A]ctions in the civil-rights field" are considered paradigmatic Rule 23(b)(2) class actions, although the subdivision is not limited to such cases.  Fed. R. Civ. P. 23(b)(2) advisory committee's note to 1966 amendment.  Defendants argue that certification under Rule 23(b)(2) is impermissible where, as here, Plaintiffs primarily seek monetary damages.  D. 609 at 16, 38; see Nexium I, 297 F.R.D. at 173.

Class certification under Rule 23(b)(2) is "not appropriate when money damages are the predominant relief that the plaintiffs seek." DeRosa, 694 F. Supp. 2d at 95; see New Motor Vehicles, 522 F.3d at 12 (explaining the district court certified the class under Rule 23(b)(2) noting that "a national injunction was the only relief available to" the class); Fed. R. Civ. P. 23(b)(2) advisory committee's note to 1966 amendment.[23] The EPPs argue that "monetary relief alone cannot remedy [the] harm" that Defendants' anticompetitive conduct has caused. D. 641 at 31. When the primary relief sought is monetary, however, certification under Rule 23(b)(2) is inappropriate. See, e.g., In re Colgate-Palmolive Softsoap Antibacterial Hand Soap Mktg. & Sales Practices Litig., No. 12-md-2320-PB, 2015 U.S. Dist. LEXIS 154602, at *26-27 (D.N.H. Nov. 16, 2015) (certifying Rule 23(b)(2) class because injunctive relief was the only form of damages available to the class); Nexium I, 297 F.R.D. at 173-74; Kottaris v. Whole Foods Mkt., Inc., 281 F.R.D. 16, 27 (D.D.C. 2012). In Nexium I, the court denied certification under Rule 23(b)(2) for a class of end-payors because, even though the assumption of antitrust injury incurred with every brand overcharge established "continuing harms," the injunctive relief sought was "merely incidental to seeking monetary damages." Nexium I, 297 F.R.D. at 174.[24] Likewise, in this case, EPPs seek over one billion dollars in damages from Defendants. See D. 577 at 2; supra Part C(2)(c). At no point do they assert that injunctive relief is their primary remedy sought. Cf. D. 641

---

[23] In Wal-Mart, the Supreme Court expressed skepticism as to whether class certification under Rule 23(b)(2) is ever appropriate to a class seeking monetary damages. See Wal-Mart, 564 U.S. at 362 (explaining "individualized monetary claims belong in Rule 23(b)(3)").

[24] The Nexium I court also noted in support of its conclusion that enjoining the reverse payment agreement after trial would provide "but little relief when the reverse payment agreements are set to expire just three months later." Nexium I, 297 F.R.D. at 174. Here, EPPs seek an injunction for harm continuing up to full competition that by their admission is set to begin in February 2018. D. 570 at 28. The trial in this case is set to begin in March 2018. D. 353.

at 31. The Court thus concludes that injunctive relief is merely incidental to the vast monetary damages EPPs seek, rendering certification under Rule 23(b)(2) inappropriate here.

**V.      Conclusion**

For the foregoing reasons, the Court ALLOWS DPPs' motion for class certification, D. 574, and ALLOWS EPPs' motion for class certification, D. 569, under Fed. R. Civ. P. 23(b)(3), excluding Montana consumer protection claims, and DENIES EPPs' motion for class certification, D. 569, under Fed. R. Civ. P. 23(b)(2).

**So Ordered.**

<u>/s/ Denise J. Casper</u>
United States District Judge