# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE SOLODYN (MINOCYCLINE HYDROCHLORIDE) ANTITRUST LITIGATION | MDL No. 2503<br>1:14-MD-2503-DJC |
| THIS DOCUMENT RELATES TO:<br><br>All Actions | **Public Version** |

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ...............................................................................................1

II.  STANDARD OF REVIEW ...............................................................................1

III.  THE UNDISPUTED EVIDENCE SHOWS THAT MEDICIS HAD MARKET POWER.............................................................................................................1

    A.  ARGUMENT ..........................................................................................2

        1.  Plaintiffs Have Undisputed Direct Evidence of Medicis's Market Power. ........................................................................................3

        2.  Plaintiffs Have Undisputed Indirect Evidence of Medicis's Market Power. ........................................................................................5

IV.  THE UNDISPUTED EVIDENCE SHOWS THAT MEDICIS COULD NOT HAVE SATISFIED ITS BURDEN OF ESTABLISHING DIRECT OR INDIRECT INFRINGEMENT OF THE '838 PATENT ....................................9

    A.  BACKGROUND ....................................................................................10

        1.  The '838 Patent. ........................................................................10

        2.  The Solodyn Patent Litigations.................................................11

        3.  Generic Labels and Promotion..................................................12

        4.  The Brand and Generic Solodyn Labels. ..................................12

    B.  ARGUMENT ..........................................................................................13

        1.  Medicis Should Have the Burden of Proving that the '838 Patent Would Have Been Infringed by A Generic Product. ..................14

        2.  The Generic Manufacturers Did Not Directly Infringe the '838 Patent.........................................................................................16

        3.  The Generic Manufacturers Did Not Indirectly Infringe the '838 Patent.........................................................................................17

            (a)  Neither Solodyn's Label Nor the Generic Labels Described a Method of Use for Reducing Vestibular Side Effects.................17

(b)    There is No Evidence that the Generic Manufacturers
       Otherwise Promoted Infringement of the '838 Patent's
       Method of Use.................................................................................18

V.    CONCLUSION....................................................................................................19

# TABLE OF AUTHORITIES

## Cases

*Abbott GmbH & Co., KG v. Centocor Ortho Biotech, Inc.*,
    870 F. Supp. 2d 206 (D. Mass. 2012) ...................................................................... 14

*Agawam Co. v. Jordan*,
    74 U.S. 583 (1868) ...................................................................................................... 14

*Akamai Techs., Inc. v. Limelight Networks, Inc.*,
    692 F.3d 1301 (Fed. Cir. 2012) .................................................................................. 14

*Allergan, Inc. v. Alcon Labs.*,
    324 F.3d 1322 (Fed. Cir. 2003) .................................................................................. 17

*AstraZeneca Pharm. LP v. Apotex Corp.*,
    669 F.3d 1370 (Fed. Cir. 2012) .................................................................................. 17

*Auburn News Co., Inc. v. Providence Journal Co.*,
    504 F. Supp. 292 (D.R.I. 1980) .................................................................................... 6

*Bayer Schering Pharma AG & Bayer HealthCare Pharm., Inc. v. Lupin, Ltd.*,
    676 F.3d 1316 (Fed. Cir. 2012) .................................................................................. 17

*Bigelow v. RKO Radio Pictures, Inc.*,
    327 U.S. 251 (1946) .................................................................................................... 15

*Brookins v. Int'l Motor Contest Ass'n*,
    219 F.3d 849 (8th Cir. 2000) ........................................................................................ 6

*Cochran v. Quest Software, Inc.*,
    328 F.3d 1 (1st Cir. 2003) ............................................................................................. 1

*Diaz Aviation Corp. v. Airport Aviation Svcs., Inc.*,
    716 F.3d 256 (1st Cir. 2013) ......................................................................................... 2

*Flovac, Inc. v. Airvac, Inc.*,
    817 F.3d 849 (1st Cir. 2016) ......................................................................................... 6

*Forsyth v. Humana, Inc.*,
    114 F.3d 1467 (9th Cir. 1997) ...................................................................................... 7

*FTC v. Actavis, Inc.*,
    133 S. Ct. 2223 (2013) ........................................................................................... 1, 14

*FTC v. H.J. Heinz Co.*,
    246 F.3d 708 (D.C. Cir. 2001) ..................................................................................... 6

*FTC v. Lundbeck, Inc.*,
   650 F.3d 1236 (8th Cir. 2011) .............................................................. 6

*FTC v. Staples, Inc.*,
   970 F. Supp. 1066 (D.D.C. 1997) ......................................................... 7

*FTC v. Swedish Match*,
   131 F. Supp. 2d 151 (D.D.C. 2000) ...................................................... 7

*George R. Whitten, Jr., Inc. v. Paddock Pool Builders*,
   508 F.2d 547 (1st Cir. 1974) ................................................................. 6

*Gorlick Distrib. Ctrs., LLC v. Car Sound Exhaust Sys., Inc.*,
   723 F.3d 1019 (9th Cir. 2013) .............................................................. 6

*Hayden Pub. Co. v. Cox Broadcasting Corp.*,
   730 F.2d 64 (2d Cir. 1984)................................................................ 6, 7

*In re Actos End-Payor Antitrust Litig.*,
   848 F.3d 89 (2d Cir. 2017)................................................................. 15

*In re Aggrenox Antitrust Litig.*,
   94 F. Supp. 3d 224 (D. Conn. 2015) ..................................................... 2

*In re Aggrenox Antitrust Litig.*,
   199 F. Supp. 3d 662 (D. Conn. 2016) ................................................... 3

*In re Asacol Antitrust Litig.*,
   2017 U.S. Dist. LEXIS 952 (D. Mass. Jan. 4, 2017) ............................ 5

*In re Loestrin 24 Fe Antitrust Litig.*,
   2017 WL 3600938 (D. R.I. Aug. 8, 2017)....................................... 2, 8

*In re Nexium (Esomeprazole) Antitrust Litig.*,
   968 F. Supp. 2d 367 (D. Mass. 2013) ................................................... 6

*In re Nexium Antitrust Litig.*,
   842 F.3d 34 (1st Cir. 2016)........................................................... 15, 16

*In re Sulfuric Acid Antitrust Litig.*,
   703 F.3d 1004 (7th Cir. 2012) .............................................................. 3

*In re Webkinz Antitrust Litig.*,
   695 F. Supp. 2d 987 (N.D. Cal. 2010) .................................................. 6

*In re Wellbutrin XL Antitrust Litig.*,
   868 F.3d 132 (3d Cir. 2017)............................................................... 15

*J. Truett Payne Co. v. Chrysler Motors Corp.*,
    451 U.S. 557 (1981) ........................................................................... 15

*Medtronic v. Mirowski Family Ventures, LLC*,
    134 S. Ct. 843 (2014) ......................................................................... 14

*Move, Inc. v. Real Estate All. Ltd.*,
    709 F.3d 1117 (Fed. Cir. 2013) ......................................................... 14

*Mutual Pharm. Co. v. Bartlett*,
    133 S. Ct. 2466 (2013) ....................................................................... 12

*Pliva v. Mensing*,
    564 U.S. 604 (2011) ........................................................................... 12

*Rebel Oil Co., Inc. v. Atlantic Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995) ............................................................... 7

*Rogers v. Fair*,
    902 F.2d 140 (1st Cir. 1990) ............................................................... 1

*SmithKline Corp. v. Eli Lilly & Co.*,
    575 F.2d 1056 (3d Cir. 1978) ............................................................... 8

*Spindler v. Johnson & Johnson Corp.*,
    2011 WL 12557884 (N.D. Cal. Aug. 1, 2011) ..................................... 6

*State of N.Y. v. Actavis PLC*,
    787 F.3d 638 (2d Cir. 2015) .............................................................. 19

*Story Parchment Co. v. Paterson Parchment Paper Co.*,
    282 U.S. 555 (1931) ........................................................................... 15

*Telecor Commc'ns, Inc. v. Sw. Bell Tel. Co.*,
    305 F.3d 1124 (10th Cir. 2002) ........................................................... 8

*Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*,
    875 F.2d 1369 (9th Cir. 1989) ............................................................. 6

*U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*,
    7 F.3d 986 (11th Cir. 1993) ................................................................. 8

*United States v. Archer-Daniels-Midland Co.*,
    866 F.2d 242 (8th Cir. 1988) ........................................................... 7, 8

*United States v. Microsoft Corp*,
    253 F.3d 34 (D.C. Cir. 2001) ............................................................... 6

*Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*,
  375 F.3d 1341 (Fed. Cir. 2004) ................................................................................................. 8

*Warner-Lambert Co. v. Apotex Corp.*,
  316 F.3d 1348 (Fed. Cir. 2003) ........................................................................................ 13, 17

**Statutes**

21 U.S.C. § 355(j)(2)(A)(v) ..................................................................................................... 12

35 U.S.C. § 271(a) .................................................................................................................. 14

## I.     INTRODUCTION

All Plaintiffs submit this memorandum of law in support of their motion for partial summary judgment on the issue of market power and the infringement of U.S. Patent 5,908,838 (the "'838 patent").

## II.    STANDARD OF REVIEW

Summary judgment is appropriate where the movant can show there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A fact is material if its resolution might affect the outcome of the case under the controlling law."[1]  "A genuine issue exists as to such a fact if there is evidence from which a reasonable trier could decide the fact either way."[2]  "To succeed, the moving party must show that there is an absence of evidence to support the nonmoving party's position."[3]

## III.   THE UNDISPUTED EVIDENCE SHOWS THAT MEDICIS HAD MARKET POWER

In this antitrust case, Plaintiffs allege that Medicis paid Impax about $40 million to delay the introduction of generic Solodyn, and that this payment violates the rule of reason standard for reverse payments under *FTC v. Actavis, Inc.*, 133 S. Ct. 2223 (2013).  Market power is typically an issue for the jury in rule of reason cases, but here Plaintiffs move for summary judgment because the undisputed facts demonstrate that there is no dispute requiring trial of market power.

Plaintiffs' undisputed direct evidence of Medicis's market power warrants summary judgment.  Medicis sold Solodyn at a supracompetitive price ███████████████████ ██████████████████████████, and purchasers would have purchased much less expensive generic Solodyn in place of the high priced branded Solodyn absent the Medicis

---

[1] *Cochran v. Quest Software, Inc.*, 328 F.3d 1, 6 (1st Cir. 2003) (citation omitted).

[2] *Id.* (citation omitted).

[3] *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir. 1990).

reverse payment.  This undisputed evidence establishes that Medicis's payment allowed it to continue to control the price of Solodyn without losing sales to less expensive generic competitors beyond the point at which it would have otherwise been able to do so.  This is the very definition of market power.

Alternatively, Plaintiffs' undisputed indirect evidence of market power also warrants summary judgment.  Because only generic Solodyn evidences significant cross-price elasticity of demand with brand Solodyn, the relevant market for Solodyn consists of Solodyn and its AB-rated generic.  Within this relevant market, Medicis had a 100% market share when it paid Impax to delay generic Solodyn.  Defendants' evidence of purported therapeutic or functional interchangeability between Solodyn and other drugs used to treat acne does not create a disputed issue of fact because it does not establish cross-price elasticity of demand as required by the relevant case law.

## A.   <u>ARGUMENT</u>

A plaintiff may prove market power directly by establishing that a defendant charges supracompetitive prices, or indirectly by defining a relevant market and establishing that a defendant controls a substantial share of that market.  Plaintiffs do not need to present both types of evidence.  Either is sufficient to prevail.[4]  Accordingly, Plaintiffs are entitled to summary judgment if they can demonstrate either undisputed direct evidence of market power *or* undisputed indirect evidence of market power.  Here, Plaintiffs can do both.

---

[4] *See Diaz Aviation Corp. v. Airport Aviation Svcs., Inc.*, 716 F.3d 256, 265 (1st Cir. 2013) ("*Absent direct proof of supracompetitive prices*, monopoly power is typically proven by defining a relevant market and showing that the defendant has a dominant share of that market.") (emphasis added).  *See also In re Loestrin 24 Fe Antitrust Litig.*, 2017 WL 3600938, at *12 (D. R.I. Aug. 8, 2017) (market power may be established through either direct evidence or circumstantial evidence); *In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d 224, 246 (D. Conn. 2015) ("when direct evidence is available that a party profitably charges supracompetitive prices, the existence of market power can be established from that fact alone").

1.      **Plaintiffs Have Undisputed Direct Evidence of Medicis's Market Power.**

Market power is the ability to profitably charge more than the competitive price for a prolonged time.  As Judge Posner explained, it is "the power to raise price above the competitive level without losing so much business to other sellers that the price would quickly fall back to that level."[5]  The courts have recognized that, "when direct evidence is available that a party profitably charges supracompetitive prices, the existence of market power can be established from that fact alone."  That is because "the ability to charge supracompetitive prices . . . is the *sine qua non* of market power."[6]

The direct evidence of Medicis's supracompetitive prices for Solodyn is undisputed.[7]

██████████████████████████████████████████████████████████████

████████████████████████  An economic statistic known as the Lerner Index establishes that these prices were supracompetitive.  The Lerner Index is a ratio of a product's "margin" (price minus marginal cost) to its price and therefore ranges from 0 to close to 1.[9]  A Lerner Index of 0 (price equal to marginal cost) indicates the complete absence of market power.[10]  Dr. Leffler, one of Plaintiffs' expert economists, explained that the DOJ/FTC Merger Guidelines suggest that

---

[5] *In re Sulfuric Acid Antitrust Litig.*, 703 F.3d 1004, 1007 (7th Cir. 2012).

[6] *In re Aggrenox Antitrust Litig.*, 199 F. Supp. 3d 662, 664-65 (D. Conn. 2016).

[7] Even if the Court were to deny this motion, traditional indirect proof of market power through definition of a relevant market and proof of market share would be unnecessary at trial since proof of the reverse payment itself is strong evidence of market power.  As the Supreme Court explained in *Actavis*, "where a reverse payment threatens to work unjustified anticompetitive harm, the patentee likely possesses the power to bring that harm about in practice."  *Actavis*, 133 S. Ct. at 22236.  That is because a firm without market power is not "likely to pay 'large sums' to induce 'others to stay out of its market.'"  *Id.*

[8] *See* SUF ¶ 8 (citing Ex. 8, Leffler Rpt., ¶¶ 52-53; Ex. 53, MRX-MDL-001024540).  "SUF" refers to Plaintiffs' Statement of Undisputed Facts Relating to Their Motion for Partial Summary Judgment, filed herewith.  Unless otherwise noted, all exhibits are appended to the accompanying Declaration of Lauren G. Barnes, dated November 1, 2017.

[9] *See* SUF ¶ 7 (citing Ex. 8, Leffler Rpt., ¶ 51).

[10] *Id.*

market power of concern occurs when a seller can set a price 5% above the competitive level, the equivalent of a Lerner Index of .05.[11]  Here, prices that are ███████████████ produce a Lerner Index of ████████████████████████████████████████████.[12]

These prices and margins are clearly supracompetitive compared to the price of generics that Plaintiffs would have purchased had Medicis not paid to delay them.[13]  Generic drugs nearly always face competition from other AB-rated generics.[14]

Medicis and Impax both recognized that, once generic Solodyn launched, Medicis would lose its ability to maintain its Solodyn unit sales at prices ███████ times Medicis's costs.[15] ████

████████████████████████████████████████████████████████████████

███████████████

███████████████████████ are consistent with extensive governmental and academic research that has uniformly concluded that FDA-approved, AB-rated generics are substantially less expensive than their branded (and patent protected) counterparts, and that, upon generic entry, the generics consistently capture a large percentage of brand sales.[17]  This ability to maintain high prices and margins by excluding generic competition is the very definition of market power.  As Dr. Leffler opined, ████████████████████████████████████████████████████

---

[11] *Id.*

[12] *See* SUF ¶ 8 (citing Ex. 8, Leffler Rpt., ¶ 52).

[13] *See* SUF ¶ 3 (citing Ex. 12, Rosenthal Decl., ¶ 48).  ████████████████████████ ████████ the margins of the generic firms were ████████████████████  *See* SUF ¶ 4 (citing Ex. 12, Rosenthal Decl., ¶ 48 & Table 2).

[14] *See* SUF ¶ 3 (citing Ex. 12, Rosenthal Decl., ¶ 48).

[15] *See* SUF ¶ 10 (citing Ex. 10, Leitzinger Rpt., ¶¶ 27-28, 30; Ex. 8, Leffler Rpt., ¶ 86).

[16] *See* SUF ¶ 11 (citing Ex. 10, Leitzinger Rpt., ¶¶ 27-28, 30; Ex. 8, Leffler Rpt., ¶ 86).

[17] *See* SUF ¶ 14 (citing Ex. 8, Leffler Rpt., ¶ 86; Ex. 10, Leitzinger Rpt., ¶¶ 23-26; Ex. 62, "Pay-for-Delay: How Drug Company Pay-Offs Cost Consumers Billions," An FTC Staff Study, at p. 8 (Jan. 2010) (generics take 90 percent of brand sales on average within a year, and generics on average are priced 85 percent below the brand)).

████████████████████████████████████████████████

████████████████████████████████████████████████

### 2. Plaintiffs Have Undisputed Indirect Evidence of Medicis's Market Power.

In addition to the undisputed direct evidence that the exclusion of generic Solodyn allowed Medicis to maintain high prices and margins, Plaintiffs have uncontroverted indirect evidence that the relevant market for Solodyn is limited to Solodyn and its AB-rated generic,[19] and Medicis had a 100% share of this market before generic entry.[20] Drugs other than generic Solodyn do not exhibit substantial cross-price elasticity of demand with Solodyn.[21] The presence (or absence) of substantial cross-price elasticity of demand determines the boundaries of the relevant antitrust market.[22] For products to be in the same relevant market, they must exhibit substantial cross-price elasticity, *i.e.*, there must be evidence of substantial switching between them as a result of a small but significant price changes. The purpose of defining a relevant antitrust market is to identify products to which purchasers turn in response to a small but significant *price* increase, because market power is by definition power over *price*. Defendants have no evidence rebutting Plaintiffs' showing that *only* generic Solodyn exhibited substantial cross-price elasticity of demand with Solodyn, and thus generic Solodyn is the only product that belongs in the relevant antitrust market with branded Solodyn.

---

[18] *See* SUF ¶ 15 (citing Ex. 9, Leffler Reply Rpt., ¶ 5).

[19] See SUF ¶¶ 23, 33 (citing Ex. 12, Rosenthal Decl., ¶¶ 60, 64, 65; Ex. 8, Leffler Rpt., at ¶¶ 10(A), 30-48).

[20] See SUF ¶ 23 (citing Ex. 8, Leffler Rpt., at ¶ 48).

[21] *See, e.g.*, SUF ¶¶ 21, 28, 34 (citing Ex. 12, Rosenthal Decl., at ¶ 60; Ex. 2, Baum Rpt., ¶¶ 18, 21; Ex. 8, Leffler Rpt., ¶¶ 34, 38-40, 42-43, 45).

[22] *See infra* pp. 6-9 & nn. 23-33. *See also, e.g.*, *In re Asacol Antitrust Litig.*, 2017 U.S. Dist. LEXIS 952, at *8-9 (D. Mass. Jan. 4, 2017) ("Relevant markets are defined in terms of cross-elasticity at the consumer level, *i.e.*, the extent to which raising the price of one product above the competitive level causes consumers to shift their purchasing choices.").

The standard for identifying the products that belong in a relevant product market is their "reasonable interchangeability" defined in terms of their significant, positive cross-price elasticity of demand with respect to one another.[23] The relevant antitrust market for Solodyn consists of only those products that exhibit substantial cross-elasticity of demand with Solodyn, *i.e.*, those products that meaningfully constrain the price of Solodyn.[24] There must be "high," "significant" or "sufficient," cross-elasticity of demand between two products for them to be

---

[23] *See In re Nexium (Esomeprazole) Antitrust Litig.*, 968 F. Supp. 2d 367, 387-88 (D. Mass. 2013) ("The Supreme Court has declared that, for antitrust purposes, a 'relevant market' is made up of 'commodities reasonably interchangeable by consumers for the same purposes.' The reasonable interchangeability of a set of products is not dependent on the similarity of their forms or functions; instead, '[s]uch limits are drawn according to the cross-elasticity of demand for the product in question — the extent to which purchasers will accept substitute products in instances of price fluctuation and other changes.'") (citations omitted). *See also Flovac, Inc. v. Airvac, Inc.*, 817 F.3d 849 (1st Cir. 2016) (relevant market is established by looking at "the extent to which consumers will change their consumption of one product in response to a price change in another, *i.e.* the cross-elasticity of demand") (internal quotations and citations omitted); *George R. Whitten, Jr., Inc. v. Paddock Pool Builders*, 508 F.2d 547, 552 (1st Cir. 1974) (relevant market is "drawn according to the cross-elasticity of demand for the product in question – the extent to which purchasers will accept substitute products in instances of price fluctuation and other changes"); *Gorlick Distrib. Ctrs., LLC v. Car Sound Exhaust Sys., Inc.*, 723 F.3d 1019, 1025 (9th Cir. 2013) ("products must be reasonably interchangeable, such that there is cross-elasticity of demand") (citation omitted); *In re Webkinz Antitrust Litig.*, 695 F. Supp. 2d 987, 994 (N.D. Cal. 2010) ("products can be considered 'reasonably interchangeable,' where there is cross-elasticity of demand, *i.e.* if customers would switch to alternatives in response to a price increase in the alleged monopolist's product") (citations omitted); *Spindler v. Johnson & Johnson Corp.*, 2011 WL 12557884, at *2 (N.D. Cal. Aug. 1, 2011) (same).

[24] *See FTC v. Lundbeck, Inc.*, 650 F.3d 1236, 1240 (8th Cir. 2011) (two drugs that treat the same ailment in separate markets due to lack of price competition); *FTC. v. H.J. Heinz Co.*, 246 F.3d 708, 718 (D.C. Cir. 2001) (definition of antitrust product market "focuses *solely* on demand substitution factors," that is, whether consumers will switch between two products "in response to a small but significant and nontransitory increase in price" for one of them) (emphasis supplied); *Hayden Pub. Co. v. Cox Broadcasting Corp.*, 730 F.2d 64, 70 (2d Cir. 1984) (district court committed reversible error in "neglect[ing] the factor of cross-elasticity of demand," which directs that the court determine not just ability of products to be substitutes for one another from a functional standpoint, but primarily "how *far* buyers will go to substitute one commodity for another") (emphasis supplied); *Brookins v. Int'l Motor Contest Ass'n*, 219 F.3d 849, 854 (8th Cir. 2000) (absence of cross-elasticity of demand between two products compels conclusion that products do not inhabit same antitrust product market); *United States v. Microsoft Corp*, 253 F.3d 34, 53-54 (D.C. Cir. 2001) ("[t]he test of reasonable interchangeability . . . required the District Court to consider *only* substitutes that constrain pricing") (emphasis added); *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1374 (9th Cir. 1989) ("a product market is typically defined to include the pool of goods or services that qualify as economic substitutes because they enjoy reasonable interchangeability of use *and cross-elasticity of demand*") (citations omitted) (emphasis added); *Auburn News Co., Inc. v. Providence Journal Co.*, 504 F. Supp. 292, 302 (D.R.I. 1980) ("When one gets down to brass tacks, or any other specific product, almost all products have substitutes:  even buses, skywriters and road signs compete with newspapers for advertising. Antitrust law, however, is only concerned with products reasonably interchangeable with one another, in other words, products for which there is some cross elasticity of demand."); Phillip E. Areeda and Herbert Hovenkamp, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION ¶ 507a (goods not in the same market "unless the availability of one effectively limited the price of the other to the competitive level or something slightly above").

included in the same relevant antitrust market.[25]

 This standard is embodied in the ABA Model Jury Instructions, which explain that consideration of cross-elasticity of demand is required and determinative in determining whether two products are in the same relevant market:

> If you find that customers would switch and that the price increase would not be profitable, then you *must* conclude that the products are in the product market. If, on the other hand, you find that customers would not switch, then you *must* conclude that the products are not in the product market.[26]

This model instruction (attached as Ex. 56) is supported by and cites ample legal authority.

 Only Plaintiffs have identified evidence of the cross-price elasticity of Solodyn. Their experts' analyses establish that no product other than generic Solodyn exhibits substantial cross-price elasticity of demand with Solodyn.[27] Defendants have no evidence of cross-price elasticity. 

—the determinative legal

---

[25] *See FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1078 (D.D.C. 1997) (low cross-elasticity results in non-inclusion of products in antitrust market); *United States v. Archer-Daniels-Midland Co.*, 866 F.2d 242, 248 (8th Cir. 1988) ("sufficient cross-elasticity of demand"); *FTC v. Swedish Match*, 131 F. Supp. 2d 151, 164 (D.D.C. 2000) ("moist snuff is incapable of inducing substitution sufficient enough to render loose leaf price increases unprofitable and cannot, therefore, be included in the relevant market on this basis"); *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1483 (9th Cir. 1997) ("A high cross elasticity of demand indicates that products are close substitutes, and should probably be treated as part of the same market. A low or zero cross elasticity of demand is evidence that products do not compete in the same relevant market."); *Rebel Oil Co., Inc. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995) ("If the sales of other producers *substantially* constrain the price-increasing ability of the monopolist or hypothetical cartel, these other producers must be included in the market.") (citation omitted) (emphasis added)

[26] Ex. 56, ABA Model Jury Instructions in Civil Antitrust Cases (2016), A-108 (emphasis added); *id.* at n.2 ("In assessing whether products are within the relevant market, the jury must consider not only whether the products are functionally similar but also whether the products are economically interchangeable. That is, there *must be* cross-price elasticity of demand.") (emphasis added).

[27] *See* SUF ¶¶ 21, 28, 34 (citing Ex. 12, Rosenthal Decl., at ¶ 60; Ex. 2, Baum Rpt., ¶¶ 18, 21; Ex. 8, Leffler Rpt., ¶¶ 34, 38-40, 42-43, 45).

[28] *See* SUF ¶¶ 38-39 (citing Ex. 19, Addanki Dep. at 130 ( ); *id.* at 142-43

question for market definition—is fatal to Defendants' attempts to enlarge the relevant market

beyond brand and generic Solodyn. ████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████  And,

because Medicis had 100% of the market consisting of Solodyn and its AB-rated generic at the

time that it paid Impax to stay off the market,[30] it had substantial market power.[31]

Instead of trying to rebut Plaintiffs' evidence of cross-price elasticity, Defendants and

their experts claim that the market must be broader than Solodyn and its AB-rated generic

because physicians can prescribe other therapeutic alternatives to treat acne.[32]  However,

Defendants' evidence of functional interchangeability does not create a disputed issue of fact

with respect to definition of the relevant market.  Products used to treat similar medical

conditions do not belong in the same relevant market *unless* they exhibit cross-price elasticity of

demand.[33]  Because Defendants failed to come forward with such evidence with respect to the

---

[29] *See* SUF ¶ 33 & n.38 (citing Ex. 63, IMPAX-SOLODYN00092702, at '05 (Impax Response to FTC CID re Solodyn, dated July 2, 2012) ██████████████████████████████████████████████████

████████████████████████████████████████████████████████████

[30] *See* SUF ¶ 23 (citing Ex. 8, Leffler Rpt., ¶ 48).

[31] *See, e.g., SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056, 1065 (3d Cir. 1978) ("Between 1964 and 1974, Lilly controlled from 100% to 89.8% of the cephalosporin market, and notwithstanding that its position in the market was originally the result of its patents, this share is generally considered monopolistic.") (citation omitted).

[32] See SUF ¶ 35, 40 (citing Ex. 18, Webster Rpt., ¶¶ 16-18, 54-58, 68; Ex. 1, Addanki Rpt., ¶¶ 77-78).

[33] *See In re Loestrin 24 FE Antitrust Litig.*, --- F. Supp. 3d ----, 2017 WL 3600938, at *12 (D.R.I. Aug. 8, 2017) ("Products are not reasonably interchangeable merely because they share similar forms or functions, but rather [s]uch limits are drawn according to the cross-elasticity of demand for the product in question – the extent to which purchasers will accept substitute products in instances of price fluctuation and other changes.") (citations and quotations omitted).  *See also Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 375 F.3d 1341, 1364 (Fed. Cir. 2004) (expert's "reliance upon technological, rather than economic, substitution is . . . a fatal flaw in establishing his proposed market definition"); *Telecor Commc'ns, Inc. v. Sw. Bell Tel. Co.*, 305 F.3d 1124, 1132 (10th Cir. 2002) ("[r]easonable interchangeability does not depend upon product similarity"); *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 995-99 (11th Cir. 1993) (even though products were interchangeable in the sense that they functioned in the same way, absence of cross elasticity of demand between them prevented products from residing in same market); *Archer-Daniels-Midland*, 866 F.2d at 248 & n.1 (sugar and high fructose corn syrup, though functionally interchangeable, do not reside in same antitrust product market because "a small change in the price of HFCS would have little or no effect on the demand for sugar" such that cross-elasticity of demand is low, despite

therapeutic alternatives that they identify, their evidence does not create a disputed issue of fact with respect to Plaintiffs' indirect evidence of market power.[34]

Accordingly, the Court should grant summary judgment that Medicis's possessed market power at the time of its reverse payment agreement with Impax because Medicis controlled 100% of the relevant market of Solodyn and its AB-rated generic.[35]

## IV.   THE UNDISPUTED EVIDENCE SHOWS THAT MEDICIS COULD NOT HAVE SATISFIED ITS BURDEN OF ESTABLISHING DIRECT OR INDIRECT INFRINGEMENT OF THE '838 PATENT

The undisputed record in this case demonstrates that Medicis could not have satisfied its burden of establishing direct or indirect infringement of the '838 patent.

First, Medicis could not establish direct infringement because the '838 patent covers a method of use for "reducing the incidence or severity of vestibular side effects resulting from the treatment of acne," and generic manufacturers are in the business of *selling* drugs, not using them to treat medical conditions.

Second, Medicis could not establish indirect infringement because it had no evidence that any generic manufacturer would induce anyone to use generic Solodyn to reduce "the incidence or severity of vestibular side effects resulting from the treatment of acne." The methods of use for generic drug products are proscribed by the FDA approved label for the brand. Here, all of the generic labels were required to be identical in all material respects to the brand Solodyn

---

evidence of actual substitution of corn syrup for sugar by consumers); *SmithKline*, 575 F.2d at 1064 (despite Lilly's evidence that "for virtually every purpose for which hospital physicians use cephalosporins, they also use other antibiotics… the cephalosporins and non-cephalosporin anti-infectives do not demonstrate significant positive cross-elasticity of demand insofar as price is concerned," and should therefore not be placed in the relevant product market).

[34] Plaintiffs have separately filed a *Daubert* motion to exclude opinions about purported therapeutic substitutability from Dr. Addanki and Dr. Webster, Medicis's medical expert, because they are contrary to this law defining a relevant market in terms of the cross-price elasticity of demand.

[35] Defendants agree that the relevant geographic market is the United States. *See* SUF ¶ 41 (citing Ex. 19, Addanki Dep. at 143).

label.  Neither the Solodyn label, nor that of its generic equivalents, listed an approved method of use for the reduction in the incidence or severity of vestibular side effects resulting from the treatment of acne.  Absent such an approved method of use *in the label*, or some other evidence that a generic manufacturer would promote the use, no generic manufacturer[36] could have been found liable, as a matter of law, for indirect infringement of the '838 patent.  Accordingly, Defendants cannot establish that the '838 patent would have prevented any generic, including Impax, from launching at risk (as Teva, Sandoz, and Mylan actually did), or would have forced any generic to exit the market after an at risk launch.

## A.    BACKGROUND

### 1.    The '838 Patent.

The '838 patent issued on June 1, 1999.[37]  It covers a "Method for the Treatment of Acne."[38]  As originally issued, the '838 patent contained two independent and sixteen dependent claims.[39]

The '838 patent was subject to a reexamination proceeding.  The reexamination certificate issued on June 1, 2010.[40]  After the reexamination, the '838 patent contained twelve independent claims and nine dependent claims.[41]  Each claim covered "[a] method for reducing the incidence or severity of vestibular side effects resulting from the treatment of acne by the use of oral minocycline . . . ."[42]

---

[36] The "generic manufacturers" are Impax Laboratories, Inc., Mylan Inc. (and subsidiaries Matrix Laboratories Ltd. and Matrix Laboratories Inc.), Sandoz, Inc., and Barr Laboratories, Inc. (a subsidiary of Teva Pharmaceuticals USA, Inc.).

[37] SUF ¶ 42 (citing Ex. 34, Wortzman Dep. Ex. 2 ('838 patent)).

[38] *Id.*

[39] *Id.*

[40] *Id.* at ¶ 43.

[41] *Id.*

[42] *Id.*

### 2.    The Solodyn Patent Litigations.

On May 8, 2006, Medicis received FDA approval for Solodyn, an extended release version of minocycline, for the treatment of acne.[43]  In October 2007, Impax filed an ANDA for a generic version of Solodyn.[44]  On December 20, 2007, Impax notified Medicis of its ANDA filing.[45]  Impax asserted that "a reasonable review of the facts will confirm that the use of the drugs for which IMPAX seeks approval is not covered by any valid claim of the '838 patent."[46]

On January 15, 2008, Impax filed a declaratory judgment action against Medicis with respect to the '838 patent, claiming that the patent was either invalid or Impax did not infringe any valid claim of the '838 patent.[47]  On November 26, 2008, Medicis and Impax settled.[48]  Plaintiffs contend that part of the settlement included a payment of about $40 million from Medicis to Impax for agreeing to delay the introduction of its generic Solodyn product.

On December 4, 2008, Sandoz notified Medicis of its ANDA for generic versions of Solodyn, asserting non-infringement.[49]  On January 13, 2009, Medicis sued Sandoz for alleged infringement of the '838 patent.[50]

---

[43] *Id*. at ¶ 44 (citing Ex. 46, MRX-MDL-000396625 (Medicis Generic Competition and New Product Introduction Timeline); Ex. 49, MRX-MDL-000936194-98 (Solodyn 2008-09 Strategic Overview)).

[44] *Id*. at ¶ 45 (citing Ex. 46, MRX-MDL-000396625 (Medicis Generic Competition and New Product Introduction Timeline)).

[45] *Id*. (citing Ex. 50, MRX-MDL-000982206-11 (Impax Letter to Jonah Shacknai, dated Dec. 20, 2007)).

[46] *Id*. (citing Ex. 50, MRX-MDL-000982206-11 at '07).

[47] *Id*. at ¶ 46 (citing Ex. 51, MRX-MDL-000982215-21 (Impax Complaint)).

[48] *Id*. (citing Ex. 30, Hanson Dep. Ex. 2).

[49] *Id*. at ¶ 48 (citing Ex. 55, SOL_SDZ0199530-44, at '31 (Sandoz paragraph IV notification)).  Teva also notified Medicis that it filed an ANDA for a generic version of Solodyn in December 2008, ███████████████████████████████████████████████ *Id*. (citing Ex. 42, MRX-MDL-000222737-49, at '38 (Barr paragraph IV notification)).  Mylan did the same.  *Id*. (citing Ex. 47, MRX-MDL-000568680-93, at '80 (Mylan paragraph IV notification ████████

[50] *Id*. at ¶ 49 (citing Ex. 40, LPIS-MDL-00329194-213 (Medicis's complaint against Sandoz)).  Medicis also sued Teva and Mylan in the same complaint.  Each generic manufacturer denied infringement of the '838 patent in its respective answer.  *Id*. (citing Ex. 44, MRX-MDL-000225845-74, at '57 (Sandoz Answer denying infringement); Ex. 43, MRX-MDL-000225681-700, at '90 (Mylan Answer denying infringement); Ex. 48, MRX-MDL-

### 3.   Generic Labels and Promotion.

███████████████████████████████████████████████████████

█████████████████████████████████

Generic companies typically do not promote their products to doctors or patients.[52]

Accordingly, they do not have means to induce any use of their products other than through the

label.[53]

### 4.   The Brand and Generic Solodyn Labels.

Solodyn is approved "to treat only inflammatory lesions of non-nodular moderate to

severe acne vulgaris in patients 12 years of age and older."[54]  The approved label for Solodyn

does not identify it as a "method for reducing the incidence or severity of vestibular side effects

resulting from the treatment of acne by the use of oral minocycline," as provided in the '838

patent.[55]

Other than information as to the manufacturer and/or distributor, here the generic labels

are identical to the Solodyn label for its 45, 90, and 135 mg products.[56]  And there is no evidence

---

000701312-30, at '19 (Barr/Teva Answer denying infringement allegations in paragraphs 57 and 58 of Medicis's complaint)).

[51] See *id*. at ¶ 50 (citing Ex. 29, Wortzman Dep. at 82:24-83:14 ████████████████████████████

████████████████████

*Mutual Pharm. Co. v. Bartlett*, 133 S. Ct. 2466, 2470 (2013) (citing *Pliva v. Mensing*, 564 U.S. 604 (2011) ("federal law prohibits generic drug manufacturers from independently changing their drugs' labels")); 21 U.S.C. § 355(j)(2)(A)(v) (stating that an ANDA must contain "information to show that the labeling proposed for the new drug is the same as the labeling approved for the [brand-name] drug . . . .").

[52] *See* SUF ¶ 51 (citing Ex. 12, Rosenthal Decl., ¶ 51 (███████████████████████████████████

████████████████████████████████████ Ex. 1, Addanki Rpt., ¶ 24 (██████████████

█████████████████████████████████████████████████████

[53] *Id*. at ¶ 52.

[54] *Id*. at ¶ 53 (citing Ex. 35, Wortzman Dep. Ex. 27 (Solodyn label)).

[55] *Id*.

[56] *See, e.g., id*. at ¶ 54 (citing Ex. 26, Polli Dep. Ex. 11 (Impax's generic Solodyn label); Ex. 54, SOL_SDZ0023442-63 (Sandoz's generic Solodyn label); Ex. 45, MRX-MDL-000237242-305 (Draft of Mylan's generic Solodyn label); *Minocycline Hydrochloride – Mylan Pharmaceuticals Inc.*, DailyMed, https://dailymed nlm.

that any of the generic Solodyn manufacturers promoted generic Solodyn ██████

███████████████████████████████████████████████████

█████████████████████████████████ █

## B.     ARGUMENT

To prove infringement of a method of use patent in a Hatch-Waxman case, a patent holder must establish that the accused infringer will actually practice the method of use (direct infringement), or that the accused infringer will induce others to practice the method of use (indirect infringement).  But generic manufacturers do not practice the method of use of any pharmaceutical product since they do not use or prescribe the product at issue.[58]  Thus, generic manufacturers can be liable for indirect infringement of a pharmaceutical method of use patent *if and only if* (a) their label instructs users in the method of use, *or* (b) the generic manufacturer otherwise promotes the practice of the method of use.

The generic labels at issue here do not instruct any use of Solodyn to "reduc[e] the incidence or severity of vestibular side effects resulting from the treatment of acne by the use of oral minocycline."  And, Medicis never identified evidence that any of the generic manufacturers promoted the method of use of the '838 patent.

---

nih.gov/dailymed/archives/fdaDrugInfo.cfm?archiveid=140979 (Mylan's generic Solodyn label); Ex. 41, LPIS-MDL-00405807-24 (Lupin's generic Solodyn label)).

[57] *Id*. at ¶ 52.

[58] *Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1363 & n.7 (Fed. Cir. 2003) (holding that there is no "genuine issue of material fact with regard to direct infringement" because there was no evidence that the ANDA-filer practiced the methods claimed in the patent, which was "hardly surprising [because] pharmaceutical companies do not generally treat diseases").

### 1.  Medicis Should Have the Burden of Proving that the '838 Patent Would Have Been Infringed by A Generic Product.

In its litigation with Impax, Medicis had the burden of proving Impax's alleged infringement.[59]  To meet this burden, Medicis had to prove that the generic formulations met each element of one or more of the claims in the patent.[60]  No reasonable juror could conclude that Medicis would have met its burden of proving infringement of the '838 patent against any of the generic Solodyn manufacturers.

In opposition to Plaintiffs' motion for leave to file this summary judgment motion, however, Defendants argued that Medicis's payment to Impax to avoid carrying this burden should create a burden on Plaintiffs to prove non-infringement.  But Plaintiffs clearly face no such burden in proving the antitrust violation.  As *Actavis* held, at the violation stage, there is little need for the court to consider the patent merits.  *Actavis*, 133 S. Ct. at 2236-37 (holding that "the size of the unexplained reverse payment can provide a workable surrogate for a patent's weakness, all without forcing a court to conduct a detailed exploration of the validity of the patent itself").  Nor should there be any burden on Plaintiffs to prove non-infringement in order to prove that a reverse payment caused a delay of generic entry.  Plaintiffs' burden to prove causation in a private antitrust case does not require Plaintiffs to prove that the patent holder would have lost the case that it paid to avoid litigating.

---

[59] *Medtronic v. Mirowski Family Ventures, LLC*, 134 S. Ct. 843, 846 (2014) ("A patentee ordinarily bears the burden of proving infringement.") (citing *Agawam Co. v. Jordan,* 74 U.S. 583, 609 (1868)).

[60] SUF ¶ 49 (citing Ex. 13, Thomas Rpt., ¶ 123); *see also, e.g., Move, Inc. v. Real Estate All. Ltd.*, 709 F.3d 1117, 1122 (Fed. Cir. 2013) ("To establish liability for direct infringement of a claimed method or process under 35 U.S.C. § 271(a), a patentee must prove that each and every step of the method or process was performed.") (citing *Akamai Techs., Inc. v. Limelight Networks, Inc.,* 692 F.3d 1301, 1307 (Fed. Cir. 2012) (*en banc*)); *Abbott GmbH & Co., KG v. Centocor Ortho Biotech, Inc.,* 870 F. Supp. 2d 206, 246 (D. Mass. 2012) ("Thus, for each asserted claim, the patentee must prove that every limitation of that claim is found in the allegedly infringing product.").

Once a plaintiff proves a violation (in this case by showing that the reverse payment violated the rule of reason), "the jury [may] conclude as a matter of just and reasonable inference from the proof of defendants' wrongful acts and their tendency to injure plaintiffs' business . . . that defendants' wrongful acts had caused damage to the plaintiffs."[61]  As *Bigelow* further explained, "[t]he most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created."[62]  Indeed, "no government seriously concerned about the evil of monopoly" would permit an antitrust violator to avoid liability merely by arguing that what would have happened absent its violation is too speculative; rather, "doubts should be resolved against the person whose behavior created the problem."[63]

Defendants may be able to argue that the '838 patent would have independently caused the delay that Plaintiffs allege was caused by the reverse payment.  But that is an intervening cause, and it is *Defendants*' burden to prove such an intervening cause.[64]

Neither *In re Nexium Antitrust Litig.*, 842 F.3d 34 (1st Cir. 2016), nor *In re Wellbutrin XL Antitrust Litig.*, 868 F.3d 132 (3d Cir. 2017), cited in Defendants' opposition for leave to file this motion, put the burden of proving noninfringement on Plaintiffs as part of their burden of proving causation.  In *Nexium*, the defendants produced evidence "that AstraZeneca's patents,

---

[61] *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264 (1946); *see also J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 565 (1981) (quoting *Bigelow*); *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 566 (1931) (jury is entitled to conclude "that the natural and probable effect of the combination and price cutting would be to destroy normal prices").

[62] *Bigelow*, 327 U.S. at 265.

[63] III Phillip Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 651(c) (2d ed. 2005).

[64] *Story Parchment*, 282 U.S. at 566 (defense contentions regarding intervening or alternate cause should be left "for the jury to be determined as a fact"); *In re Actos End-Payor Antitrust Litig.* 848 F.3d 89, 100-01 (2d Cir. 2017) (holding that once plaintiffs demonstrated a violation, it was Defendants' burden to show that patent litigation, a pending Citizens Petition, or failure to get FDA approval "was "the 'true' cause of the delay, and therefore the 'true' cause of the artificially high drug prices plaintiffs paid").

not its reverse payment to Ranbaxy, were the bar to a generic launch."[65]  In those circumstances, plaintiffs were required to produce "some evidence" of the patent's invalidity in order to reach the jury on whether the generic manufacturer would have marketed the product "at-risk."[66]  Similarly, in *Wellbutrin XL*, defendants' evidence that the generic infringed a third party's patent (not the brand's own patent) was unrebutted by plaintiffs.  Thus, defendants met their burden because, according to the Third Circuit, plaintiffs failed to offer any evidence to rebut defendants' evidence.  Accordingly, if Defendants believe that a patent would have caused the same delay that they appear to have paid for, it should at a minimum be up to them to prove that the patent had that power by proving infringement, just as they would have had to do had they not paid to eliminate the risk of losing the patent case.

In any event, however, the burden of proof does not make a difference in this case. Regardless of who has the burden, there is no material dispute of fact that the generic Solodyn labels do not list the method of use covered by the '838 patent, nor that any of the generic manufacturers promoted the method of use covered by the '838 patent.  Thus, there is no evidence of direct or indirect infringement by the generic manufacturers.

##### 2.    The Generic Manufacturers Did Not Directly Infringe the '838 Patent.

Throughout this case, Medicis has insisted tha

---

[65] *Nexium*, 842 F.3d at 63.

[66] *Id.*

[67] Ex. 17, Wagner Rpt., ¶ 180; *see also* Ex. 5, Godici Rebuttal Rpt., ¶ 87.



[68] Thus, if Dynacin (or any formulation) could not anticipate the patent, Dynacin itself (or any formulation) *also could not infringe* the patent.

Medicis could not prove direct infringement of the '838 patent because generic manufacturers simply do not practice methods of using prescription drugs.[70]

### 3. The Generic Manufacturers Did Not Indirectly Infringe the '838 Patent.

#### (a) Neither Solodyn's Label Nor the Generic Labels Described a Method of Use for Reducing Vestibular Side Effects.

The case law is clear:  for a generic company to be liable for the induced infringement of a method of use patent, the patentee must show that the FDA approved label promotes or instructs the practice of the patented method of use.[71]

---

[68] Ex. 24, Wagner Dep. at 69:14-70:14.

[69] SUF ¶ 49 (citing Ex. 24, Wagner Dep. at 59:13-66:13).

[70] *Id.* (citing Ex. 14, Thomas Rebuttal Rpt., ¶ 47

[71] *See, e.g., AstraZeneca Pharm. LP v. Apotex Corp.*, 669 F.3d 1370, 1378-79 (Fed. Cir. 2012) (holding that generics cannot infringe patents claiming methods of use for which the generics are not seeking approval); *Allergan, Inc. v. Alcon Labs.*, 324 F.3d 1322, 1334 (Fed. Cir. 2003) (patent-holder precluded from suing ANDA-filers for inducing infringement because they were not seeking FDA approval for the uses claimed in the patents and because the uses claimed in the patents were not FDA-approved); *Warner-Lambert Co.,* 316 F.3d at 1354-55 ("[I]t is not an act of infringement to submit an ANDA for approval to market a drug for a use when neither the drug nor the use is covered by an existing patent, and the patent at issue is for a use not approved under the NDA."). *See also Bayer Schering Pharma AG & Bayer HealthCare Pharm., Inc. v. Lupin, Ltd.*, 676 F.3d 1316, 1326 (Fed. Cir. 2012) (holding that ANDA-filers for a generic birth control drug, Yasmin, did not infringe a method of use patent that claimed to achieve three effects—contraception, an antiandrogenic effect, and an anti-aldosterone effect—because Yasmin was only approved for the contraceptive effect and the generics did not seek FDA approval for the combination of effects that the patent covered).

The FDA approved labels for Solodyn and its generic equivalents do not include the patented method of use ("reducing the incidence or severity of vestibular side effects").[72] Medicis has no expert opinion to prove infringement. ████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████ ██ Nor does Medicis have any other evidence to prove that any generic company with an ANDA for generic Solodyn could be liable for indirect infringement of the '838 patent.

**(b)   There is No Evidence that the Generic Manufacturers Otherwise Promoted Infringement of the '838 Patent's Method of Use.**

Medicis had no evidence that any of the generic manufacturers have, or otherwise would have, promoted Solodyn for the use in the '838 patent. Generic manufacturers do not generally promote their products. They do not have the economic incentives that compel brand manufacturers to engage in promotion. With respect to generic drugs, pharmacies have discretion to fill a prescription with any AB-rated product and they tend to choose the least expensive. Accordingly, ████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████[74] Brand companies also possess economies of scale in detailing

---

[72] *See* SUF ¶ 54 (citing Ex. 14, Thomas Rebuttal Rpt., ¶ 47 ██████████████████████████████
███████████████████████████████████████████████████████

[73] *Id*. (citing Ex. 17, Wagner Rpt., ¶ 14; Ex. 24, Wagner Dep. at 132:17-133:3).

[74] *Id*. at ¶ 51 (citing Ex. 12, Rosenthal Decl., ¶ 51).

that generic manufacturers do not possess.[75]  Even Defendants' expert seems to agree that

generic manufacturers do not typically promote their products to doctors or patients.[76]

There is no evidence that the generic manufacturers here promoted infringement of the

'838 patent's method of use.  The generic labels do not mention a reduction in vestibular side

effects, nor is there evidence that they otherwise promoted such a reduction in vestibular side

effects.[77]  Accordingly, Medicis could not have met its burden of showing that the generic

manufacturers indirectly infringed the '838 patent in the Solodyn patent litigations, and the Court

should enter summary judgment in favor of Plaintiffs establishing that no generic manufacturer

could have been found to infringe the '838 patent.

## V.   CONCLUSION

For the foregoing reasons, the Court should grant partial summary judgment as to

Medicis's possession of market power and as to Plaintiffs establishing that the '838 patent could

not have been found to be infringed by any manufacturer of generic Solodyn.

Dated:  November 1, 2017                                 Respectfully submitted,

**/s/Lauren Guth Barnes**                               **/s/ Steve D. Shadowen**
Thomas M. Sobol                                         Steve D. Shadowen
Lauren Guth Barnes                                      Hilliard & Shadowen LLP
Kiersten A. Taylor                                      919 Congress Avenue, Suite 1325
Hagens Berman Sobol Shapiro LLP                         Austin, TX 78748
55 Cambridge Parkway, Suite 301                         Tel: (855) 344-3928
Cambridge, MA 02142                                     Email: steve@hilliardshadowenlaw.com
Tel: (617) 482-3700
Fax: (617)482-3003                                      Michael M. Buchman
Email: tom@hbsslaw.com                                  Motley Rice LLC
          lauren@hbsslaw.com                            600 Third Avenue, 21st Floor

---

[75] *Id.*

[76] *Id.* (citing Ex. 1, Addanki Rpt., ¶ 24).  *See State of N.Y. v. Actavis PLC*, 787 F.3d 638, 655-56 (2d Cir. 2015) ("competition through state drug substitution laws is the only cost-efficient means of competing available to generic manufacturers" and "additional expenditures by generics on marketing would be impractical and ineffective because a generic manufacturer promoting a product would have no way to ensure that a pharmacist would substitute its product, rather than one made by one of its generic competitors.").

[77] *See* SUF ¶ 54 (citing Impax, Sandoz, Mylan, and Lupin generic Solodyn labels); *id.* at ¶ 52 (citing Ex. 36, IMPAX-SOLODYN00032142 (Impax press release regarding launch of generic Solodyn with no mention of the method of use to reduce vestibular side effects)).

kierstent@hbsslaw.com

*Interim Liaison and Co-Lead Counsel for
Proposed Direct Purchaser Class*


David F. Sorensen
Andrew C. Curley
Caitlin G. Coslett
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, PA 19103
Tel: (215) 875-3000
Fax: (215) 875-4604
Email: dsorensen@bm.net
         acurley@bm.net
         ccoslett@bm.net

*Interim Co-Lead Counsel for Proposed Direct
Purchaser Class*

**/s/ Barry L. Refsin**
Barry L. Refsin
Monica L. Rebuck
Hangley Aronchick Segal Pudlin
& Schiller
One Logan Square, 27th Floor
Philadelphia, PA 19103
Tel: (215) 568-6200
Fax: (215) 568-0300

*Counsel for CVS Pharmacy, Inc. and Rite Aid
Corporation*

New York, NY 10016
Tel: (212) 577-0040
Email: mbuchman@motleyrice.com

*Interim Co-Lead Counsel for the Proposed
End Payor Class*

Glen DeValerio
Berman DeValerio
One Liberty Square
Boston, MA 02109
Tel: (617) 542-8300

*Interim Liaison Counsel for the Proposed End
Payor Class*

**/s/ Scott E. Perwin**
Scott E. Perwin
Lauren C. Ravkind
Anna T. Neill
Kenny Nachwalter, P.A.
1100 Miami Center
201 South Biscayne Boulevard
Miami, FL 33131-4327
Tel. (305) 373-1000
Fax: (305) 372-1861

*Counsel for Walgreen Co. et al.*

**CERTIFICATE OF SERVICE**

I, Lauren Guth Barnes, hereby certify that I caused a copy of the foregoing to be filed electronically via the Court's electronic filing system. Those attorneys who are registered with the Court's electronic filing system may access these filings through the Court's system, and notice of these filings will be sent to these parties by operation of the Court's electronic filing system.

 Dated: November 1, 2017                     **/s/ Lauren Guth Barnes**
                                             Lauren Guth Barnes