**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE SOLODYN (MINOCYCLINE HYDROCHLORIDE) ANTITRUST LITIGATION | MDL No. 2503<br>1:14-MD-2503-DJC |
| THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | **Public Version** |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION TO EXCLUDE CERTAIN PORTIONS OF THE EXPERT TESTIMONY OF (1) TAMAR HOWSON AND (2) DENNIS CARLTON**

**Table of Contents**

**I. INTRODUCTION** .......... **1**

**II. FACTS** .......... **3**

**III. ARGUMENT** .......... **6**

A. Expert testimony must be relevant and reliable. .......... 6

B. The Court should preclude both Ms. Howson and Dr. Carlton from offering any opinion [redacted] .......... 7

1. Both Ms. Howson and Dr. Carlton [redacted] .......... 7

2. Ms. Howson's opinion [redacted] .......... 9

C. The Court should preclude Dr. Carlton's testimony [redacted] .......... 12

D. The Court should preclude Dr. Carlton's testimony regarding [redacted] .......... 14

1. [redacted] .......... 14

2. [redacted] .......... 17

**IV. CONCLUSION** .......... **18**

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993)....................6

*In re Ciprofloxacin Hydrochloride Antitrust Litig.*,
544 F.3d 1323 (Fed. Cir. 2008)....................17

*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993)....................3, 6

*FTC v. Actavis, Inc.*,
133 S. Ct. 2223 (2013).................... *passim*

*FTC v. Watson Pharmaceuticals, Inc.*,
677 F.3d 1298 (11th Cir. 2012) ....................17

*Herbert v. Lisle Corp*.,
99 F.3d 1109 (Fed. Cir. 1996)....................6

*Law v. National Collegiate Athletic Ass'n*,
902 F.Supp. 1394 (D. Kan. 1995), *aff'd*, 134 F.3d 1010 (10th Cir. 1998), *cert. denied*, 525 U.S. 822 (1998) ....................16

*Los Angeles Mem'l Coliseum Com'n v. Nat'l Football League*,
726 F.2d 1381 (9th Cir. 1984), *cert. denied*, 469 U.S. 990 (1984)....................16

*McGovern v. Brigham & Women's Hosp.*,
584 F.Supp.2d 418 (D. Mass. 2008) ....................6

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Ok.*,
468 U.S. 85 (1984)....................14

*In re Nexium (Esomeprazole) Antitrust Litig.*,
No. 12-md-02409, 2013 WL 4832176 (D. Mass Sept. 11, 2013) ....................18

*In re Niaspan Antitrust Litig.*,
42 F.Supp.3d 735 (E.D. Pa. 2014) ....................16

*Paladin Assocs., Inc. v. Montana Power Co.*,
328 F.3d 1145 (9th Cir. 2003) ....................16

*In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*,
No. 14-md-02503-DJC, 2015 WL 5458570 (D. Mass. Aug. 14, 2015) ....................7, 9

*Sullivan v. Nat'l Football League*,
34 F.3d 1091 (1st Cir. 1994)....................14

*In re Tamoxifen Citrate Antitrust Litig.*,
466 F.3d 187 (2nd Cir. 2006)....................17

*U.S. v. Phila. Nat'l Bank*,
374 U.S. 321 (1963)....................16

**Other Authorities**

Aaron Edlin, Scott Hemphill, Herbert Hovenkamp, & Carl Shapiro, *Activating Actavis*, 28 ANTITRUST 16, 21 (2013)....................18

Carrier, *Five Arguments Laid to Rest After Actavis*, ANTITRUST SOURCE, Oct. 2013....................18

Fed. R. Evid. 403....................6

*FTC v. Actavis and the Future of Reverse Payment Cases*, Remarks of Joshua D. Wright, Commissioner, Federal Trade Commission at the Concurrences Journal Annual Dinner, Sept. 26, 2013....................18

*The FTC's Role in Shaping Antitrust Doctrine: Recent Successes and Future Targets*, Remarks of Joshua D. Wright, Commissioner, Federal Trade Commission, 2013 Georgetown Global Antitrust Symposium Dinner, Sept. 24, 2013....................18

All Plaintiffs submit this memorandum in support of their motion to exclude certain opinions of Defendants' proposed experts Ms. Tamar Howson and Dr. Dennis Carlton.

## I. INTRODUCTION

In this case, Plaintiffs allege that Medicis Pharmaceutical Corp. ("Medicis") made a reverse payment to Impax Laboratories, Inc. ("Impax") to delay generic Solodyn. Medicis made this payment by entering into an agreement (the "November 2008 deal") that allowed Medicis to unlawfully preserve its monopoly power in exchange for sharing its supracompetitive revenues. At the same time, Medicis settled patent litigation against Impax, which agreed to delay its generic launch until November 26, 2011.

To obscure the nature of the delay payments to Impax, the November 2008 deal consisted of two intertwined cross-referencing agreements, both executed on November 26, 2008: (a) a License and Settlement Agreement (and amendments) ("LSA") in which Impax agreed to drop its challenge of the '838 Patent and keep its Legacy Strength generic Solodyn products off the market until November 2011, and (b) a purported "Joint Development Agreement" ("JDA") (and amendments), specifically referenced in the LSA, through which Impax received large, unjustified and continuing payments that far exceed the fair value for any services that may have been performed by Impax.

Under the November 2008 deal, Impax agreed to develop a new form of Solodyn ("next-gen Solodyn") and four generic dermatology products (the "ANDA products"). Plaintiffs' expert John Tupman, a former business development executive at Eli Lilly, reviewed the five products that Impax agreed to develop and concluded that the payments that Medicis agreed to make to

Impax exceeded the fair value of Impax's development services by about [redacted][1]

Ms. Howson, a former business development executive from Bristol-Meyers Squibb and SmithKline Beecham, and Dr. Carlton, an economist, appear to suggest in their reports that Medicis did not overpay for the developments services. Their opinions on this front are untethered from the law and unreliable. First, Dr. Gregory Bell, another of Defendants' experts, [redacted]. This is not a cognizable response to Plaintiffs' evidence under *FTC v. Actavis, Inc.*[3]

Second, the [redacted]

---

[1] *See* Expert Report of John R. Tupman, Jr., dated May 2, 2017, attached as Ex. 15 to Declaration of Lauren Barnes ISO Plaintiffs' Motion for Partial Summary Judgment and *Daubert* Motions filed Nov. 1, 2017 ("Barnes Decl."), at 5.

[2] *See* Expert Report of Gregory K. Bell, Ph.D., dated June 30, 2017 ("Bell Rpt."), attached as Ex. 3 to Barnes Decl., ¶ 55 n.128 [redacted]

[3] 133 S. Ct. 2223 (2013) ("*Actavis*").



[redacted]

Third, [redacted]

Finally, Dr. Carlton opined that [redacted] are not legally cognizable under *Actavis*.

Each of these opinions should be stricken under *Daubert* as unreliable and lacking fit.

## II. FACTS

Defendants retained Ms. Howson [redacted],[4] and retained Dr. Carlton [redacted][5] Ms. Howson purported to opine that [redacted]"[6] She further asserted, based on her [redacted]"[7] that [redacted]

---

[4] Expert Report of Tamar D. Howson, dated June 30, 2017 ("Howson Rpt."), attached as Ex. 6 to Barnes Decl., ¶ 5. Ms. Howson [redacted]

[5] Expert Report of Dennis W. Carlton, dated June 30, 2017 ("Carlton Rpt."), attached as Ex. 4 to Barnes Decl., ¶ 6. Dr. Carlton also opines on the potential profits from the APA.

[6] Howson Rpt. ¶ 84.

[7] Transcript of Deposition of Tamar D. Howson, taken Aug. 10, 2017 ("Howson Tr."), attached as Ex. 22 to Barnes Decl., at 97:14-15; *see also id.* at 101:4-13 [redacted] *id.* at 102:1-13 [redacted]



[redacted] Ms. Howson claimed that [redacted]

At her deposition, Ms. Howson [redacted]"[11] Rather, [redacted] Ms. Howson [redacted][13] Indeed, no one – not Medicis, not Impax, nor any of the multiple contract research organizations that Medicis hired – [redacted] which he defined as

---

something that's visible. I don't know what each and every pharmaceutical company does, because they don't talk [redacted]

[8] Howson Rpt. ¶ 82. Phase III is the final phase of human testing, conducted before a new drug is submitted to the FDA for approval. Howson Tr. 95-96.

[9] Howson Rpt. ¶ 83.

[10] Howson Tr. at 188:3-9 [redacted] (emphasis added).

[11] Howson Tr. at 95:19-20.

[12] *Id.* at 95:20-21.

[13] *Id.* at 103:21-104:3.



[redacted] Dr. Carlton calculated the [redacted] of the JDA to range from [redacted][15] [redacted][17]

[redacted]

Finally, Dr. Carlton [redacted][18] (Dr. Carlton reached this conclusion [redacted]

---

[14] Carlton Rpt. ¶ 40.

[15] *Id.* ¶ 41.

[16] *Id.*

[17] *Id.*

[18] *Id.* ¶ 55.

[redacted] In any event, any alleged benefits from the JDA concerned products distinct from the Legacy Strength generic Solodyn that Impax agreed to delay, thus any benefits from these other products would affect a different market than the one affected by Medicis's reverse payment.

## III. ARGUMENT

### A. Expert testimony must be relevant and reliable.

Pursuant to *Daubert*,[19] expert opinion must be reliable and fit the facts of the case. "Rule 702 of the Federal Rules of Evidence assigns to the trial judge the responsibility for ensuring that an expert's testimony as to scientific, technical, or other specialized knowledge both rests on a reliable foundation and is relevant to the task at hand."[20] The trial court should exercise this gatekeeping function when purported experts proffer "incorrect statements of law"[21] and opinions that are not supported by the facts.[22]

Moreover, "a judge assessing a proffer of expert scientific testimony under Rule 702 should also be mindful of other applicable rules," including Fed. R. Evid. 403, which permits exclusion of relevant evidence if it might mislead the jury.[23]

---

[19] *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

[20] *McGovern v. Brigham & Women's Hosp.*, 584 F.Supp.2d 418, 422-423 (D. Mass. 2008).

[21] *Herbert v. Lisle Corp*., 99 F.3d 1109, 1117 (Fed. Cir. 1996) ("[the] exercise of the trial court's gatekeeper authority [is encouraged] when parties proffer, through purported experts, not only unproven science . . . but markedly incorrect law. Incorrect statements of law are no more admissible through 'experts' than are falsifiable scientific theories.").

[22] *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) ("When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict.").

[23] *Daubert*, 509 U.S. at 595; Fed.R.Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of … misleading the jury….").

**B. The Court should preclude both Ms. Howson and Dr. Carlton from offering any opinion that [redacted]**

**1. Both Ms. Howson and Dr. Carlton [redacted]**

*Actavis* permits a defendant to attempt to justify a reverse payment by demonstrating that it represents only "fair value for services" rather than a payment to avoid the risk of competition.[24] Plaintiffs retained Mr. Tupman to show that Defendants cannot satisfy this burden.[25] Mr. Tupman explained that in the industry, the term [redacted] refers [redacted]."[26] He explained that [redacted] that [redacted]"[27] Mr. Tupman concluded [redacted]

[redacted][28] Any doubt that Defendants intend to rely on Ms. Howson and Dr. Carlton [redacted] is

[24] *Actavis*, 133 S. Ct. at 2236; *see also In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, No. 14-md-02503-DJC, 2015 WL 5458570, at *7 (D. Mass. Aug. 14, 2015) ("burden then shifts to Defendants to produce evidence to justify the payment by showing it was no more than the brand-name manufacturer's own saved litigation costs or was fair value for services the generic manufacturer promised to perform and was not a payment for delay").

[25] Expert Rebuttal Report of John R. Tupman, Jr., dated Aug. 21, 2017, attached as Ex. 16 to Barnes Decl., at 3.

[26] *Id.*

[27] *Id.* at 6-7 [redacted]

[28] Howson Rpt. ¶ 77 ([redacted] mphasis in original); Carlton Rpt. ¶ 23 [redacted]

dispelled by Dr. Bell, another of their experts, who wrote in his report that



[29] However, at deposition,

[30]

Ms. Howson

Instead,

The issue under *Actavis* is not whether it made business sense for the parties to use a reverse payment to resolve their patent dispute. It is whether the payment was made to avoid the risk of generic competition or for some other reason.[34] Because a significant part of this analysis is whether the patentee used the payment to induce the generic to abandon its claim in exchange for a share of the brand manufacturer's monopoly profits,[35] it is not appropriate to focus exclusively on value to the brand manufacturer and ignore the generic's perspective. An

[29] Bell Rpt. ¶ 55 n.128.

[30] Transcript of the Deposition of Dennis Carlton, taken Sept. 19,2017 ("Carlton Tr."), attached as Ex. 21 to Barnes Decl., at 78:3-11; Howson Tr. at 72:6-11.

[31] Howson Dep. at 72.

[32] *Id.* at 69-70.

[33] Carlton Rpt. ¶ 8.

[34] *Actavis*, 133 S. Ct at 2237 ("Although the parties may have reasons to prefer settlements that include reverse payments, the relevant antitrust question is: What are those reasons? If the basic reason is a desire to maintain and to share patent generated monopoly profits, then, in the absence of some other justification, the antitrust laws are likely to forbid the arrangement.").

[35] *Actavis*, 133 S. Ct. at 2235 (explaining that a reverse payment is evidence "that the patentee seeks to induce the generic challenger to abandon its claim with a share of its monopoly profits that would otherwise be lost in the competitive market").

objective fair value analysis addresses whether other market participants *not* involved in patent litigation would make the same payment for the same services at issue, and therefore answers the questions raised by *Actavis* with respect to whether the payment "was fair value for services the generic manufacturer promised to perform."[36] [redacted] will not be helpful to the jury. The transaction obviously made business sense to Medicis. If it didn't, Medicis would have not have agreed to it. Accordingly, these analyses of Ms. Howson and Dr. Carlton do not fit the issues in this case and should be excluded.

**2. Ms. Howson's opinion on [redacted]**

[redacted] But Ms. Howson does not offer such an opinion. [redacted].[39] However, even if Ms. Howson's opinion [redacted] were not excluded as speculative, it would not support Dr. Carlton's analysis because [redacted]

[36] *In re Solodyn*, 2015 WL 5458570, at *7.

[37] Carlton Rpt. ¶ 41.

[38] Howson Tr. at 213:16-18.

[39] Howson Tr. at 97:11-20



[redacted] Accordingly, regardless of the Court's determination as to the admissibility of Ms. Howson's opinions, [redacted] should be excluded because it relies on an opinion from Ms. Howson that does not exist.

In her report, Ms. Howson asserted that Impax [redacted]" in developing next-gen Solodyn.[40] [redacted][41] While Ms. Howson [redacted][44] More significantly, [redacted]

Ms. Howson's unsupported speculation is more likely to confuse or improperly influence the jury than to provide it with probative evidence of Medicis's estimate of the agreement's

---

[40] Howson Rpt. ¶ 82.

[41] *Id.*

[42] Howson Tr. at 100:16-101:13.

[43] *Id.* at 213:6-214:19.

[44] *Id.* at 102:21-103:11.

[45] *Id.* at 103:21-104:3.

[46] *Id.* at 213:16-18.

[47] *Id.* at 95:20-22.

potential profitability. It should be excluded on that basis.

But even if the Court does not exclude Ms. Howson's opinion,



"[50]

. She could not have been plainer that

Her only opinion

[48] Carlton Rpt. ¶ 40.

[49] *Id.* ¶ 41.

[50] *Id.* At his deposition, (Carlton Tr. at 303:13-22), but Plaintiffs are not aware of

[51] *See supra* pp. 3-4.

[52] Howson Tr. at 95:19-20 (

[53] *Id.* at 190:4-7



[redacted].[54] Without such supporting opinions, there is no basis for Dr. Carlton to conclude that [redacted] As such, Dr. Carlton's opinion is not reliable. It is also misleading because [redacted]

**C. The Court should preclude Dr. Carlton's testimony to the extent he relies [redacted]**

While their experts admit that "[redacted][55] Defendants offer no expert opinion on whether the '838 patent, or any other patent, was infringed. Their expert, [redacted][56] and [redacted] As to other patents, [redacted]

[54] *Compare* Howson Tr. at 192-94 ([redacted] *with* Carlton Tr. at 299:24-302:1 ([redacted] *and* Rice University, University of Houston Clear Lake & Tufts University, OnlineStat Book, Ch. 5 *Basic Concepts* available at http://onlinestatbook.com/2/probability/basic.html (explaining that "[w]hen two events are independent, the probability of both occurring is the product of the probabilities of the individual events.").

[55] Transcript of Deposition of R. Polk Wagner, taken Sept. 15, 2017 ("Wagner Tr."), attached as Ex. 24 to Barnes Decl., at 22:8-10.

[56] Wagner Tr. at 89:6-8. *See generally id.* at 88:25-89:10, 94:16-95:12 [redacted] 96:18-97:2 [redacted]

[57] Expert Report of Robert Langer, dated June 30, 2017 ("Langer Rpt."), attached as Ex. 7 to Barnes Decl., at 71 [redacted], 72 ([redacted]



[58] or [59] Defendants have no expert opinion on the likelihood of demonstrating infringement of the '838 patent or any other patent.

In his original report, and thus, for his own calculations, " [60] in assessing what the world absent the unlawful reverse payment looks like.[61] However, weeks after submitting his expert report, Dr. Carlton submitted an errata that sought to " to include ."[62] Defendants need that change because a valid patent that is not infringed would, of course, be no impediment to Impax or any other generic launching (hence, the at-risk launches by Teva, Sandoz and Mylan). At his deposition, .[63] But this is not so.

[58] Langer Rpt. at 58 ( 71 (

[59] pt. at 38-58 (stating that an element of Claim 1 an gree as Claim 1, and that Claim 6 is infringed to the same degree as Claim 5 but failing to perform any inspection or analysis for either Impax's or Sandoz's product), 59-71 (stating that " " various elements of Claim 1 as well as Claims 2, 3, or 4 of the '705 Patent and that Claims 5-8 are infringed to the same degree as Claim 1 but failing to perform any such analysis of the generic products). Concurrently with this motion, Plaintiffs seek to exclude Dr. Langer's testimony relating to whether the generic manufacturers' formulations of minocycline hydrochloride infringe any of Medicis's Solodyn patents.

[60] Carlton Rpt. at 30-31. *See id.* at 5 Expert Report of R. Polk Wagner dated June 30, 2017, attached as Ex. 17 to Barnes Decl.

[61] *See id.* at 30

[62] Carlton Errata Sheet, dated Aug. 21, 2017, attached as Ex. 27 to Barnes Decl., at 1.

[63] Carlton Tr. at 319:8-16.



[redacted]fringement. Thus [redacted] for such a conclusion is improper.

Because [redacted] any other defense expert [redacted], Dr. Carlton has no basis for an opinion requiring [redacted] Plaintiffs request that Dr. Carlton's alternate settlement analysis relying on [redacted] precluded and the errata change to paragraph 9 of his report, changing [redacted]" to "[redacted]" be struck.

### D. The Court should preclude Dr. Carlton's testimony regarding purported [redacted]

Dr. Carlton's opinions on purported [redacted] are contrary to law.

#### 1. [redacted] cannot justify the payments.

Dr. Carlton asserted that [redacted]" including [redacted]"[64] but claimed that [redacted] for these benefits. Dr. Carlton should not be permitted to mention this speculation about "[redacted] for which he does not account, are unsupported, and which are not cognizable under the law.

Under the rule of reason analysis, an "antitrust defendant may show . . . that legitimate justifications are present, thereby explaining the presence of the *challenged term* and showing the lawfulness *of that term*."[65] Here, Plaintiffs challenge Medicis's reverse payment, not the

---

[64] Carlton Rpt. ¶ 55.

[65] *Actavis*, 133 S. Ct. at 2236 (emphasis added); *id.* (defendants may identify "offsetting or redeeming virtues" of a reverse payment); *see also Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Ok.*, 468 U.S. 85, 117 (1984) (defendants must justify the "specific restraints on football telecasts that are challenged in this case"); *Sullivan v. Nat'l Football League*, 34 F.3d 1091, 1112 (1st Cir. 1994) (courts must "exclud[e] justifications that are

ability of pharmaceutical manufacturers to settle Hatch-Waxman litigation. *Actavis* explicitly acknowledged that drug manufacturers do not need reverse payments to settle patent cases because they "may, as in other industries, settle in other ways, for example, by allowing the generic manufacturer to enter the patentee's market prior to the patent's expiration, without the patentee paying the challenger to stay out prior to that point."[66] *Payments* from the brand manufacturer, not settlements generally, have the "potential for genuine adverse effects of competition."[67]

The two examples *Actavis* provides underscore that the procompetitive justifications must justify the *payments*, not the settlement:

> The reverse *payment*, for example, may amount to no more than a rough approximation of the litigation expenses saved through the settlement. That *payment* may reflect compensation for other services that the generic has promised to perform . . . Where a reverse *payment* reflects traditional settlement considerations, such as avoided litigation costs or fair value for services, there is not the same concern that a patentee is using its monopoly profits to avoid the risk of patent invalidation or a finding of noninfringement.[68]

The Court unambiguously concluded that, "one who makes such a *payment*" must be able to "explain and to justify *it*."[69] [REDACTED] are not a legally cognizable justification pursuant to *Actavis.*

Moreover, any procompetitive justification must benefit the market affected by the

---

so unrelated to the challenged practice that they amount to a collateral attempt to salvage a practice that is decidedly in restraint of trade").

[66] *Actavis*, 133 S. Ct. at 2237.

[67] *Id.* at 2234 (quoting *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460-61 (1986)).

[68] *Id*. at 2236 (emphasis added).

[69] *Id*. at 2237 (emphasis added).

anticompetitive conduct. *Actavis* explained that payments might be justified when they "reflect compensation for other services that the generic has promised to perform – such as distributing the *patented item* or helping to develop a *market for that item*."[70] This statement suggests that that any benefits must be in the same market for the product alleged to have been delayed. For the payment to benefit the relevant consumers, it must reflect fair value for "distributing the patented item or helping to develop the market for that item."[71] Similarly, traditional rule-of-reason case law holds that "[p]rocompetitive justifications for price-fixing must apply to the same market in which the restraint is found, not to some other market."[72] The development of a different product in a different market does not create any offsetting benefit in the market for the product affected by the reverse payment; development of a different product or product is thus not a cognizable procompetitive benefit.[73]

[redacted], Dr. Carlton offers no explanation for [redacted]. The opposite is true.[74]

---

[70] *Id.* at 2236 (emphasis added).

[71] *Id.*

[72] *Law v. National Collegiate Athletic Ass'n*, 902 F.Supp. 1394, 1406 (D. Kan. 1995), *aff'd*, 134 F.3d 1010 (10th Cir. 1998), *cert. denied*, 525 U.S. 822 (1998); *see also Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1157 n.11 (9th Cir. 2003) (holding that procompetitive effects in one market cannot justify anticompetitive effects in a separate market); *Los Angeles Mem'l Coliseum Com'n v. Nat'l Football League*, 726 F.2d 1381, 1392 (9th Cir. 1984) ("The relevant market provides the basis on which to balance competitive harms and benefits of the restraint at issue."), *cert. denied*, 469 U.S. 990 (1984).

[73] *See e.g., U.S. v. Phila. Nat'l Bank*, 374 U.S. 321, 370 (1963) (asserting anticompetitive effects of conduct in one market cannot be justified by beneficial effects in another).

[74] *See In re Niaspan Antitrust Litig.*, 42 F.Supp.3d 735, 753 (E.D. Pa. 2014) (holding that tying obligations under an agreement that were purportedly for fair value to the generic continuing to keep its product off of the market indicates that the payments do not reflect traditional settlement considerations, but rather are meant to ensure the generic stays off of the market and/or does not challenge the brand's patents).

**2. Permitting Generic Entry Before Patent Expiry Does Not Justify the Payments.**

Dr. Carlton opined that [redacted].[75] [redacted] cannot justify a reverse payment.

In *Actavis* itself, the agreement permitted generic entry more than five years before expiration of the patent.[76] Nowhere in the opinion did the Supreme Court suggest that a pre-patent expiry entry date could constitute a procompetitive justification. That was the rationale of the so-called "scope of the patent" test that *Actavis* expressly rejected.[77] Under that test, reverse payments were lawful so long as entry was permitted no later than expiration of the patent term.[78]

*Actavis* squarely rejected this approach of "measur[ing] the length or amount of a restriction solely against the length of the patent's term."[79] Deeming an agreement procompetitive merely because it permits pre-patent-expiry entry assumes that the patent is valid and infringed and that consumers therefore benefit from any "early" entry.

That assumption --[redacted] -- is precisely what *Actavis* rejected. As it explained, a patent "may or may not be valid, and may or may not be infringed."[80] The patent litigation "put the patent's validity at issue, as well as its actual

[75] Carlton Rpt. ¶ 55.

[76] *Actavis*, 133 S.Ct. at 2229.

[77] *FTC v. Watson Pharmaceuticals, Inc.*, 677 F.3d 1298, 1312 (11th Cir. 2012).

[78] *Id.*; *see also Actavis*, 133 S.Ct. at 2227 ("[S]ince the alleged infringer's promise not to enter the patentee's market expired before the patent's term ended, the [Eleventh] Circuit found the agreement legal and dismissed the FTC complaint."); *see also In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 544 F.3d 1323, 1332-37 (Fed. Cir. 2008); *In re Tamoxifen Citrate Antitrust Litig.*, 466 F.3d 187, 212-13 (2nd Cir. 2006).

[79] *Actavis*, 133 S. Ct. at 2231.

[80] *Id.*

preclusive scope[,]"[81]and it is therefore error to answer the antitrust question by merely referring "as the [Eleventh] Circuit referred, simply to what the holder of a valid patent could do,"[82] when the brand's payment was designed to prevent a judicial determination of the patent's power. No brand manufacturer would make a payment to a competitor that it was suing unless it believed that the payment was likely to delay entry. Commentators concur that after *Actavis* manufacturers "cannot defend their agreements by merely arguing that . . . the settlement provided entry prior to patent expiration."[83]

## IV. CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully request that the Court preclude the foregoing opinions of Ms. Howson and Dr. Carlton.

---

[81] *Id.*

[82] *Id.* at 2230-31; *see also In re Nexium (Esomeprazole) Antitrust Litig.*, No. 12-md-02409, 2013 WL 4832176 at *10-11 (D. Mass Sept. 11, 2013) (defendants' argument is "predicated" on the "widely followed scope-of-the-patent test" which "the Supreme Court rejected" in Actavis).

[83] *FTC v. Actavis and the Future of Reverse Payment Cases*, Remarks of Joshua D. Wright, Commissioner, Federal Trade Commission at the Concurrences Journal Annual Dinner, Sept. 26, 2013, attached as Ex. 60 to Barnes Decl.; *see also The FTC's Role in Shaping Antitrust Doctrine: Recent Successes and Future Targets*, Remarks of Joshua D. Wright, Commissioner, Federal Trade Commission, 2013 Georgetown Global Antitrust Symposium Dinner, Sept. 24, 2013, attached as Ex. 61 to Barnes Decl., ("The Court flatly rejected the scope of the patent test, and accepted the Commission's argument that companies cannot defend such agreements by merely arguing that the brand-name drug company would likely have prevailed had the patent case been fully litigated or that the settlement provided for entry prior to patent expiration."); Carrier, *Five Arguments Laid to Rest After Actavis*, ANTITRUST SOURCE, Oct. 2013, at *2-3, attached as Ex. 59 to Barnes Decl. (courts applying the scope-of-the-patent test "assumed the patent was valid and infringed and up[held] the agreement as long as it did not extend beyond the patent's expiration date" but "[t]he Supreme Court made clear that this deferential scope test is not appropriate I determining the antitrust legality of reverse-payment settlements."); Aaron Edlin, Scott Hemphill, Herbert Hovenkamp, & Carl Shapiro, *Activating Actavis*, 28 ANTITRUST 16, 21 (2013) attached as Ex. 57 to Barnes Decl. ("[T]he Court makes clear that payments made to delay competition or to avoid the risk of competition (in the event that the patentee loses the patent litigation) violate the antitrust laws. They do so even if the claimed infringer has only agreed to abstain from competition during a portion of the patent period.").

Dated: November 1, 2017

Respectfully submitted,

**/s/Lauren Guth Barnes**
Thomas M. Sobol
Lauren Guth Barnes
Kiersten A. Taylor
Hagens Berman Sobol Shapiro LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142
Tel: (617) 482-3700
Fax: (617)482-3003
Email: tom@hbsslaw.com
lauren@hbsslaw.com
kierstent@hbsslaw.com

*Interim Liaison and Co-Lead Counsel for Proposed Direct Purchaser Class*

David F. Sorensen
Andrew C. Curley
Caitlin G. Coslett
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, PA 19103
Tel: (215) 875-3000
Fax: (215) 875-4604
Email: dsorensen@bm.net
acurley@bm.net
ccoslett@bm.net

*Interim Co-Lead Counsel for Proposed Direct Purchaser Class*

**/s/ Steve D. Shadowen**
Steve D. Shadowen
Hilliard & Shadowen LLP
919 Congress Avenue, Suite 1325
Austin, TX 78748
Tel: (855) 344-3928
Email: steve@hilliardshadowenlaw.com

Michael M. Buchman
Motley Rice LLC
600 Third Avenue, 21st Floor
New York, NY 10016
Tel: (212) 577-0040
Email: mbuchman@motleyrice.com

*Interim Co-Lead Counsel for the Proposed End Payor Class*

Glen DeValerio
Berman DeValerio
One Liberty Square
Boston, MA 02109
Tel: (617) 542-8300

*Interim Liaison Counsel for the Proposed End Payor Class*

**/s/ Barry L. Refsin**
Barry L. Refsin
Monica L. Rebuck
Hangley Aronchick Segal Pudlin & Schiller
One Logan Square, 27th Floor
Philadelphia, PA 19103
Tel: (215) 568-6200
Fax: (215) 568-0300

*Counsel for Rite Aid Corporation et al.*

**/s/ Scott E. Perwin**
Scott E. Perwin
Lauren C. Ravkind
Anna T. Neill
Kenny Nachwalter, P.A.
1100 Miami Center
201 South Biscayne Boulevard
Miami, FL 33131-4327
Tel. (305) 373-1000
Fax: (305) 372-1861

*Counsel for Walgreen Co. et al.*

**CERTIFICATE OF SERVICE**

I, Lauren G. Barnes, hereby certify that this document was electronically filed and served by email on all counsel of record.

Date: November 1, 2017

/s/ Lauren G. Barnes
Lauren G. Barnes