# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE SOLODYN (MINOCYCLINE HYDROCHLORIDE) ANTITRUST LITIGATION<br><br>THIS DOCUMENT RELATES TO ALL ACTIONS | Civil Action No. 1:14-md-2503-DJC<br><br>ORAL ARGUMENT SCHEDULED FOR JANUARY 31, 2018 AT 2:00 PM (ECF NO. 353)<br><br>**FILED UNDER SEAL** |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE OPINIONS AND TESTIMONY OF JOHN R. THOMAS AND PETER HARDIGAN

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

LEGAL STANDARD..................................................................................................... 2

I.     PROFESSOR THOMAS'S OPINIONS ON VALIDITY, INFRINGEMENT, AND MEDICIS'S LIKELIHOOD OF SUCCESS IN PATENT LITIGATION ARE RELIABLE AND ADMISSIBLE................................................................. 3

     A.    Defendants Bear the Burden of Proving Infringement .............................. 4

     B.    Professor Thomas is Qualified to Opine on Patent Infringement, Validity, and Medicis's Likelihood of Success ......................................... 4

     C.    Professor Thomas Does Not Merely "Parrot" Dr. Kibbe's Opinions......... 9

II.    PROFESSOR THOMAS'S OPINIONS ON INEQUITABLE CONDUCT ARE RELIABLE AND ADMISSIBLE................................................................. 10

III.   PROFESSOR THOMAS'S OPINION REGARDING THE LITIGATION TIMELINE IS RELIABLE AND ADMISSIBLE ................................................ 15

     A.    Mr. Hardigan's Calculation of Litigation Expenses is Reliable and Admissible ............................................................................................... 20

CONCLUSION.............................................................................................................. 20

# TABLE OF AUTHORITIES

**Cases**                                                                                              **Page(s)**

*Allen v. Martin Surfacing*,
  263 F.R.D. 47 (D. Mass. 2008) ...............................................................................................9

*In re Asacol Antitrust Litig.*,
  No. 15-cv-12730-DJC,
  2017 U.S. Dist. LEXIS 186009 (D. Mass. Nov. 9, 2017) ..................................................2, 15

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
  509 U.S. 579 (1993) ..............................................................................................................1

*Egyptian Goddess, Inc. v. Swisa, Inc.*,
  543 F.3d 665 (Fed. Cir. 2008) ...............................................................................................4

*Exergen Corp. v. Wal-Mart Stores, Inc.*,
  575 F.3d 1312 (Fed. Cir. 2009) .............................................................................................10

*Ferrara & DiMercurio v. St. Paul Mercury Ins. Co.*,
  240 F.3d 1 (1st Cir. 2001) .....................................................................................................9

*Holmes Grp., Inc. v. RPS Prods.*,
  No. 03-40146-FDS, 2010 U.S. Dist. LEXIS 102727 (D. Mass. June 25, 2010) ...................13

*Imhaeuser v. Buerk*,
  101 U.S. 647 (1879) ..............................................................................................................4

*Iris Corp. v. Japan Airlines Int'l Co.*,
  No. 06-6336, 2009 WL 3245910 (E.D.N.Y. Sept. 30, 2009) ................................................20

*Joyal Prods. v. Johnson Elec. N. Am., Inc.*,
  No. 04-5172 (JAP), 2009 WL 512156 (D.N.J. Feb. 27, 2009) .............................................10

*King Drug Co. of Florence, Inc. v. Cephalon, Inc.*,
  No. 06-1797, 2015 WL 12645764 (E.D. Pa. Dec. 22, 2015) ..........................................4, 9, 16

*Lehigh Valley R.R. Co. v. Mellon*,
  104 U.S. 112 (1881) ..............................................................................................................4

*Mass. Mut. Life Ins. Co. v. DB Structured Prods.*,
  2015 U.S. Dist. LEXIS 59998 (D. Mass. May 15, 2015) .......................................................3

*Meds. Co. v. Mylan Inc.*,
  No. 11-cv-1285, 2014 U.S. Dist. LEXIS 61084 (N.D. Ill. May 2, 2014) .........................11, 13

*Microfinancial, Inc. v. Premier Holidays Int'l, Inc.*,
  385 F.3d 72 (1st Cir. 2004) ...................................................................................................5

*Milward v. Acuity Specialty Prods. Grp.*,
  639 F.3d 11 (1st Cir. 2011) ........................................................................................3

*In re Nexium (Esomeprazole) Antitrust Litig.*,
  842 F.3d 34 (1st Cir. 2016) ......................................................................................19

*Peckham v. Cont'l Cas. Ins. Co.*,
  895 F.2d 830 (1st Cir. 1990) ....................................................................................14

*Therasense, Inc. v. Becton, Dickinson & Co.*,
  No. C 04-02123 WHA,
  2008 U.S. Dist. LEXIS 107992 (N.D. Cal. May 12, 2008) ...........................6, 8, 11

*Under Sea Ind., Inc. v. Dacor Corp.*,
  833 F. 2d 1551 (Fed. Cir. 1987) .................................................................................4

*United Food & Commer. Workers Local 1776 v. Teikoku Pharma USA*,
  No. 14-md-02521-WHO,
  2017 U.S. Dist. LEXIS 182940 (N.D. Cal. Nov. 3, 2017) .....................5, 11, 13, 15

*United States v. Valle*,
  72 F.3d 210 (1st Cir. 1995) ......................................................................................13

*United States v. Zolot*,
  968 F. Supp. 2d 411 (D. Mass. 2013) ........................................................................2

*In re Wellbutrin XL Antitrust Litig.*,
  868 F.3d 132 (3d Cir. 2017) .....................................................................................15

*In re Wellbutrin XL Antitrust Litig.*,
  133 F. Supp. 3d 734 (E.D. Pa. 2015) .........................................................................5

*In re Yasmin & YAZ (Drospirenone) Mktg., Sales Practices & Prods. Liab. Litig.*,
  No. 3:09-MD-02100-DRH,
  2011 U.S. Dist. LEXIS 145593 (S.D. Ill. Dec. 16, 2011) .......................................15

*Young v. Lumenis, Inc.*,
  341 F. Supp. 2d 925 (S.D. Ohio 2004) .....................................................................20

**Other Authorities**

Fed. R. Evid. 702(b) ........................................................................................................9

## INTRODUCTION

Plaintiffs submit this Opposition to Defendants' motion to exclude the opinions of Plaintiffs' expert Professor John Thomas and portions of the opinion of Peter Hardigan pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  Professor Thomas, a patent law professor at Georgetown University School of Law, who has been recognized as an expert by Congress,[1] the United States Patent and Trademark Office ("PTO"),[2] and the Federal Judiciary,[3] and who is the author of the text, *Pharmaceutical Patent Law*,[4] is more than qualified to opine on the validity and infringement of Medicis's patents, as well as the timeline for Impax-Medicis patent litigation.  Defendants' criticisms are unfounded and should be rejected.  Defendants' only criticism of Mr. Hardigan's opinion regarding litigation expenses is that he relies on the timeline provided by Professor Thomas.  Since Professor Thomas's opinion is reliable and admissible, so is Mr. Hardigan's.[5]

Professor Thomas reviewed the record from the various patent litigations over Medicis's patents as well as the expert opinions of Plaintiffs' technical expert, Dr. Arthur Kibbe, and came to certain conclusions on issues of infringement, validity, and enforceability concerning

---

[1] Expert Report of John Thomas, Esq., dated May 4, 2017 ("Thomas Rpt."), attached as Ex. 13 to Decl. of Lauren Barnes ISO Plaintiffs' Motion for Partial Summary Judgment and Daubert Motions filed Nov. 1, 2017 ("Barnes Decl."), at ¶ 4 (noting that he has received several grants to serve as a Visiting Scholar at the Congressional Research Service, has written numerous reports for Congress concerning intellectual property, and has also testified before congressional committees on numerous occasions).

[2] *Id*. at ¶ 3 (noting that he served as the inaugural Thomas Alva Edison Visiting Scholar at the PTO).

[3] *Id*. at ¶ 4 (noting he has served as a Special Master for the U.S. District Court for the Eastern District of Michigan in a number of intellectual property cases, and also as an expert witness in Brazil, Canada, England, Germany, Norway, and the United States).

[4] *Id*. at ¶ 6.

[5] Defendants also seek to exclude portions of the expert report of Thomas G. McGuire on the basis that he relies on Professor Thomas for "the estimated length of the '838 patent litigation between Medicis and Impax had there been no settlement."  Mem. in Support of Defs.' to Exclude the Testimony of Thomas G. McGuire at 18-19.  Defendants' objection to Professor McGuire is baseless for the same reasons set forth herein.

Medicis's patents.[6]  Additionally, after analyzing the record in Medicis's litigations over the '838

patent against other generic competitors, Professor Thomas came to certain conclusions about

the timeline for a hypothetical similar litigation between Medicis and Impax that was never filed

because Impax accepted a large unjustified payment from Medicis rather than launching its

generic product.  These opinions are relevant to issues before the jury, namely the strength of

Medicis's patents, some of which were the subject of Medicis's agreements with Impax and

Sandoz.  Professor Thomas's opinions will assist the parties in efficiently explaining the patent

litigation landscape to the jury, both in terms of the weakness of Medicis's patents and the length

of time the parties would have expected any hypothetical litigation to have lasted absent a

settlement agreement.  In his analysis of litigation costs that Medicis and Impax saved by

settling, Mr. Hardigan relied upon Professor Thomas's analysis concerning litigation timing.[7]

## LEGAL STANDARD

Expert opinion should only be excluded where it "is so fundamentally unsupported that it

can offer no assistance to the jury.'"[8]  Lesser criticisms of expert testimony should be addressed

through the adversarial process, including through cross-examination.[9]  Further, "*Daubert* does

---

[6] Professor Thomas analyzed certain patents that Medicis actually asserted against the generic competitors Sandoz and Lupin, or which were at issue with defendant Impax, including U.S. Patent No. 5,908,838 ("'838 patent") and U.S. Patent No. 7,790,705 ("'705 Patent").  Additionally, Professor Thomas analyzed certain patents that Medicis owned but never asserted against any of these generic manufacturers, including U.S. Patent No. 7,541,347 ("'347 Patent"), U.S. Patent No. 7,544,373 ("'373 Patent"), U.S. Patent No. 7,919,483 ("'483 Patent"), U.S. Patent No. 8,268,804 ("'804 Patent"), and U.S. Patent No. 8,252,776 ("'776 Patent").  Collectively, and for ease of reference, these patents are referred to as "Medicis's patents."

[7] Mr. Hardigan was asked by counsel to assume that the jury will find Mr. Thomas's opinion regarding the litigation timeline reasonable.

[8] *United States v. Zolot*, 968 F. Supp. 2d 411, 417 (D. Mass. 2013) (citation omitted).

[9] *Id.* (adhering to "'the Supreme Court's admonition that 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'") (quoting *Daubert*, 509 U.S. at 596); *accord In re Asacol Antitrust Litig.*, No. 15-cv-12730-DJC, 2017 U.S. Dist. LEXIS 186009, at *35 (D. Mass. Nov. 9, 2017) (citation omitted) ("As long as an expert's scientific testimony rests upon good grounds, based on what is known, it should be tested by the adversary

not require that a party who proffers the expert testimony carry the burden of proving to the judge that the expert's assessment of the situation is correct."[10]

Courts within this District have succinctly described the *Daubert* inquiry as posing three questions: (1) Is this junk science? (2) Is this a junk scientist? (3) Is this a junk opinion?[11]  Here, the answer to all three questions is a resounding "no."  Defendants' critiques of Professor Thomas's opinions do not raise questions of admissibility, only questions of weight, which Defendants may seek to explore on cross-examination.

## I.  PROFESSOR THOMAS'S OPINIONS ON VALIDITY, INFRINGEMENT, AND MEDICIS'S LIKELIHOOD OF SUCCESS IN PATENT LITIGATION ARE RELIABLE AND ADMISSIBLE

Professor Thomas is more than qualified to opine on patent validity, infringement, and Medicis's likelihood of success against generic companies in litigation over the '838 patent. Defendants' attacks on his qualifications and methodologies are untenable.[12]

---

process—competing expert testimony and active cross-examination—rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies.").

[10] *Milward v. Acuity Specialty Prods. Grp.*, 639 F.3d 11, 15 (1st Cir. 2011).

[11] *Mass. Mut. Life Ins. Co. v. DB Structured Prods.*, 2015 U.S. Dist. LEXIS 59998, at *29 (D. Mass. May 15, 2015) (citing *First Choice Armor & Equipment, Inc. v. Toyobo Am., Inc.*, 839 F. Supp. 2d 407, 416 (D. Mass. 2012)).

[12] Defendants dedicate a portion of their brief to arguing that Professor Thomas's non-infringement opinion on the '838 patent was untimely.  Defs.' Br. at 2-5.  On December 5, 2017, this Court "decline[d] to preclude Plaintiffs from relying on this theory at trial," and ordered that Defendants could further depose Professor Thomas on the opinions in his Rebuttal Report on noninfringement.  Electronic Order, ECF No. 827.  Thus, Plaintiffs will not respond to Defendants' timeliness arguments here.  However, Plaintiffs dispute that during his deposition, Professor Thomas "introduced a second new non-infringement opinion for the '838 Patent. . . . that the '838 Patent would not—and could not—have been infringed by the generic manufacturers due to the wording of their proposed labels."  Defs.' Br. at 2-3.  Professor Thomas's testimony was consistent with the opinions expressed in paragraphs 5 and 47-50 of his Rebuttal Report regarding the generics' proposed labels.  *Compare* Deposition Transcript of John Thomas, dated Sept. 29, 2017 ("Thomas Tr."), attached as Ex. 83 to Decl. of Lauren Barnes ISO Plaintiffs' Opp. to Defendants' Mots. for Summary Judgment, Daubert Mots. and Local Rule 56.1 Statement of Material Facts as to Which There is No Genuine Issue to Be Tried" ("Barnes Opp. Decl.")), at 53:7-19; 114:13-20; 119:2-15; 120:5-15, *with* Rebuttal Expert Report of John Thomas, dated May 4, 2017 ("Thomas Reb."), attached as Ex. 14 to Barnes Decl., at ¶¶ 5, 47-50.  It was not a "new" or "separate" non-infringement opinion as Defendants misleadingly assert.  Defs.' Br. at 2.

A.      **Defendants Bear the Burden of Proving Infringement**

Professor Thomas opines 

While Defendants argue that

Plaintiffs bear the burden of proof on infringement,[14] as the patent holder, Medicis has the initial

burden of proving infringement.[15]   While there may be a presumption of validity, there is never a

presumption of infringement.   Accordingly, Defendants bear the burden of proof on this issue.[16]

In any event, this issue does not go to the admissibility of Professor Thomas's opinions.

B.      **Professor Thomas is Qualified to Opine on Patent Infringement, Validity, and Medicis's Likelihood of Success**

Professor Thomas's expertise in patent law is beyond question.[17]   Defendants do not

dispute that he is an expert in patent law.   He has been recognized as an expert by Congress, the

PTO, and the Federal Judiciary.   Moreover, as a professor of law at Georgetown University,

Professor Thomas has taught courses in patent law and practice and on the Hatch-Waxman Act

for fifteen years.[18]   He has co-authored the treatise *Principles of Patent Law*, as well as a text on

---

[13] *See* Thomas Reb. at ¶¶ 5, 47-50.

[14] Defs.' Br. at 4.

[15] It is bedrock law that the patent holder always bears the burden of proving infringement. *See, e.g., Lehigh Valley R.R. Co. v. Mellon*, 104 U.S. 112, 119 (1881) (infringement "cannot be presumed"); *Imhaeuser v. Buerk*, 101 U.S. 647, 662 (1879) ("burden to prove infringement never shifts"); *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 678 (Fed. Cir. 2008) ("the burden of proof as to infringement remains on the patentee"); *Under Sea Ind., Inc. v. Dacor Corp.*, 833 F. 2d 1551, 1557 (Fed. Cir. 1987) ("The burden always is on the patentee to show infringement"). The fact that this is an antitrust case changes nothing on this score, since if Medicis could not have sustained its burden of proving infringement in the patent case, the jury in this antitrust case will be entitled to find that Medicis would have lost its infringement claim against Impax.

[16] *See* Pls.' Opp'n to Defs.' Mot. for Summ. J. Due to Lack of Causation, at Sec. III.B.2.

[17] *See, e.g., King Drug Co. of Florence, Inc. v. Cephalon, Inc.*, No. 06-1797, 2015 WL 12645764, at *3 (E.D. Pa. Dec. 22, 2015) (holding that Professor Thomas's "varied and substantial experience" allowed him "to offer opinions on the FDA and patent landscapes in general as well as when the ANDAs would have been eligible, as a regulatory matter, to receive final approval in specific").

[18] Thomas Rpt. at ¶ 2.

*Pharmaceutical Patent Law* with the Bureau of National Affairs.[19]  Additionally, he has co-authored a patent law casebook, an intellectual property hornbook, book chapters on intellectual property law, and numerous law review articles on intellectual property law.[20]  Finally, Professor Thomas has served as an Instructor and Visiting Scholar at the Patent and Trademark Office.[21]

Professor Thomas is indisputably an expert on pharmaceutical patent law and practice and regulatory issues associated with the Hatch-Waxman Act, which are the subjects on which Professor Thomas opines here.[22]  Experts with qualifications similar to his have been permitted to testify as to the strength of the generic companies' positions with respect to validity and infringement of patents.[23]  Tellingly, Defendants also proffered a law professor (Professor Wagner) to opine on validity issues with respect to the '838 patent.[24]

Professor Thomas opines that (1) the '838 patent was invalid as obvious and unenforceable based on inequitable conduct due to withholding material information regarding the on-sale bar; (2) the '838 patent was not infringed by generic formulations; and (3) each of the remaining patents are invalid as obvious or not infringed.

---

[19] *Id*. at ¶ 6.

[20] *Id*.

[21] *Id*. (Curriculum Vitae at 1).

[22] Professor Thomas does not claim to be a person skilled in the art with respect to the technical aspects of the '838 patent, but such qualification are not necessary for him to render his opinions here.

[23] *See United Food & Commer. Workers Local 1776 v. Teikoku Pharma USA*, No. 14-md-02521-WHO, 2017 U.S. Dist. LEXIS 182940, at *117-22 (N.D. Cal. Nov. 3, 2017) ("*Lidoderm*") (denying motions to exclude the opinions of plaintiffs' patent law and technical experts as to "what would have been the likely outcome of the '529 patent litigation"); *In re Wellbutrin XL Antitrust Litig.*, 133 F. Supp. 3d 734, 765-66 (E.D. Pa. 2015) (allowing the expert, a patent law professor, to opine on a patent litigant's chances of success in a patent suit), *aff'd, In re Wellbutrin XL Antitrust Litig.*, 868 F.3d 132, 169 (3d Cir. 2017) (relying on the same expert's testimony regarding patent litigant's chances of prevailing on infringement, validity, and inequitable conduct); *cf. Microfinancial, Inc. v. Premier Holidays Int'l, Inc.*, 385 F.3d 72, 80 (1st Cir. 2004) ("Rule 702 is not so wooden as to demand an intimate level of familiarity with every component of a transaction or device as a prerequisite to offering expert testimony.") (citing *Daubert*, 509 U.S. at 594).

[24] Expert Report of R. Polk Wagner, dated June 30, 2017 ("Wagner Rpt."), attached as Ex. 17 to Barnes Decl., at ¶¶ 1-3 (stating qualifications).

Professor Thomas noted that ████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████ They do so in order to posit that two slowly dissolving formulations of minocycline that had been used to treat acne for years before the application for the '838 patent, Minocin and Dynacin, were not inherent embodiments of the '838 patent, and thus the patent was not invalid because of the on-sale bar.[26]  Assuming *arguendo* that is the case, Professor Thomas opines ████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████.[27]

Professor Thomas's non-infringement opinion with regard to the '838 patent does not hinge on the technical aspects of the patent, but goes to whether the generic label includes any information showing that the drug is to be used for a ████████████████████████████ ████████████████████████████████████████████████████████████ There is no scientific or technical expertise needed for that analysis; one only needs an understanding of patent law and how generic companies market their products.  The label expressly describes what use the product is indicated for, and Professor Thomas, as an expert in pharmaceutical patent law, is more than competent to review the patent and the label for that purpose.[28]

---

[25] Thomas Reb. at ¶ 47.

[26] *Id.*

[27] *Id.*

[28] *Therasense, Inc. v. Becton, Dickinson & Co.*, No. C 04-02123 WHA, 2008 U.S. Dist. LEXIS 107992, at *9-10 (N.D. Cal. May 12, 2008) ("Some issues of materiality may be so independent of scientific complexity that even patent lawyers can understand them. . . . if scientist are needed to explain . . . then mere lawyers should refrain from purporting to explain the science part.").

Professor Thomas's opinions as to the invalidity of Claim 8 of the '705 patent and Claims 7 through 13 of the '776 patent are based upon his expertise in pharmaceutical patent law and his reliance upon the opinions of Dr. Kibbe and Plaintiffs' medical expert, Dr. Vashi.[29]  Claim 8 of the '705 patent depends from Claim 1 of the patent (a method of using a specific formulation of minocycline to treat acne), which Dr. Kibbe opined was obvious, and adds the element that the treatment of acne be from among a list of acne conditions that had long been known in the art according to Dr. Vashi.[30]  Similarly, Claims 7 through 13 of the '776 patent depend from Claim 1 (a method of using a formulation of minocycline with a specific dissolution rate to treat acne), for which Dr. Kibbe offered an opinion on obviousness.  Claims 7 through 13 similarly add elements concerning the treatment of acne, and the distribution of information about known side effects of minocycline.  Professor Thomas relies upon Dr. Vashi's opinions that these elements were known in the prior art.[31]  Thus, Defendants' assertion that Professor Thomas is offering opinions as to these patents outside his area of expertise is unfounded.[32]  Where appropriate, Professor Thomas relies on Dr. Kibbe or Dr. Vashi for a scientific or technical analysis, but applies his own understanding of patent law to opine on validity and infringement.

Defendants claim that Professor Thomas never offered an opinion as to non-infringement of claims 9-17 of the '705 patent.[33]  That is not so.  In his opening report, Professor Thomas notes █████████████████████████████████████████████████████████████

---

[29] Thomas Rpt. at ¶¶ 200, 210-213.

[30] See id. at ¶¶ 189-200.

[31] See id. at ¶¶ 203-13.

[32] Defendants also assert that Professor Thomas's opinions on validity as to the '347 and '373 patents have no basis. Def. Br. at 7.  Ultimately, this is irrelevant.  Defendants' expert, Dr. Langer admitted that those patents are simply not infringed by any of the generics.  See Expert Report of Robert Langer, dated June 30, 2017 ("Langer Rpt."), attached as Ex. 7 to Barnes Decl., at ¶¶ 221, 224.  Thus, those patents are no longer relevant in this case.

[33] See Defs.' Br. at 6 n.7.

"effectively treats acne of the patient and with a reduction in adverse vestibular side effects by the once daily administration of the oral dosage form, as compared to administration of an immediate-release dosage form."[34]  He further opines that ███████████████████████████

████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████

████████████████████████████████  He further notes that ██████████████████████

████████████████████████████████████████

██████████████████████████████████████

████████████████████████[6]  Professor Thomas does not need to rely on Dr. Kibbe to reach this conclusion, as the answer is supplied by his expertise and knowledge of patent law.[37]

In each instance of patent evaluation, Professor Thomas either relies on Dr. Kibbe or Dr. Vashi for the requisite technical analysis, or supplies his own opinion where a scientific explanation is not required or useful.  This procedure comports with the law. As the district court noted in *Therasense,* "it is not always true" that an expert needs to be a "person of ordinary skill in the art" to opine on materiality, because some issues "may be so independent of scientific complexity that even patent lawyers can understand them."[38]  Accordingly, none of his testimony should be excluded.

---

[34] Thomas Rpt. at ¶ 164.

[35] *Id*. at ¶ 165.

[36] *Id*.

[37] Thomas Tr. at 279:1-17 ██████████████████████████████████████
████████████████████████████████████████████████████████████
███████████████████████████████████████████

[38] 2008 U.S. Dist. LEXIS 107992, at *9.

### C.     Professor Thomas Does Not Merely "Parrot" Dr. Kibbe's Opinions

As Defendants admit, "experts may rely on the opinions of other experts."[39]  Under

Federal Rule of Evidence 702, an expert's opinions must be "based on sufficient facts or data"—

"[t]he term 'data' is intended to encompass the reliable opinions of other experts."[40]  "[W]hen an

expert relies on the opinion of another, such reliance goes to the weight, not to the admissibility

of the expert's opinion."[41]

Professor Thomas relies on Dr. Kibbe's analysis of the technical aspects of the '838 and

several other patents in order to opine on Medicis's chances of success in prevailing in patent

litigation.[42]  Again, Defendants do not dispute that Professor Thomas is an expert in

pharmaceutical patent law.  Accordingly, he is well-qualified to render these opinions.  Similar

attacks on his testimony have been rejected in other cases.[43]  Professor Thomas does not merely

recite Dr. Kibbe's patent analyses, but supplements them with his *own* independent conclusions

as to the likely outcome of patent litigation.  While Dr. Kibbe can provide the testimony that

demonstrates what would be obvious to a person of skill in the art, Professor Thomas's testimony

is necessary to educate the jury about the impact of Dr. Kibbe's analysis.  Professor Thomas is

able to explain to the jury that under the patent law, Dr. Kibbe's analysis provides a basis for

concluding that the patents at issue are obvious.  Moreover, Professor Thomas is then able to

---

[39] Defs.' Br. at 8.

[40] Fed. R. Evid. 702(b) & advisory committee's note.

[41] *Ferrara & DiMercurio v. St. Paul Mercury Ins. Co.*, 240 F.3d 1, 9 (1st Cir. 2001); *accord Allen v. Martin Surfacing*, 263 F.R.D. 47, 64 (D. Mass. 2008) (finding that defendant's challenge to an expert's reliance on another expert went "to the weight of the testimony, not to its admissibility").

[42] *See, e.g.,* Thomas Rpt. at ¶¶ 102, 129, 135, 159, 202, 207.

[43] *King Drug,* 2015 WL 12645764, at *5 ("In reaching his conclusions, [Professor Thomas] did not simply parrot the ideas of other experts. Furthermore, there is nothing impermissible about consulting studies or research conducted by others in the relevant field.").

explain, based upon Dr. Kibbe's analysis, that the generic manufacturers were likely to prevail in

the litigation.  Again, it is noteworthy that Defendants' expert, Professor Wagner, a patent law

professor, ████████████████████████████████████████████████████████

████████████████████████████████████████)[44] in coming to his own conclusions

about validity and infringement.[45]

Although they do not expressly argue that it is a basis to exclude Professor Thomas's

opinion, Defendants suggest that Dr. Kibbe's opinions are erroneous.[46]  Defendants' criticisms of

Dr. Kibbe's opinions are appropriately addressed in Plaintiffs' Opposition to Defendants' Motion

to Exclude Opinions and Testimony of Arthur Kibbe, Ph.D.

## II.    PROFESSOR THOMAS'S OPINIONS ON INEQUITABLE CONDUCT ARE RELIABLE AND ADMISSIBLE

As an expert in pharmaceutical patent law, Professor Thomas is qualified to opine on

inequitable conduct.  There are two elements to an inequitable conduct claim: "(1) an individual

associated with the filing and prosecution of a patent application made an affirmative

misrepresentation of material fact, failed to disclose material information, or submitted false

material information; and (2) the individual did so with a specific intent to deceive the PTO."[47]

---

[44] Plaintiffs have submitted a challenge to certain of Professor Wagner's opinions for which he relies upon Dr. Langer.  Plaintiffs did so because Dr. Langer does not actually opine that each claim element is met, and thus, Professor Wagner's conclusions as to infringement are unsupported by the very technical opinion upon which he purports to rely.  *See* Pls.' Mot. To Exclude Certain Portions Of The Proposed Expert Testimony Of (1) Dr. Robert S. Langer and (2) R. Polk Wagner.  1:14-md-2503-DJC, ECF No. 788 (Nov. 22, 2017).

[45] Defendants cite *Joyal Prods. v. Johnson Elec. N. Am., Inc.,* No. 04-5172 (JAP), 2009 WL 512156 (D.N.J. Feb. 27, 2009), suggesting that Professor Thomas was excluded in that case because he improperly relied on another expert.  Defs.' Br. at 9.  However, the *Joyal* opinion does not deal with precluding testimony, but addresses whether treble damages for willful infringement were appropriate.  Defendants speculate as to why the court excluded Professor Thomas, as it did not issue an opinion on the issue.  *See Joyal Prods.,* No. 04-5172 (JAP), Order at 1, ECF No. 142 (D.N.J. July 8, 2008) (precluding testimony without explanation).  As such, *Joyal* provides no support for Defendants' motion here.

[46] *See* Defs.' Br. at 9 n.9 (arguing that Dr. Kibbe provided conclusory explanations for why one of skill in the art would combine references for obviousness).

[47] *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1327 n.3 (Fed. Cir. 2009)).

Courts have found that a legal expert such as Professor Thomas is indeed permitted to opine on unenforceability due to inequitable conduct, including the elements of materiality and specific intent.[48]  Much like the plaintiffs' expert in *Lidoderm*, here Professor Thomas opines that ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████  Professor Thomas's analysis is not speculative, but is based on information and evidence that the generic companies possessed in the Solodyn patent litigations.[50]  Based upon the circumstantial evidence, Professor Thomas reasonably opined that Dr. Gans' actions were intentional and the material withheld was material.[51]

Furthermore, Defendants distort the extent to which Professor Thomas opines on specific intent.  In his report and during his deposition, Professor Thomas ████████████████████████████

---

[48] *See Lidoderm,* 2017 U.S. Dist. LEXIS 182940, at *59-61 (allowing plaintiffs' legal expert, a law professor, to opine on inequitable conduct, specifically the issue of "whether [defendant] and the [patent] inventor (Ono) affirmatively misled the PTO by failing to disclose specific . . . prior art references"); *Meds. Co. v. Mylan Inc.,* No. 11-cv-1285, 2014 U.S. Dist. LEXIS 61084, at *17 (N.D. Ill. May 2, 2014) (permitting expert to testify based upon the file history and record to support an inference that the applicants acted with intent to deceive the PTO); *Therasense,* 2008 U.S. Dist. LEXIS 107992, at *12 (holding that patent law expert "should be allowed to opine on whether [material information] should have been revealed to the PTO").

[49] *See* Thomas Rpt. at ¶¶ 103-110.  Plaintiffs' theory with respect to inequitable conduct is not that Medicis had been pursuing sham litigation; this Court has already ruled on that theory (Plaintiffs reserve all appellate rights as to that theory).  Instead, Plaintiffs will offer Professor Thomas's opinion in support of the theory that the generic defendants had a very strong patent unenforceability position, rendering the '838 patent suspect for additional reasons beyond non-infringement and invalidity on obviousness grounds.

[50] *See, e.g., id.* at ¶ 103 & n.25 (stating that ███████████████████████████████



[51] Citing their concurrently-filed *Daubert* motion to exclude the testimony of Mr. Doll, Defendants argue that Professor Thomas cannot opine on "the actions that an examiner would have taken if presented with the allegedly material information." Defs.' Br. at 10 (emphasis omitted).  For the reasons explained in Plaintiffs' opposition to that motion, Professor Thomas should also be permitted to opine on what a reasonable patent examiner would have done.  *See* Pls.' Opp'n to Defs.' Mot. to Exclude Opinions and Testimony of John Doll, at Sec. III.

█████████████████████████████████████████████████████████

████████████████████████ .[52]  Professor Thomas's highly specialized experience provides the basis

for his opinions.  It is Professor Thomas's understanding of the patenting process, informed by

years of study and teaching, both as a patent law professor, but also as an instructor at the PTO,

that is useful to the jury to understand the interplay between the patent applicant and the PTO

necessary to provide context for the disclosure and the non-disclosure of information to the PTO.

For example, he testified:



Defendants note that "Thomas' reports do not even *mention* any 'intent' of Dr. Gans or

Medicis," yet argue that he introduced opinions on intent for the first time at his deposition.[54]

---

[52] Thomas Rpt. at ¶¶ 103-110 ████████████████████████████████
██████████████ Thomas Tr. at 255:15-24 ('████████████████████████████
█████████████████████████████████████████████████████ *id*. at
263:5-7 ████████████████████████████████████████████████

[53] Thomas Tr. at 262:8-263:7.

[54] Defs.' Br. at 12 n.11.

The testimony that Defendants cite of Professor Thomas's deposition transcript is not fairly characterized as "speculating as to Dr. Gans' intent."[55]  Rather, he was simply recounting ███████████████████████████████████████████, in direct response to questions posed by defense counsel.[56]  This form of testimony is permissible.[57]  Professor Thomas clearly described the evidence he relied upon.  Defendants may seek to cross-examine Professor Thomas on how he interpreted the record evidence.

With respect to materiality, Professor Thomas is more than competent to opine on what information would be material to a patent application, such as whether a product that encompassed the claimed invention was on-sale over a year prior to the application.[58]  As Professor Thomas explained in his deposition, such information is among the most basic information that a patent examiner is trained to look for, and is one of the first issues he teaches in his course on patent law.  As he testified in his deposition:



---

[55] *Id*. at 11.

[56] *See* Thomas Tr. at 58:24-61:20.

[57] *United States v. Valle*, 72 F.3d 210, 216 (1st Cir. 1995) (stating that experts are not prohibited "from testifying to predicate facts from which a jury might infer . . . intent"); *Meds. Co.*, 2014 U.S. Dist. LEXIS 61084, at *17 (expert permitted to "identify certain facts from the file history and record to support an inference that the [patent] applicants acted with intent to deceive [the Patent Office]").  In any event, even if Professor Thomas does opine on specific intent, such testimony is permissible.  *See Lidoderm*, 2017 U.S. Dist. LEXIS 182940, at *59-61, *117-20 (allowing the parties to opine as to "intent to deceive" the PTO within the context of disputing inequitable conduct in a pharmaceutical reverse-payment settlement case).

[58] *Meds. Co.*, 2014 U.S. Dist. LEXIS 61084, at *19 (allowing patent law expert to "opine on whether a certain criteria is material to a Patent Office examiner"); *Holmes Grp., Inc. v. RPS Prods.*, No. 03-40146-FDS, 2010 U.S. Dist. LEXIS 102727, at *16 (D. Mass. June 25, 2010) (allowing expert to "testify as to whether a reasonable patent examiner would have considered the information to be material").

[59] Thomas Tr. at 152:13-19.

Defendants have admitted that Dynacin meets the dissolution profile of several of the claims of the patent, but instead argue the formulation is not the "method of use" in the patent.  If the jury accepts Defendants' experts' position that a formulation cannot be material to a method of use patent, they jury can disregard Professor Thomas's opinion on materiality.  If, however, a formulation can anticipate a method of use patent, as Professor Thomas opines, his opinion on materiality is highly relevant and clearly within Professor Thomas's expertise.

Defendants' final objection to Professor Thomas's opinion on inequitable conduct—that it amounts to an "ultimate legal conclusion[]"—is also unpersuasive.[60]  Even if it were an ultimate conclusion for the jury to make, "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."[61]  Thus, while Professor Thomas identifies facts that are relevant to and embrace the issue of inequitable conduct, and draws reasonable inferences from those facts, his opinion does not become an impermissible legal conclusion.  Unlike in a patent case such as *Sundance*, where opining on inequitable conduct would potentially invade the province of the jury on the ultimate issue, this is an antitrust case, where the ultimate issue for the jury to decide is whether the Defendants engaged in anticompetitive conduct by entering into reverse-payment patent settlements.[62]  Professor Thomas's testimony does not present the same concerns.

---

[60] Defs.' Br. at 13.

[61] *Peckham v. Cont'l Cas. Ins. Co.*, 895 F.2d 830, 837-38 (1st Cir. 1990) (citing Fed. R. Evid. 704(a)).

[62] *See* Defs.' Br. at 12 (citing *Sundance, Inc. v. Demonte Fabricating Ltd.*, 550 F.3d 1356, 1364 (Fed. Cir. 2008)).

## III.   PROFESSOR THOMAS'S OPINION REGARDING THE LITIGATION TIMELINE IS RELIABLE AND ADMISSIBLE

Professor Thomas opines on what Impax and Medicis could have reasonably expected regarding the patent litigation timeline for Solodyn had they not settled.[63]  Professor Thomas's opinion is not merely "*ipse dixit*" as Defendants claim, but is supported by facts and a reliable methodology.

As an expert in patent law, Professor Thomas should be permitted to offer his opinion as to the likely disposition of the patent litigation.[64]  Professor Thomas notes that his analysis concerning the ███████████████████████████████████████████ ████████████████████████████████████████████████ ███████████████  Professor Thomas analyzed the ██████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████ ████████████████  Then, analyzing statistics of the average timing of appeals in the Federal Circuit as of 2008, Professor Thomas concludes that ████████████████████ ████████████████████████████████  Finally, conservatively assuming that a trial were

---

[63] Thomas Rpt. at ¶ 228 ███████████████████████████████████████████ ████████████████████████████████████████████████

[64] *In re Wellbutrin XL Antitrust Litig.*, 868 F.3d 132, 169 (3d Cir. 2017) (allowing patent law expert to opine on patent litigant's "chance[s] of prevailing" on infringement, validity, and inequitable conduct); *Lidoderm*, 2017 U.S. Dist. LEXIS 182940, at *117-22 (denying motions to exclude the opinions of plaintiffs' experts as to "what would have been the likely outcome of the '529 patent litigation"); *cf. Asacol*, 2017 U.S. Dist. LEXIS 186009, at *58-59 (allowing FDA expert to opine on whether "FDA would have approved" a certain formulation of the drug Asacol); *In re Yasmin & YAZ (Drospirenone) Mktg., Sales Practices & Prods. Liab. Litig.*, No. 3:09-MD-02100-DRH, 2011 U.S. Dist. LEXIS 145593, at *41-42 (S.D. Ill. Dec. 16, 2011) (finding that an expert "with unquestioned knowledge of the regulatory scheme and requirements . . . may testify about what a reasonable FDA official would have done").

[65] Thomas Rpt. at ¶ 231.

[66] *Id.*

[67] *See id.* at ¶ 232 (citing 2008 statistics for timing of appeals in the Federal Circuit).

even necessary in the '838 patent litigation, Professor Thomas concludes ██████████
█████████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████ [68]  Although his

textbook on pharmaceutical patent law may state that "litigation rarely runs its course in the 30-

month time frame,"[69] at his deposition he clarified that "████████████████████████
████████████████████████████████████  Professor Thomas has

previously been permitted to offer a timeline of when certain generic defendants would have

been able to receive final FDA approval on their drugs.[71]

Defendants note that the timeline in the Mylan-Medicis litigation was eventually

extended and argue that Professor Thomas "fail[ed] to alter his proposed timeline accordingly."[72]

However, Professor Thomas explains why his timeline is unaltered in his opening report.  There,

he acknowledges that the "████████████████████████████████████████████████
████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████ [73]

However, he explains that his timeline is based upon what Medicis and Impax could have

reasonably *expected at the time of settlement*, and there is no reason they would have known of

future events, such as the reexamination of the '838 patent, that would extend the initial

---

[68] *Id.* at ¶ 233.

[69] Defs.' Br. at 7.

[70] Thomas Tr. at 37:22-24.

[71] *See King Drug,* 2015 WL 12645764, at *4 (holding that Professor Thomas's "timeline" of "when the Generic Defendants would have been eligible to receive final approval as a regulatory matter satisf[ies] Rule 702's reliability requirement").

[72] Defs.' Br. at 16.

[73] Thomas Rpt. at ¶ 231 n.70.

timeline.[74]  Defendants ignore this fundamental facet of Professor Thomas's timeline analysis.

Given the straightforward issues in the litigation, and the likelihood of summary disposition,

even earlier resolution than Professor Thomas's trial timeline was most likely.

Defendants also take issue with Professor Thomas's opinion that litigation between

Impax and Medicis "would have been ripe for summary judgment, and would have concluded . .

. much earlier than in [his] original, very conservative, timeline, which laid out the time period

for trial and appeal."[75]  Professor Thomas notes that this opinion is ██████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████

Based upon Defendants' experts' opinions ███████████████████████████████████

███████████████████████████████████████████  Professor Thomas's opinion on

early resolution of the patent litigation was strengthened.  Either the patent is invalid based upon

the on-sale bar, or it cannot be infringed because the generic manufacturers neither practice nor

induce infringement of the patent—and both of these paths are amenable to summary disposition.

Moreover, because Impax had final approval as of February 2009, the court would have been

more amenable to expedited resolution.  The parties that continued in the '838 patent litigation

(Mylan and Lupin) did not have final approval until years after the litigation began.[77]

---

[74] *Id.*

[75] Thomas Reb. at ¶ 11 (footnote omitted).

[76] *Id.* at ¶ 11 n.3.

[77] Mylan did not get final approval until July 20 2010, and Lupin did not get final approval until November 30, 2011.  *See* Appendix B to Defendants' Local Rule 56.1 Statement of Material Facts as to Which There Is No Genuine Issue to be Tried (listing oral tetracycline FDA approvals from May 2006 to present).  Professor Thomas's discussion in his book *Pharmaceutical Patent Law* concerned the average Hatch-Waxman case, wherein there is a 30 month stay, and the generic defendant typically has yet to gain approval.

Professor Thomas's opinion as to summary judgment is based on a straight-forward interpretation of patent law and an analysis of the facts of the case.  As he explained during his deposition as to the issue of the on-sale bar:



Professor Thomas further explained why the issues of infringement and validity were amenable to summary disposition during his deposition, and demonstrated that he is well qualified to give his opinion as to how the Impax-Medicis litigation would have unfolded:



---

[78] Thomas Tr. at 44:19-45:20.

[79] *Id*. at 46:15-47:7.

Defendants cite to two decisions in which courts have disagreed with Professor Thomas's analyses and one in which his opinion was excluded.[80]  As the Court is aware, exclusions under *Daubert* are case specific.  Professor Thomas has been permitted to testify in approximately 20 cases.[81]  And, as shown above, his opinions more than meet the *Daubert* standards.

Defendants' reliance on *Nexium* is misplaced.[82]  There, *all* patent experts were stricken for the purposes of trial, without prejudice to later move for their admission, because the Court was convinced that it was "not trying a patent case."[83]  And the First Circuit held that the district court had not ruled out patent evidence.[84]  Professor Thomas's opinion on the litigation timeline not only supports Mr. Hardigan's opinion, but it also supports Mr. McGuire's and Dr. Leffler's alternative settlement opinions, and therefore has broad applicability in this case.

The *Nexium* court did not take issue with Professor Thomas's qualifications, or doubt whether his testimony could assist the jury.[85]  The portion of the *Nexium* transcript that Defendants cite did not concern Professor Thomas's testimony regarding whether an appeal "was likely to succeed," but concerned whether he could opine on reasonable royalty damages and the size of a reverse payment.[86]  Professor Thomas offers no such testimony in this case.  Defendants

---

[80] *See* Def. Br. at 18 & n.13 (citing *Nexium*, *Young* and *Iris* cases).

[81] *See* Thomas Rpt., curriculum vitae at 9-10.

[82] *See* Defs.' Br. at 18 (citing *Nexium* transcript stating that "two lawyers, Upadhye and Thomas will not testify").

[83] *See In re Nexium (Esomeprazole) Antitrust Litig.,* No. 12-02409, Tr. at 23:1-27:4, ECF No. 716 (D. Mass. Dec. 30, 2013) (striking all patent experts without prejudice regarding trial testimony, but letting them "all stand" for summary judgment).

[84] *In re Nexium (Esomeprazole) Antitrust Litig.*, 842 F.3d 34, 47 (1st Cir. 2016) (noting that plaintiffs chose not to put on patent evidence but "[t]his choice by the plaintiffs was not mandated by the district court's ruling").

[85] *Nexium,* No. 12-02409, Tr. at 24:25-25:6, ECF No. 716 ("[I]n this case every one of these experts seems, and the Court is prepared to find, speaks to an area of endeavor that is sufficiently specialized that they would assist the jury. We have no junk science here. All of these experts pass that test. Second, these experts are not hired guns, they are experts in their own field and they all, they all pass that test.").

[86] *See Nexium*, 842 F.3d at 46 (noting that experts Upadhye and Thomas could not testify about *settlement negotiations* because the Court found they were "lawyers, not economists"); *see generally Nexium,* No. 12-02409,

also miscite *Young v. Lumenis*.  There, the court accepted Professor Thomas's opinion.[87]  And, in

*Iris Corp. v. Japan Airlines*, Professor Thomas's opinion was adopted by the court.[88]

### A.  Mr. Hardigan's Calculation of Litigation Expenses is Reliable and Admissible

Defendants' only basis for seeking exclusion of Mr. Hardigan's calculation of litigation

expenses is that he relies upon the litigation timeline provided by Professor Thomas.[89]  They do

not question Mr. Hardigan's qualifications to do so, or otherwise question his methodology.  As

shown above, Professor Thomas's opinion as to the timeline for litigation between Impax and

Medicis is reliable and admissible.  If Defendants disagree with it, they can use cross-

examination.  Accordingly, Defendants' attacks on Mr. Hardigan's calculation of litigation

expenses are meritless, and his opinion should not be excluded.[90]

## CONCLUSION

Defendants have not provided a legally or factually sound basis upon which to exclude

the testimony of Professor Thomas and Mr. Hardigan.  Defendants' motion to exclude Professor

Thomas's and Mr. Hardigan's testimony should be denied.

---

Mot. to Exclude Expert Testimony of Thomas McGuire, Shashank Upadhye and John Thomas Relating to Prilosec Litig., ECF No. 605 (Dec. 10, 2013).

[87] *Compare* Defs.' Br. at 18 n.13 (citing *Young* and suggesting that Thomas's expert testimony regarding inequitable conduct was excluded), *with Young v. Lumenis, Inc.*, 341 F. Supp. 2d 925 (S.D. Ohio 2004) (nowhere holding that that Professor's Thomas's testimony should be excluded under *Daubert* or Rule 702); *see also Iris Corp. v. Japan Airlines Int'l Co.*, No. 06-6336, ECF No. 33 (E.D.N.Y. Jan. 14, 2008) (nowhere excluding Professor Thomas's expert opinion).

[88] *Iris Corp. v. Japan Airlines Int'l Co.*, No. 06-6336, 2009 WL 3245910, at *4 (E.D.N.Y. Sept. 30, 2009) (finding that defendant's examination of passports constituted a "use" of the passports under § 271(g)).

[89] *See* Defs.' Br. at 19-20.

[90] Defendants also attack Mr. McGuire's reliance on Professor Thomas's litigation timeline to support his alternative "competitive scenarios" in the absence of a settlement between Impax and Medicis.  *See* Mem. in Support of Mot. to Exclude the Testimony of Thomas G. McGuire at 18-19.  As explained above, Professor Thomas used a reliable methodology to determine the expected length of the litigation, and accordingly Mr. McGuire's opinions should not be excluded.

Dated: December 15, 2017                      Respectfully submitted,


**/s/Lauren Guth Barnes**                     **/s/ Steve D. Shadowen**
Thomas M. Sobol                               Steve D. Shadowen
Lauren Guth Barnes                            Hilliard & Shadowen LLP
Kiersten A. Taylor                            919 Congress Avenue, Suite 1325
Hagens Berman Sobol Shapiro LLP               Austin, TX 78748
55 Cambridge Parkway, Suite 301               Tel: (855) 344-3928
Cambridge, MA 02142                           Email: steve@hilliardshadowenlaw.com
Tel: (617) 482-3700
Fax: (617)482-3003                            Michael M. Buchman
Email: tom@hbsslaw.com                        Motley Rice LLC
      lauren@hbsslaw.com                     600 Third Avenue, 21st Floor
      kierstent@hbsslaw.com                  New York, NY 10016
                                             Tel: (212) 577-0040
                                             Email: mbuchman@motleyrice.com


*Interim Liaison and Co-Lead Counsel for*     *Interim Co-Lead Counsel for the Proposed End*
*Proposed Direct Purchaser Class*             *Payor Class*

David F. Sorensen                             Glen DeValerio
Andrew C. Curley                              Berman DeValerio
Caitlin G. Coslett                            One Liberty Square
Berger & Montague, P.C.                       Boston, MA 02109
1622 Locust Street                            Tel: (617) 542-8300
Philadelphia, PA 19103
Tel: (215) 875-3000
Fax: (215) 875-4604
Email: dsorensen@bm.net
      acurley@bm.net
      ccoslett@bm.net


*Interim Co-Lead Counsel for Proposed Direct*  *Interim Liaison Counsel for the Proposed End*
*Purchaser Class*                              *Payor Class*

**/s/ Barry L. Refsin**                        **/s/ Scott E. Perwin**
Barry L. Refsin                               Scott E. Perwin
Monica L. Rebuck                              Lauren C. Ravkind
Hangley Aronchick Segal Pudlin                Anna T. Neill
& Schiller                                    Kenny Nachwalter, P.A.
One Logan Square, 27th Floor                  1100 Miami Center
Philadelphia, PA 19103                        201 South Biscayne Boulevard
Tel: (215) 568-6200                           Miami, FL 33131-4327
Fax: (215) 568-0300                           Tel. (305) 373-1000

Fax: (305) 372-1861

*Counsel for Rite Aid Corporation et al.*

*Counsel for Walgreen Co. et al.*

**CERTIFICATE OF SERVICE**

I hereby certify that under-seal copies of this document will be electronically served on Defendants' counsel of record on December 15, 2017, and a redacted public version will be filed on the court's CM/ECF system, which will automatically email notice to all counsel of record.

Dated: December 15, 2017                    **/s/ Lauren G. Barnes**

                                             Lauren G. Barnes