UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|                                      | ) |                              |
|---                                   |---|---                           |
|                                      | ) |                              |
|                                      | ) |                              |
| IN RE SOLODYN (MINOCYCLINE           | ) |                              |
| HYDROCHLORIDE) ANTITRUST             | ) |                              |
| LITIGATION                           | ) | Civil Action No. 14-md-02503 |
|                                      | ) |                              |
|                                      | ) |                              |
|                                      | ) |                              |

**MEMORANDUM AND ORDER**

**CASPER, J.**                                                    February 6, 2018

**I.      Introduction**

The Court has previously resolved eleven of the motions to exclude proffered expert testimony under Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993) filed, D. 948, and now, after oral argument, D. 979, the Court resolves the remaining five Daubert motions. D. 742, 743, 746, 749, 750.

**II.     Discussion**

   **A.      W. Paul DeBree**

Defendants move to strike W. Paul DeBree's ("DeBree") expert testimony. D. 742. DeBree has over twenty years of experience in the Pharmacy Benefit Manager ("PBM") industry, and "opine[s] on the mechanics of the PBM industry and the possibility of identifying indirect purchasers" for the EPP class. D. 577-1 ¶¶ 1, 5 ("DeBree Rpt."). He concludes that "the identities of those who paid or reimbursed for Solodyn and generic Solodyn" and the amount they paid are "readily available" without analyzing individual PBM contracts. Id. ¶¶ 6, 24.

1

Defendants argue that DeBree's opinion is "irrelevant to the ascertainability standard," under which, Defendants argue, the Plaintiffs must "establish a mechanism for distinguishing the injured from uninjured class members." D. 742-1 at 3 (quoting In re Nexium Antitrust Litig., 777 F.3d 9, 19 (1st Cir. 2015)). Defendants argue that DeBree identifies class members without proposing a method for excluding uninjured members. D. 742-1 at 3-4. DeBree relies upon records that include purchasers that EPPs purport to exclude, such as flat co-payers, third-party purchasers that are fully insured and consumers who used coupons. D. 742-1 at 4-7. The Court already allowed class certification, and as the Court explained then, the ascertainability requirement demands an "objective criterion" upon which to define the class, a standard the EPP class readily met, with the support of DeBree's testimony. D. 682 at 28 (quoting Nexium, 777 F.3d at 19). Even if Defendants are correct that DeBree does not propose a mechanism for separating the uninjured from the injured class members, EPPs relied upon other expert testimony—such as that of Dr. Richard Frank—for that at class certification. See D. 682 at 30-38. DeBree's testimony was still relevant to the ascertainability standard and the Court does not strike it on this basis.

It is not clear whether DeBree's testimony will be offered during Phase I of the trial, given that his testimony focuses on class certification and damages allocation, see DeBree Rpt. ¶¶ 5-6, but he is currently listed as a potential witness for the Plaintiffs, D. 943 at 47. Seeing no other objections to DeBree's expert opinion, the Court DENIES Defendants' motion to exclude it, D. 742.

    **B.**    **Dr. Richard Frank**

Defendants also move to strike the expert opinion of Dr. Richard Frank ("Frank"). D. 743. Frank is a professor of Health Economics at Harvard Medical School with three decades of

experience working as an economist focused on the pharmaceutical industry. D. 732-1 ¶¶ 1-4 ("Frank Rpt."). Defendants argue that Frank's methodology is unreliable because it depends upon but-for scenarios that are without support in his report or elsewhere in the record. D. 743-1 at 4-7. EPPs argue that Frank's expert opinion rather focuses on the antitrust injury and damages resulting from Plaintiffs' hypothetical success on each causation theory. D. 865 at 7-8. In fact, Frank's report makes clear that he is not opining on which but-for scenarios would have occurred, or why. Frank Rpt. ¶ 48. Moreover, as the Court has ruled, D. 948 at 37, 41, 43-44, 51, there remains a genuine dispute of material fact regarding Plaintiffs' causation theories.

Defendants focus on what Frank calls Scenario 1 (and what the Court has now labeled "Scenario A," D. 948 at 31), a but-for scenario in which Impax launched at-risk. D. 743-1 at 4-5. The Court will not decide the sufficiency of this particular causation theory, which is built on several evidentiary building blocks already discussed, see D. 948 at 31-44, within the context of deciding the admissibility of Frank's expert opinion, which uses the but-for scenarios as working assumptions. Rather, the jury must determine whether those causation theories have merit and whether the assumptions Frank relied upon are reliable bases for his opinion. See In re Asacol Antitrust Litig., No. 15-cv-12730-DJC, 2017 U.S. Dist. LEXIS 186009, at *41 (D. Mass. Nov. 8, 2017). If Defendants persuade the jury that, as they argue, Frank's Scenario 1 could not have occurred in a but-for world, then they will be undermining Frank's damages calculations that depend on that assumption as well.

Defendants also argue that Frank's opinions are unreliable because they are based upon certain conclusions about but-for scenarios by Plaintiffs' expert Thomas McGuire. D. 743-1 at 5-6. Experts are permitted to rely on the conclusions of other experts, see Ferrara & DiMercurio v.

St. Paul Mercury, 240 F.3d 1, 9 (1st Cir. 2001), and the Court has declined to exclude the portions of McGuire's testimony relevant here. D. 948 at 47-48.

Finally, Defendants contend that Frank opines on the state of mind of the FDA and Congress and offers opinions regarding the law. D. 743-1 at 6-7; D. 909 at 8-9. Defendants are correct that Frank cannot testify as to the state of mind of an agency or corporation, but Defendants have not identified particular statements from Frank's report that are problematic in this way. The Court sees no Daubert issue with Frank's explanation of concepts such as, for example, generic and brand equivalence, state substitution laws and the regulatory approval process, as they serve as the basis for his methodology.

The Court thus DENIES Defendants' motion to exclude Frank's opinion, D. 743.

**C.     John Tupman**

Finally, Defendants move to exclude the expert opinion of John Tupman ("Tupman"). D. 746. Tupman, a consultant for business development and licensing in the life sciences industry, with thirty-two years of experience in Eli Lilly's corporate business department, D. 746-2 at 29 ("Tupman Rpt."), opines that the Medicis-Impax Joint Development Agreement ("JDA") is "[h]ighly [a]typical," and "no reasonable pharmaceutical company in Medicis's position would have agreed to the Impax JDA in November 2008 unless they were receiving something of value beyond the service provided by Impax under the Impax JDA." Id. at 31.

Defendants argue that Tupman impermissibly opines on parties' intentions or states of mind, and that much of Tupman's report is merely "his recitation of Plaintiffs' version of the facts, excerpts of testimony and documents, and his interpretation of straightforward evidence." D. 746-1 at 5-7. "Inferences about the intent or motive of parties or others lie outside the bounds of expert testimony," In re Rezulin Prods. Liab. Litig., 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004), as does

4

testimony that merely "describes 'lay matters which a jury is capable of understanding and deciding without the expert's help,'" id. at 546 (quoting Andrews v. Metro N. Commuter R.R. Co., 882 F.2d 705, 708 (2d Cir. 1989)). Defendants point to several specific topics in which, they argue, Tupman improperly opined on Medicis's or Impax's state of mind, D. 746-1 at 5-6, two of which merit discussion.

First, Defendants contend that Tupman opines that "Impax thought the likelihood of next-generation Solodyn submission or approval was low," D. 746-1 at 5. Although Defendants are correct that Tupman cannot opine about what Impax thought, Tupman may still opine about how a reasonable company sitting in Medicis' shoes may analyze the business context. See D. 856 at 14.

Second, Defendants argue that Tupman impermissibly opines that Medicis's decision to enter the JDA was not influenced by financial forecasts or due diligence. D. 746-1 at 6. Although Tupman may opine as to how Medicis's actions do not appear to be consistent with forecasts and due diligence, Tupman's testimony appears to be inferential conclusions regarding Medicis's actual state of mind, which will not be permitted.

As to the remainder of Defendants' challenges, although the Court agrees that testimony as to intent or mental state is inadmissible, the other specific examples Defendants criticize are admissible. As the Court explained at oral argument, experts will not be permitted, in the first instance, to recite the facts or learned treatises upon which they relied during direct examination, and even upon on redirect examination, recitation of the factual basis of their opinion will be limited to rebutting the score of cross-examination. Accordingly, this Court will not further limit Tupman's opinion on this basis.

5

Defendants also argue that Tupman provides no authority to support his valuation methodologies and that those methodologies are flawed because he did not account for litigation expenses in his cost-based calculations and because he relied upon Impax documents to estimate Medicis's valuation of the JDA. D. 746-1 at 9-10. Defendants do not, however, argue that Tupman's approach differs in any meaningful way from the approach described in literature or followed by their own experts. Daubert directs courts to consider whether the expert's technique or theory "can be (and has been) tested," "has been subject to peer review and publication" and is generally accepted within the relevant scientific community. Daubert, 509 U.S. at 594-95. Defendants have not shown that Tupman's methodology fails this inquiry. The Court is not persuaded that the alleged flaws in Tupman's opinion render it inadmissible; rather, they are best addressed through cross-examination.

Finally, Defendants argue that Tupman is not qualified to opine on what is "typical" in the pharmaceutical industry because his professional experience is limited to one pharmaceutical company. D. 746-1 at 10-11. Defendants explain that they are "vastly different" in terms of "size, culture, management style, and approach to decision-making, strategy, planning and due diligence" from Eli Lilly. D. 746-1 at 11. Plaintiffs argue that Tupman's experience includes approximately 150 transactions on behalf of Eli Lilly with other entities that ranged in size, and that his other experiences include advising pharmaceutical companies of varying size. D. 856 at 20-24. What, if any, weight to give the testimony of someone who has worked at Eli Lilly as to how a company the size and makeup of Medicis or Impax typically behaves is a question for the jury to decide at trial and not for the Court at this time.

The Court thus ALLOWS Defendants' motion to exclude Tupman's testimony, D. 746, as to Medicis's or Impax's intent or state of mind, including their subjective valuations of certain forecasts. The motion is otherwise DENIED.

**D.     Dr. Gregory Bell**

Plaintiffs move to exclude the expert testimony of Dr. Gregory Bell ("Bell"), D. 749, group vice president at Charles River Associates, an economics and management consulting firm, with twenty-four years leading its life sciences practice group. D. 753-3 ¶¶ 1-2 ("Bell Rpt."). Bell opines on behalf of Impax that the Medicis-Impax agreements did not delay generic entry, were commercially reasonable from Impax's perspective, and gave rise to "procompetitive benefits and efficiency gains." Id. ¶¶ 7-9.

Plaintiffs argue that Bell's conclusion that Medicis's reverse payment did not delay generic entry "does not fit the facts of this case" because it contemplates only one of Plaintiffs' but-for causation theories and fails to explain why, after Impax's Board of Directors approved a plan to launch generic Solodyn at-risk, Impax would have changed its mind. D. 749-1 at 7-12. Defendant Impax responds, correctly, that "there is no requirement that an expert address every theory advanced by plaintiffs in order to be admissible." D. 870 at 10. Impax also disputes Plaintiffs' interpretation of the record, as Defendants did during summary judgment, see D. 948 at 43, and argue that Bell did consider the board approval vote in his analysis. D. 870 at 12. This issue belongs before the jury, and Plaintiffs may present any evidence within the record contrary to Bell's opinion during cross-examination. See Daubert, 509 U.S. at 596.

Plaintiffs also contest Bell's opinion that the JDA was commercially reasonable will not assist the jury because commercial reasonableness "is not an element of any claim or defense in this case." D. 749-1 at 12. Bell opines that "from an economic perspective, it was commercially

7

reasonable for Impax to enter into the JDA" because the JDA "leveraged Impax's specialized formulation capabilities and was expected to address the Medicis desire for a next-generation formulation of Solodyn." Bell Rpt. ¶ 55. Plaintiffs argue that this does not comport with FTC v. Actavis, Inc., 133 S. Ct. 2223 (2013). D. 749-1 at 12. In Actavis, the Supreme Court explained that a reverse payment may not bring about anticompetitive consequences—that is, it may not be "unjustified"—where the agreement "reflects traditional settlement considerations, such as avoided litigation costs or fair value for services." Actavis, 133 S. Ct. at 2236. First, to Plaintiffs, fair value requires "an arms-length, objective, market-based measurement" of the services Impax promised to perform, whereas Bell addresses only "whether it would have made business sense for the two parties involved," a standard too "nebulous" to help the jury. D. 749-1 at 12-14. Moreover, Plaintiffs argue, Actavis requires that Defendants demonstrate that the payment itself— not the settlement—was justified, and Bell does not focus on the payment itself. D. 748-1 at 13-14.

Bell does not purport to opine on fair value, stating that he understands Defendant experts Tamar Howson and Dennis Carlton will do so, Bell Rpt. ¶ 55 n.128, but Impax argues that whether the deal was commercially reasonable is relevant to whether the reverse payment was justified. D. 870 at 13-14. "[A]ntitrust litigation often requires an 'elaborate inquiry into the reasonableness of a challenged business practice.'" Rochester Drug Co-Operative, Inc. v. Warner Chilcott Co. (In re Loestrin 24 Fe Antitrust Litig.), 814 F.3d 538, 552 (1st Cir. 2016) (quoting Ariz. v. Maricopa Cty. Med. Soc'y, 457 U.S. 332, 343 (1982)). Whether a payment was large and unjustified," Actavis, 133 S. Ct. at 2237, requires viewing the payment in the context of the facts of the case, which may include business considerations that are less tangible or quantifiable. Whether Bell's opinion satisfies Impax's burden under Actavis remains to be seen, but it is relevant to the question

8

of whether a reverse payment was indeed "large and unjustified." Plaintiffs' objections, therefore, go to the weight of this evidence, and not its admissibility.

Finally, Plaintiffs argue that Bell's purported procompetitive justifications for the Medicis-Impax agreements are not legally cognizable. D. 749-1 at 14-18. Under Actavis, Defendants bear the burden of demonstrating "that legitimate justifications are present" for settlements involving reverse payments. Actavis, 133 S. Ct. at 2336. The Court must then "balance the economic detriments of the agreements at issue against the economic benefits thereof." In re Nexium (Esomeprazole) Antitrust Litig., 968 F. Supp. 2d 367, 392 (D. Mass. 2015); see D. 184 at 15 (explaining that after Plaintiffs satisfy initial burden of alleging anticompetitive effects, "the burden shifts to defendants to show that the challenged conduct promotes a sufficiently competitive objective"). Plaintiffs again contend that Bell's proffered justifications focus, improperly, upon the settlement agreements as a whole, rather than justifying the payment itself. D. 910 at 8-10. The Court declines to take such a narrow view, such that the payment would be divorced from its business context. Whether the proffered justifications will suffice for Defendants' burden in this balancing test is a question for another day.

Bell offers three procompetitive justifications. Bell Rpt. ¶¶ 65-67. First, Bell opines that the agreements allowed generic Solodyn to enter six years before the patent's expiration. Id. ¶ 65. Plaintiffs argue that the Supreme Court rejected this purported justification in Actavis when adopting the rule-of-reason test, because under the scope-of-the-patent test—which the Court rejected—reverse payments were lawful if entry was permitted prior to the expiration of the patent term. D. 749-1 at 15 (citing Actavis, 133 S. Ct. at 2231); see Valley Drug Co. v. Geneva Pharms., 344 F.3d 1294, 1312 (11th Cir. 2003) (applying scope of patent test). Plaintiffs point out that in Actavis, the Court faced an agreement involving entry over five years before patent expiration, but

9

the Court "did not suggest that such entry could justify the reverse payment." D. 910 at 10. Impax argues that Actavis actually supports early entry as a procompetitive justification, D. 870 at 16-17 (citing Actavis, 133 S. Ct. at 2234 (stating that "settlement on terms permitting the patent challenger to enter the market before the patent expires would also bring about competition")), and that other courts have declined to exclude Bell's testimony on the topic, D. 870 at 17 (citing In re Nexium (Esomeprazole) Antitrust Litig., No. 12-md-02409, D. 966 (July 11, 2014) (denying motion to exclude Bell's expert testimony) and King Drug Co. of Florence v. Cephalon, Inc., No. 2:06-cv-1797, 2015 U.S. Dist. LEXIS 135264, at *27, 52 (E.D. Pa. Oct. 5, 2015) (denying motion to exclude Bell's testimony on the topic)). Although the Actavis Court rejected the proposition that early generic entry *per se* justified a reverse payment, the Court is satisfied that at least from the perspective of Impax, the generic manufacturer here, early entry may be relevant to the inquiry. This testimony is thus admissible as to Impax's procompetitive justifications for entering into these agreements with Medicis.

Second, Bell asserts that the settlement eliminated "risk and uncertainty." Bell Rpt. ¶ 66. Plaintiffs argue that reverse payments are unnecessary to avoid the risk and uncertainty of litigation. D. 749-1 at 16. Defendants respond that Medicis's risk and uncertainty may not be a procompetitive justification, but Impax's may be. D. 870 at 18-19. In King Drug, the Court explained that the brand manufacturer could not introduce this procompetitive justification because it would run afoul of Actavis. King Drug, 2015 U.S. Dist. LEXIS 135264, at *46-48 (citing Actavis, 133 S. Ct. at 2236). Generic defendants, however, could introduce this procompetitive justification to justify a reverse-payment settlement because the uncertainty that generic defendants "faced in the underlying infringement litigation was the potential of the . . . patent being upheld as valid and infringed," with the risks avoided by settlement including generic exclusion

10

from the market or paying damages for at-risk launch, which "do not implicate anticompetitive motivations." Id. at *48. The Court agrees with this distinction, and thus allows Impax to introduce this procompetitive justification.

Third, Bell opines that the JDA offered the procompetitive benefit of new product development for generic Adoxa. Bell Rpt. ¶ 67. Plaintiffs argue that "any benefits must be in the same market" as the product at issue in the settlement, and Adoxa is not in the same market. D. 749-1 at 17; D. 910 at 13 (citing King Drug Co. of Florence v. SmithKline Beecham Corp., 791 F.3d 388, 410 n.34 (3d Cir. 2015) (noting that "[i]t might also be (though we do not decide) that procompetitive effects in one market cannot justify anticompetitive effects in a separate market")). Impax argues that procompetitive justifications are not limited to a single market, but that even if they were, Solodyn's market, when properly defined, includes Adoxa. D. 870 at 19-20. The Court is not persuaded that the range of procompetitive justifications contemplated in Actavis is so limited to require excluding a theory limiting procompetitive benefits to one market. Regardless, there also remains a genuine dispute as to whether Adoxa is in the same market as Solodyn when the market is properly defined. See D. 948 at 10-23. Whether Bell's purported justifications satisfy Defendants' burden is a question for the jury.

The Court thus DENIES Plaintiffs' motion to exclude Bell's testimony, D. 749.

### E. Tamar Howson and Dr. Dennis Carlton

Finally, Plaintiffs move to exclude portions of Tamar Howson's ("Howson") and Dr. Dennis Carlton's ("Carlton") expert reports. D. 750. Howson, a former business development executive and consultant working in life sciences, D. 753-6 ¶¶ 8-14 ("Howson Rpt."), and Carlton, an economics professor at the University of Chicago, D. 753-4 ¶ 1 ("Carlton Rpt."), opine that

Medicis's payment when settling with Impax was justifiable, typical and rational. Howson Rpt. ¶ 18; Carlton Rpt. ¶ 8.

Plaintiffs first argue that Howson and Carlton purport to conduct a fair value analysis of the JDA, but fail to do so. D. 750-1 at 11-12. Howson opines that "Impax was a good fit for Medicis's reformulation project." Howson Rpt. ¶ 54. She relies upon Medicis's forecasts and deposition testimony of Medicis executives to conclude that "[c]onsidering the size of the Solodyn franchise and its importance to Medicis, development of an improved next-generation Solodyn product, *by itself*, could have easily justified a $40 million upfront payment and the $8 million in Solodyn-related milestones," id. ¶ 77, and this value was supplemented by "the ANDA basket of products," which "was estimated to generate substantial value to Medicis," id. ¶ 83. Carlton opines that Medicis's "net present value from the Impax JDA was positive," focusing on Medicis's perspective "to analyze whether Medicis thought it was providing a cash payment to Impax." Carlton Rpt. ¶ 31. Using a range of estimates of future profits for next-generation Solodyn that Carlton constructs from Medicis's projections and sales estimates for comparable drugs, along with Medicis's projected profits for the ANDA basket, he opines that the potential profits of successful next-generation Solodyn ranged from "$155 million to $319 million (in November 2008 dollars)" and ANDA basket ranged from $145 to $240 million. Id. ¶¶ 31-38. Carlton quantifies Medicis's $40 million payment to Impax and milestone payments as $58.1 million in present value as of 2008. Id. ¶ 39.

Plaintiffs argue that neither Howson nor Carlton conducts a fair value analysis as Plaintiffs define it, and that the two experts improperly focused on Medicis's perspective, when the analysis must address "whether other market participants *not* involved in patent litigation would make the same payment for the services at issue." D. 750-1 at 12-13. Defendants argue that "fair value for

services" is not defined in Actavis, and it encompasses "the broad question of what value the brand receives." D. 868 at 8. The Court declines to adopt the narrow definition proposed by Plaintiffs as the only acceptable method of proving fair value, and the Court is not persuaded that focusing on Medicis's perspective of future earnings is irrelevant to the question of fair value. Plaintiffs may challenge these experts' testimony on this basis before a jury, as it bears upon the weight, and not the admissibility, of their opinions.

Plaintiffs also argue that Carlton's "breakeven analysis" is unreliable. D. 750-1 at 13. Carlton attempts to account for uncertainty in pharmaceutical development projects by analyzing the probability of successfully launching next-generation Solodyn and "products within the ANDA basket" by "work[ing] backwards to derive a 'breakeven' probability of success." Carlton Rpt. ¶ 40. He defines this probability as "one in which the expected future profits to Medicis" equal "the expected future payments made by Medicis under the Impax JDA." Id. Carlton concludes that the breakeven probability of success ranges from 10.4% to 19.4%, explaining that "if Medicis believed the probability of success to be higher, then Medicis' expected value of the Impax JDA would have been positive and would not reflect a net payment to Impax." Id. ¶ 41. Referring to Howson's testimony on Medicis's likely probability of technical and regulatory success, he concludes that the Impax JDA "would have been expected to generate substantial profits to Medicis" such that the reverse payment was justified. Id.

Plaintiffs first argue that this portion of Howson's testimony is speculative. D. 750-1 at 13. Howson opines that Impax "should have been expected to have a high probability of success" in developing next-generation Solodyn products, "similar to a Phase III drug and later, *i.e.*, 50% to 85%." Howson Rpt. ¶ 82. Plaintiffs contend that Howson later conceded that she relied upon only her experience for this opinion despite her lack of expertise in Solodyn itself. D. 750-1 at 14.

13

Howson has years of experience in business development at pharmaceutical companies, shouldering such responsibilities as "assessing pharmaceutical products for their development potential," during which she observed successful and failed attempts to develop next-generation product extensions. D. 868 at 11. She compares next-generation Solodyn to a Phase III drug—which has progressed to clinical trials—because it is a product extension of a drug that has already passed clinical trials, gained FDA approval, and is on the market "with known safety and efficacy," thereby eliminating many of the risks associated with development. D. 868 at 12. The Court is satisfied that Howson possesses the requisite experience to offer an admissible opinion on probability of successfully developing next-generation Solodyn.

As to the relevance of Howson's opinion to Carlton's analysis, Plaintiffs argue that because Carlton's analysis seeks to show economic or commercial success, his reliance upon Howson's estimate of technical or regulatory success is improper. D. 750-1 at 13. Defendants reply that Carlton's breakeven analysis "exists independently of Ms. Howson" and is based, instead, upon his own economic analysis. D. 868 at 13. Only after performing the analysis does Carlton rely upon Howson's opinion to conclude that it would have been reasonable for Medicis to expect the JDA to earn a profit. Id.; Carlton Rpt. ¶¶ 40-41. Howson's opinion is limited to the regulatory and technical success of developing next-generation Solodyn. See Howson Rpt ¶ 82. Carlton cannot, therefore, overstate Howson's testimony, to the extent he would use it to suggest Medicis's expectations of commercial success, but the Court declines otherwise to exclude his breakeven analysis.

Plaintiffs argue that that Carlton's proffered procompetitive justifications should be excluded. D. 750-1 at 18. Carlton opines that the JDA was procompetitive because it resulted in "consumer benefits" resulting from additional development and permitted generic entry before the

Solodyn patent expiration date. Carlton Rpt. ¶ 55. Plaintiffs raise the same arguments here as with Bell, explaining that the purported justifications do not explain the size of the reverse payment and go beyond the Solodyn market. D. 750-1 at 19-21. As with Bell, the Court concludes that Carlton's purported justifications are admissible and are a matter to be weighed by the jury.

Finally, Plaintiffs argue that Carlton's testimony relies upon an assumption of patent validity and infringement that is unsupported by Defendants' other experts. D. 750-1 at 16-18. Defendants urge the Court to defer ruling on this question given its order acknowledging the infringement issue as untimely, D. 827. D. 868 at 22. Regardless, the Court does not see Plaintiffs' objection as a basis for exclusion. Plaintiffs' objection to Carlton's opinion here "questions the factual underpinnings" of his testimony, and, thus, goes to the weight and not the admissibility of his opinion. See Crowe v. Marchand, 506 F.3d 13, 18 (1st Cir. 2007).

Plaintiffs' motion to exclude portions of Howson's and Carlton's opinions, D. 750, is thus ALLOWED IN PART, as to Carlton's reliance upon Howson's technical probability estimates to demonstrate economic success, but otherwise DENIED.

## III. Conclusion

For the reasons discussed above, the Court resolves D. 742, D. 743, D. 746, D. 749 and D. 750.