```
 1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MASSACHUSETTS
 2

 3   _____

     IN RE:
 4   SOLODYN (MINOCYCLINE HYDROCHLORIDE)    Civil Action
     ANTITRUST LITIGATION                   No. 14-md-02503-DJC
 5
                                            January 31, 2018
 6                                          2:00 p.m.

 7   _____

 8


 9           TRANSCRIPT OF FINAL PRETRIAL CONFERENCE DAY 1

10             BEFORE THE HONORABLE DENISE J. CASPER

11               UNITED STATES DISTRICT COURT

12             JOHN J. MOAKLEY U.S. COURTHOUSE

13                  1 COURTHOUSE WAY

14                 BOSTON, MA  02210

15

16

17

18
                   DEBRA M. JOYCE, RMR, CRR, FCRR
19                    Official Court Reporter
                   John J. Moakley U.S. Courthouse
20                 1 Courthouse Way, Room 5204
                        Boston, MA  02210
21                     joycedebra@gmail.com

22

23

24

25
```

```
 1    APPEARANCES:

 2    FOR THE PLAINTIFFS:

 3    LAUREN G. BARNES, ESQ.
      THOMAS M. SOBOL, ESQ.
 4    Hagens Berman Sobol Shapiro LLP
      55 Cambridge Parkway
 5    Suite 301
      Cambridge, MA 02142
 6    617-482-3700

 7    RICHARD ALAN ARNOLD, ESQ.
      Kenny Nachwalter, P.A.
 8    Suite 1100
      1441 Brickell Avenue
 9    Miami, FL 33131
      305-373-1000
10
      BARRY L. REFSIN, ESQ.
11    Hangley Aronchick Segal Pudlin & Schiller
      One Logan Square, 27th Floor
12    Philadelphia, PA 19103
      215-496-7031
13
      STEVE D. SHADOWEN, ESQ.
14    Hilliard & Shadowen LLP
      919 Congress Ave
15    Suite 1325
      Austin, TX 78701
16    512-993-3070

17    FOR THE DEFENDANTS:

18    JAMES R. CARROLL, ESQ.
      CHRISTOPHER G. CLARK, ESQ.
19    Skadden, Arps, Slate, Meagher & Flom LLP
      500 Boylston Street
20    Boston, MA 02116
      617-573-4800
21
      JULIA K. YORK, ESQ.
22    Skadden, Arps, Slate, Meagher & Flom LLP
      1440 New York Avenue, N.W.
23    Washington, DC 20005
      202-371-7860
24

25
```

```
 1   APPEARANCES (CONT'D)

 2   DANIELLE R. FOLEY, ESQ.
     JAMES DOUGLAS BALDRIDGE, ESQ.
 3   Venable LLP
     575 7th Street, N.W.
 4   Washington, DC 20004
     202-344-4343
 5
     KRISTIN M. KOGER, ESQ.
 6   Venable LLP
     One Church Street
 7   Suite 604
     Rockville, MD 20850
 8   301-217-5643

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

<u>P R O C E E D I N G S</u>

1

2          (The following proceedings were held in open

3   court before the Honorable Denise J. Casper, United States

4   District Judge, United States District Court, District of

5   Massachusetts, at the John J. Moakley United States Courthouse,

6   1 Courthouse Way, Boston, Massachusetts, on January 31, 2018.)

7          THE CLERK:  Court is in session.  Please be seated.

8          Civil action 14-md-02503, <u>In Re: Solodyn</u>.

9          THE COURT:  Good afternoon, counsel.

02:01 10        ALL:  Good afternoon.

11          THE COURT:  Counsel, I know we're here on several of

12   the remaining pending motions.  I did receive the parties'

13   joint submission in regards to your preferences about argument

14   on certain of the motions and not on others.  Counsel, I'll

15   accept that.  I'm assuming you wanted to be heard in the order

16   they're listed here, counsel; is that correct?

17          MR. SOBOL:  I think so.

18          THE COURT:  So, counsel, I'm prepared to hear argument

19   in regards, first, to the plaintiffs' motion to exclude

02:01 20   Dr. Bell.  I think counsel had asked for ten minutes either

21   side.

22          Counsel?

23          MR. SOBOL:  Good afternoon, your Honor.  Tom Sobol for

24   the direct purchasers and making the argument on this motion

25   for all parties.

|    |    |
|----|----|
| 1  | THE COURT:  Good afternoon. |
| 2  | MR. SOBOL:  Good afternoon. |
| 3  | Can I approach with two items, if I may? |
| 4  | THE COURT:  Sure. |
| 5  | MR. SOBOL:  One is a portion of the excerpts of the |
| 6  | deposition of Dr. Bell, and the second is a short slide |
| 7  | presentation that addresses this motion and the motion |
| 8  | regarding Mr. Carlton and Ms. Howson. |
| 9  | First, regarding the matter of Dr. Bell -- oh, and may |
| 02:02 10 | I argue for eight minutes and reserve two, please? |
| 11 | THE COURT:  Yes. |
| 12 | MR. SOBOL:  First, three comments, and then I'll dig |
| 13 | into the meat of the argument. |
| 14 | The first comment is this:  It's now clear that |
| 15 | Dr. Bell cannot testify that the settlement did not delay |
| 16 | generic entry.  He has conceded that he did not proffer a |
| 17 | but-for scenario regarding an alternative settlement with an |
| 18 | earlier entry date; and, therefore, if allowed to testify at |
| 19 | all on this topic, it must be limited to an at-risk scenario, |
| 02:03 20 | an at-risk scenario only.  So his more generalized opinion must |
| 21 | come out.  That's first. |
| 22 | Second, his opinion that would be limited to at-risk |
| 23 | we'll rest on the briefs.  I'll just make one comment that may |
| 24 | not be clear in the briefs, which is this:  Impax itself |
| 25 | anticipated launching at-risk and did so mindful and would |

1    agree to -- planned to do so even though there would be other

2    generics in the market.  Dr. Bell leans heavily on the notion

3    that Impax would not launch at-risk if there were others in the

4    market.  That directly contradicts and does not fit the Impax

5    story.

6          The third comment, the reason I've handed the

7    transcript --

8          THE COURT:  Because of the board vote earlier on?

9          MR. SOBOL:  The board vote.  The board vote and the

02:03 10   projections that are in the record show that the scenarios

11   under which the board reviewed the situation provided three

12   different scenarios, and two of those scenarios contemplated

13   earlier generic entry by other generic entrants, and yet, that

14   did not stop the board's decision to vote to launch at-risk.

15         The third comment is that Dr. Bell has a truly

16   remarkable opinion that the agreements were what he calls

17   commercially reasonable.  It's an absolutely nonsensical

18   concept that he has.

19         I questioned him on this topic at his deposition.

02:04 20   I've given you the excerpt of that.  At bottom, he would not

21   enable the jury to use that concept at all because one thing

22   that is important to a concept is that you know when you're

23   inside it and when you're outside it.  When I asked him how

24   would the jury understand whether something was -- for

25   instance, can you give me an example of something that is

1    commercially unreasonable?  His answer was:  Buying a Lexus for

2    $5.  So if that's the difference between something that's

3    unreasonable and reasonable, I would suggest that it's a

4    completely amorphous concept and not one that's going to aid

5    the jury because the jury has a much more refined inquiry,

6    which is to talk about whether there are justifiable excuses

7    for the large payment in the agreement and whether there are

8    justifiable procompetitive benefits.  It's got nothing to do

9    with some kind of overall notion of commercial reasonableness.

02:05 10         THE COURT:  Counsel, in your view, does it bear upon

11    this whole idea of fair value?

12         MR. SOBOL:  No, it does not.  Because the question of

13    fair value focuses on the payment, were the goods or services

14    that ostensibly were provided for the payment at fair market

15    value for what was paid for it, or was the brand company

16    overpaying for those goods or services as compared to an

17    objective fair market value.

18         What Dr. Bell is doing on his commercial

19    reasonableness is not looking at the payment, not looking at

02:06 20    the focus of what the fair value was of the services, he even

21    admits in his report, he says, I am not providing an opinion

22    regarding their value.  So he himself excludes the fact that --

23    the relevance or the fit of his opinion.  Instead, he talks

24    about some amorphous concept about this being generally a good

25    thing and how one company wanted one thing and another company

1    wants something else and aren't we all happy about doing some

2    kind of deal together.  It just makes the whole antitrust

3    analysis into some kind of untethered free-for-all.

4         So now I'll turn to really the meat of what I want to

5    turn to with Dr. Bell, which is his proffered unlawful --

6    excuse me -- his justifications for the payment or what is

7    ostensibly supposed to be justifications.

8         Now, this I think is important -- and I'm taking one

9    step back for half a minute here.  These Daubert motions and

02:07  10   this topic are binary, meaning, you are now the Court that the

11   Actavis Supreme Court said is going to guide what the law for

12   this case is on a rule of reason and what it is is fair game to

13   even bring before the jury in the first place, whether or not

14   your expert's qualified or not, are you doing something that

15   the law permits, are you arguing something that the law

16   permits.  And we suggest that in several regards, what Dr. Bell

17   is seeking to argue, and also what Dr. Carlton seeks to argue,

18   is against the law, period.

19        The first is this:  Dr. Bell seeks to justify what he

02:07  20   calls this agreement -- although he shouldn't be justifying the

21   agreement, he should be justifying the payment -- because it

22   eliminates the uncertainty of a loss.  It eliminates the risk

23   of loss.  That is against the law of Actavis.  Why?  In

24   Actavis, the Supreme Court had a very interesting insight.

25   Their insight was this:  Their insight was every patent is

1    either valid or invalid, infringed or not infringed.  There's

2    risk of loss to the patent.  Often that risk of loss can be

3    quite large.  If you have two parties bargaining arm's length

4    and trying to come to a settlement without a payment, the

5    result of that settlement will reflect the risk of loss.  There

6    will be earlier generic entry as a result of that arm's-length

7    deal.

8         If, on the other hand, you enter into that equation a

9    payment -- oh, by the way, I should say that risk, that

02:08   10    negotiation then, that compromise on the basis of the risk of

11    loss, results in competition and results in benefit to

12    purchasers because the weakness of the patent finds its way

13    into the competition between those parties and earlier generic

14    entry.  But if you enter a payment into that mix and the

15    payment is designed to avoid that risk of loss, Actavis says

16    you're paying -- that payment is anticompetitive, that's the

17    anticompetitive harm.

18         So what Dr. Bell is seeking to do is the exact

19    opposite of what Actavis says.  In fact, if Dr. Bell were to

02:09   20    take the stand and say the payment was to avoid the risk of

21    loss, he will be admitting that the companies violated the law.

22    But it's certainly confusing and it's against to law for --

23    contrary to Actavis and against the law for Dr. Bell to be

24    proffering that as an excuse.

25         The second thing that he says which is against the

1    law -- and there should be no testimony and no argument by the

2    lawyers at defense side at any point about this during the

3    trial -- is that the agreement provided for an entry date

4    earlier than the expiration of the patent, because that's not

5    the inquiry.  The inquiry is whether adding a payment made the

6    agreed entry date later than it otherwise would have been.

7         So in Actavis, the agreed entry date was earlier than

8    the expiration of the patent, but, nevertheless, the Supreme

9    Court held that that might be a violation.

02:10 10         Now, if we can go to slide 2, please.

11         The defendants' briefs in this case, your Honor, it

12    used to be the case that when you quoted the law, counsel had

13    some obligation to be somewhat genuine to what the case

14    actually stands for.  And in this case, the briefing by the

15    defendants violates that law repeatedly.

16         In their brief, the defendants say, In Actavis, the

17    Supreme Court was clear that generic entry before expiration is

18    procompetitive and must be taken into account under the rule of

19    reason.  And then they have the following quote:  We concede

02:10 20    that settlement on terms permitting the patent challenger to

21    enter the market before the patent expires would also bring

22    about competition again to the benefit of consumers, period,

23    end quote.  That's where they stop.  But they omit what the

24    Supreme Court then said.  Because the Supreme Court immediately

25    after that quote said -- as I have on the right in red --

1    but -- that should be a signal to any lawyer that you should

2    add the next sentence, the Supreme Court saying the word

3    "but" -- but

4         THE COURT:  Counsel, I see that here.  Ms. Hourihan

5    told me you were at eight minutes, but I see the point here.

6         MR. SOBOL:  Okay.

7         Having made that point then -- and I'll take the one

8    more minute and reserve on one -- your Honor, is this:  What

9    you will see throughout the defendants' brief on the subject of

02:11  10   procompetitive justifications is that they have misstated the

11   law to you repeatedly, and in our reply brief we pointed that

12   out.

13        My last example of this will be, if you go to slide

14   10, if we compare what the Supreme Court said in Actavis, which

15   is that the payment, if otherwise unexplained, likely seeks to

16   prevent the risk of competition and, as we have said, that

17   consequence constitutes the relevant anticompetitive harm.

18        And yet, you compare what Dr. Bell is seeking to say

19   in his report, he wants to say the opposite.  He wants to

02:12  20   overrule the Supreme Court and come up with his own opinion.

21        So I will rest -- you'll also see from our other

22   slides, your Honor, I have pointed out for their other

23   justifications how they have completely misrepresented to you

24   what the Supreme Court and what the Circuit Courts and District

25   Courts have said regarding procompetitive benefits.  I would

```
 1    ask that you look very carefully at the law and knock out all

 2    of Dr. Bell's proposed justifications.

 3              THE COURT:  Thank you, counsel.

 4              Counsel?

 5              MS. FOLEY:  Thank you, your Honor.  Danielle Foley for

 6    Impax.

 7              THE COURT:  Good afternoon.

 8              MS. FOLEY:  There's no dispute here about Dr. Bell's

 9    qualifications.  He's an economist with over 30 years of

02:13 10    experience analyzing economic issues in the pharmaceutical

11    industry.  Why is that important?  Because Dr. Bell has been

12    qualified and accepted to testify on the same issues that he is

13    offering opinions on in other reverse payments.  The only two

14    cases that have gone to trial where courts have had to consider

15    the same Daubert motions by the plaintiffs here have rejected

16    these motions.

17              Nexium, Judge Young denied the Daubert motion and

18    allowed Dr. Bell to testify on a number of issues, including

19    the procompetitive benefits of the settlement, something the

02:13 20    plaintiffs challenge here.

21              In Modafinil, which also went to trial last summer,

22    Judge Goldberg allowed Dr. Bell to testify about the commercial

23    reasonableness of contemporaneous business transactions that

24    were entered into by the parties at the same time as the

25    settlements.  He was allowed to testify about plaintiffs'
```

1    at-risk launch theory and why, from an economic perspective,

2    there would not have been an at-risk launch.  And he was also

3    allowed to testify about the procompetitive benefits of the

4    settlement.

5         In the Shire case he was also allowed to offer

6    opinions that included no harm to competition.

7         Every time the plaintiffs bring these motions, they've

8    been rejected, and they should be rejected here.

9         Turning first on the launch at-risk theory.  Mr. Sobol

02:14 10   didn't spend much time on it because there shouldn't be much

11   time on it.  All of the arguments the plaintiffs raise go to

12   the weight, if anything, of Dr. Bell's opinions and they can be

13   addressed on cross-examination.  He squarely opines that his

14   opinion is the -- against plaintiffs' theory that Impax would

15   have launched at-risk.  He explains why.  In his opinion he

16   takes on and considers the board of directors' decisions.  He

17   doesn't ignore it, but he explains why, even with the actions

18   taken by the board of directors in the summer of 2008, it would

19   not have been economically rational for a company in Impax's

02:15 20   position to have launched at-risk months later in March 2009

21   with the economic and factual situation that Impax was facing.

22        With respect to the commercial reasonableness, the

23   opinion by Dr. Bell is absolutely relevant to explain the

24   payment.  Now, Actavis doesn't just limit the explanations for

25   the payment to fair value.  Actavis is clear it's a broad

1    inquiry.  It's a broad inquiry that looks at traditional

2    settlement considerations, fair value, as well as other

3    explanations.  Dr. Bell absolutely offers the business

4    justifications for the agreement, for the joint development

5    agreement.

6         Now, Mr. Sobol talked about, Oh, at his deposition

7    there were some questions that he couldn't answer.  But what he

8    doesn't do is look at what Dr. Bell says in his report.

9         In his report Dr. Bell says, I looked at it from an

02:16 10   economic perspective.  Was it commercially reasonable for Impax

11   to enter into the joint development agreement?  He looked at

12   Impax's specialized capabilities in the specific area,

13   controlled-release products.  He looked at Impax's past track

14   record on collaboration agreements where it provided

15   development of controlled-release products, he looked at

16   Medicis' need, and he looked at all of the work that was done

17   under the joint development agreement.

18        This is completely in line with the range of economic

19   evidence and explanations that have been accepted by other

02:16 20   courts, including in Modafinil and including in the K-Dur case

21   which we cited in our briefing.

22        Now, turning to the last piece, which was the

23   procompetitive benefits, there can be no debate --

24        THE COURT:  But do you think he gives sufficient

25   definition of "commercially reasonable"?

1        MS. FOLEY:  He does.  He explains why it's

2   commercially reasonable.  He says to a company in Impax's

3   position, which is in the position of developing generic

4   products like generic Solodyn, like generic Adoxa and Doryx and

5   the other products he was going to do, when a company comes to

6   them and says, We want to partner with you to use your

7   capability and to make a brand-new follow-on product and make

8   some other generics and bring them to the market, that

9   absolutely is commercially reasonable.  And it bears on all of

02:17 10   the questions at issue in this case, which is explaining the

11   joint development agreement, or what the plaintiffs like to say

12   the payment.

13        And on the procompetitive benefits, you have to look

14   at the procompetitive benefits of the settlement as a whole.

15   There can be no debate about this.  Again, every court that has

16   been presented with this question has said, yes, you look at

17   and you weigh the anticompetitive effects of the settlement

18   with the procompetitive benefits of the settlement.

19        Specifically with respect to early entry before patent

02:18 20   expiration, Actavis recognized that it's a procompetitive

21   benefit.  Again, Judge Goldberg --

22        THE COURT:  But what would you have -- just to leap

23   forward.  What would you have the Court say about what he

24   labels "commercially reasonable" in terms of what the jury has

25   to find under Actavis?

           1           MS. FOLEY:  Under Actavis the question is:  Was the

           2    payment large and unexplained?  And the question is:  Are there

           3    explanations for the payment?  And here one of the explanations

           4    for the payment is:  Was it commercially reasonable?  Did it

           5    fit these two parties and what their needs were for the brand

           6    and the expertise of the generic?

           7           And when you look at exactly that's what Dr. Bell

           8    looked at, those were considerations in Modafinil,

           9    considerations in K-Dur, where courts have allowed this same

02:19 10    testimony through, and that's how it fits.  It sort of informs

          11    the overall body of evidence that the Court -- that the jury

          12    will hear and will consider.

          13           And I can go on, the procompetitive benefits of the

          14    settlement, again, just to say every time this issue has come

          15    up, courts have repeatedly rejected it.  There's no case the

          16    plaintiffs have where a court was presented with the question

          17    of can the defendants present procompetitive benefits of the

          18    settlement and the court said no.  Each of the cases that have

          19    gone to trial have exactly allowed that evidence to be

02:19 20    presented.  Dr. Bell talked about that extensively in Modafinil

          21    last summer.

          22           Thank you.

          23           THE COURT:  Counsel, I think you reserved a little

          24    time.

          25           MR. SOBOL:  If you can turn to slide 5, please.

1        The law is that you must justify the payment, not the

2   settlement.

3        The defendants say that under <u>Actavis</u> a defendant is

4   broadly entitled to justify an agreement or agreements.  But if

5   you read the case, the Supreme Court repeatedly talks about the

6   payment in the settlement.  At least the size of a payment from

7   a branded drug manufacturer is itself a strong indicator of

8   payment.  They talk about payment, payment, payment, not

9   settlements.  Indeed, the Supreme Court says it's okay to go

02:20 10   about settlements.  What we're trying to look at is the

11   payments.

12        If we go to the next slide.

13        Here's one case.  How about the 3rd Circuit Court of

14   Appeals.  So the defendants say courts applying <u>Actavis</u>

15   routinely consider procompetitive justifications of the

16   challenged agreements as a whole, and they cite the District

17   Court decision in <u>Wellbutrin XL</u> but not the 3rd Circuit's

18   decision in <u>Wellbutrin XL</u> that says the opposite.

19        3rd Circuit rejected the <u>Wellbutrin's</u> District Court's

02:21 20   analysis that evaluated the settlement as a whole, explained

21   proper focus was on whether the payment was unjustified in the

22   sense of it being unexplained.

23        And the other case the defendants cite, <u>Provigil</u>, was

24   a District Court decision that preceded that 3rd Circuit

25   decision.

<br>

1          So it is critically important, I think, your Honor,

2    that when you're going about your analysis here that what we're

3    looking for are explanations, not generalized explanations --

4    everybody likes settlement, business is good, this free-for-all

5    what the defendants want to have.  The focus has to be why does

6    the settlement have $40 million without any strings attached

7    other than Impax's delay for three years in this deal?  That's

8    the question.  And if they're not answering that question, they

9    shouldn't be making any arguments or presenting any evidence to

02:21  10    the jury.

11          Thank you.

12          MS. FOLEY:  Your Honor, may I briefly respond?

13          THE COURT:  Well, in a moment.

14          Even though, counsel, where the two agreements happen

15    at the same time?  So, counsel --

16          MR. SOBOL:  So the two agreements are happening at the

17    same time.  So the question then, what are we looking at about

18    those two agreements?  Are we looking at everything?  Right.

19    Or are we trying to figure out why is the payment in those two

02:22  20    deals, why is the -- once we have -- we'll have a fight about

21    whether there's a payment.  If there is a payment, then the

22    question is:  What justifies that payment?

23          What we're saying is justifications like you have to

24    justify the payment, not, oh, well, gee, we're going to be

25    doing a lot of other good things or we're settling a lawsuit,

```
 1   we're having an earlier agreed entry date.  All of those other
 2   things are not explaining the payment.  And that's what they
 3   have to explain.
 4        THE COURT:  But isn't that taking the payment out of
 5   the business context, which you say is anticompetitive and the
 6   defendants say is procompetitive?
 7        MR. SOBOL:  Hit me with that again, your Honor.  It
 8   didn't land for me.
 9        THE COURT:  Sure.  I guess what I'm saying is, I mean,
10   I understand your argument as a point of advocacy.  I'm not
11   sure I understand it as a point --
12        MR. SOBOL:  Analytically?
13        THE COURT:  Well, as a point of law.  Meaning, I
14   understand the plaintiffs' position that this is a payment and
15   the defendants' argument that this is, you know, a justified
16   business decision.  But I guess whether or not it's one or the
17   other, aren't both of those fair for advocacy, and how do you
18   talk about the justification for the payment without talking
19   about the business context in which it's made?
20        MR. SOBOL:  Fair enough.
21        THE COURT:  Okay.
22        MR. SOBOL:  So I think it's important to get the
23   two-step analysis or the three-step analysis in place.
24        The plaintiffs need to prove that there was a payment,
25   right.  The defendants need to -- and there will be -- the
```

parties will have a fight over whether or not the
60-odd-million dollars was a 40 million overpayment or a zero
dollar overpayment, right.  And if the defendants had competent
evidence about what the fair market value was of those
services -- we don't think that they do -- but if they had that
kind of competent evidence, that would go into the calculation
about whether or not there is a payment.  So I agree with you
there, that if the defendants have evidence about the fair
market value of the services or goods that Impax was to
provide, that that would go into the calculation of whether
there's a payment.

Now, if there is a payment that exceeds Medicis'
future anticipated litigation costs, if there is a payment
that's large, in other words, now the question is:  What
justifies it?  What are the defendants allowed to throw against
the wall to justify the fact that it's X million dollars more
than the fair market value of the services of Impax?  We say
it's for $40 million.

Now when they start throwing those things against the
wall, we say you're only allow to throw things against the wall
that the law permits.  So you're not allowed to say you settled
a lawsuit and we like getting rid of lawsuits to avoid risk,
because that's not consistent with the law.  You can't say that
you did an earlier entry date, because that's not consistent
with the law.  And you can't be then going back to, Well, we

1    want there to be good business -- we want there to be good

2    business.  Medicis was going to make a lot of money, Impax was

3    going to make a lot of money, so it was commercially sensible

4    for them to be able to do this.  No, those are not appropriate.

5              Every antitrust violation makes commercial sense; both

6    parties to it make a lot of money, right.  So if you're going

7    to justify antitrust violations on the basis that both

8    companies make a lot of company, then there is no more

9    antitrust law.

02:26 10            That would be my answer to the question, your Honor.

11             THE COURT:  Thank you.

12             MS. FOLEY:  May I briefly respond?

13             THE COURT:  Yes.

14             MS. FOLEY:  First, neither Actavis nor Wellbutrin was

15   asked the question of whether you have to limit the

16   justifications to the payment and whether you limit the

17   procompetitive benefits, specifically what evidence comes in on

18   procompetitive benefits.  But Actavis makes clear the question

19   is whether the agreement -- it's in the first paragraph -- the

02:26 20   agreement can sometimes unreasonably diminish competition.  And

21   when you're looking at that question, what you have to do is

22   look at the agreement as a whole and balance the

23   anticompetitive effects of the agreement versus the

24   procompetitive benefits of the agreement.

25             You don't have to look very far to confirm that.  You

 1   can look to the jury verdict form in <u>Nexium</u>, which went up to

 2   the 1st Circuit and was affirmed.  The question to the jury

 3   was:  Was there a large and unjustified payment from the brand

 4   to the generic in the patent litigation settlement?

 5        And then the next question was:  If so, was the

 6   settlement unreasonably anticompetitive?  Did the

 7   anticompetitive effects of that settlement outweigh the

 8   procompetitive justifications?

 9        So this whole narrow focus that the plaintiffs are

02:27 10   trying to do of trying to exclude evidence that doesn't go in

11   their favor ignores what the rule of reason is, and it is a

12   balancing of the anticompetitive effects and the procompetitive

13   effects of the settlement as a whole.  That's what every case

14   has found.

15        THE COURT:  Thank you, counsel.

16        Counsel, why don't we move on to the next argument.  I

17   think this was also the plaintiffs' motion about Ms. Howson and

18   Dr. Carlton, counsel.  And I think you had asked for eight

19   minutes, either side.

02:27 20        MR. SOBOL:  Yes.  I'll reserve a minute then, your

21   Honor.

22        THE COURT:  Yes.

23        MR. SOBOL:  So I'll first address Ms. Howson's

24   opinion.

25        Now, her opinion basically is a prediction of the

 1    likelihood that Solodyn would have a new line extension for

 2    next-generation Solodyn.  What next-generation Solodyn was to

 3    be was an extended-release minocycline hydrochloride.  The

 4    existing one was already at 70 to 80 percent bioavailable.  And

 5    the notion was, at Medicis, if we can take it from 70 to 80

 6    percent bioavailable to something greater and show that that

 7    greater amount has a real clinical benefit, improvement, then

 8    we might be able to commercialize it.  That's what the project

 9    was.

02:28 10          Now you turn to slide 11.

 11          Ms. Howson was asked a couple of questions about her

 12    opinion about the prediction.  One of them was -- and she gave

 13    some percentages about what her prediction was.  She was

 14    predicting technical ability to get an FDA approval.

 15          "Are those percentages of getting approved, are they

 16    percentages of commercially successful?

 17          "A.  It has nothing to do with commercial success.  It

 18    is moving from phase II to phase III and from being filed with

 19    the FDA to being approved, and then all bets are off."

02:29 20          Well, according to her testimony, she shouldn't be

 21    making bets then about the success or not success of the

 22    product line because, A, she's not predicting commercial

 23    success; and B, after you get the technical approval, she

 24    has -- all bets are off.  So she shouldn't be making any bets.

 25          The next thing, on page 12 of the slides, she was

1   asked a series of questions about whether she knew anything

2   about this product.  And she was asked:

3        "My question is whether Solodyn is already an

4   extended-release formulation?

5        "A.  I am not -- I really don't remember what the

6   label on Solodyn.

7        "Q.  You don't know whether it was already extended

8   release?

9        "No.

02:30 10     "Do you remember whether it was sustained release?

11       "I don't know."

12       I'll drop down.

13       The question is then asked in red:

14       "If a product is already a sustained-release product,

15   do you have an opinion about how likely it is that an improved

16   sustained-release product would be developed?

17       "A.  No."

18       This does it for her.  She should be out.  You can

19   talk about all the other experience that she has and things

02:30 20   that she looked at.  She does not have an opinion about how

21   this product would have been improved, and she should be out.

22       The next slide.

23       Both -- here's the point I want to make about both

24   Dr. Carlton and about Dr. Howson.

25       Both Dr. Carlton and Dr. Howson rely upon predictions

1    of the ability of next-generation Solodyn and the five ANDA

2    products to get approved.  But they rely upon the self-serving

3    testimony of the CEO of Medicis, Mr. Shacknai, and the GC of

4    Medicis, Mr. Hanson.  This is what we call garbage in, garbage

5    out.  Both of these experts rely upon self-serving testimony of

6    each of these gentlemen as to their after-the-fact predictions

7    of what they think Impax might be able to do on a project which

8    Medicis had been unable to get accomplished, take those

9    opinions, put them through a series of assumptions, and then

02:31 10    are trying to package that in a final firm opinion to the jury.

11          Now, in both instances of these experts, there is no

12    prediction, A, about the likelihood of the five ANDA products

13    being approved, yet, an ultimate opinion about the value is

14    being articulated.

15          Also, in both situations neither of them are answering

16    the right question.  Both of them answer the question:  Well,

17    is there a possibility that Medicis will make more money than

18    not on the basis of my assumptions?  They aren't asking the

19    question:  Is Medicis overpaying Impax for this package of

02:32 20    products?  That's a fundamental difference that the parties

21    have here.

22          You can make money on a product but be well overpaying

23    for it and cause the kind of detriment that you would expect in

24    a case like this.  Why?  Because in a case like this, as our

25    experts have shown, the fair market value of these services

1    were exceeded by almost $40 million.  Even if on some

2    theoretical idea you can say, Well, gee, maybe if everything

3    had happened the right way, we would have been able to make

4    more money, so would say Medicis, you are still overpaying the

5    generic and causing the delay in the agreement.  That's why

6    it's fundamentally important, not because we think that there's

7    some hypertechnical notion of fair value, but rather that

8    everybody understands the concept of fair market value and why

9    it is that why you look at an objective test like that rather

02:33 10    than the self-serving testimony of these two gentlemen which is

11    then being repackaged into firm opinions by an economist and an

12    industry person.

13             I'll reserve the rest of my time for rebuttal.

14             THE COURT:  Thank you.

15             Counsel.

16             MR. CARROLL:  Good afternoon, your Honor.

17             THE COURT:  Good afternoon.

18             MR. CARROLL:  I've got a hand-up, if I might, to just

19    try and encapsulate some of the remarks.  But I'll start

02:33 20    quickly, if I could, addressing the criticisms of Howson.

21             The notion that someone would need to have particular

22    expertise in extended-release minocycline drug development in

23    order to opine makes no sense whatsoever.  If plaintiffs want

24    to criticize Howson for not having extended-release minocycline

25    experience, have at it; that goes to the weight.  The

1   credentials are impeccable for exactly the opinions she's

2   giving.  This is somebody who's been in the industry for

3   decades, has done hundreds of business development deals, many

4   joint development deals.  She's looked at this.  And based on

5   that expertise can opine, Listen, when you've got a drug that's

6   already been through FDA approval and what you're working on is

7   that next generation of the drug, that's a lot easier from

8   starting to scratch -- than starting from scratch, and she

9   builds her opinion off of that.  It's that experience base.  It

02:34 10   wouldn't have to be a particular expertise in extended-release

11   minocycline.  You'd never be able to have an expert testify if

12   that was the case.  If the plaintiffs think that's inadequate,

13   well, have at it.  That goes to weight; it doesn't go to

14   admissibility.

15       And I'd like to draw your Honor's attention, in

16   particular, to the commentary on fair value.

17       The notion put forward by the plaintiffs' briefs is

18   that fair value has to be done in some objective way consistent

19   with accounting standards, citing this FASB financial

02:35 20   accounting standard.  That's what they've argued, particularly

21   in their reply.  Actavis has nothing to do with that

22   whatsoever.  That's what accountants use if they're trying to

23   put a valuation on an illiquid CDO.

24       The question Actavis asks in terms of fair value of

25   services is what is that going to mean, and how does that

compare, the fair value of services, to the payment?  Is it a

large payment?  Is it an unexplained payment?  And Carlton

answers that question precisely in the same way that courts

have repeatedly accepted in these sorts of cases.  And what he

does is he does an evaluation on a net present value basis of

what the value of those services that Impax was providing were

to Medicis as they would have looked at them at the time,

compare that against the net present value of the payments

being made, and look at that calculus.  And from that you can

tell that the parties entering this contract at the time would

have expected that there was a very fair value for the

services, and provides the explanation that Actavis asks for.

What's the explanation?  Well, it's a very good business deal

and here's the reasons why and here's the backup for it.

There's no large, unexplained payment; it's perfectly

explained.

Carlton does not rely on Howson, as is urged by the

plaintiffs, does not rely on Howson with respect to the

probability of success.  Dr. Carlton does a break-even analysis

and looks specifically not just at the internal contemporaneous

Medicis documents that he cites in his report, but also to the

testimony of the Medicis executives as to what they thought at

the time in terms of the prospects.  That's what forms the

foundation of his report.

Finally, your Honor, much of the criticism here, much

1    of the criticism particularly of Howson, is based on taking

2    things out of context.  It is true that Howson used the word

3    "guess" in her deposition testimony.  This is on the reverse

4    side of this page, I've quoted it.

5         She said, Well, as I said earlier, the 50-85 percent

6    range would be my guess as to potential probability.

7         But she's referring back to a prior answer.  This

8    isn't guesswork.  She was referring back to the analysis that

9    she did and the foundation for it which is all laid out in the

02:37 10   report.  That's not guesswork.  That's the kind of expert

11   testimony that courts rely on and the jury should be entitled

12   today hear.

13        If the plaintiffs wish to criticize it, they say,

14   Well, we don't think that's the right foundation, you should

15   have known more about minocycline.  Fine.  That's open game for

16   cross-examination; it has nothing to do, respectfully, with

17   admissibility.

18        Thank you.

19        THE COURT:  Thank you.

02:37 20   Counsel, you had some time left.

21        MR. SOBOL:  Yes.  Thank you, your Honor.

22        First, we're not criticizing Ms. Howson 's background,

23   nor a basis for an opinion.  We're pointing out that shes does

24   not have an opinion on the precise question that she was asked

25   which is the likelihood of being able to produce a

1   next-generation Solodyn, which, by definition, is a further

2   additional extended release that has greater bioavailability

3   than 70 to 80 percent.  Nor does she have an opinion about its

4   commercial success either.

5         So regardless of her background, she's not opining on

6   the relevant things, and therefore, her testimony must be

7   stricken.

8         And in addition, to the extent that there's any

9   corroborative reliance that Dr. Carlton has on Dr. Howson's or

02:38 10   Ms. Howson's opinion, that, too, needs to be struck.

11         It's also the case that this product was already an

12   extended-release product.  So you should not be looking to data

13   about how it is you already have an approved non-extended and

14   what it takes to get the first generation of it extended; that

15   was not the problem here.  The problem was that it was already

16   an extended-release product that had very great

17   bioavailability, 70 to 80 percent, and trying to get that

18   higher and clinically relevant and commercialized was the task.

19         I also point out Medicis itself could not do that.

02:39 20   Its testimony was that by the middle of 2008, it basically was

21   shutting down its own efforts to get that accomplished.  So how

22   it is that now Medicis' lawyers can find an expert, so-called

23   expert, who's now going to give an opinion, even though she's

24   saying she can't give an opinion, that Impax, out of nowhere,

25   is going to have a 50 to 80 percent chance of being able to do

1     it is ludicrous.

2           The final thing about Dr. Carlton I will say is that

3     his break-even analysis where he says that, you know, you've

4     got to have a greater likelihood or not of being successful on

5     this subject.  By definition he is talking about a break-even

6     point which means you're making profit on all six products, not

7     just the next-generation Solodyn but on all five ANDAs as well.

8     And yet, he doesn't have a basis upon which to predict the

9     likelihood that all five ANDA products are going to be

02:40 10    commercialized and the next-generation product are going to be

11    commercialized and the cumulative probability of all that

12    happening, as we mentioned in our reply brief, is preposterous.

13    So it falls apart at that level, too.

14           Thank you.

15           MR. CARROLL:  Thirty seconds, your Honor?

16           THE COURT:  Thirty seconds.

17           MR. CARROLL:  Howson's opinion, the probability that

18    she opines on, talks about getting the drug through the FDA.

19    It can't get through the FDA unless it's safe and effective.

02:40 20    So criticism that her testimony has anything to do with, Well,

21    it can't work and Medicis wasn't able to get it to work, that's

22    in her opinion; they can cross-examine her on it if they like.

23           The last point with respect to this bundling with

24    Carlton's testimony is simply mistaken, and reference to the

25    report explains it.

1          THE COURT:  Thank you.

2          Counsel, the last motion that you wanted to argue was

3     in regards to John Tupman.  I believe this is defendants'

4     motion, seven minutes either side.

5          Counsel?

6          MR. BALDRIDGE:  Yes, your Honor.  Doug Baldridge.

7          THE COURT:  Good afternoon.

8          MR. BALDRIDGE:  Good afternoon.

9          We can largely rest on the briefs.  It's a pretty

02:41 10   clear-cut issue, but I'll try to give a quick summary.

11          Tupman is being offered by the plaintiffs as a

12    businessman to essentially state that the joint defense (sic.)

13    agreement is an atypical transaction and that somehow Medicis

14    overpaid Impax for the services provided under the JDA.

15          Interestingly enough, Tupman was a business executive,

16    I think, at Eli Lilly, a branded company, had one job, and

17    based on that one job has decided he knows what is atypical in

18    the entire industry as a whole, including on the generic side,

19    which is where my client is.

02:42 20        So putting that as a background, there are really four

21    reasons well briefed on why Tupman ought to be excluded.

22          The first one is if you read his report, it's pretty

23    obvious that what he's trying to say is what was between the

24    ears of the parties in the negotiation.  He is being a mind

25    reader.  He is testifying what they intended, what they

thought, what their state of mind was.  The cases just go on

and on that that's inappropriate, and it is really as simple as

looking at his report to realize that's what he's doing.

The second thing he does is he just regurgitates what

the record says, which is already going to be in front of this

jury to decide what that record means.  The Court is well

aware, I'm sure, about multiple cases about regurgitation of

the record, and simply being a narrative summarizer of what the

record says is not appropriate space for an expert.

02:43  THE COURT:  And I guess, counsel, and I don't know

that I've discussed it with counsel in this case yet, but in

terms of my view on how experts get presented to a jury, given

that particular concern, on direct examination, I don't

envision experts on either side regurgitating at length the

things that they relied upon, whether or not they were facts in

this case or treatises in their particular field.  My view is

if those are brought out on cross-examination, they would be

ripe for redirect.

Given that, counsel, does that give you some comfort

02:44  in regards to this particular part of your challenge to him?

MR. BALDRIDGE:  Well, it certainly gives me some

comfort.  The regurgitation, though, is what he tries to throw

out there to support his ability to be a mind reader, which is

flaw number one.  So I'm going to be a mind reader because I

can read and provide a narrative of what I think the record

```
 1   says.  So they are interrelated.  It probably requires a quick
 2   look at the report.
 3          The third reason is he really has no methodology.
 4   Interestingly enough, the plaintiffs seem to -- I won't say
 5   concede, but seem to understand that that he had no
 6   methodology, so they came back in the reply brief and they
 7   quoted these FASB standards again that Mr. Carroll spoke about.
 8          The only thing I have to add to Mr. Carroll's argument
 9   on FASB is that while the plaintiffs' lawyers argued that
10   supported this methodology, Tupman testified in his deposition
11   at page 158 that he didn't rely on the FASB for his
12   methodology; he relied on his experience.  That's at 158, line
13   18, spilling over to 159.  So the FASB thing is a lawyer's
14   support for the methodology, not a Tupman support for his own
15   methodology.
16          That's really all I have.  I think the briefs well lay
17   this out.  Thank you.
18          THE COURT:  Thank you.
19          Counsel?
20          MR. REFSIN:  Your Honor, Barry Refsin for CVS and Rite
21   Aid, and I'm also speaking on behalf of all plaintiffs with
22   respect to Mr. Tupman.
23          THE COURT:  Good afternoon.
24          MR. REFSIN:  Thank you, your Honor.
25          Mr. Baldridge said that Mr. Tupman is an expert on
```

1   whether the joint development agreement is atypical.  That's

2   not correct.  Mr. Tupman is our expert on the fair value of the

3   joint development agreement and also with respect to the fair

4   value of the Sandoz agreement that purchased the doxycycline

5   ANDA.  He's really the only expert in this case who gives an

6   opinion on the fair value of anything.  As we've discussed,

7   neither Ms. Howson nor Dr. Carlton gave a fair value analysis.

8        He's certainly qualified to give such an opinion.  He

9   worked for Eli Lilly for over 30 years, seventeen years of that

02:46 10  time he spent in business development negotiating agreements of

11   the type of the joint development agreement, or at least he

12   negotiated joint development agreements and license agreements;

13   and he explains why a true joint development agreement doesn't

14   look anything like the joint development agreement in this

15   case, both because of the kind of due diligence that companies

16   do with respect to such agreement, all the work and preparation

17   that they do to make sure that they're paying fair value for

18   it, and because of the terms of this particular agreement.

19        Mr. Baldridge says that Mr. Tupman is giving opinion

02:46 20  on state of mind.  That's simply not true.  Mr. Tupman

21   repeatedly testified during his deposition that the final

22   decision of why Medicis paid what they paid will be for the

23   jury, will be for the trier of fact.

24        The criticisms that defendants make of Mr. Tupman's

25   opinions are about the facts that he points to in the

1    documents.  He's not reading anybody's mind.  He's looking at

2    documents.

3         For instance, one of the things that he says in

4    forming his opinions is that Impax recognized a low likelihood

5    of approval of next generic Solodyn.  So when he made that

6    statement, he wasn't trying to read the minds of Impax.  What

7    he was saying was he looked at Impax's forecasts, and those

8    Impax forecasts clearly stated that the royalties from the

9    next-generation Solodyn were, quote, at extreme risk, end

02:47 10   quote.  And Mr. Tupman pointed that out.  That's one of the

11   documents that we plan to have in front of the jury before

12   Mr. Tupman testifies.

13        All of the examples that the defendants have pointed

14   to with respect to Mr. Tupman reading minds are actually

15   examples from documents.  He points to documents.

16        For instance, another thing that he said was that

17   Medicis' limited transaction due diligence did not appear to

18   influence the terms of the JDA.  He wasn't reading Medicis'

19   mind.  What he did was he looked at the documents that were

02:48 20   produced by Medicis.  He saw that Medicis had no financial

21   analysis of next-generation Solodyn.  He says that's very

22   strange because when I was in business development, we did

23   financial analyses of the product that we were entering into a

24   joint development agreement.

25        And then he looked at the testimony of the key

1    decision makers.  During discovery, each of the key decision

2    makers were asked whether they considered financial analyses,

3    and he pointed out in his report that those decision makers

4    said that they did not see financial forecasts, they did not

5    consider financial forecasts.

6            So these aren't things that Mr. Tupman read minds

7    about.  These are documents that he looked at, and he compared

8    what he saw in the record of this case to what he would expect

9    based on his 30 years of experience at Eli Lilly and then also

02:49 10    the experience that he had as a member of the Licensing

11    Executive Society, which is the premier licensing society in

12    this country; and he's also participates in a venture fund for

13    Sea Pharmaceutical Companies, and he's seen transactions in

14    that respect as well.

15            The narrative point is related to this one,

16    Mr. Baldridge complained that he was giving a narrative.  I

17    think that your Honor's remarks deal completely with that

18    issue.  He does cite in a lot of detail in his report, he

19    explains all the facts that he's going to be relying on.  But

02:49 20    those facts are not going to be proved through Mr. Tupman,

21    they're going to be proved by the plaintiffs in this case, and

22    then Mr. Tupman is going to explain why the facts of this case

23    are different from what -- the way a joint development

24    agreement would really work if you are really negotiating the

25    joint development agreement at arm's length.

1          So I don't see any issue with respect to there being

2     an improper narrative of the facts.  He explained the basis for

3     his opinion.

4          The third issue that Mr. Baldridge argued was that

5     there was no basis for the valuation methodology that

6     Mr. Tupman employed.  Mr. Tupman explained, based on his

7     experience in business development, the way joint development

8     agreements are valued.  He identified three methods: a

9     comparable approach, that's looking at other similar

02:50 10    transactions; he identified a profit approach, where you do a

11    discounted cash flow of the expected forecasted profits from a

12    product; and he identified a cost method.  Those are all

13    accepted methodologies.  He didn't say that you apply an

14    accounting standard to value, that Actavis had accepted and

15    adopted an accounting standard.  He said, based on my

16    experience, this is what I understand to be fair value, this is

17    the way you do it.  And then to show that his opinion about

18    what fair value is is correct, he pointed to an accounting

19    standard, a standard by the Financial Accounting Standards

02:51 20    Board.

21          And then when we briefed this issue, we said, in

22    addition, these standards that Mr. Tupman identified based on

23    his experience are exactly the same as what the valuation

24    literature identifies.  And we cited in our briefs a number of

25    books.  We identified a number of articles about the

         1   pharmaceutical evaluations in particular that show that
         2   Mr. Tupman's valuation methodologies are exactly the way these
         3   valuation analyses are supposed to be conducted.
         4          Now, Mr. Tupman also explained the meaning of fair
         5   value to a business executive.  Activist specifically uses the
         6   term "fair value."  That has a meaning in the industry to
         7   Mr. Tupman, and he provides that meaning to him.
         8          The Supreme Court didn't say it's just about the
         9   profits that are earned.  It said you need to do an objective
02:52   10   fair value analysis.  And Mr. Tupman provides an opinion with
        11   respect to that what that fair value is.
        12          I think my time might be up.
        13          THE COURT:  Thank you, counsel.
        14          MR. REFSIN:  Thank you.
        15          MR. BALDRIDGE:  May I have 30 seconds or less?
        16          THE COURT:  Yes.  I think you had some time reserved,
        17   counsel.
        18          MR. BALDRIDGE:  Yes, just very quickly.
        19          Mr. Refsin said that Mr. Tupman points to examples
02:52   20   from the documents in record -- and I'm finishing with my own
        21   words -- to show what the parties thought.  Well, that's both
        22   regurgitation and mind reading.  So right out of his mouth what
        23   he does is regurgitation and mind reading.
        24          The second point I'd make is there's just simply no
        25   substitute for looking at his report to see what he did.  He

did opine on the atypical nature of the transaction according

to his one brand experience, and he clearly did go back and

forth as to what the parties were thinking and what they were

doing.  It's right in the report.

And the final point I would make brings us all the way

back to Dr. Bell and Ms. Foley's argument in quibbling with

what Tupman opined to.  Mr. Refsin said, No, he opined to the

fair value of the agreement.  That's right.  The agreement is

the central issue to be valued here.  It is not, as Mr. Sobol

previously said, is exactly as Ms. Foley said, and that's

exactly why they're offering Tupman as an expert on the

agreement itself and not the payment.

THE COURT:  Thank you, counsel.

I will, counsel, go back to the reports with your

arguments in mind.

Counsel, I know you're resting on the briefs as to the

DeBree and Frank motion, which I'll also take under advisement.

Counsel, with fair warning that I have some other

matters on after you, is there anything else, since you're all

assembled here, that I should take up?

MR. SOBOL:  I think we should prioritize a couple of

matters, your Honor.

This matter is on technically for the first of two

installments of the pretrial conference.  Let me address a

couple of witness issues.

1          The first is this:  The parties have exchanged witness

2     lists, and the plaintiffs have two issues with the defendants'

3     list.  Number one, they list all 57 of their witnesses as may

4     call, so we have no idea who they will call or who they may

5     call, it's just all 57 may call.

6          The other issue, which is also an important one, that

7     I'm sure that you probably expected would be here, is this:  If

8     they are going to be allowed to call anybody live, they have to

9     make that person available in our case in chief.  This is an

02:55 10   important case.  This is not recess.  We should not be playing,

11     as Judge Young would put it, cat and mouse by having witnesses

12     lay back, see what happens with their deposition designations

13     and the videotape during the plaintiffs' case and then bring a

14     witness live in the defense case.  If they are going to be

15     allowed to bring a witness live in their case, they have to

16     make them available for ours.  We'd like a ruling in that

17     regard.

18          I do appreciate that counsel for the defendants have

19     apprised us of five witnesses who they may call live, though

02:55 20   they're reserving all sorts of things, and they don't know

21     whether they're going to call them or not because they want to

22     see how everything else goes.  I do appreciate that they've

23     identified who they at least theoretically might have live.

24     But my point is, if they're going to be allowed to call them in

25     their case, they need to be available in ours.

```
 1              THE COURT:  Counsel, just give me one second.
 2              (Discussion off the record.)
 3              THE COURT:  Counsel.
 4              MR. SOBOL:  There are a couple of other witness
 5      issues.
 6              THE COURT:  I guess, counsel -- not to cut off
 7      discussion since, obviously, I'll stand ready to --
 8              (Discussion off the record.)
 9              THE COURT:  Counsel, not that I want to cut off
10      discussion in resolving the things that counsel can't resolve.
11      Obviously, counsel here doesn't necessarily write on a blank
12      slate since I went through a lot of these issues with your
13      brothers and sisters in Asacol, particularly on live witnesses
14      versus depo and who gets to call whom.  So I guess, counsel, I
15      would expect you're already doing this, but I would hope that
16      counsel would take that as a guide about what I'd likely do
17      here.
18              MR. SOBOL:  Well, let me make a suggestion, your
19      Honor.
20              THE COURT:  Yes.
21              MR. SOBOL:  Because I'm mindful also --
22              THE COURT:  And I say that, counsel -- I'm happy --
23      I'm happy, as I said, to resolve things counsel can't, but
24      where I'm likely to fall is where as I ruled in Asacol on these
25      sort of logistical issues between the parties in regards to
```

02:56 (line 10)
02:57 (line 20)

1    witnesses and so forth.

2         MR. SOBOL:  So while I can't say that we, or myself,

3    I'm up to speed on what you've been doing in the Asacol case

4    frankly.  For my own personal knowledge, I don't know if all

5    parties -- all the lawyers are.  So if we had an opportunity to

6    do that, maybe come back before March 7th if there are

7    remaining issues.

8         THE COURT:  Okay.

9         MR. SOBOL:  That's what I would suggest.

02:58 10        THE COURT:  And let me ask one of your brothers or

11   sisters on the other side if that makes some sense, counsel?

12        I guess what I'm trying to say is, I know you don't

13   think I'm repeating myself, but I certainly feel like I will be

14   if I go a few rounds and land in the same place after having

15   given this a lot of thought in another case just before this

16   one.

17        So, counsel, I'd --

18        MR. SOBOL:  Three weeks ago.

19        THE COURT:  A very short time ago, counsel.

02:58 20        So I'm inclined to let counsel brew on what I said in

21   that case and see if they can work out what their positions

22   would be and perhaps see you before the 7th.  Because, counsel,

23   as you know, I have a little more time these days.

24        (Laughter).

25        THE COURT:  So I'm sure I can find or Ms. Hourihan can

 1    find some time on my calendar to see you before the 7th just to

 2    talk through some of these logistical issues, and I can give

 3    you the benefit of my rulings or my position on these.

 4             Does that make some sense?

 5             MR. CARROLL:  Works for us, your Honor.

 6             MR. BALDRIDGE:  Your Honor, it works for us.

 7             I just want to make one point clear.  As we get closer

 8    to the 7th, I get less and less control over many of these

 9    witnesses, that I just want the Court to know, these aren't

02:59 10   employees anymore.  So I'm having some tough times --

 11            THE COURT:  Counsel, it's sounding familiar to me.  I

 12   appreciate that, and I know timing for third-party witnesses is

 13   an issue all around.

 14            So, counsel, I'd just ask you to confer with

 15   Ms. Hourihan about timing, and we'll get a date.  I'm happy to

 16   see you all in person, but I'm also happy to do that particular

 17   conference by phone, counsel, if it would be more convenient.

 18            Counsel, with that said, and the fact that I may at

 19   least see you or speak to you briefly before the 7th, anything

03:00 20   else I need to take up at this moment?

 21            MR. SOBOL:  No, your Honor.  Thank you very much.

 22            MR. CARROLL:  No, your Honor.

 23            MR. BALDRIDGE:  No, your Honor.

 24            THE COURT:  Thank you, counsel.

 25            (Court adjourned at 3:00 p.m.)

1                   - - - - - - - - - - - -

2                          CERTIFICATION

3          I certify that the foregoing is a correct transcript

4     of the record of proceedings in the above-entitled matter to

5     the best of my skill and ability.

6

7

8

9     /s/Debra M. Joyce_____              February 6, 2018_____
      Debra M. Joyce, RMR, CRR, FCRR        Date
10    Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25