# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE SOLODYN (MINOCYCLINE HYDROCHLORIDE) ANTITRUST LITIGATION | MDL No. 2503 |
| This Document Relates to:<br><br>**All Actions** | Civil Action No. 1:14-MD-2503-DJC |

# PLAINTIFFS' OPPOSITION TO IMPAX'S MOTION IN LIMINE TO EXCLUDE FEDERAL TRADE COMMISSION PUBLICATIONS AND DOCUMENTS

## I. INTRODUCTION

Impax states that the Federal Trade Commission ("FTC") documents and publications on Plaintiffs' exhibit list should be excluded from evidence because they are purportedly irrelevant, prejudicial, and hearsay outside the scope of the public records exception. While Plaintiffs disagree with Impax's Motion with respect to all of the questioned FTC documents, Plaintiffs only seek to introduce four FTC documents: (1) the January 2010 FTC Staff Study, "Pay-for-Delay - How Drug Company Pay-Offs Cost Consumers Billions" (henceforth the "2010 FTC Study,");[1] (2) Federal Trade Commission, "Authorized Generics: An Interim Report," June 2009 (henceforth the "2009 FTC Study");[2] (3) the August 2011 FTC Study "Authorized Generic Drugs: Short-Term Effects and Long-Term Impact (henceforth the "2011 FTC Study");[3] and (4) FTC, "To Promote Innovation: The Proper Balance of Competition and Patent Law and Policy," October 2003[4] (the "2003 FTC Patent Study") (the 2003 FTC Patent Study, the 2009 FTC Study, 2010 FTC Study, and 2011 FTC Study are collectively the "FTC Studies"). Plaintiffs seek to admit these FTC Studies only for their factual content, not their conclusions. In addition, Plaintiffs seek to admit the FTC Studies and several others (henceforth the "Other Studies") only for purposes of showing that, empirically, patent settlements can occur without reverse payments and delayed generic entry. For the reasons shown below, the FTC Studies and Other Studies are

---

[1] Federal Trade Commission, *Pay-for-Delay: How Drug Company Pay-Offs Cost Consumers Billions* (2010), available at https://www.ftc.gov/sites/default/files/documents/reports/pay-delay-how-drug-company-pay-offs-cost-consumers-billions-federal-trade-commission-staff-study/100112payfordelayrpt.pdf. Exhibit AOZ.

[2] Available at https://www.ftc.gov/sites/default/files/documents/reports/authorized-generics-interim-report-federal-trade-commission/p062105authorizedgenericsreport.pdf. Attached as Exhibit 6 to the Declaration of Lauren Guth Barnes ("Barnes Decl."). The 2009 FTC Study was inadvertently not included on Plaintiffs' exhibit list.

[3] Available at https://www.ftc.gov/sites/default/files/documents/reports/authorized-generic-drugs-short-term-effects-and-long-term-impact-report-federal-trade-commission/authorized-generic-drugs-short-term-effects-and-long-term-impact-report-federal-trade-commission.pdf. Exhibit BHC.

[4] Available at https://www.ftc.gov/sites/default/files/documents/reports/promote-innovation-proper-balance-competition-and-patent-law-and-policy/innovationrpt.pdf. Exhibit BRM.

relevant, admissible as public records, and not inappropriately prejudicial to Impax. They should be admitted.[5] Non-germane material from the studies can be redacted.

## II. ARGUMENT

### A. The FTC Studies and Other Studies are relevant.

Impax's Motion states (p. 3) that the FTC Studies and Other Studies are irrelevant to the questions that will be presented to the jury in this case, because they do not involve the settlement at issue in this case, and are based on unrelated settlements between unrelated parties pertaining to different pharmaceutical products.

However, the 2010 FTC Study is a study of 218 settlement agreements for patent litigations between brand and generic pharmaceutical companies between fiscal years 2004 and 2009, and contains factual findings such as (1) 70% of those settlements did not involve a payment from the brand company to the generic company (reverse payment) combined with a delay in generic entry,[6] (2) agreements with a reverse payment resulted in an average additional delay in generic entry of nearly 17 months,[7] and (3) one year after the first generic entry, the generics typically have 90% of the market at 15% of the pre-entry brand price.[8] The Other

---

[5] Impax asserts, without citation, that if the admissible FTC Studies and Other Studies are introduced, it should be able to tell the jury that the FTC did not take action against Impax. Not so. As explained in Plaintiffs' motion in limine No. 15 (ECF No. 1013 at 5-9), there is no probative value to, and no inferences can properly be drawn from, the FTC's inaction as to the Medicis-Impax reverse payment agreement, as such inaction does not mean that the FTC "approved" or in any way blessed the Medicis-Impax reverse payment agreement. And any limited probative value of the FTC's inaction would be far outweighed by the unfair prejudice and confusion caused by admitting such evidence, because admitting that information could easily lead the jury to believe that the FTC's inaction meant that there was no wrongful conduct. *See King Drug Co. of Florence, Inc. v. Cephalon, Inc.*, No. 06-1797 (E.D. Pa. Jan. 8, 2016), Dkt. No. 986 (on similar motion in limine, holding that "any reference to the FTC investigation, lawsuit and settlement is excluded" because "such evidence is not relevant and inadmissible," including under Fed. R. Evid. 403). There is no basis for Impax's suggestion that as a *quid pro quo* the Court should punish Plaintiffs for the introduction of the admissible and factually relevant FTC Studies by also admitting irrelevant and prejudicial evidence concerning the FTC not taking action against Impax.

[6] 2010 FTC Study, p. 4.

[7] 2010 FTC Study, p. 4.

[8] 2010 FTC Study, p. 8.

Studies also update the 2010 FTC Study's factual information regarding the frequency of patent settlements that do not involve reverse payments and delayed generic entry, which information will also be introduced. Those factual findings are clearly relevant to experts, and if used to question experts, would assist the jury in evaluating expert testimony and the credibility and weight to assign to different experts.

The 2010 FTC Study also included relevant factual information about the typical, predictable effects of generic competition. For example, the FTC found that "a generic market typically matures about one year after the first entrant comes on the market. The generic penetration rate at that point is about 90% on average, *i.e.* pharmacists fill 90 of every 100 prescriptions for the molecule with an AB-rated (or bioequivalent) generic."[9] The 2010 FTC Study further found that "generic prices are, on average, 85% lower than the pre-entry branded drug price."[10] This is admissible factual evidence relevant to Plaintiffs' claims that generic Solodyn sales would have been substantially higher (and brand Solodyn sales substantially lower) if Impax had launched generic Solodyn earlier and stayed on the market absent the challenged agreement. Similarly, the 2009 FTC Study and the 2011 FTC Study both reported factual findings that generic prices are lower on average when there are two generics on the market (a generic with an authorized generic).[11] This is relevant factual evidence that, as Plaintiffs allege, the generic Solodyn price would have been lower if there had been multiple generics on the market at once, instead of what happened here, where Teva, Sandoz, and Mylan each sold generic Solodyn alone on the market for a few days (and thus were able to charge a higher, supracompetitive price for generic Solodyn).

---

[9] 2010 FTC Study, at p.8.

[10] 2010 FTC Study at p. 8.

[11] 2009 FTC Study at pp. 9-11; 2011 FTC Study at pp. ii, 33, 46, 48.

The 2011 FTC Study likewise includes relevant factual information. In that study, the FTC reported that, during the 2003-08 period studied by the FTC, out of the 24 manufacturers of the highest selling drugs whose first competition was with a generic with a 180-day exclusivity period, 19, or almost 80%, introduced an authorized generic.[12] The FTC also found that the authorized generic was typically launched at or around the same time as the generic competitor.[13] The 2009 FTC Study includes similar factual findings. Both studies thus include relevant factual evidence that Medicis would have likely launched an authorized generic Solodyn to compete with Impax's generic absent the challenged agreement.

The 2003 FTC Patent Study, among other things, reports an estimate of the time a patent examiner has to "read and understand each application, search for prior art, evaluate patentability, communicate with the applicant, work out necessary revisions, and reach and write up conclusions": 8-25 hours.[14] Such information provides relevant background to understand the context of patent litigation in general and the Impax-Medicis suit in particular.

In *SEC v. Pentagon Capital Mgmt. PLC*,[15] the SEC accused a financial company and its officer of the illegal practices of "late trading" and "market timing." The defendants sought to introduce testimony by an SEC official before a Senate subcommittee about an SEC investigation that revealed that those illegal practices were actually fairly common among mutual

---

[12] 2011 FTC Study, at p.30.

[13] *Id.* at pp. 26-30.

[14] 2003 FTC Patent Study at 10.

[15] 722 F. Supp. 2d 440, 441 (S.D.N.Y. 2010)

funds and broker-dealers.[16] The court granted the motion for admissibility, stating that the testimony appeared relevant.[17]

Similarly, in this action, the factual findings in the FTC Studies and Other Studies are relevant as they will assist a jury in evaluating experts' testimony and conclusions, and should be admitted.

### B. The FTC Studies and Other Studies are not prejudicial.

Impax's Motion states (p. 3-4) that the purported relevance of the FTC Studies and Other Studies are outweighed by their prejudicial effect, since (1) there is a significant risk the jury will give them more significance than they deserve, because they have the government stamp of approval, (2) there is a significant risk that the jury would punish Impax based on the inference that pharmaceutical companies have a character trait of engaging in anticompetitive conduct, and (3) Plaintiffs are trying to create the impression that all reverse-payment settlements are anticompetitive and cause consumers to pay too much for prescription drugs, and therefore the Impax-Medicis agreements must be anticompetitive too.

First, Plaintiffs do not seek to admit the FTC Studies and Other Studies for their conclusions, but rather, for factual findings contained therein, whose truth Impax does not question. Therefore, there is no concern about the jury being prejudiced by the FTC Studies and Other Studies as being unduly weighted by having the stamp of the federal government. The FTC Studies (and the Other Studies admitted only for the discrete fact of the frequency of non-reverse payment non-delayed generic entry settlements) can be appropriately redacted to ensure that other substantive content is not presented to the jury.

---

[16] *Id.*, at 441-2.

[17] *Id.*, at 443. The court also stated that discovery was still incomplete and the SEC would have leave to renew its relevance objection after the issues and evidence were clarified. *Id.*, at 443.

5

Second, Plaintiffs are not seeking to admit evidence of other anticompetitive actions by Impax, and therefore Fed. R. Evid. 404 is inapplicable. Factual content from the FTC Studies and Other Studies has probative value for the jury in understanding and evaluating expert testimony, and that probative value far exceeds any possibility of unfair prejudice from the jury mischaracterizing the reports as an attack on pharmaceutical companies. For instance, the 2010 FTC Study criticizes a specific type of patent settlement, with factual support for that criticism, and does not single out specific companies nor suggest that this type of settlement is universal in the pharmaceutical industry.

Finally, Plaintiffs will not argue that all reverse payment agreements are anticompetitive, but will introduce factual statements from the FTC Studies and Other Studies as further evidence in support of Plaintiffs' actual case, which follows the law as set forth in *Actavis*.[18]

### C. The FTC Studies and Other Studies are admissible as public records.

Impax's Motion states (p. 4-5) that the FTC Studies and Other Studies are hearsay that is not covered by the public records exception, because the 2010 FTC Study was prepared by "staff from the FTC's Bureau of Competition, Bureau of Economics, and Office of Policy Planning"[19] and is not an official statement of the FTC.

#### 1. Three of the four FTC Studies are official statements of the FTC.

While Plaintiffs disagree that the 2010 FTC Study is not admissible as a public record because it was prepared by certain FTC staff rather than as an official statement of the FTC (it meets the requirements for admissibility, as will be explained below), that contention is not valid

---

[18] *FTC v. Actavis, Inc.*, 570 US. 136 (2013).
[19] 2010 FTC Study, p. 7.

as to the other FTC Studies, because the 2003 FTC Patent Study, 2009 FTC Study, and 2011 FTC Study are all official statements of the FTC.

### 2. The FTC Studies are admissible public records.

The FTC Studies are admissible under the public records exception to the hearsay rule. The FTC Studies are investigatory reports of the FTC, and thus are admissible pursuant to Federal Rule of Evidence 803(8), which provides that "[a] record or statement of a public office [that] sets out . . . factual findings from a legally authorized investigation" is admissible if "the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness."[20] The FTC Studies—publicly available studies regarding *inter alia* the typical, average effects of generic competition, the frequency with which brand companies launch authorized generic drugs to compete with generic products, and competitive effects of reverse payment settlements—are precisely such factual findings resulting from legally authorized investigations and trustworthy records, and are thus plainly admissible under Rule 803(8).

Courts have found similar reports to be admissible, including in *Nexium*, where the court found the 2010 FTC Study to be admissible under Rule 803(8) (though it was not actually admitted there, because the plaintiffs failed to introduce the report in their case-in-chief, and then sought to admit it on rebuttal).[21]

### 3. The FTC Studies are "factual findings from a legally authorized investigation."

---

[20] Fed. R. Evid. 803(8).

[21] *In re Nexium (Esomeprazole) Antitrust Litigation*, No. 12-md-02409 (D. Mass.), Trial Tr. Dec. 2, 2014 (ECF No. 1438), at 40-43 (firmly rejecting defendants' objections to the admissibility of the report, then stating: "The document is excluded. It's excluded not – and let the record be clear, not because it doesn't meet 803(8), it does. It could have been admitted. But because it's not true rebuttal, it's central to the case. And if we wanted to check out its reliability we should have done it weeks ago. It's excluded."). A copy of the cited portion of the transcript is attached at Exhibit 7 to the Barnes Decl.

Section 6(b) of the FTC Act empowers the FTC to require the filing of "annual or special . . . reports or answers in writing to specific questions."[22] The FTC's 6(b) authority "enables it to conduct wide-ranging economic studies that do not have a specific law enforcement purpose [and] also authorizes the Commission to 'make public from time to time' portions of the information that it obtains, where disclosure would serve the public interest."[23] The FTC Studies qualify as factual findings made pursuant to authority granted by the FTC Act.

As discussed above, the FTC Studies report numerous factual findings, including that (1) 70% of patent settlements between brand and generic companies did not involve a reverse payment combined with a delay in generic entry,[24] (2) reverse payment agreements resulted in an average additional delay in generic entry of nearly 17 months,[25] (3) one year after the first generic entry, the generics typically have 90% of the market at 15% of the pre-entry brand price,[26] (4) generic prices are lower when there is an authorized generic product on the market,[27] and (5) authorized generic products are frequently launched at or around the time the brand company faces generic competition.[28] While Plaintiffs do not seek to introduce the conclusions of the FTC Studies, and would be willing to redact them as the Court deems necessary, the FTC Studies cannot be excluded on grounds that they state conclusions or opinions, as "factual findings" may extend beyond mere "facts" and include opinions and conclusions,[29] and

---

[22] 15 U.S.C. § 46.

[23] *A Brief Overview of the Federal Trade Commission's Investigative and Law Enforcement Authority,* FEDERAL TRADE COMMISSION (July 2008), http://www.ftc.gov/about-ftc/what-we-do/enforcement-authority.

[24] 2010 FTC Study, p. 4.

[25] 2010 FTC Study, p. 4.

[26] 2010 FTC Study, p. 8.

[27] 2009 FTC Study at pp. 9-11; 2011 FTC Study at pp. ii, 33, 46, 48.

[28] 2011 FTC Study, at pp. 26-30.

[29] *See Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 162 (1988) (holding that "factually based conclusions or opinions are not on that account excluded from the scope of Rule 803(8)(C)"). *See also Johnson v. City of*

objections to the conclusions of a report and the methodology of the report go to the weight of a public record rather than to its admissibility.[30]

Similar reports by federal agencies—including the FTC—are routinely admitted into evidence under Fed. R. Evid. 803(8). *See, e.g.*, *LocusPoint Networks*[31] (admitting a Federal Communications Commission report over defendant's objections); *Heffner v. Murphy*[32] (denying defendants' motion to strike the admission into evidence of an FTC report because "such documents may be properly considered pursuant to Federal Rule of Evidence 803(8) under the public records and reports exception to the hearsay rule."); *Rochester Gas & Elec. Corp. v. GPU*,[33] (deeming admissible agency reports by the FTC, the SEC, and the Federal Power Commission); *Cherry Hill Vineyards*[34] (admitting, over defendants' objections, a "July 2003 Federal Trade Commission Staff Report entitled 'Possible Anticompetitive Barriers to E-

---

*Pleasanton*, 982 F.2d 350, 352 (9th Cir. 1992); *POM Wonderful LLC v. Coca Cola Co.*, 166 F. Supp. 3d 1085, 1101-02 (C.D. Cal. 2016) (admitting an "FTC Opinion" that made a number of factual findings and ultimately opined that one of the parties had violated the FTC Act); *LocusPoint Networks, LLC v. D.T.V. LLC*, No. 14-1278, 2015 U.S. Dist. LEXIS 113356, at *19-22 (N.D. Cal. Aug. 25, 2015), at *20 ("[P]ortions of investigatory reports otherwise inadmissible under Rule [803(8)] are not inadmissible merely because they state a conclusion or opinion.") (alterations in original) (quoting *Rainey*, 488 U.S. at 170).

[30] *See, e.g.*, *Cherry Hill Vineyards, LLC v. Hudgins*, 488 F. Supp. 2d 601, 610 (W.D. Ky. 2006) (noting that because the FTC report "is a report of a United States government agency, it falls under the public records exception to the hearsay rule and is self-authenticating. The principal criticism of the report, however, is that it is 'deeply flawed,' having drawn 'questionable conclusions based on limited statistics with no sworn testimony.' The Wholesalers urge the court to disregard the report despite the reliance upon it by the Supreme Court in *Granholm*. Again, this argument goes to the weight rather than to the admissibility of the evidence.") (citations omitted); *Limone v. United States*, 497 F. Supp. 2d 143, 156 n.16 (D. Mass. 2007) ("The government contested both the admissibility and the weight to be given to this report. The plaintiffs sought to admit it in connection with the public records exception to the hearsay rule, and on the authority of *Rainey*. I admitted the evidence as a public record, leaving open the question of the weight to be given it in my final opinion.") (citations omitted).

[31] *LocusPoint Networks, LLC v. D.T.V. LLC*, No. 14-1278, 2015 U.S. Dist. LEXIS 113356, at *19-22 (N.D. Cal. Aug. 25, 2015).

[32] 866 F. Supp. 2d 358, 431 n.30 (M.D. Pa. 2012), *partially overturned on other grounds*, *Heffner v. Murphy*, 745 F.3d 56 (3d Cir. 2014).

[33] No. 00-6369, 2008 U.S. Dist. LEXIS 111918, at *6-7 & n.5 (W.D.N.Y. Aug. 8, 2008).

[34] 488 F. Supp. 2d at 601, 610 (W.D. Ky. 2006).

Commerce: Wine'"); *O'Dell v. Hercules, Inc.*[35] (deeming "admissible under the investigative public reports exception to the hearsay rule embodied in Fed. R. Evid. 803(8)(C)" a CDC study "predicting the possible health risks from exposure to soil containing the levels of dioxin found at the plant site and in the landfills."). *See also POM Wonderful*,[36] (admitting an "FTC Opinion" that "resulted from a legally authorized investigation" and "contains a number of factual findings"); Barnes Decl., Exh. 7, at 40-43 (the 2010 FTC Study was "excluded not – and let the record be clear, not because it doesn't meet 803(8), it does. It could have been admitted.")

### 4. The FTC Studies are trustworthy.

The FTC Studies are trustworthy. "In considering whether an official report is sufficiently reliable to be admitted under [Rule 803(8)(B)], we start from the premise that such reports of investigations are presumed to be reliable. . . . Before [untrustworthiness] objections may be recognized . . . the party challenging the validity of an official report admitted under [803(8)(B)] must come forward with some evidence which would impugn its trustworthiness."[37] Where the reporting agency determines that the information it relied on for its investigation was sufficiently reliable to publish for the public, government reports have been deemed sufficiently

---

[35] 904 F.2d 1194, 1205 (8th Cir. 1990).

[36] 166 F. Supp. 3d 1085, 1101-02 (C.D. Cal. 2016).

[37] *Melville v. Am. Home Assurance Co.*, 584 F.2d 1306, 1316 (3d Cir. 1978). *See also Rainey*, 488 U.S. at 167, 169 (outlining "[a] broad approach to admissibility") that, at 167 ("assumes admissibility in the first instance"); *United States v. Lewis*, 27 F. App'x 768, 769 (9th Cir. 2001) ("Public records tendered at trial are presumed accurate and trustworthy, and the burden rests upon the opponent of such evidence to prove otherwise."); *City of Pleasanton*, 982 F.2d at 352; *Cortes v. Maxus Exploration Co.*, 977 F.2d 195, 201 (5th Cir. 1992); *Keith v. Volpe*, 858 F.2d 467, 481 (9th Cir. 1988) ("The presumption is one of trustworthiness, with the burden of establishing untrustworthiness on the opponent of the evidence."); *Fayson v. Schmadl*, 126 F.R.D. 419, 420 (D.D.C. 1988); *Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*, 505 F. Supp. 1125, 1143 (E.D. Pa. 1980) ("The language of [803(8)(C)] literally provides for the admission of entire agency reports so long as those reports include, inter alia, factual findings . . . ."), *aff'd in part on other grounds*, 723 F.2d 238 (3d Cir. 1983), *rev'd on other grounds*, 475 U.S. 574 (1986)).

trustworthy.[38] In dealing with the question of trustworthiness, courts should look only at the methods and means of investigation, not the substance of the report.[39] There is no reason to doubt that the FTC Studies are trustworthy. The factual findings in the 2009, 2010, and 2011 FTC Studies are taken from settlement agreements that were required by law to be filed with the FTC.[40] The FTC therefore had a comprehensive set of settlement agreements over the period in question, and could make accurate factual findings based on those settlement agreements. The 2003 FTC Patent Study draws on PTO information,[41] and the 2009 and 2011 FTC Studies also draw on FDA information.[42]

The cases cited by Impax are not to the contrary. In *New York v. Pullman, Inc.*,[43] the court excluded a report that was "the tentative results of an incomplete staff investigation"[44] rather than the findings of an agency. In *Smith v. Isuzu Motors Ltd.*,[45] the court excluded three memoranda by staff members that the agency ultimately declined to adopt, and stated

---

[38] *Robbins v. Whelan*, 653 F.2d 47, 52 (1st Cir. 1981), citing, as here, legal requirements to provide accurate data.

[39] *See Rainey*, 488 U.S. 153, 167 n.11 (setting forth factors relevant to trustworthiness, such as "the timeliness of the investigation" and "whether a hearing was held"); *Moss v. Ole S. Real Estate, Inc.*, 933 F.2d 1300, 1306-7 (5th Cir. 1991) (determining that the magistrate judge "abused his discretion in excluding the two reports," one from HUD and one from Air Force regarding discrimination, despite the fact that the magistrate "found the report untimely," noted that "the circumstances prompting the second investigation were somewhat irregular," "found the investigation itself inadequate . . . because there was no formal hearing or cross-examination of witnesses," and "noted that exhibits in the file were inadmissible before a court, that findings were incomplete and misleading, and that witnesses relied upon were biased." The magistrate's conclusions as to the reports looked broadly at credibility which, again, is an issue of weight, not of admissibility. "The court must allow the jury to make credibility decisions and to decide what weight to afford a report's findings. . . . In making the trustworthiness determination required by Rule 803, *courts should not focus on questions regarding the accuracy or completeness of the document's conclusions.*") (emphasis added).

[40] 2010 FTC Study, p. 3.

[41] *See e.g.* 2003 FTC Patent Study, p. 9.

[42] 2009 FTC Study, p. A-1; 2011 FTC Study, p. 7.

[43] 662 F.2d 910, 914-15 (2d Cir. 1981).

[44] *Id.*, at 915.

[45] 137 F.3d 859, 862 (5th Cir. 1998).

11

specifically that "[t]he memoranda do not reflect 'factual findings' of the NHTSA. Rather, they embody the positions and opinions of individual staff members, which the agency ultimately declined to accept."[46] In *In re September 11 Litig.*, 621 F. Supp. 2d 131, 155 (S.D.N.Y. 2009), the court also rejected admission of interim reports that were submitted as recommendations to the commission that eventually produced a separate final report. Unlike the report in *Pullman*, the memoranda in *Smith,* and the interim reports in *September 11*, the FTC Studies contain actual factual findings, whose truth is not in dispute. Also, Plaintiffs do not seek to admit the FTC Studies for their conclusions, but rather for factual findings contained within.

### 5. The Other Studies are admissible on the same grounds as the FTC Studies.

The Other Studies are admissible on the same grounds as the FTC Studies as set forth above in Sections II-C-1 through 4: they contain factual findings from legally authorized investigations, and Impax fails to show any reason for their lack of trustworthiness.

## III. CONCLUSION

The factual findings in the FTC Studies and Other Studies should not be excluded.

---

[46] *Id.*, at 862.

12

Dated: February 28, 2018                    Respectfully submitted,

**/s/Lauren Guth Barnes**
Thomas M. Sobol
Lauren Guth Barnes
Hagens Berman Sobol Shapiro LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142
Tel: (617) 482-3700
Fax: (617)482-3003
Email: tom@hbsslaw.com
          lauren@hbsslaw.com

*Liaison and Co-Lead Counsel for Direct Purchaser Class*

David F. Sorensen
Andrew C. Curley
Caitlin G. Coslett
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, PA 19103
Tel: (215) 875-3000
Fax: (215) 875-4604
Email: dsorensen@bm.net
          acurley@bm.net
          ccoslett@bm.net

*Co-Lead Counsel for Direct Purchaser Class*

**/s/ Barry L. Refsin**
Barry L. Refsin
Monica L. Kiley
Hangley Aronchick Segal Pudlin
& Schiller
One Logan Square, 27th Floor
Philadelphia, PA 19103
Tel: (215) 568-6200
Fax: (215) 568-0300

*Counsel for Rite Aid Corporation et al.*

**/s/ Steve D. Shadowen**
Steve D. Shadowen
Hilliard & Shadowen LLP
919 Congress Avenue, Suite 1325
Austin, TX 78748
Tel: (855) 344-3928
Email: steve@hilliardshadowenlaw.com

Michael M. Buchman
Motley Rice LLC
600 Third Avenue, 21st Floor
New York, NY 10016
Tel: (212) 577-0040
Email: mbuchman@motleyrice.com

*Co-Lead Counsel for the End Payor Class*

Nathaniel L. Orenstein
BERMAN TABACCO
One Liberty Square
Boston, MA 02109
Tel: (617) 542-8300
norenstein@bermantabacco.com

*Liaison Counsel for the End Payor Class*

**/s/ Scott E. Perwin**
Scott E. Perwin
Lauren C. Ravkind
Anna T. Neill
Kenny Nachwalter, P.A.
1100 Miami Center
201 South Biscayne Boulevard
Miami, FL 33131-4327
Tel. (305) 373-1000
Fax: (305) 372-1861

*Counsel for Walgreen Co. et al.*

# CERTIFICATE OF SERVICE

I, Lauren G. Barnes, certify that, on this date, the foregoing document was served by filing it on the court's CM/ECF system, which will automatically email notice to all counsel of record.

Dated: February 28, 2018  **/s/ Lauren G. Barnes**
Lauren G. Barnes