**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| IN RE SOLODYN (MINOCYCLINE HYDROCHLORIDE) ANTITRUST LITIGATION | MDL No. 2503

Civil Action No. 1:14-MD-2503-DJC |
| This Document Relates to:

Direct Purchaser Actions |  |

**DIRECT PURCHASER CLASS PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR ENTRY OF ORDERS (1) REIMBURSING AND PAYING EXPENSES AND DISBURSING REMAINING SANDOZ AND LUPIN FUNDS TO THE CLASS; (2) APPROVING SERVICE AWARDS TO CLASS REPRESENTATIVES AND AWARDING ATTORNEYS' FEES; (3) APPROVING THE PLAN OF ALLOCATION; AND (4) FINDING NOTICE TO SATISFY DUE PROCESS, GRANTING FINAL APPROVAL OF MEDICIS AND IMPAX SETTLEMENTS, AND ORDERING DISMISSAL WITH PREJUDICE**

## TABLE OF CONTENTS

I.     INTRODUCTION ...............................................................................................1

II.    SUMMARY OF THE CASE ..............................................................................3

III.   ARGUMENT ......................................................................................................7

       A.    Settlement of class action lawsuits is encouraged. ..................................7

       B.    All Class members received individual direct mail notice. ......................7

       C.    Courts are awarded wide latitude in determining whether a class action
             settlement is reasonable. ........................................................................8

       D.    The Settlements should be approved as fair, reasonable, and adequate. .................9

             1.    The Settlements are the result of arm's-length negotiations.....................10

             2.    The quality of Class Counsel weighs in favor of approval.......................10

             3.    The litigation was complex and expensive and likely would have
                   been protracted...........................................................................11

             4.    The Class has reacted favorably to the Settlements.................................13

             5.    The parties understood the strengths and weaknesses of the case at
                   the time of the Settlements........................................................14

             6.    The Settlements obviate the risks inherent in establishing liability
                   and damages.........................................................................14

             7.    The risk of maintaining the class action through the trial weighs in
                   favor of approval...................................................................16

             8.    The defendants' ability to withstand a greater judgment does not
                   weigh against approval. ...........................................................16

             9.    The Settlements are well within the range of reasonableness in
                   light of the best possible recovery and all of the attendant risks of
                   litigation. ............................................................................16

       E.    The plan of allocation is fair, reasonable, and adequate and should be
             approved................................................................................17

IV.    CONCLUSION..................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Automotive Refinishing Paint Antitrust Litig.*,
  MDL No. 1426, 2004 U.S. Dist. LEXIS 29162 (E.D. Pa. Oct. 13, 2004) .............................14

*In re Cardizem CD Antitrust Litig.*,
  218 F.R.D. 508 (E.D. Mich. 2003) ........................................................................................11

*In re Celexa and Lexapro Mktg. and Sales Practice Litig.*,
  No. 09-2067, 2014 WL 4446464 (D. Mass. Sept. 8, 2014) ....................................................17

*City of Detroit v. Grinnell Corp.*,
  495 F.2d 448 (2d Cir. 1974) ................................................................................................9, 17

*City P'ship Co. v. Atl. Acquisition Ltd. P'ship*,
  100 F.3d 1041 (1st Cir. 1996) ...............................................................................................10

*In re DDAVP Direct Purchaser Antitrust Litig.*,
  No. 05-cv-2237 (S.D.N.Y.), Dkt. No. 101 .............................................................................19

*In re Doryx Antitrust Litig.*,
  No. 12-cv-3824 (E.D. Pa.), Dkt. No. 452-3 ...........................................................................19

*In re General Motors Corp. Pick-Up Truck Fuel Tanks Products Liab. Litig.*,
  55 F.3d 768 (3rd Cir. 1995) ................................................................................................7, 17

*Giusti-Bravo v. U.S. Veterans Admin.*,
  853 F.Supp. 34 (D.P.R. 1993) ...............................................................................................11

*Granada Investments, Inc. v. DWG Corp.*,
  962 F.2d 1203 (6th Cir. 1992) .................................................................................................7

*Greenspun v. Bogan*,
  492 F.2d 375 (1st Cir. 1974) ....................................................................................................9

*Gulbankian v. MW Mfrs., Inc.*,
  No. 10-10392, 2014 WL 7384075 (D. Mass. Dec. 29, 2014) ...............................10, 13, 15, 17

*Hill v. State St. Corp.*,
  No. 09-cv-12146-GAO, 2015 WL 127728 (D. Mass. Jan. 8, 2015) ..................................17, 18

*Hochstadt v. Boston Sci. Corp.*,
  708 F. Supp. 2d 95 (D. Mass. 2010) .......................................................................................17

*King Drug Company of Florence, Inc., et al. v. Cephalon, Inc.*,
   No. 2:06-cv-1797-MSG (E.D. Pa.), Dkt. No. 864-17 ............................................................19

*In re Lupron Marketing and Sales Practices Litig.*,
   MDL 1430, 2005 WL 2006833 (D. Mass. Aug. 17 2005) ......................................................15

*In re Lupron Mktg and Sales Practices Litig.*,
   228 F.R.D. 75 (D. Mass. 2005) .....................................................................................15, 17

*In re M.D.C. Holdings Sec. Litig.*,
   No. CV89-0090, 1990 WL 454747 (S.D. Cal. Aug. 30, 1990) ............................................13

*In re Modafinil Antitrust Litig.*,
   837 F.3d 238 (3d Cir. 2016) ............................................................................................16

*Mullane v. Cent. Hanover Bank & Trust Co.*,
   339 U.S. 306 (1950) ......................................................................................................7

*New England Carpenters Benefits Fund v. First DataBank, Inc.*,
   602 F.Supp.2d 277 (D. Mass. 2009) ...........................................................................8, 9, 14

*In re Pharm. Industry Avg. Wholesale Price ("AWP") Litig.*,
   588 F.3d 24 (1st Cir. 2009) ..........................................................................................8, 10

*In re Prograf Antitrust Litig.*,
   No. 11-md-2242 (D. Mass), Dkt. No. 664-2 ...................................................................19

*In re Prudential Ins. Co. of Am. Sales Practices Litig.*,
   148 F.3d 283 (3d Cir. 1998) ............................................................................................13

*In re Relafen Antitrust Litig.*,
   231 F.R.D. 52 (D. Mass. 2005) ..............................................................................9, 15, 16, 17

*In re Remeron Direct Purchaser Antitrust Litig.*,
   No. 03-0085, 2005 WL 3008808 (D.N.J. Nov. 9, 2005) ...................................................13, 16

*Rolland v. Cellucci*,
   191 F.R.D. 3 (D. Mass. 2000) ....................................................................................11, 17

*Shapiro v. JPMorgan Chase & Co.*,
   No. 11 Civ. 8331, 2014 U.S. Dist. LEXIS 37872 (S.D.N.Y. March 21, 2014) ......................16

*In re Shopping Carts Antitrust Litig.*,
   MDL No. 451, 1983 WL 1950 (S.D.N.Y. Nov. 18, 1983) ..................................................14

*Siegel v. Realty Equities Corp. of New York*,
   No. 70 Civ. 4338, 1973 WL 414 (S.D.N.Y. July 30, 1973) ................................................7

*In re Skelaxin Antitrust Litig.*,
    No. 12-cv-83 (E.D. Tenn.), Dkt No. 101 ...................................................................................19

*Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*,
    No. 03-4578, 2005 WL 1213926 (E.D. Pa. May 19, 2005)......................................................11

*Storage Tech. Corp. v. Custom Hardware Engineering & Consulting*,
    No. 02-12102, 2006 WL 1766434 (D. Mass. June 28, 2006)..................................................15

*Thompson v. Metro. Life Ins. Co.*,
    216 F.R.D. 55 (S.D.N.Y. 2003) ..................................................................................................9

*In re Tricor Direct Purchaser Antitrust Litig.*,
    No. 05-cv-340 (D. Del.), Dkt. No. 536-1...................................................................................19

*United States v. Cannons Engineering Corp.*,
    899 F.2d 79 (1st Cir. 1990)..........................................................................................................7

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
    396 F.3d 96 (2d Cir. 2005)..........................................................................................................14

*In re Warfarin Sodium Antitrust Litig.*,
    212 F.R.D. 231 (D. Del. 2002) .............................................................................................13, 14

*Williams v. First Nat'l Bank*,
    216 U.S. 582 (1910)......................................................................................................................7

## Other Authorities

Fed. R. Civ. P. 23(e)(2)............................................................................................................7, 8

# I.    INTRODUCTION

The Settlements[1] between the Direct Purchaser Class (the "Class") and defendant Medicis Pharmaceutical Corp. ("Medicis") and defendant Impax Laboratories, Inc. ("Impax") provide a total of $72,500,000 in cash to the benefit of the Class.[2] In exchange, if the Court approves the settlements, Class representatives Ahold USA, Inc. ("Ahold") and Rochester Drug Co-Operative, Inc. ("RDC"), on behalf of the Class, will dismiss this case with prejudice as to the remaining defendants Medicis and Impax, and the members of the Class will release claims against Medicis and Impax as more fully set forth in the Settlement Agreements.[3] The Medicis and Impax Settlement Funds will be distributed to the Class on a *pro rata* basis, after subtracting service awards to the two Class representatives and payment of Class Counsel's fees as awarded by the Court.[4]

---

[1] Capitalized terms used but not defined in this memorandum have the meaning ascribed to them in the Order Granting Direct Purchaser Class Plaintiffs' Unopposed Motion for Preliminary Approval of Proposed Settlement with Medicis Pharmaceutical Corp, Approval of the Form and Manner of Notice, and Setting Schedule for Final Approval Hearing (ECF No. 1078), and the Order Granting Direct Purchaser Class Plaintiffs' Unopposed Motion for Preliminary Approval of Proposed Settlement with Impax Laboratories, Inc., Approval of the Form and Manner of Notice and Setting Schedule for Final Approval Hearing (ECF No. 1095).

[2] On October 16, 2017, this Court certified a Direct Purchaser Class of "[a]ll persons or entities in the United States and its territories, including Puerto Rico, who purchased (a) 45mg, 55mg, 65mg, 80mg, 90mg, 105mg, 115mg, and/or 135mg brand or generic Solodyn tablets directly from any Defendant or other manufacturer at any time during the period July 23, 2009 through and including November 25, 2012 and/or (b) 55mg, 65mg, 80mg, 105mg, and/or 115mg brand Solodyn tablets directly from Medicis at any time from November 26, 2012 until November 30, 2015. Excluded from the Class are Defendants, and their officers, directors, management, employees, subsidiaries, or affiliates, and all federal government entities." ECF No. 682. Subsequently, on December 14, 2017 this Court confirmed the appointment of Hagens Berman Sobol Shapiro LLP and Berger & Montague, P.C. as Co-Lead Counsel for the Direct Purchaser Class. ECF No. 838.

[3] The Settlement Agreements are on file with the Court. *See* Exhibit 1 to the Declaration of Lauren Guth Barnes ("Medicis Prelim. Approval Decl."), ECF No. 1064 ("Medicis Settlement Agreement"); Exhibit 1 to the Declaration of Lauren Guth Barnes ("Impax Prelim. Approval Decl."), ECF No. 1094 ("Impax Settlement Agreement").

[4] Class Counsel seek no expenses from the Medicis and Impax Settlement Funds; Class Counsel instead sought and this Court approved payment of litigation expenses from the Sandoz and Lupin Settlement Funds. ECF No. 809. Class Counsel have separately moved for the release of an additional $454,698.56 from those funds covering additional unreimbursed costs and expenses and to have all remaining monies from the Sandoz and Lupin settlements distributed to the Class. ECF No. 1153.

These Settlements, reached after contested, arm's-length negotiations spanning many months and involving experienced and highly-skilled antitrust counsel, provide an excellent result for the Class of direct purchasers. The proposed Settlements are in all respects fair, reasonable, and adequate, and should be granted final approval.[5] Members of the Class received individual direct mail notice, informing them of the Settlements, right to opt out or object, and Class Counsel's requests for attorneys' fees and service awards for Class representatives Ahold and RDC. The favorable reaction of the Class confirms the fairness and reasonableness of the Settlements and of the accompanying requests – none of the Class members have objected to the Settlements.[6]

Class Counsel have separately requested orders (1) releasing funds covering additional unreimbursed costs and expenses and to have all remaining monies from the Sandoz and Lupin Settlements distributed to the Class alongside the Medicis and Impax Settlement Funds (ECF No. 1153) and (2) approving service awards to the Class representatives and awarding attorneys' fees (ECF No. 1150).[7] Class Counsel, on behalf of the Class, respectfully request that the Court grant those orders, issue an order approving the plan of allocation, and issue an order finding the notice in this case to satisfy due process, granting final approval of the separate settlements between the Class and Medicis and the Class and Impax, and ordering dismissal with prejudice.

---

[5] *See* Joint Declaration of Co-Lead Counsel for the Direct Purchaser Class, Lauren G. Barnes and David F. Sorensen, in Support of Direct Purchaser Class Plaintiffs' Motions for Final Approval of the Medicis and Impax Settlements ("Decl. of Co-Lead Counsel"), filed herewith, at ¶ 4.

[6] *See* Declaration of Steven J. Giannotti of Angeion Group, LLC Regarding Notice of Proposed Settlements ("Giannotti Decl."), filed herewith, at ¶ 9.

[7] For the Court's convenience, the proposed Orders submitted with those motions are attached as Exhibits A and B to the Joint Declaration of Co-Lead Counsel for the Direct Purchaser Class, Lauren G. Barnes and David F. Sorensen, filed with this Motion.

## II.     SUMMARY OF THE CASE

The facts and procedural history of this case are well-known to this Court[8] and were recently recounted in Class Counsel's Memorandum in Support of the Motion for an Award of Attorneys' Fees and Approval of Service Awards to the Class Representatives, and the declaration of co-lead counsel Lauren Guth Barnes in support thereof.[9] As a result, the direct purchasers will only briefly review the salient points.

This is an antitrust class action brought under § 1 of the Sherman Act by direct purchasers of the prescription acne treatment Solodyn (extended release minocycline hydrochloride) and/or its AB-rated generic equivalents. The direct purchasers' central allegation is that brand manufacturer Medicis along with generic Solodyn manufacturers Impax, Sandoz, and Lupin violated the federal antitrust laws by entering into unlawful agreements whereby Medicis paid the generic manufacturers and, in exchange, the generic manufacturers agreed to delay full-fledged competition in the market for extended release minocycline hydrochloride tablets.[10] The direct purchasers allege that, as a result of the defendants' antitrust violations, members of the Class were forced to pay artificially inflated prices for brand and/or generic Solodyn. The defendants deny the direct purchasers' allegations of unlawful or wrongful conduct in their entirety, deny that any of the challenged conduct caused any damage to Class members at all, and asserted many defenses of law and fact to the direct purchasers' claims.[11]

On February 25, 2014, the Judicial Panel on Multidistrict Litigation transferred actions filed by direct purchasers against Medicis, Impax, and others to this Court.[12] The direct

---

[8] *See, e.g.*, ECF Nos. 184, 682, 948.

[9] ECF Nos. 1151, 1152.

[10] ECF No. 88 at 1-3.

[11] *See*, *e.g.*, ECF Nos. 206, 210.

[12] ECF No. 2.

purchasers filed a consolidated amended complaint on September 12, 2014.[13] The defendants
moved to dismiss the consolidated amended complaint on November 24, 2014;[14] on August 14,
2015, this Court denied those motions in part, finding that the direct purchasers had sufficiently
pleaded violations of Section 1 of the Sherman Act.[15]

Thereafter, the parties engaged in extensive, hard fought fact discovery, including 25+
fact depositions, production and review of over half a million documents, and motions to compel
additional discovery.

This litigation brought numerous unique complexities. For example, most pharmaceutical
antitrust actions arise in the context of the Hatch-Waxman regulatory framework that provides
exclusivity to the first generic filer; that framework did not apply at the time that Medicis and
Impax entered into the alleged reverse payment agreement, meaning the challenged agreement
did not create a bottleneck preventing all generic sales until the first filer's delayed launch. To
the contrary, here several generic competitors actually launched product into the market,
although in a limited way, before halting all sales.[16]

In early April 2017, the direct purchasers moved for preliminary approval of settlements
with defendants Sandoz and Lupin. The Court granted final approval to those settlements by
order dated November 27, 2017.[17]

---

[13] ECF No. 88.

[14] ECF No. 110.

[15] ECF Nos. 184-185.

[16] Declaration of Co-Lead Counsel Lauren G. Barnes in Support of Class Counsel' Mot. for an Award of
Attorneys' Fees and Approval of Service Awards to the Class Representatives (ECF No. 1152), filed herewith, at ¶ 7
("Barnes Decl.").

[17] ECF No. 808. In resolving the direct purchasers' claims against Sandoz and Lupin, Class Counsel requested
that all settlement monies received from those two settling defendants would be applied in the first instance to
reimburse Class Counsel's expenses in the ongoing litigation against the remaining defendants, Medicis and Impax.
Class Counsel further requested that funds remaining, if any, at the conclusion of the litigation would then be
disbursed to the Class, if practicable. The Court granted Class Counsel's requests. *See* ECF No. 809, Order Granting
Direct Purchaser Settlement Class Plaintiffs' and Class Counsel's Unopposed Motion for Reimbursement of

On May 2, 2017, the direct purchasers moved for class certification and, with other plaintiffs, served 14 expert reports.[18] The parties subsequently served rebuttal and reply expert reports, ultimately taking nearly 30 depositions of expert witnesses.

On October 16, 2017, the Court certified the direct purchaser Class, defined as follows:

> All persons or entities in the United States and its territories, including Puerto Rico, who purchased (a 45mg, 55mg, 65mg, 80mg, 90mg, 105mg, 115mg, and/or 135mg brand or generic Solodyn tablets directly from any Defendant or other manufacturer at any time during the period July 23, 2009 through and including November 25, 2012 and/or (b) 55mg, 65mg, 80mg, 105mg, and/or 115mg brand Solodyn tablets directly from Medicis at any time from November 26, 2012 until November 30, 2015.[19]

On December 14, 2017, the Court confirmed the appointment of Ahold and RDC as class representatives, and the law firms of Hagens Berman Sobol Shapiro LLP and Berger & Montague, P.C. as Co-Lead Class Counsel.[20] Class members received individual notice, mailed on December 16, 2017, and no entities opted out of the Direct Purchaser Class except for the Retailer Plaintiffs that litigated their claims individually.[21]

On November 1, 2017, the parties filed multiple motions for summary judgment[22] as well as 16 *Daubert* motions.[23] Briefing of these motions extended through January 2018. Between

---

Expenses and Service Awards to the Class Representatives, filed November 27, 2017. Class Counsel have separately moved for the release of an additional $454,698.56 from those funds covering additional unreimbursed costs and expenses and to have all post-expenses monies from the Sandoz and Lupin settlements distributed to the Class. ECF No. 1153.

[18] ECF No. 574.

[19] ECF No. 682. Excluded from the class definition are defendants and their officers, directors, management, employees, subsidiaries, or affiliates, all federal governmental entities, and the eight retailer plaintiffs (Walgreen Co., The Kroger Co., Safeway, Inc., HEB Grocery Company L.P., Albertson's, LLC, Rite Aid Corporation, Rite Aid Hdqtrs. Corp., and CVS Pharmacy, Inc.) who opted out of the direct purchaser plaintiff class.

[20] ECF No. 838.

[21] *See* ECF No. 989-1.

[22] ECF Nos. 717-20.

[23] ECF Nos. 705-16, 720.

December 2017 and March 2018, the direct purchaser plaintiffs undertook extensive trial preparation, including preparation of opening statements, fact and expert witness examinations, exhibit lists, and numerous pretrial filings. In the lead-up to trial, the parties also filed and responded to 34 motions *in limine.*

In contemporaneously kept records, Class Counsel report having devoted more than 55,000 hours (attorney and staff time) and millions of dollars to litigating this matter which has involved a unique and complex intersection of scientific and medical information, patent and regulatory issues, antitrust law, and economics.[24]

As the trial date of March 12, 2018 approached, the parties continued to explore the possibility of settlement. On February 2, 2018, the direct purchasers and Medicis reached a settlement in principal, in which Medicis would pay $35 million in cash into a common fund to be distributed to members of the certified direct purchaser Class, in exchange for Class members' release and dismissal of their case against Medicis with prejudice.

On March 8, 2018, the direct purchasers and Impax agreed to settle on similar terms, resulting in Impax paying $37.5 million into a common fund, also for distribution to members of the certified direct purchaser Class in exchange for releases and dismissal of the case against Impax with prejudice.

---

[24] Declaration of Co-Lead Counsel Lauren Guth Barnes in support of Class Counsel's Motion for an Award of Attorneys' Fees and Approval of Service Awards to the Class Representatives (ECF No. 1152, hereinafter "Barnes Decl."), at ¶ 27.

## III.     ARGUMENT

### A.     Settlement of class action lawsuits is encouraged.

Courts encourage settlement of lawsuits.[25] Courts particularly encourage settlements in complex litigation because settlements promote the interest of judicial economy.[26] In evaluating settlements like the one at issue here, courts have recognized that complex litigation is "notoriously difficult and unpredictable."[27] "Absent evidence of fraud or collusion, such settlements are not to be trifled with."[28]

### B.     All Class members received individual direct mail notice.

In considering whether to grant final approval of a proposed class action settlement, the Court must determine whether adequate notice was issued to all prospective class members, in accordance with due process concerns and Rule 23. To satisfy due process considerations, notice to class members must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."[29]

This Court approved the form of notice that was mailed directly via first-class U.S. mail to members of the Class.[30] The Notice described the claims alleged in the class action, the terms

---

[25] *Williams v. First Nat'l Bank*, 216 U.S. 582, 595 (1910) (noting "compromises of disputed claims are favored by the courts . . ."); *United States v. Cannons Engineering Corp.*, 899 F.2d 79, 84 (1st Cir. 1990) (noting "it is the policy of the law to encourage settlements").

[26] *In re General Motors Corp. Pick-Up Truck Fuel Tanks Products Liab. Litig.*, 55 F.3d 768, 784 (3rd Cir. 1995) ("[t]he law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation."); *Siegel v. Realty Equities Corp. of New York*, No. 70 Civ. 4338, 1973 WL 414, at *2 (S.D.N.Y. July 30, 1973) ("Public policy favors settlement. This policy not only fosters judicial economy but also encourages litigants to determine their respective rights in arms-length bargaining likely to produce a fair settlement.").

[27] *Granada Investments, Inc. v. DWG Corp.*, 962 F.2d 1203, 1205 (6th Cir. 1992) (quoting *Maher v. Zapata Corp.*, 714 F.2d 436, 455 (5th Cir. 1983)).

[28] *Granada*, 962 F.2d at 1205.

[29] *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).

[30] ECF No. 1111. *See* Decl. of Co-Lead Counsel at ¶ 13.

of the Settlement Agreements, the rights of Class members under the Settlements (including the right to object to any terms of the Settlements), Class Counsel's request for fees, the request for proposed service awards to each of the Class representatives, and that the Settlement Funds would be distributed to Class members on a pro rata basis, consistent with the proposed plan of allocation.[31] Class members were also advised that they may appear at the July 18, 2018 fairness hearing.[32] Accordingly, the Notice fairly apprised Class members of the Settlements and their options and satisfied the requirements of due process and Rule 23(c)(2).

**C.    Courts are awarded wide latitude in determining whether a class action settlement is reasonable.**

Under Fed. R. Civ. P. 23(e)(2),

> a district court can approve a class action settlement only if it is fair, adequate and reasonable, or (in shorthand) reasonable. If the parties negotiated at arm's-length and conducted sufficient discovery, the district court must presume the settlement is reasonable. The district court enjoys considerable range in approving and disapproving a class settlement, given the generality of the standard and the need to balance a settlement's benefits and costs.[33]

In addition, the "fairness determination is not based on a single inflexible litmus test but, instead, reflects [the court's] studied review of a wide variety of factors bearing on the central question of whether the settlement is reasonable in light of the uncertainty of litigation."[34] Courts in the First Circuit have relied on more than one list of factors, though the lists are

---

[31] *See* Decl. of Co-Lead Counsel at ¶ 13, n.1.

[32] *See* Notice of Settlement (ECF No. 1108-1) at 12.

[33] *See In re Pharm. Industry Avg. Wholesale Price ("AWP") Litig.*, 588 F.3d 24, 32-33 (1st Cir. 2009) (*citing City P'ship Co. v. Atl. Acquisition Ltd. P'ship*, 100 F.3d 1041, 1043 (1st Cir. 1996); *Nat'l Ass'n of Chain Drug Stores v. New England Carpenters Benefits Fund*, 582 F.3d 30, 44-45 (1st Cir. 2009)).

[34] *New England Carpenters Benefits Fund v. First DataBank, Inc.*, 602 F.Supp.2d 277, 280 (D. Mass. 2009) (*citing Bussie v. Allmerica Fin. Corp.,* 50 F.Supp.2d 59, 72 (D. Mass. 1999)).

"fundamentally similar."[35] The most exhaustive of these lists comes from the Second Circuit in

*City of Detroit v. Grinnell Corp.*, which analyzes the following factors (the "*Grinnell* factors"):

1. the complexity, expense, and likely duration of the litigation;
2. the reaction of the class to the settlement;
3. the stage of the proceedings and the amount of discovery completed;
4. the risks of establishing liability;
5. the risks of establishing damages;
6. the risks of maintaining the class action through the trial;
7. the ability of the defendants to withstand a greater judgment;
8. the range of reasonableness of the settlement fund in light of the best possible recovery; and
9. the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.[36]

Courts reviewing settlements recognize that not all *Grinnell* factors must be satisfied for

a settlement to receive approval; instead, the Court should look at the factors in light of the

circumstances of the case.[37] And the Court should neither substitute its judgment for that of the

parties who negotiated the settlement, nor conduct a mini-trial on the merits of the action.[38]

**D.     The Settlements should be approved as fair, reasonable, and adequate.**

While courts in this Circuit have recognized that a shorter (though still fundamentally

similar) list may be more appropriate given the facts and posture of a certain case,[39] for the sake

of completeness the direct purchasers will address all factors articulated in *Grinnell*, as well as

the negotiations and quality of counsel. Based on the review of these factors, the Settlements

satisfy the criteria for final approval.

---

[35] *First DataBank*, 602 F.Supp.2d at 281.

[36] *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 463 (2d Cir. 1974); *see In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 72 (D. Mass. 2005).

[37] *See Thompson v. Metro. Life Ins. Co.*, 216 F.R.D. 55, 61 (S.D.N.Y. 2003).

[38] *See Greenspun v. Bogan*, 492 F.2d 375, 381 (1st Cir. 1974) ("[A]ny settlement is the result of a compromise – each party surrendering something in order to prevent unprofitable litigation, and the risks and costs inherent in taking litigation to completion. A district court, in reviewing a settlement proposal, need not engage in a trial of the merits, for the purpose of settlement is precisely to avoid such a trial.").

[39] *First DataBank*, 602 F.Supp.2d at 280-81.

1.      **The Settlements are the result of arm's-length negotiations.**

Where a settlement is "the product of arms-length negotiation following extensive discovery, its fairness is presumed."[40] The Settlements here were negotiated at arm's-length by counsel experienced in similar class antitrust cases.[41] Each side vigorously advocated and considered the strengths and weakness of its positions, weighing the costs and benefits of further litigation, prior to settlement. Through these comprehensive negotiations, Class Counsel advocated the best possible case while pressing for the maximum recovery in light of the risks the direct purchasers faced at the time from continued litigation. The time and effort spent, and the circumstances of the negotiations, are persuasive indicators that there was no collusion in either the negotiation process or the result achieved. Agreements in-principle were reached on February 2, 2018 and March 8, 2018 with Medicis and Impax respectively, the latter within days of trial. Settling so close to trial, after summary judgment briefing, and the Court's rulings on various motions *in limine*, the parties were fully aware of the strengths and weaknesses of the case.[42] The settlement is presumptively fair.[43]

2.      **The quality of Class Counsel weighs in favor of approval.**

In approving class action settlements, courts give great weight to the opinion and judgment of experienced counsel who have conducted arm's-length negotiations. "When the parties' attorneys are experienced and knowledgeable about the facts and claims, their representations to the court that the settlement provides class relief which is fair, reasonable, and

---

[40] *Gulbankian v. MW Mfrs., Inc.*, No. 10-10392, 2014 WL 7384075, at *2 (D. Mass. Dec. 29, 2014).

[41] Decl. of Co-Lead Counsel, at ¶ 11.

[42] *See, e.g.*, *AWP*, 588 F.3d at 32-33.

[43] *City P'ship Co. v. Atl. Acquisition Ltd.. P'ship*, 100 F.3d 1041, 1043 (1st Cir. 1996).

adequate should be given significant weight."[44] With respect to the quality of counsel, courts have looked at various factors, including "the length of their involvement with the litigation, their competence, and their experience in this particular type of litigation."[45]

Class Counsel respectfully submit that the quality of their work in this case is apparent from their vigorous prosecution of this action. In addition, Class Counsel have extensive background and experience in litigating pharmaceutical antitrust cases over the past two decades.[46] Several of the firms acting as Class Counsel in this case were among the first to challenge reverse payment settlement agreements between brand and generic pharmaceutical companies that delayed generic competition in the 1990s, and they have concentrated their practices in this area since.[47]

Class Counsel, who are most familiar with the facts, legal arguments, and risks attendant to continued litigation against the defendants in this case, believe the Settlements to be fair, reasonable, and in the best interest of the Class.[48]

### 3. The litigation was complex and expensive and likely would have been protracted.

The complexity, expense, and likely duration of the litigation also weigh in favor of approving the Settlements. Antitrust class actions are "arguably the most complex action(s) to prosecute. The legal and factual issues involved are always numerous and uncertain in outcome."[49]

---

[44] *Rolland v. Cellucci*, 191 F.R.D. 3, 10 (D. Mass. 2000).

[45] *Giusti-Bravo v. U.S. Veterans Admin.*, 853 F.Supp. 34, 40 (D.P.R. 1993).

[46] Barnes Decl., (ECF No. 1152) at ¶¶ 20-23.

[47] Barnes Decl., (ECF No. 1152) at ¶ 21.

[48] Decl. of Co-Lead Counsel, at ¶ 4.

[49] *Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*, No. 03-4578, 2005 WL 1213926, *11 (E.D. Pa.May 19, 2005) (quoting *In re Linerboard Antitrust Litig.,* 296 F. Supp. 2d 568, 577 (E.D. Pa. 2003)). *See also In*

This case is no exception. It raised many complicated factual and legal issues to which the defendants presented robust defenses, including claims that the Medicis-Impax settlement was a good faith, legal compromise of contested patents, that the joint development agreement was made in good faith and was commercially reasonable, that the Medicis-Impax agreements did not delay generic entry, and that Class members suffered no damages as a result of the defendants' conduct.[50] In an effort to overcome these challenges, Class Counsel took extensive fact discovery, undertook independent research, worked with noted experts in biochemistry, economics, patent law, and other fields, and engaged in significant motion practice at all stages of the litigation.[51]

This action has been hard-fought and resource intensive. It was only after obtaining class certification, filing and/or defending against multiple motions for summary judgment, as well as 16 *Daubert* motions and more than 30 motions *in limine*, that the parties settled on the eve of trial. Absent the Settlements, the direct purchasers would have tried their claims in a complex jury trial and litigated their claims through a lengthy post-trial motion phase and appeals with no certainty of a favorable outcome.[52] By contrast, the Settlements provide immediate, definite and substantial relief without the delay, risk, and uncertainty of continued litigation. "The complexity, expense and likely duration of the litigation . . . all weigh heavily in favor of final approval" of the Settlements.[53]

---

*re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 533 (E.D. Mich. 2003) ("Moreover, the complexity of this case cannot be overstated. Antitrust class actions are inherently complex...").

[50] Decl. of Co-Lead Counsel, at ¶ 9.

[51] Decl. of Co-Lead Counsel, at ¶ 8.

[52] Decl. of Co-Lead Counsel, at ¶ 10.

[53] *RElf* 231 F.R.D. 52, 72 (D. Mass. 2005).

### 4.     The Class has reacted favorably to the Settlements.

The positive response of the Class to the Settlements also strongly supports final approval. "Reaction to a settlement is positive when the number of objectors is minimal compared with the number of claimants, provided notice effectively reached absent class members."[54] No Class member has filed an objection to any aspect of either Settlements.[55] "Such acceptance of the Settlement on the part of the Class is convincing evidence of the proposed Settlement's fairness and adequacy."[56]

Where, as here, the Class is comprised largely of business entities, the absence of any objections is a particularly strong indicator of the adequacy of the Settlements.[57] The absence of objections is particularly significant because numerous Class members have also been members of classes in many other pharmaceutical antitrust cases challenging similar conduct, and are therefore well-situated to evaluate the proposed Settlements in this case.[58]

The Class's reaction favors final approval of the Settlements.

---

[54] *Gulbankian,* 2014 WL 7384075, at *2.

[55] *See* Decl. of Co-Lead Counsel at ¶ 14.

[56] *In re Remeron Direct Purchaser Antitrust Litig.*, No. 03-0085, 2005 WL 3008808 at *6 (D.N.J. Nov. 9, 2005) (citing *Stoetzner v. U.S. Steel Corp.*, 897 F.2d 115, 118-19 (3d Cir. 1990) ("only" 29 objections in 281 member class "strongly favors settlement")); *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d 283, 318 (3d Cir. 1998), *cert. denied*, 525 U.S. 1114 (1999) (affirming conclusion that class reaction was favorable where 19,000 policyholders out of 8 million opted out and 300 objected).

[57] *See In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 254-255 (D. Del. 2002), *aff'd*, 391 F.3d 516 (3d Cir. 2004) ("the court finds the low number of objections from [third party payors] particularly significant, because these are sophisticated businesses with, in some case, large potential claims, and they could be expected to object to a settlement they perceived as unfair or inadequate."); *In re M.D.C. Holdings Sec. Litig.*, No. CV89-0090, 1990 WL 454747, at *7 n.5 (S.D. Cal. Aug. 30, 1990) (lack of objections "is significant since the class includes sophisticated financial institutions … who have counsel available to advise and represent them and submit objections to either the settlement or the fees and expenses").

[58] *See Remeron*, 2005 WL 3008808, at *6 (citing *In re Relafen Antitrust Litig.*, 231 F.R.D. 52 (D. Mass. 2005)).

### 5. The parties understood the strengths and weaknesses of the case at the time of the Settlements.

By the time the Settlements were reached, the parties were within weeks or days of trial and had ample information to allow them to negotiate and reach informed settlements. The parties had briefed motions to dismiss, numerous discovery motions, summary judgment motions, 16 *Daubert* motions, and dozens of pretrial motions *in limine*. They had reviewed more than half a million documents, deposed and defended over 40 depositions of fact and expert witnesses, prepared opening statements, and drafted witness examinations.[59] As a result, Class Counsel and the defendants both understood the strengths and weaknesses of the Class's claims and the defenses.[60] Class Counsel plainly had a strong basis from which to negotiate the Settlements.[61] This factor too weighs in favor of approval.

### 6. The Settlements obviate the risks inherent in establishing liability and damages.

As federal courts have long recognized, "antitrust cases, by their nature, are highly complex."[62] In particular, the "legal and factual issues involved are always numerous and uncertain in outcome."[63]

At the time the direct purchasers agreed in principle to the Settlements, Class Counsel believed in the merits of the case but also recognized that ultimate success in the trial on liability

---

[59] *See* Decl. of Co-Lead Counsel, at ¶ 8,

[60] *First DataBank*, 602 F.Supp.2d at 280-81 (quoting *Grinnell*, 495 F.2d at 463).

[61] *See Warfarin*, 212 F.R.D. at 255 (finding this factor supported final approval of settlement since Class Counsel "pursued this litigation for over three years," "engaged in substantial discovery and coordinated these efforts with other plaintiffs' counsel," and "voluminous documents were reviewed and numerous depositions taken and motions filed.").

[62] *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 122 (2d Cir. 2005).

[63] *In re Automotive Refinishing Paint Antitrust Litig.*, MDL No. 1426, 2004 U.S. Dist. LEXIS 29162, at *23 (E.D. Pa. Oct. 13, 2004) (citing *In re Linerboard Antitrust Litig.*, 296 F. Supp. 2d 568, 577 (E.D. PA. 2003)); *see In re Shopping Carts Antitrust Litig.*, MDL No. 451, 1983 WL 1950, at *7 (S.D.N.Y. Nov. 18, 1983) (noting that "antitrust price fixing actions are generally complex, expensive and lengthy.").

and damages, and then in likely appeals, was not assured.[64] The direct purchasers believed (and believe now) that the Settlements, when viewed in light of the risks of litigation and time involved in getting an ultimate decision, were and are undoubtedly fair, adequate, and reasonable.[65]

Establishing damages in an antitrust class action is a complex task, thus federal courts have long noted that in "antitrust cases … market uncertainties 'usually deny us the sure knowledge of what plaintiff's situation would have been in the absence of the defendant's antitrust violation."[66] This case was no exception. In addition to establishing liability and antitrust causation, the direct purchasers faced the further hurdle of having to prove their damages. While the direct purchasers are confident in the proof of damages, a risk of not obtaining the support and endorsement of the jury or appellate courts nevertheless existed. Antitrust jurisprudence is "replete with cases in which plaintiffs prevailed at trial on issues of liability, but recovered little or nothing by way of damages."[67]

A settlement is approvable where it "avoids substantial risks and costs for both sides, giving a certain positive outcome in the face of a costly and uncertain one."[68] This factor applies here and weighs strongly in favor of final approval.

---

[64] Decl. of Co-Lead Counsel, at ¶ 4.

[65] *See In re Lupron Mktg and Sales Practices Litig.*, 228 F.R.D. 75, 97 (D. Mass. 2005) ("As any experienced lawyer knows, a significant element of risk adheres to any litigation taken to binary adjudication.").

[66] *Storage Tech. Corp. v. Custom Hardware Engineering & Consulting,* No. 02-12102, 2006 WL 1766434, at *21 (D. Mass. June 28, 2006) (citing *Hasbrouck v. Texaco, Inc.,* 842 F.2d. 1034, 1044 (9th Cir. 1987)).

[67] *In re Lupron Marketing and Sales Practices Litig.*, MDL 1430, 2005 WL 2006833 (D. Mass. Aug. 17 2005). *See* Decl. of Co-Lead Counsel, at ¶ 3; s*ee also, Gulbankian*, 2014 WL 7384075, at *3 (approving settlement after "extensive and well-developed discovery" had taken place, "[m]ultiple motions to compel" were filed, "over a dozen depositions" taken, and "[o]ver 130,000 pages of …produced."); *Relafen*, 231 F.R.D. at 73 ("This is not a case where the bulk of the attorneys' time was spent on negotiations. Class Counsel has consistently and vigorously been preparing for trial, which, were this Court to reject the Settlement, would commence in the near future.").

[68] *Gulbankian*, 2014 WL 7384075, at *3.

**7.     The risk of maintaining the class action through the trial weighs in favor of approval.**

Until recently, not one direct purchaser class in a pharmaceutical antitrust case had ever been decertified. But in 2016, a divided panel of the Court of Appeals for the Third Circuit, presiding over *In re Modafinil Antitrust Litigation*, vacated the district court's decision to certify a (significantly smaller) direct purchaser class.[69] The direct purchasers believe the risk of decertification here is minimal: *Modafinil* is not controlling in this Circuit and even if it was applicable, the factors *Modafinil* identifies are readily met here. However, the minimal but extant risk weighs in favor of approving the Settlements.

**8.     The defendants' ability to withstand a greater judgment does not weigh against approval.**

The direct purchasers do not maintain that Medicis and Impax could not withstand a judgment larger than the Settlements, but that does not weigh heavily against approval.[70] As in *In re Relafen Antitrust Litigation*, "[t]his 'defendant oriented' consideration, is largely neutral as this is, evidently, a 'defendant [ ] with classic deep pockets.'"[71]

**9.     The Settlements are well within the range of reasonableness in light of the best possible recovery and all of the attendant risks of litigation.**

Courts also consider the range of reasonableness of the settlement in light of (i) the best possible recovery and (ii) litigation risks. In analyzing these factors, the issue for the Court is not whether the Settlements represent the best possible recovery, but how the Settlements relate to the strengths and weaknesses of the case. "[T]he court . . . consider[s] and weigh[s] the nature of

---

[69] *In re Modafinil Antitrust Litig.,* 837 F.3d 238 (3d Cir. 2016).

[70] *Relafen,* 231 F.R.D. at 73 (citing *In re Lupron,* 228 F.R.D. at 97); *Remeron,* 2005 WL 3008808, at *9 ("[M]any settlements have been approved where a settling defendant has had the ability to pay greater amounts.").

[71] *Relafen,* 231 F.R.D. at 73 (citing *In re Lupron,* 228 F.R.D. at 97). *See Shapiro v. JPMorgan Chase & Co.*, No. 11 Civ. 8331, 2014 U.S. Dist. LEXIS 37872, at *41 (S.D.N.Y. March 21, 2014) (internal quotation omitted).

the claim, the possible defenses, the situation of the parties, and the exercise of business judgment in determining whether the proposed settlement is reasonable,"[72] while "guard[ing] against demanding too large a settlement based on its view of the merits of the litigation; after all, settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution."[73] "[A] settlement need not reimburse 100% of the estimated damages to class members in order to be fair."[74] Potential damages, minus any trebling or any punitive damages, "appropriately discounted for the risk of not prevailing, should be compared with the amount of the proposed settlement."[75] The Settlements provide a recovery well within the range of reasonableness in light of the best possible recovery and the risks of litigation outlined above.[76]

## E.      The plan of allocation is fair, reasonable, and adequate and should be approved.

Court approval of the plan for the allocation of a class settlement fund is governed by the same legal standards as the settlement: it must be "fair, reasonable and adequate."[77] Generally, an allocation plan is reasonable if it reimburses class members based on the type and extent of

---

[72] *Grinnell*, 495 F.2d at 462.

[73] *In re General Motors.*, 55 F.3d 768 at 806 (citing *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977)).

[74] *In re Celexa and Lexapro Mktg. and Sales Practice Litig.*, No. 09-2067, 2014 WL 4446464, at *7 (D. Mass. Sept. 8, 2014). As Judge Young explained in *In re Relafen*, "[a] fine-tuned equation by which to determine the reasonableness of the size of a settlement fund does not exist. In any case, there is a range of reasonableness with respect to a settlement. Moreover, a high degree of precision cannot be expected in valuing a litigation, especially regarding the estimation of the probability of particular outcomes." 231 F.R.D. at 73 (citations omitted).

[75] *In re Lupron*, 228 F.R.D. at 98.

[76] *Gulbankian*, 2014 WL 7384075, at *5 (citing *In re Celexa*, 2014 WL 4446464, at *5) (in class action seeking damages to consumers from defective windows, settlement compensation was fair even though it did not cover "actual real world cost of replacing a defective window"); *Rolland*, 191 F.R.D. at 14-15 ("[i]n evaluating the substantive fairness of a class action settlement, the court cannot, and should not, use as a benchmark the highest award that could be made to the plaintiff after full and successful litigation of the claim.") (citation omitted).

[77] *Hill v. State St. Corp.*, No. 09-cv-12146-GAO, 2015 WL 127728, at *11 (D. Mass. Jan. 8, 2015) ("A plan for allocating settlement proceeds, like the settlement itself, should be approved if it is fair, reasonable and adequate."). *See Hochstadt v. Boston Sci. Corp.*, 708 F. Supp. 2d 95, 109 (D. Mass. 2010) ("As with the settlement itself, 'the plan of allocation must be fair, reasonable, and adequate.'") (quoting *In re Tyco Int'l, Ltd. Multidistrict Litig.*, 535 F.Supp.2d 249, 262 (D.N.H. 2007)).

their injuries.[78] Courts routinely approve plans of allocation in antitrust settlements that allocate funds on a *pro rata* basis.[79]

The proposed plan of allocation here meets this standard.  As set forth in the Direct Purchaser Class Plaintiffs' [Proposed] Plan of Allocation for the Direct Purchaser Class ("Proposed Plan of Allocation") and in the Declaration of Jeffrey J. Leitzinger, Ph.D., Related to Proposed Allocation Plan and Net Settlement Fund Allocation, dated June 8, 2018 ("Leitzinger Decl."), the direct purchasers propose that each Class member's allocation be set *pro rata* to a weighted combined total of each Class member's direct purchases of brand Solodyn from Medicis from July 23, 2009 through November 30, 2015 and generic Solodyn from generic Solodyn manufacturers from July 23, 2009 through September 30, 2015.[80] The July 23, 2009 start date for brand and generic Solodyn purchases is the beginning of the Class period.[81] November 30, 2015 is the end of the data produced during discovery showing direct brand Solodyn purchases by members of the Class, and September 30, 2015 is the end of the data produced during discovery showing generic Solodyn purchases from the generic Solodyn manufacturers by members of the Class.[82]

The Proposed Plan of Allocation gives fair weight to brand Solodyn purchases as compared with generic Solodyn purchases. To ensure that fairness, Dr. Leitzinger has calculated the ratio of the average classwide overcharge per unit of brand Solodyn as compared to the

---

[78] *Hill*, 2015 WL 127728, at *11 (approving a pro rata settlement and noting that "[a] reasonable plan of allocation . . . may allocate funds based on the extent of class members' injuries and 'consider the relative strength and values of different categories of claims'" (internal citation and quotations omitted)).

[79] 3 Newberg on Class Actions, § 8:45 (4th ed. 2011) ("Typically, a class recovery in antitrust or securities suits will divide the common fund on a pro rata basis among all who timely file eligible claims, thus leaving no unclaimed funds.").

[80] *See* Proposed Plan of Allocation, § 2.

[81] *Id.*, § 2.1.

[82] *Id.*

average classwide overcharge per unit of generic Solodyn, enabling him to translate generic purchase volumes into overcharge-equivalent brand purchase volumes. According to Dr. Leitzinger's calculation, the average unit overcharge on generic Solodyn purchases is 41 percent of the average unit overcharge for brand Solodyn purchases; a generic purchase unit is equivalent to 0.41 of a brand unit from the standpoint of overcharges and for purposes of calculating each Class member's weighted combined total of brand and generic Solodyn unit purchases under the allocation plan.[83]

In addition, the Proposed Plan of Allocation will account for assignments by removing any purchases for which the rights to damages in this litigation have been assigned by agreement to a Class member's customer, using data provided by the Class member or its corresponding assignee.[84]

This Proposed Plan of Allocation is similar to other court-approved *pro rata* allocation plans in similar cases involving alleged overcharges from delayed generic competition and can be implemented with a high degree of efficiency.[85] In Dr. Leitzinger's opinion, the plan "is practical and efficient inasmuch as it uses sales data for brand and generic Solodyn already obtained from Medicis, Impax, Lupin, Mylan, and Sandoz--the same data I used in calculating aggregate Class damages. … Finally, this method provides a reasonable procedure, in my opinion, for distributing the Net Settlement Fund and reimbursing Claimants. It reflects the type

---

[83] *Id.* § 2.3. *See also* Leitzinger Decl. ¶ 5.d & n.11.

[84] Leitzinger Decl. ¶ 5.c.

[85] *See, e.g., In re Prograf Antitrust Litig.*, No. 11-md-2242 (D. Mass), Dkt. No. 664-2 (*pro rata* shares of settlement fund computed on basis of class members' purchases of brand); *King Drug Company of Florence, Inc., et al. v. Cephalon, Inc.*, No. 2:06-cv-1797-MSG (E.D. Pa.), Dkt. No. 864-17; (same); *In re Doryx Antitrust Litig.*, No. 12-cv-3824 (E.D. Pa.), Dkt. No. 452-3 (same); *In re Skelaxin Antitrust Litig.*, No. 12-cv-83 (E.D. Tenn.), Dkt No. 101 (same); *In re DDAVP Direct Purchaser Antitrust Litig.*, No. 05-cv-2237 (S.D.N.Y.), Dkt. No. 101 (same); *In re Tricor Direct Purchaser Antitrust Litig.*, No. 05-cv-340 (D. Del.), Dkt. No. 536-1 (same). *See also* Leitzinger Decl.. ¶¶ 4, 7.

and approximate extent of their injury and does not systematically favor recovery (relative to actual overcharges) on the part of potential Claimants who purchased brand or generic forms of Solodyn."[86]

The Proposed Plan of Allocation reimburses Class members on a *pro rata* basis, based on the extent of their injuries, and is fair, reasonable and adequate, and should be approved.

### IV.    CONCLUSION

For the reasons detailed above, and in other supporting documents including Class Counsel's motion for an award of attorneys' fees and approval of services awards to the Class representatives and the accompanying documents thereto,[87] the direct purchasers respectfully request that the Court issue three orders: (1) releasing funds covering additional unreimbursed costs and expenses and to have all remaining monies from the Sandoz and Lupin Settlements distributed to the Class alongside the Medicis and Impax Settlement Funds (ECF No. 1153); (2) approving service awards to the Class representatives and awarding attorneys' fees (ECF No. 1150); (3) approving the plan of allocation of the Settlement Funds to members of the Class; and (4) finding the notice in this case to satisfy due process, granting final approval of the separate settlements between the Direct Purchaser Class and Medicis and the Direct Purchaser Class and Impax, and ordering dismissal with prejudice.

Dated:  June 11, 2018                                    Respectfully submitted,

                                                         **/s/Lauren Guth Barnes**
                                                         Thomas M. Sobol
                                                         Lauren Guth Barnes
                                                         Hagens Berman Sobol Shapiro LLP
                                                         55 Cambridge Parkway, Suite 301

---

[86] Leitzinger Decl.. ¶ 7.

[87] ECF Nos. 1150-52.

Cambridge, MA 02142
Tel: (617) 482-3700
Fax: (617)482-3003
Email: tom@hbsslaw.com
        lauren@hbsslaw.com

*Liaison and Co-Lead Counsel for Direct
Purchaser Class*

David F. Sorensen
Andrew C. Curley
Caitlin G. Coslett
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, PA 19103
Tel: (215) 875-3000
Fax: (215) 875-4604
Email: dsorensen@bm.net
        acurley@bm.net
        ccoslett@bm.net

*Co-Lead Counsel for Direct Purchaser Class*

## CERTIFICATE OF SERVICE

I, Lauren G. Barnes, certify that, on this date, the foregoing document was served by filing it on the court's CM/ECF system, which will automatically email notice to all counsel of record.

Dated: June 11, 2018                                                 **/s/ Lauren G. Barnes**
                                                                     Lauren G. Barnes